Paul L. Hoffman (Bar No. 71244)
SCHONBURN DESIMONE SEPLOW
HARRIS & HOFFMAN LLP
723 Ocean Front Walk
Venice, CA 90291
Tel: 310-396-0731
Fax: 310-399-7040

Agnieszka M. Fryszman (*admitted pro hac vice*)
Matthew K. Handley (*admitted pro hac vice*)
Maureen E. McOwen (*admitted pro hac vice*)
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Avenue, N.W.
West Tower, STE 500
Washington, D.C. 20005-3964
Telephone: 202-408-4600
Facsimile: 202-408-4699
Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAMCHANDRA ADHIKARI, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> DAOUD & PARTNERS, KELLOGG BROWN & ROOT, INC., KELLOGG BROWN & ROOT SERVICES, INC., KBR, INC.; KBR HOLDINGS, LLC; KELLOGG BROWN & ROOT LLC; KBR TECHNICAL SERVICES, INC.; KELLOGG BROWN & ROOT INTERNATIONAL, INC.; SERVICE EMPLOYEES INTERNATIONAL INC.; AND OVERSEAS EMPLOYMENT ADMINISTRATION, <br><br> Defendants. | Case No. 08-cv-05626 RGK(AJWx) <br><br> **FIRST AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

The above-named Plaintiffs, by, and through their undersigned attorneys, bring this action on behalf of themselves against Defendants Daoud & Partners (also known as New World For Investment Co. Ltd.), Kellogg Brown & Root, Inc., Kellogg Brown & Root Services, Inc., KBR, Inc., KBR Holdings, LLC, Kellogg Brown & Root LLC, KBR Technical Services, Inc., Kellogg Brown & Root International, Inc., Service Employees International Inc. and Overseas Employment Administration ("Defendants") alleging as follows:

## I.    INTRODUCTION

1.    This is an action for damages brought by the family members of twelve men who were victims of trafficking in persons and one surviving laborer. All of the trafficked men were illicitly trafficked across international borders to provide menial labor at a United States military facility in Iraq for Defendants, which are United States military contractors.

2.    The men were recruited in Nepal to work overseas. Most of them left their homes believing they were going to work at a luxury hotel in Amman, Jordan. Their families went deep into debt to arrange the jobs, which they hoped would lift them out of poverty. Instead, they were transported to work as laborers at a military base in Iraq. Twelve of the men were killed in Iraq.

## II.    JURISDICTION

3.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, this action involving questions of federal law, and 28 U.S.C. § 1350, this action

1    involving a civil action by an alien for a tort in violation of the law of nations and

2    treaties of the United States.  Supplemental jurisdiction over additional claims is

3

4    conferred upon this Court by 28 U.S.C. § 1367(a), as these claims arise out of the

5    same nucleus of facts which support the federal claims.

6        4.   This Court has personal jurisdiction over Defendants because Defendants

7

8    have substantial, continuous and systematic business contacts with the United

9    States.  In addition, because Plaintiffs' claims arise out of Defendants' activities

10

11   with the United States and Defendants have purposefully availed themselves of the

12   privileges of conducting activities in the United States, the exercise of personal

13   jurisdiction over Defendants is reasonable.

14       5.   This Court further has personal jurisdiction over the KBR Defendants

15

16   (defined herein) which have continuous and systematic business contacts within the

17   State of California, maintain an agent for service of process in California and/or

18

19   were sufficiently and actually controlled by other KBR Defendants such that they

20   were merely the general or specific agent, or the alter ego, of those KBR

21   Defendants.

22       6.   Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(3) and

23

24   (d).

25   **III.   PARTIES**

26   Plaintiffs

27

28       7.   Ramchandra Adhikari and Devaka Adhikari bring this suit on behalf of

COHEN, MILSTEIN,
SELLERS & TOLL
P.L.L.C.
ATTORNEYS AT LAW

Case No: 08-cv-05626 RGK(AJWx)          - 3 -          FIRST AMENDED COMPLAINT

themselves and their son, Prakash Adhikari.  Prakash Adhikari was a 22 year old part time teacher and farmer residing in Jhapa, Nepal when he was recruited to work as a cleaner at a hotel in Amman, Jordan. Instead of finding the work promised, however, he was trafficked into Iraq, where he was killed.  Ramchandra Adhikari and Devaka Adhikari were dependent upon Prakash, particularly because Ramchandra is ill and cannot work.  Prakash had aided his parents on their farm and maintained the water pump for the entire village.

8.  Jit Bahdur Khadka and Radhika Khadka bring this suit on behalf of themselves and their son, Ramesh Khadka.  Ramesh Khadka was a 19 year old farmer and stone cutter residing in Lalitpur, Nepal when he was recruited to work as a cook at a hotel in Amman, Jordan for approximately $500 (U.S.) per month. Jit Bahdur Khadka and Radhika Khadka took out a loan to pay for Ramesh to travel outside of Nepal for work.  Instead of finding the work promised, however, he was trafficked into Iraq, where he was killed.  Jit Bahdur and Radhika Khadka are subsistence farmers and depended on their son for support.   His brother told the BBC after his death that Ramesh was deceived: "He was supposed to go to Jordan to work."

9.  Bindeshore Singh Koiri and Pukari Devi Koiri bring this suit on behalf of themselves and their son, Lalan Koiri.  Lalan Koiri was a 21 year old day laborer residing in Dhanusha, Nepal when he was recruited to work outside of Nepal.  He was then trafficked into Iraq, where he was killed.  Bindeshore Singh Koiri and

Pukari Devi Koiri took out a loan to pay for Lalan to travel outside of Nepal for work.

10. Chittij Limbu brings this suit on behalf of himself and his brother, Mangal Limbu. Mangal Limbu was a 22 year old residing in Dhankuta, Nepal when he was recruited to work as a cook at a hotel in Amman, Jordan for approximately $500 (U.S.) per month. Instead of finding the work promised in Jordan, however, he was trafficked into Iraq, where he was killed.

11. Kamala Thapa Magar, her daughter Maya Thapa Magar and Bhakti Maya Thapa Magar bring this suit on behalf of themselves and, respectively, their husband, father and son, Jeet Magar. Jeet Magar was a 22 year old resident of Gorkha, Nepal when he was recruited to work as a cleaner at a hotel in Amman, Jordan for approximately $500 (U.S.) per month. Instead of finding the work promised, however, he was trafficked into Iraq, where he was killed. Kamala Thapa Magar, Maya Thapa Magar and Bhakti Maya Thapa Magar were dependent upon Jeet for their financial support.

12. Tara Shrestha, her son Nischal Shrestha, Dil Bahadur Shrestha and Ganga Maya Shrestha bring this suit on behalf of themselves and, respectively, their husband, father and son, Gyanendra Shrestha. Gyanendra Shrestha was residing in Khotang, Nepal when he was recruited to work as a laborer in Amman, Jordan for approximately $500.00 (U.S.) per month. Instead of finding the work promised, however, he was trafficked into Iraq, where he was killed. Tara

Shrestha, her son Nischal Shrestha, Dil Bahadur Shrestha and Ganga Maya Shrestha were dependent upon Gyanendra for their financial support.

13.    Renuka Karki Shrestha, Ram Kumar Shrestha, and Nirmaya Shrestha bring this suit on behalf of themselves and, respectively, their husband and son, Rajendra Shrestha. Rajendra Shrestha was a 27 year old residing in Khotang, Nepal when he was recruited to work as a laborer in Amman, Jordan for approximately $500.00 (U.S.) per month. Instead of finding the work promised, however, he was trafficked into Iraq, where he was killed. Renuka Karki Shrestha, Ram Kumar Shrestha and Nirmaya Shrestha were dependent upon Rajendra for their financial support.

14.    Satya Narayan Shah and Ram Dulari Sudi bring this suit on behalf of themselves and their brother, Budhan Sudi. Budhan Sudi was a 25 year old working at a movie theater and living in Dhanusha, Nepal when he was recruited to work outside of Nepal. He was then trafficked into Iraq, where he was killed. Ram Dulari Sudi helped finance Budhan's fees to obtain work.

15.    Ram Narayan Thakur and Samundri Devi Thakur bring this suit on behalf of themselves and their son, Manoj Thakur. Manoj Thakur was a 24 year old college student living in Dhanusha, Nepal and helping in his father's shop when he was recruited to work outside of Nepal. He was then trafficked into Iraq, where he was killed.

16.    Jitini Devi Thakur brings this suit on behalf of herself and her son,

Sanjay Thakur. Sanjay Thakur was a 21 year old barber residing in Dhanusha, Nepal when he was recruited to work as a kitchen helper at a hotel in Amman, Jordan. Instead of finding the work promised, however, he was trafficked into Iraq, where he was killed. Jitini Devi Thakur is partially paralyzed and unable to speak, and was dependent upon Sanjay for financial support.

17.    Bhim Bahadur Thapa and Bishnu Maya Thapa bring this suit on behalf of themselves and their son, Bishnu Thapa. Bishnu Thapa was an 18 year old working as a part-time watchman in a hydropower plant residing in Lamjung, Nepal when he was recruited to work as a cleaner at the Le Royal Hotel in Amman, Jordan. Bishnu had found an advertisement for jobs in Amman, Jordan, paying between $200 and $500 a month. He interviewed for such a job, and his mother borrowed approximately $2,100, at an interest rate of 36% a month, to finance the fee. Instead of being sent to the Le Royal Hotel in Amman as promised, he was trafficked into Iraq, where he was killed. Bhim Bahadur Thapa and Bishnu Maya Thapa depended on Bishnu for financial support.

18.    Dhana Roka Magar, Kul Prasad Thapa, and Bhuji Thapa bring this suit on behalf of themselves and their, respectively, husband and son Jhok Bahadur Thapa. Jhok Bahadur Thapa was 23 years old when he was recruited to work outside of Nepal. He was then trafficked into Iraq, where he was killed.

19.    Buddi Prasad Gurung was living in Nepal when he was recruited to work outside of Nepal. He was then trafficked to Iraq by Defendants to work at a

United States military facility, the Al Asad Air Base.  He worked as a menial laborer on construction projects as an employee of Daoud and the KBR Defendants. He has since returned to Nepal.

20.    Prakash Adhikari, Ramesh Khadka, Lalan Koiri, Mangal Limbu, Jeet Magar, Gyanendra Shrestha, Rajendra Shrestha, Budhan Sudi, Manoj Thakur, Sanjay Thakur, Bishnu Thapa and Jhok Bahadur Thapa are referred to herein as the "Deceased Victims."

21.    The Deceased Victims and Buddi Guring are referred to herein as the "Nepali Laborers."

Defendants

22.    Defendant DAOUD & PARTNERS, also known as New World For Investment Co. Ltd. ("Daoud"), is a Jordanian corporation which has its principal places of business at 20 Talha Bin Ubid Allah Street, Amman, Jordan, and Rue Robert De Traz 1, 1206 Geneva Switzerland.  Defendant Daoud has entered into a number of contracts with the United States for the provision of services at military bases, including the Al Asad Air Base in Iraq.  Defendant Daoud's contracts with the United States have included a Blanket Purchase Agreement, Purchase Orders, a LOGCAP contract, and other contracts with the Department of Defense, Air Force, Navy, and Army.  Defendant Daoud obtained a Data Universal Numbering System (DUNS) number, registered in the United States government Central Contractor Registration System and obtained approval to contract with the United States

Central Command.  Defendant Daoud's contracts with the United States include contracts that were submitted to, accepted at, administered and paid from United States government facilities at Columbus, Ohio, and/or Rock Island, Illinois. Defendant Daoud has also performed work for the United States as a subcontractor on KBR Defendants' contracts with the United States military.  Defendant Daoud is one of the top United States military contractors operating in Iraq, with over 2,000 employees.  Defendant Daoud falls within the category of employers required to secure payment of compensation and other benefits to its employees under the Defense Base Act, 42 U.S.C. §§ 1651, and the Longshore and Harbor Workers' Compensation Act, 33 USC § 901, et seq., which are administered by the Department of Labor.    At all relevant times, Daoud was a contractor or subcontractor within the meaning of the TVPRA, 22 U.S.C. § 7104(g).

23.    Defendant, KELLOGG BROWN & ROOT, also known as KELLOGG BROWN & ROOT, INC., ("KBR"), is a Corporation and is believed to conduct its operations in Iraq through its division KELLOGG BROWN & ROOT SERVICES, INC., is incorporated in the State of Texas, and maintains its principal place of business at 601 Jefferson Street, Houston, Texas 77002.

24.    Defendant KELLOGG BROWN & ROOT SERVICES, INC. ("KBR Services" or "KBRSI") is a Delaware Corporation and subsidiary of KBR with its principal place of business at 1550 Wilson Boulevard, Suite 400, Arlington, VA 22209-2435.  At all times relevant hereto, KBRSI was a contractor with the United

States. KBR Services had several contracts to perform specified duties in United States military facilities in Iraq, including at least one contract with Defendant Daoud at the time Defendant Daoud was facilitating the trafficking of human labor to the Al Asad Air Base near Ramadi, Iraq.

25.    Defendant KBR, Inc. ("KBRI") is a Delaware Corporation and is the parent company of KBR Holdings and KBR Technical Services. KBRI maintains an agent for service of process at 818 West Seventh St, Los Angeles, CA 90017. Defendant KBRSI has identified KBRI as having a possible pecuniary interest in the outcome of this case.

26.    Defendant KBR Holdings, LLC ("KBR Holdings") is a Delaware Corporation and is the parent company of KBR Services and KBR LLC. KBR Holdings maintains an agent for service of process at 818 West Seventh St, Los Angeles, CA 90017. Defendant KBRSI has identified KBR Holdings as having a possible pecuniary interest in the outcome of this case.

27.    Kellogg Brown & Root LLC ("KBR LLC") is a Delaware Corporation and is the parent company of KBR International. KBR LLC maintains an agent for service of process at 818 West Seventh St, Los Angeles, CA 90017. Defendant KBRSI has identified KBR LLC as having a possible pecuniary interest in the outcome of this case.

28.    KBR Technical Services, Inc. ("KBR Technical Services") is a Delaware Corporation and a subsidiary of KBRI. KBR Technical Services

maintains an agent for service of process at 818 West Seventh St, Los Angeles, CA 90017, and employs persons identified by Defendant KBR Services as important to this action. Defendant KBRSI has identified KBR Technical Services as having a possible pecuniary interest in the outcome of this case.

29.    Kellogg Brown & Root International, Inc. ("KBR International") is a Delaware Corporation and a subsidiary of KBR LLC. KBR International maintains an agent for service of process at 818 West Seventh St, Los Angeles, CA 90017. KBR International had several contracts to perform specified duties in United States military facilities in Iraq, including at least one contract with Defendant Daoud at the time Defendant Daoud was facilitating the trafficking of human labor to the Al Asad Air Base near Ramadi, Iraq. Defendant KBRSI has identified KBR International as having a possible pecuniary interest in the outcome of this case.

30.    Defendant Service Employees International, Inc. ("SEII") is a foreign corporation and is believed by Plaintiffs to be incorporated in the Cayman Islands, a British territory. SEII is a one hundred percent (100%) wholly owned subsidiary of KBR International. Other KBR Defendants named herein exercised sufficient actual control over SEII that the latter was merely the general or specific agent, or the alter ego, of the former. Defendant KBRSI has identified SEII as having a possible pecuniary interest in the outcome of this case.

31.    Defendant Overseas Administration Services ("OAS") is a foreign subsidiary of the KBR entities and is believed by Plaintiffs to be incorporated in the

Cayman Islands, a British territory.  Other KBR Defendants named herein exercised sufficient actual control over OAS that the latter was merely a general or specific agent, or the alter ego, of the former.  Defendant KBRSI has identified OAS as having a possible pecuniary interest in the outcome of this case.

32.    Defendants KBR, KBRSI, KBRI, KBR Holdings, KBR LLC, KBR Technical Services, KBR International, SEII and OAS are referred to herein as the KBR Defendants.

Unnamed Co-Conspirators

33.    Defendants committed the wrongs alleged herein with co-conspirators Moonlight Consultant Pvt, Ltd, Morning Star for Recruitment and Manpower Supply and Bishrat & Partners.  The co-conspirators either actively participated in the trafficking enterprise as set forth in detail below or acted as agents for Defendants.

34.    Co-conspirator Moonlight Consultant Pvt, Ltd. (hereinafter "Moonlight") is a Nepali company.  It recruited laborers as Defendants' agent, on behalf of Defendants and/or as part of the illegal trafficking enterprise alleged herein.  Moonlight then transferred the laborers to co-conspirator Morning Star for Recruitment and Manpower Supply as set forth in detail below.

35.    Co-conspirator Morning Star for Recruitment and Manpower Supply (hereinafter "Morning Star") is a Jordanian job brokerage company that operates in Amman, Jordan.  Since the onset of the Iraq war, Morning Star's business has

COHEN, MILSTEIN,
SELLERS & TOLL
P.L.L.C.
ATTORNEYS AT LAW

boomed, primarily by exporting foreign laborers to Iraq.  Morning Star housed the laborers in Amman, Jordan as Defendants' agent, on behalf of Defendants and/or as part of the illegal trafficking enterprise alleged herein.

36.    Co-conspirator Bisharat & Partners (hereinafter "Bisharat") is a Jordanian corporation.    It transported laborers from Amman, Jordan, to Iraq pursuant to a contract with Defendant Daoud, as Defendants' agent or alter ego, on behalf of Defendants and/or as part of the illegal trafficking enterprise as set forth in detail below.

37.    At all relevant times, various other persons, companies, and corporations, the identities of which are presently unknown, willingly conspired with Defendants and the other unnamed coconspirators, acted on behalf of Defendants and/or acted as part of the illegal trafficking enterprise as set forth in detail below.  All averments herein against any named Defendant are also averred against these unnamed co-conspirators.

## IV.    FACTUAL ALLEGATIONS

### Trafficking in Persons – Modern Day Slavery

38.    Trafficking in human beings is a growing scourge around the world. The United States government estimates that approximately 800,000 people are trafficked across international borders each year.[1]    That estimate has increased significantly since the U.S. State Department issued its first annual report on human

trafficking in 2001, despite the efforts of the United States to improve enforcement of anti-trafficking statutes at home and abroad.

39.     Human Traffickers prey on the most vulnerable members of society, including people living in abject poverty and persons unable to find work in their countries.    They typically trick, coerce, or win the confidence of their victims through promises of a better life.[2]    Victims are often lured with false promises of good jobs and better lives, only to find themselves trapped in brutal or dangerous conditions.[3]    The sheer viciousness of human trafficking has led to its condemnation as "a modern-day form of slavery."[4]

40.     Trafficking is a transnational criminal enterprise, generating billions of dollars each year.[5]    Trafficking is the fastest growing source of profits for organized criminal enterprises worldwide.[6]    Some traffickers are individuals, but others are part of large criminal organizations that use the routes set up for trafficking in illicit items such as guns or drugs to traffic in human beings.

41.     In order to combat trafficking, the United States became a party to the United Nations' Protocol to Prevent Suppress and Punish Trafficking in Persons,

---

[1] United States Department of State, Trafficking in Persons Report (June 2007) at 8 [hereinafter "TIP 2007"].

[2] Id. at 9.

[3] Attorney General's Annual Report to Congress on U.S. Government Activities to Combat Trafficking in Persons, Fiscal Year 2006 (May 2007) at 1.

[4] Introductory Letter to TIP 2007.

[5] United States Department of State, Trafficking in Persons Report (June 2005) at 14 [hereinafter "TIP 2005"] ("According to the U.S. Federal Bureau of Investigation, human trafficking generates an estimated $9.5 billion in annual revenue").

along with 113 other nations.    In addition, Congress enacted the Trafficking Victims Protection Act to combat the use of forced and bonded labor.

42.    Congress has stated that "[t]he involvement of employees and contractors of the United States Government and members of the Armed Forces in trafficking in persons, facilitating the trafficking in persons, or exploiting the victims of trafficking in persons is inconsistent with United States laws and policies and undermines the credibility and mission of United States Government programs in post-conflict regions."

**Iraq As A Destination For Trafficked Labor**

43.    Iraq is a destination country for trafficked labor.[7]  The United States government has found that Iraq is a destination for men trafficked from South and Southeast Asia for work as construction workers, and other menial jobs: "some of these workers are offered fraudulent jobs in safe environments in Kuwait or Jordan, but are then forced into involuntary servitude in Iraq instead; others go to Iraq voluntarily, but are subjected to conditions of involuntary servitude after arrival."[8]

44.    "Brokers and subcontractors from Asia to the Middle East have worked in concert to import thousands of laborers into Iraq from impoverished countries, often employing fraud or coercion along the way, seizing workers' passports and charging recruitment 'fees' that make it difficult for workers to

---

[6] Findings, Public Law 106-386 at Sec. 102 (b)(8).

[7] TIP 2007 at 217.

COHEN, MILSTEIN,
SELLERS & TOLL
P.L.L.C.
ATTORNEYS AT LAW

1    escape employment in the war zone."[9]

2    45.    The United States reports that Jordan is a transit country for men from

3
     Southeast Asia trafficked for the purpose of labor exploitation, particularly for men
4
5    "deceptively recruited with fraudulent job offers in Jordan instead trafficked to

6
     work involuntarily in Iraq."[10]
7
8    46.    In 2006, the top United States Commander in Iraq confirmed that

9    contractors on American military bases had violated human-trafficking laws and

10
     committed other abuses, including deceptive hiring practices, excessive fees
11
12   charged by overseas job brokers who lure workers into Iraq, and circumvention of

13   Iraqi immigration procedures by contractors/subcontractors, and other violations.

14
     General Casey ordered that contractors be required to return passports that had been
15
16   illegally confiscated from laborers on U.S. bases and to end other abuses.[11]

17   47.    The United States described these abuses as "indicative of trafficking

18
     in persons" in a report on the Department of Defense response to labor trafficking
19
20   in Iraq.[12]

21   48.    Approximately 35,000 of the 48,000 people working under contract on

22
23   American bases in Iraq are "Third Country Nationals," workers who are imported

24

25   [8] *Id.* at 217.

26   [9] Cam Simpson, U.S. Tax Dollars Tied to Human Trafficking, Report Alleges, Chicago Tribune, June 6, 2006 at 8.

     [10] TIP 2007 at 126
27
     [11] MNF-I FRAGO 06-188 [Trafficking in Persons],  Order issued by General Casey.
28
     [12] United States Department of State, Trafficking in Persons Report, June 2006 at 19.

from outside Iraq and who are not United States citizens.

49.     Contractors have brought the Third Country Nationals (TCNs) to Iraq from impoverished countries such as Nepal, the Philippines and Bangladesh to do menial jobs, from cooking and serving food to cleaning toilets and running the laundry.  The TCNs toil long hours for low pay and endure living conditions that their home nations have called human rights violations.  The TCNs often must work for months simply to pay off the debts their families incurred to labor traffickers. Many had no idea that they would end up in a war zone.[13]

50.     According to media reports, the TCNs work 12 hours a day; are allowed one day a month off, without pay; lack medical insurance and are sometimes reduced to begging for needed medication; are not provided safety equipment; are not permitted to use the recreation facilities or access internet or telephone communications; and share cramped living quarters.[14]

51.     Labor advocates have called this practice modern-day indentured servitude, funded by U.S. taxpayers.

**The Human Trafficking Enterprise**

52.     Defendants entered into a number of contracts with the United States Department of Defense.  For example, Daoud contracted to provide food services at

---

[13] Moni Basu, Workers from Poor Countries Serve the 48th, Atlanta J. Constitution, Nov. 6, 2005.

[14] Id.

United States military bases in Iraq, provide transportation, provide labor for logistics support, and to do construction. Daoud was also at all relevant times a subcontractor on the KBR Defendants' contracts with the Department of Defense.

53. During the relevant period, the KBR Defendants employed more private contractors and held a larger contract with the United States government than any other firm. The KBR Defendants provided military housing, maintenance services, and other services in Iraq.

54. In an effort to fulfill their contractual obligations, Defendants and the co-conspirators willfully and purposefully formed an enterprise with the goal of procuring cheap labor and increasing profits. In order to achieve the illegal purpose of this enterprise, Defendants established, engaged and/or contracted with a network of suppliers, agents, and/or partners in order to procure laborers from third world countries. The common scheme of this enterprise was to traffic in laborers and to profit from the provision of this labor.

55. As part of its trafficking activities, the enterprise established a route for transporting laborers from Nepal to Iraq. Each member of the enterprise, including Defendants, served a role in furthering the enterprise's common illegal purpose.

56. Nepal is one of the poorest countries in the world, with approximately one-third of its citizens living in poverty. Per capita GDP in 2006 was estimated to be $1,500. Wire transfers from young Nepalis working abroad account for an

estimated $1 billion of the Nepalese economy, exceeding tourism, exports and foreign aid combined.    Travel abroad to work can provide young Nepalis an opportunity to earn a living and support their families.

57.    Agencies specializing in recruiting Nepalis for jobs overseas are a booming business in Nepal.    There were fewer than a dozen a decade ago, more than 750 now exist.    Reportedly, Nepalis are valued by employers because they have a reputation as hard workers who are unlikely to complain.

58.    Moonlight conducted the recruiting.[15]    For example, Moonlight placed advertisements in Nepali newspapers for jobs in Amman, Jordan, paying between $220 and $500 per month.    Upon information and belief, the ad stated that a "demand letter" for hotel jobs in Amman from Morning Star was on file with the Nepali government.    Operating in concert, Moonlight and Morning Star transported the laborers who had been recruited in Nepal to Amman, Jordan.

59.    Morning Star housed the men upon their arrival in Jordan and arranged for their transfer to Iraq.    Upon information and belief, the documents filed by Moonlight with the Government of Nepal stated that the men entered Jordan under Morning Star's authority.    Morning Star then provided the newly arrived laborers to Defendant Daoud.

60.    Iyad Mansoor, the director-general of Morning Star told the media at

---

[15] Thomas F. Gimble, Principal Deputy,  Inspector General, Department of Defense,  Memorandum for Under Secretary of Defense (Personnel and Readiness), Apr. 14, 2006 at 1 [hereinafter "Gimble Memorandum"].

various times that he had hired the Nepalis through Moonlight to work in factories in Jordan.

61.    The men who arrived safely at Al Asad air base worked for Defendants on their contracts to provide services for the United States.

**The Plaintiffs' Journey**

62.    The Deceased Victims, men whose ages range from eighteen (18) to twenty-seven (27), were recruited from their several places of residence in Nepal by members of the human trafficking enterprise and/or agents of Defendants, including Moonlight.

63.    Most of the men were told that they would be employed by luxury hotels, including the Le Royal Hotel, in Amman, Jordan. Those who were not told that they would be working in Amman, were instead told that they would be working in an American Camp. Their family members assumed they were going to the United States. All of the men were told that they would not be placed in dangerous areas and that if they found themselves in dangerous areas they would be sent back at the employers' expense.

64.    The Nepali Laborers were told that their salaries would be approximately $500 per month.

65.    In order to arrange the promised jobs, the men and their families incurred tremendous debt to pay their brokerage fees to the trafficking enterprise. The fees ranged from the equivalent of $1,000 to $3,500 per man, with interest rates

as high as 36 percent. $3,500 is more than a decade's worth of earnings for many Nepalis. The men hoped to repay this debt with the salaries promised them.

66. Upon information and belief, Moonlight filed documents with the Government of Nepal stating that the men were to work at the Le Royal Hotel in Amman, Jordan and that they entered Jordan under the authority of Morning Star. Moonlight then transferred the men to the custody of Morning Star.[16]

67. The men were held in Jordan by agents of Daoud.

68. All of the men were required to turn over their passports to Daoud when they arrived in Jordan. This was a common practice. Defendants retained the passports of their TCN laborers until they had completed their contracts and were returning home. Mr. Gurung's passport was not returned until he was returned to Nepal upon the completion of his contract.

69. The men were not provided the promised jobs at a hotel or anywhere else in Jordan. In addition, an additional "fee" was charged by Daoud and/or its agents, which was more than the men expected. Lalan Koiri, Budhan Sudi and Manoj Thakur were told that they must surrender two months' pay as a fee.

70. The men learned that there were no hotel jobs waiting for them in Jordan. They discovered they were headed to Iraq, to work for Defendants at Al Asad Air Base, north of Ramadi, Iraq. Several of the men phoned their relatives in Nepal in a panic.

71. For example, in or around late July, 2004, Bishnu Thapa called the New Bamboo Cottage, a restaurant in Nepal where his brother worked. The line quickly went dead. When Bishnu Thapa called back, he spoke to Gana Magar, the owner of the restaurant. Bishnu Thapa said that he was in Jordan, and left the cryptic message, "I am done for," before the line went dead again.

72. Mangal Limbu called his family from Amman and reported that he and the other men were being kept in a dark room where they were unable to see.

73. After arriving in Jordan and having their passports taken, the men were told that they would only be paid approximately three-quarters of what they were promised.

74. The men desperately wanted to return home to Nepal, rather than proceed into the Iraqi war zone. However, because of the large debts their families had assumed to pay the brokers, the men were compelled to proceed to Iraq.[17]

75. Daoud transported the Nepali men into Iraq on or about August 19, 2004 via an unprotected automobile caravan of 17 vehicles.

76. This caravan traveled along the Amman-to-Baghdad highway, well-known as one of the most dangerous roads in the world at the time. Daoud provided no security for this caravan as it headed for its intended destination, the Al Asad Air Base north of Ramadi, Iraq.

---

[16] Gimble Memorandum at 1.

[17] Gimble Memorandum at 2.

77.   The American and British governments issued repeated and specific warnings against traveling along the Amman-to-Baghdad highway without security in the weeks before the departure of the caravan transporting the men.

78.   Just weeks prior, two of drivers for Daoud had been kidnapped in Iraq. Ahmad Salameh Hussein and Fayez Saad al-Adwan were captured by an insurgent group on or about June 26, 2004.  In exchange for their release, which occurred on or about August 9, 2004, Daoud publicly announced it would cease its operations in Iraq.  Daoud did not cease its operations in Iraq, however.

79.   Daoud contacted Morning Star prior to the departure of the caravan in an effort to recruit more drivers.  At least one driver from Morning Star refused to travel with the caravan because of the risks of traveling along the Amman-to-Baghdad highway, including the high likelihood of insurgent attack or kidnapping.

80.   Since late 2003, many Western contractor personnel had avoided the Amman-to-Baghdad highway, which runs through Iraq's Anbar province, because of the known risks of attack or kidnapping.  Fear of attacks against contractor personnel were exacerbated following the March 2004 attack in Fallujah of four security personnel, employees of Blackwater USA, who were brutally dismembered, burned, dragged through the streets and hung from a bridge.

81.   Despite the well-known dangers and well-publicized warnings, Defendants and their co-conspirators provided no security for the caravan.  The Deceased Victims were in the two lead cars, well ahead of the other 15 cars.  About

40 miles south of the Al Asad base, a handful of men stopped the two cars and told the drivers they had to leave the workers at the checkpoint, that the Americans would come from the base and pick them up.

82.    The men at the checkpoint later revealed themselves as the Ansar al-Sunna Army, an insurgent group in Iraq.

83.    On or about August 20, 2004, the Ansar al-Sunna Army posted an internet statement that it had captured the Deceased Victims. The insurgent group's message listed the names of its captives.

84.    On or about August 22, 2004, the Ansar al-Sunna Army posted pictures of the Deceased Victims on the internet.

85.    Several of the family members of the Deceased Victims saw the images broadcast on Nepali television.

86.    On or about August 24, 2004, the Foreign Ministry of Nepal received a video of ten of the Deceased Victims. Frightened, the captives spoke in stuttering Nepalese, recounting the details of how they were trafficked from Nepal to Iraq. The Nepalis explained that they "were kept as captives in Jordan at first" and were not allowed to return home. All 12 captives shown on television stated that they were forced to go to Iraq. One captive in the video says, "I do not know when I will die, today or tomorrow."

87.    On or about August 31, 2004, international media outlets broadcasted video of the Ansar al-Sunna Army executing the twelve Deceased Victims. The

insurgent group beheaded one of the men by sawing through his neck.    The insurgent group shot the other eleven men, one by one, in the back of their heads as they lay face down in a ditch.

88.    The families of the Deceased Victims saw the execution video, causing them great emotional distress.

89.    Upon information and belief, the bodies of the Deceased Victims were never found.

90.    The other cars in the caravan reached the Al Asad base.

91.    Plaintiff Gurung's journey to Iraq was similar to that of the Deceased Victims.  He was recruited in Nepal and first sent to Delhi, India for twenty (20) days and then on to Amman, Jordan for twenty (20) days.

92.    While in Jordan, representatives of Defendant Daoud had Plaintiff Gurung sign an employment contract, a copy of which was not provided to Plaintiff Gurung.  After signing the papers, Plaintiff Gurung was placed in a caravan for transport to the Al Asad base.  The caravan included the cars with the twelve men who were captured and killed.

93.    Plaintiff Gurung's car was not captured and he arrived at the Al Asad base as scheduled.  Once there, Plaintiff Gurung began work as a loader/unloader in a warehouse.  He was supervised by representatives of the KBR Defendants.

94.    Following the kidnapping of the twelve men and his arrival at Al Asad, Plaintiff Gurung was very scared for his safety and wanted to leave to return to

Nepal.  His employers (both Defendants Daoud and the KBR Defendants) told him that he could not leave until his work in Iraq was complete.

95.    Mortar fire was a regular occurrence at the base during Plaintiff Gurung's employment there, a fact which he was not told prior to arrival.  His only protection was to take shelter in a bunker when an announcement of "Incoming!" was made, which was often.  His Daoud and KBR supervisors all were given protection such as bullet-proof vests, but Plaintiff Gurung was not given such protection.

96.    After fifteen (15) months, Plaintiff Gurung was permitted to return to Nepal.

97.    The KBR Defendants already knew or should have known of the human trafficking scheme from which it was benefitting prior to August 2004.

98.    Employees and managers of the KBR Defendants in Iraq were told by the laborers there that they had been taken to Iraq against their will.  For example, another Nepali laborer, Sarad Sapkota, was recruited to work outside of Nepal as a cook in Oman in 2003, but was instead taken to Iraq against his will and forced to work for KBR on a military base.  He and the other TCNs working with him repeatedly told their KBR managers that they did not want to come to Iraq and were not informed that they would be sent to Iraq, but were repeatedly told by KBR that they had no choice and would be forced to work in Iraq until their contract was completed.

99.   Mr. Sapkota was one of approximately 90 TCNs from Sri Lanka and Nepal who arrived in Iraq at the same time and under similar circumstances.  He and the other men he was with were forced to work seven days a week, 12 hours a day, while there were constant bombings all around them.  Mr. Sapkota described bullets often coming through the windows of the bunk house were they were staying, and that a mortar bomb came in to the butchery, where one of the TCNs working with Mr. Sapkota had a heart attack when the bomb exploded.

100.   In the summer of 2003, several Indian men who believed they were travelling to work in Kuwait, were instead deceived into working for KBR in Iraq. As with the other TCNS, the Indian men were hired through recruiters and had their passports taken from them.  These men and other similarly situated workers were not provided with adequate drinking water, food, health care or security while in Iraq, even while subject to gunfire and mortar and rocket attacks.   KBR knew of the workers' complaints both directly and through newspaper articles.  *See, e.g.,* Ariana Eunjung Cha, Underclass of Workers Created in Iraq, Wash. Post, Jul. 1, 2004 at A1.

101.   KBR acknowledged it had the authority to terminate all subcontractors who mistreated employees, unlawfully compelled employees to perform work or unlawfully compelled employees to remain in place against their will.

102.   Daoud, also, already had a history of human trafficking prior to the deaths of the twelve men.  In the months prior to the deaths of the twelve men,

eighteen Indians employed by Daoud in Fallujah were being forcefully kept by Daoud in the camp where they worked even though they had quit their jobs months before. The men were initially recruited to work in Jordan but found themselves taken to Iraq.

## V.    CAUSES OF ACTION

### COUNT I
### Violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595 (Against All Defendants)

103.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if set forth fully here.

104.    Defendants, along with their co-conspirators and agents, developed a scheme, plan or pattern in order to knowingly provide the labor and services of persons, including the Nepali Laborers, for menial work on the United States Al Asad Air Base.

105.    Defendants knowingly obtained the Nepali Laborers' labor or services by means of such scheme, plan or pattern.

106.    Defendants and/or their co-conspirators and/or agents intended to cause the Nepali Laborers to believe that if they did not perform such labor or services, they would suffer serious harm or physical restraint, in violation of 28 U.S.C. § 1589. In addition, Defendants and/or their co-conspirators and/or agents physically restrained the Nepali Laborers, including isolating the workers in Jordan,

transporting them against their will to Iraq, withholding their passports and preventing them from freely leaving Iraq until the term of their contract ended, in violation of 28 U.S.C. § 1589.

107.    As part of their scheme, plan or pattern, Defendants and/or their co-conspirators and agents filed false papers with the Government of Nepal, and confiscated and retained the passports of at least some of the Nepali workers in violation of 28 U.S.C. § 1589.

108.    The scheme, plan or pattern perpetrated by Defendants and their co-conspirators and/or agents resulted in the deaths of the twelve Nepali workers.

109.    Defendants and their co-conspirators and/or agents knowingly recruited, harbored, transported, provided, and obtained the Nepali Laborers for labor or services.

110.    Defendants' actions violated 18 U.S.C. § 1589 and 18 U.S.C. § 1590, provisions of the TVPRA.

111.    As a result of the conduct of Defendants' and their agents and/or co-conspirators, Plaintiffs have suffered damages in an amount to be determined at trial.

112.    Plaintiffs are entitled to recover damages and reasonable attorneys' fees for the wrongful conduct of Defendants and their agents and/or co-conspirators.

## COUNT II
### Violation of 18 U.S.C. § 1962(c) –
### Racketeering Influenced and Corrupt Organizations Act
### (Against Daoud)

113.   Plaintiffs reallege and incorporate by reference all of the preceding paragraphs as if set forth herein.

114.   As set forth in detail above, Daoud and its agents and co-conspirators are "persons" within the meaning of 18 U.S.C. § 1961(3) who formed an enterprise as defined in 18 U.S.C. § 1961(4) whereby they engaged in pattern of racketeering activity for the common illegal purpose of providing trafficked labor at low cost to United States military installations inside of Iraq and earning profits therefrom in violation of 18 U.S.C. § 1962(c).

115.   Daoud used its position as a United States military contractor or subcontractor, to make ongoing associations with two or more parties, including with its co-conspirators, for the purpose of executing essential aspects of the criminal worker exploitation scheme alleged herein.  Daoud could not successfully conduct the criminal worker exploitation scheme without the associations that formed this enterprise.

116.   The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Daoud, including its employees and agents, and (ii) its co-conspirators, Moonlight; Morning Star; and Bisharat, including their employees and agents.

117.   Daoud and its agents and co-conspirators, each being associated with

COHEN, MILSTEIN,
SELLERS & TOLL
P.L.L.C.
ATTORNEYS AT LAW

the enterprise, did unlawfully, knowingly, and intentionally conduct and participate, directly and indirectly, in the conduct, management, and operation of the affairs of the enterprise through a variety of actions including, *inter alia*, the following:

(a)    Organizing the trafficking operation that would bring low cost employees to United States military facilities in Iraq;

(b)    Subcontracting different parts of the trafficking enterprise to different members thereof.

(c)    Establishing a route by which laborers were to be trafficked from their home countries through Jordan to military installations in Iraq;

(d)    Establishing a location for employees to be housed in Jordan while awaiting transfer from Jordan to Iraq;

(e)    Arranging for and transporting the employees into Iraq; and

(f)    Withholding the passports of the workers, preventing them from leaving when they so chose.

118.    The enterprise alleged herein was engaged in, and the activities of which affected, interstate and foreign commerce, through a pattern of racketeering activity consisting of numerous indictable predicate acts, including the following, in violation of 18 U.S.C. § 1962 (c) and 18 U.S.C. § 1961(1)(A):

(a)    **Violation of 18 U.S.C. § 1951: Extortion:** Daoud and its agents and  co-conspirators knowingly and willfully committed multiple predicate acts of extortion in violation of 18 U.S.C. § 1951 by wrongfully using threatened force and

fear, as described herein, to induce the Nepali Laborers to abandon their property

rights to labor free of coercion  These acts of extortion in violation of 18 U.S.C. §

1951 constitute "racketeering activity" as defined in the RICO, 18 U.S.C. §

1961(1)(B).

(b)    **Violation of 18 U.S.C. § 1581: Peonage:**  Daoud and/or its

agents or its co-conspirators knowingly and willfully held the Nepali Laborers with

the intent of placing them in a condition of peonage, as described herein, to cause

the Nepali Laborers to believe that they had no choice but to continue to work for

the Defendants.  These acts of peonage in violation of 18 U.S.C. § 1581 constitute

"racketeering activity" as defined in the RICO, 18 U.S.C. § 1961(1)(B).

(c)    **Violation of 18 U.S.C. § 1584: Involuntary Servitude:**  Daoud

and/or its agents or its co-conspirators knowingly and willfully held the Nepali

Laborers in involuntary servitude in violation of 18 U.S.C. § 1584 by means of a

scheme, plan or pattern to cause the Nepali Laborers to believe that failure to work

for Defendants would result in serious harm to the Nepali Laborers, as described

herein.  These acts of involuntary servitude in violation of 18 U.S.C. § 1584

constitute "racketeering activity" as defined in the RICO, 18 U.S.C. § 1961(1)(B).

(d)    **Violation of 18 U.S.C. § 1589: Forced Labor:**  Daoud and/or

its agents or its co-conspirators knowingly and willfully provided or obtained the

labor or services of the Nepali Laborers in violation of 18 U.S.C. § 1589 by means

of a scheme, plan or pattern to cause the Nepali Laborers to believe that failure to

work for Defendants would result in serious harm to the Nepali Laborers, as described herein. These acts of forced labor constitute "racketeering activity" as defined by the RICO, 18 U.S.C. § 1961(1)(B).

(e) **Violation of 18 U.S.C. § 1590: Trafficking:** Daoud and/or its agents or its co-conspirators knowingly and willfully recruited, harbored, transported, provided, or obtained the Nepali Laborers for labor or services in violation of 18 U.S.C. § 1590 through the use of fraud and coercion for the purpose of subjecting the Nepali Laborers to peonage, involuntary servitude and forced labor, as described herein Daoud, aided and abetted by its co-conspirators, engaged in acts of trafficking to acquire cheap labor that would allow Defendants to fulfill contracts to provide labor for United States military facilities. These acts of human trafficking constitute "racketeering activity" as defined by the RICO, 18 U.S.C. § 1961(1)(B).

(f) **Violation of 18 U.S.C. § 1592: Unlawful Conduct with Respect to Documents in Furtherance of Trafficking:** Daoud and/or its agents or its co-conspirators knowingly and willfully concealed, removed, confiscated, or possessed the Nepali Laborers' passports in the course of the violations described herein, in violation of 18 U.S.C. § 1592(a). Daoud and/or its co-conspirators performed the acts described herein, with intent to violate 18 U.S.C. §§ 1581, 1584, 1589, or 1590 in violation of 18 U.S.C. § 1592(b) and to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the Nepali Laborers' liberty

to move or travel, in order to maintain the labor or services of the Nepali Laborers, when the Nepali Laborers were or had been victims of a severe form of trafficking in persons, as defined by 22 U.S.C. § 7102(8)(B).  These acts of unlawful conduct with respect to documents in furtherance of trafficking constitute "racketeering activity" as defined in the RICO, 18 U.S.C. § 1961(1)(B).

(g)    **Violation of Cal. Penal Code § 518: Extortion:**  Daoud and/or its agents or its co-conspirators knowingly and willfully committed multiple predicate acts of extortion in violation of Cal. Penal Code § 518 by wrongfully using force or fear, as described, to induce the Nepali Laborers to abandon their property rights to labor free of coercion  These acts of extortion in violation of Cal. Penal Code § 518 constitute "racketeering activity" as defined by the RICO, 18 U.S.C. § 1961(1)(A).

(h)    **Violation of Cal. Penal Code § 207(C): Kidnapping**:  Daoud and/or its agents or its co-conspirators knowingly and willfully committed kidnapping in violation of Cal. Penal Code § 207(c) by hiring, persuading, or seducing by false promises or misrepresentations the Nepali Laborers with the intent to employ the Nepali Laborers without their free will and consent, as described herein.  These acts of kidnapping in violation of Cal. Penal Code § 207(c) constitute "racketeering activity" as defined by the RICO, 18 U.S.C. § 1961(1)(A).

119.   In the conduct of its pattern of racketeering activity as set forth above, the enterprise regularly moved goods and people across foreign borders and

1   therefore was engaged in foreign commerce.

2   120.   The enterprise engaged in and affected interstate commerce because,
3
4   *inter alia*, it contracted with the United States Department of Defense to provide

5   employment services, among other services, on United States military facilities in
6
7   Iraq.   In the course of negotiating and finalizing said contracts, members of the

8   enterprise passed money through the United States banking system.

9   121.   The predicate acts of criminal racketeering activity described above
10
11  amounted to a common, ongoing course of conduct intended to cause and in fact

12  causing the Nepali Laborers to be illicitly trafficked into Iraq, proximately causing

13  death for twelve of the Nepali men. Each such racketeering activity was related,
14
15  having (1) common participants; (2) the same victims, including the Nepali

16  Laborers; and (3) the same purpose and result of benefiting Defendants and/or

17  thheir agents or co-conspirators at the expense of Plaintiffs.   The predicate acts
18
19  constituting a pattern of racketeering activity also were interrelated in that, without

20  the acts of forced labor, Daoud and other parties to the scheme would not have

21  kidnapped and trafficked the Nepali Laborers, held them in a condition of peonage
22
23  and involuntary servitude, unlawfully concealed, removed, confiscated, or

24  possessed their passports, or extorted their rights to labor free of coercion.

25  122.   Daoud and/or its agents or its co-conspirators engaged in the pattern of
26
27  racketeering activity alleged herein for the purpose of conducting the affairs of the

28  enterprise, which is separate and distinct.   Such acts of racketeering activity have

been continuous and related, having been part of Daoud's and/or its agents' or co-conspirators' regular way of doing business through the enterprise.

123.   As a direct and proximate result of Daoud's and/or its agents' or co-conspirators' conduct and participation in the conduct of the affairs of the enterprise through the said racketeering conspiracy, Plaintiffs were injured in their property and person, including by loss of wages, the ability to provide for their family in Nepal and pain and suffering.

124.   By virtue of these violations of 18 U.S.C. § 1962(c), Daoud is jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT III**
**Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate 18 U.S.C. § 1962(c)**
**(Against Daoud)**

125.   Plaintiffs reallege and incorporate by reference all of the preceding paragraphs as if set forth herein.

126.   Daoud and/or its agents and co-conspirators agreed and conspired to participate in, or to facilitate the commission of, predicate acts as aforesaid, and agreed and conspired to facilitate the acts leading to the substantive offense of conducting the affairs of the enterprise through a pattern of racketeering activity, which included the repeated acts alleged above, in violation of 18 U.S.C. §1962(d).

127.   The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the section 1962(c) enterprise

described previously through a pattern of racketeering activity.

128.   As demonstrated in detail above, Daoud and its co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to deprive Plaintiffs of their rights.

129.   The nature of the above-described acts of Daoud and its co-conspirators, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that the members of the enterprise not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

130.   As a direct and proximate result of Daoud's and/or its agents' and co-conspirators' conspiracy to participate in the conduct of the affairs of the enterprise alleged herein, Plaintiffs have been and are continuing to be injured in their property and person, as set forth above.

### COUNT IV
### Violation of 18 U.S.C. § 1962(c) –
### Racketeering Influenced and Corrupt Organizations Act
### (Against the KBR Defendants)

131.   Plaintiffs reallege and incorporate by reference all of the preceding paragraphs as if set forth herein.

132.   As set forth in detail above, the KBR Defendants and their agents and

co-conspirators are "persons" within the meaning of 18 U.S.C. § 1961(3) who formed an enterprise as defined in 18 U.S.C. § 1961(4) whereby they engaged in pattern of racketeering activity for the common illegal purpose of providing trafficked labor at low cost to United States military installations inside of Iraq and earning profits therefrom in violation of 18 U.S.C. § 1962(c).

133.   The KBR Defendants used their position as a United States military contractor or subcontractor, to make ongoing associations with two or more parties, including with its co-conspirators, for the purpose of executing essential aspects of the criminal worker exploitation scheme alleged herein.   The KBR Defendants could not successfully conduct the criminal worker exploitation scheme without the associations that formed this enterprise.

134.   The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) the KBR Defendants, including their employees and agents, and (ii) their co-conspirators, Daoud, Moonlight; Morning Star; and Bisharat, including their employees and agents.

135.   The KBR Defendants and their agents and co-conspirators, each being associated with the enterprise, did unlawfully, knowingly, and intentionally conduct and participate, directly and indirectly, in the conduct, management, and operation of the affairs of the enterprise through a variety of actions including, *inter alia*, the following:

(a)     Organizing the trafficking operation that would bring low cost

employees to United States military facilities in Iraq;

        (b)    Subcontracting different parts of the trafficking enterprise to different members thereof.

        (c)    Establishing a route by which laborers were to be trafficked from their home countries through Jordan to military installations in Iraq;

        (d)    Establishing a location for employees to be housed in Jordan while awaiting transfer from Jordan to Iraq;

        (e)    Arranging for and transporting the employees into Iraq; and

        (f)    Withholding the passports of the workers, preventing them from leaving when they so chose.

    136.   The enterprise alleged herein was engaged in, and the activities of which affected, interstate and foreign commerce, through a pattern of racketeering activity consisting of numerous indictable predicate acts, including the following, in violation of 18 U.S.C. § 1962 (c) and 18 U.S.C. § 1961(1)(A):

        (a)    **Violation of 18 U.S.C. § 1951: Extortion:** The KBR Defendants and their agents and co-conspirators knowingly and willfully committed multiple predicate acts of extortion in violation of 18 U.S.C. § 1951 by wrongfully using threatened force and fear, as described herein, to induce the Nepali Laborers to abandon their property rights to labor free of coercion  These acts of extortion in violation of 18 U.S.C. § 1951 constitute "racketeering activity" as defined in the RICO, 18 U.S.C. § 1961(1)(B).

(b)     **Violation of 18 U.S.C. § 1581: Peonage:**  The KBR Defendants and/or their agents or its co-conspirators knowingly and willfully held the Nepali Laborers with the intent of placing them in a condition of peonage, as described herein, to cause the Nepali Laborers to believe that they had no choice but to continue to work for the Defendants.  These acts of peonage in violation of 18 U.S.C. § 1581 constitute "racketeering activity" as defined in the RICO, 18 U.S.C. § 1961(1)(B).

(c)     **Violation of 18 U.S.C. § 1584: Involuntary Servitude:**  The KBR Defendants and/or their agents or their co-conspirators knowingly and willfully held the Nepali Laborers in involuntary servitude in violation of 18 U.S.C. § 1584 by means of a scheme, plan or pattern to cause the Nepali Laborers to believe that failure to work for Defendants would result in serious harm to the Nepali Laborers, as described herein.  These acts of involuntary servitude in violation of 18 U.S.C. § 1584 constitute "racketeering activity" as defined in the RICO, 18 U.S.C. § 1961(1)(B).

(d)     **Violation of 18 U.S.C. § 1589: Forced Labor:**  The KBR Defendants and/or their agents or their co-conspirators knowingly and willfully provided or obtained the labor or services of the Nepali Laborers in violation of 18 U.S.C. § 1589 by means of a scheme, plan or pattern to cause the Nepali Laborers to believe that failure to work for Defendants would result in serious harm to the Nepali Laborers, as described herein.  These acts of forced labor constitute

1   "racketeering activity" as defined by the RICO, 18 U.S.C. § 1961(1)(B).

2           (e)     **Violation of 18 U.S.C. § 1590: Trafficking:**  The KBR

3   Defendants and/or their agents or their co-conspirators knowingly and willfully

4

5   recruited, harbored, transported, provided, or obtained the Nepali Laborers for labor

6   or services in violation of 18 U.S.C. § 1590 through the use of fraud and coercion

7

8   for the purpose of subjecting the Nepali Laborers to peonage, involuntary servitude

9   and forced labor, as described herein.  The KBR Defendants, aided and abetted by

10  their co-conspirators, engaged in acts of trafficking to acquire cheap labor that

11

12  would allow Defendants to fulfill contracts to provide labor for United States

13  military facilities.  These acts of human trafficking constitute "racketeering

14  activity" as defined by the RICO, 18 U.S.C. § 1961(1)(B).

15

16          (f)     **Violation of 18 U.S.C. § 1592: Unlawful Conduct with**

17  **Respect to Documents in Furtherance of Trafficking:**  The KBR Defendants

18  and/or their agents or their  co-conspirators knowingly and willfully concealed,

19

20  removed, confiscated, or possessed the Nepali Laborers's passports in the course of

21  the violations described herein, in violation of 18 U.S.C. § 1592(a).  The KBR

22

23  Defendants and/or their co-conspirators performed the acts described herein, with

24  intent to violate 18 U.S.C. §§ 1581, 1584, 1589, or 1590 in violation of 18 U.S.C. §

25  1592(b) and to prevent or restrict or to attempt to prevent or restrict, without lawful

26

27  authority, the Nepali Laborers's liberty to move or travel, in order to maintain the

28  labor or services of the Nepali Laborers, when the Nepali Laborers were or had

1   been victims of a severe form of trafficking in persons, as defined by 22 U.S.C. §

2   7102(8)(B).  These acts of unlawful conduct with respect to documents in

3

4   furtherance of trafficking constitute "racketeering activity" as defined in the RICO,

5   18 U.S.C. § 1961(1)(B).

6          (g)    **Violation of Cal. Penal Code § 518: Extortion:**  The KBR

7   Defendants and/or their agents or their co-conspirators knowingly and willfully

8

9   committed multiple predicate acts of extortion in violation of Cal. Penal Code § 518

10  by wrongfully using force or fear, as described herein, to induce the Nepali

11

12  Laborers to abandon their property rights to labor free of coercion  These acts of

13  extortion in violation of Cal. Penal Code § 518 constitute "racketeering activity" as

14
    defined by the RICO, 18 U.S.C. § 1961(1)(A).
15

16         (h)    **Violation of Cal. Penal Code § 207(C): Kidnapping:**  The

17  KBR Defendants and/or their agents or their co-conspirators knowingly and

18
    willfully committed kidnapping in violation of Cal. Penal Code § 207(c) by hiring,
19

20  persuading, or seducing by false promises or misrepresentations the Nepali

21  Laborers with the intent to employ the Nepali Laborers without their free will and

22
    consent, as described herein.  These acts of kidnapping in violation of Cal. Penal
23

24  Code § 207(c) constitute "racketeering activity" as defined by the RICO, 18 U.S.C.

25  § 1961(1)(A).

26         137.   In the conduct of its pattern of racketeering activity as set forth above,
27
    the enterprise regularly moved goods and people across foreign borders and
28

1    therefore was engaged in foreign commerce.

2    138.  The enterprise engaged in and affected interstate commerce because,
3
4    *inter alia*, it contracted with the United States Department of Defense to provide
5    employment services, among other services, on United States military facilities in
6    Iraq.  In the course of negotiating and finalizing said contracts, members of the
7
8    enterprise passed money through the United States banking system.

9    139.  The predicate acts of criminal racketeering activity described above
10
11   amounted to a common, ongoing course of conduct intended to cause and in fact
12   causing the Nepali Laborers to be illicitly trafficked into Iraq, proximately causing
13   death for twelve of the Nepali men. Each such racketeering activity was related,
14
15   having (1) common participants; (2) the same victims, including Nepali Laborers;
16   and (3) the same purpose and result of benefiting Defendants and/or their agents or
17   co-conspirators at the expense of Plaintiffs.  The predicate acts constituting a
18
19   pattern of racketeering activity also were interrelated in that, without the acts of
20   forced labor, the KBR Defendants and other parties to the scheme would not have
21   kidnapped and trafficked the Nepali Laborers, held them in a condition of peonage
22
23   and involuntary servitude, unlawfully concealed, removed, confiscated, or
24   possessed their passports, or extorted their rights to labor free of coercion.

25   140.  The KBR Defendants and/or their agents or its co-conspirators
26
27   engaged in the pattern of racketeering activity alleged herein for the purpose of
28   conducting the affairs of the enterprise, which is separate and distinct. Such acts of

racketeering activity have been continuous and related, having been part of the KBR Defendants and/or their agents' or co-conspirators' regular way of doing business through the enterprise.

141.  As a direct and proximate result of the KBR Defendants and/or their agents' or co-conspirators' conduct and participation in the conduct of the affairs of the enterprise through the said racketeering conspiracy, Plaintiffs were injured in their property and person, including by loss of wages, the ability to provide for their family in Nepal and pain and suffering.

142.  By virtue of these violations of 18 U.S.C. § 1962(c), the KBR Defendants are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT V
**Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate 18 U.S.C. § 1962(c) (Against the KBR Defendants)**

143.  Plaintiffs reallege and incorporate by reference all of the preceding paragraphs as if set forth herein.

144.  The KBR Defendants and/or their agents and co-conspirators agreed and conspired to participate in, or to facilitate the commission of, predicate acts as aforesaid, and agreed and conspired to facilitate the acts leading to the substantive offense of conducting the affairs of the enterprise through a pattern of racketeering activity, which included the repeated acts alleged above, in violation of 18 U.S.C.

§1962(d).

145.   The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the section 1962(c) enterprise described previously through a pattern of racketeering activity.

146.   As demonstrated in detail above, the KBR Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to deprive Plaintiffs of their rights.

147.   The nature of the above-described acts of the KBR Defendants and their co-conspirators, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that the members of the enterprise not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

148.   As a direct and proximate result of the KBR Defendants' and/or their agents' and co-conspirators' conspiracy to participate in the conduct of the affairs of the enterprise alleged herein, Plaintiffs have been and are continuing to be injured in their property and person, as set forth above.

## COUNT VI
### Vicarious RICO Violation of 18 U.S.C. § 1962(c)
### (Against the KBR Defendants)

149.   This Count is pled in the alternative to Counts IV and V.  Plaintiffs reallege and incorporate by reference paragraphs 1-53 and 55-102 as if set forth herein.

150.   As set forth in detail above, Defendant Daoud and its agents and co-conspirators are "persons" within the meaning of 18 U.S.C. § 1961(3) who formed an enterprise as defined in 18 U.S.C. § 1961(4) whereby they engaged in pattern of racketeering activity for the common illegal purpose of providing trafficked labor at low cost to United States military installations inside of Iraq and earning profits therefrom in violation of 18 U.S.C. § 1962(c).

151.   Defendant Daoud used its position as a United States military contractor or subcontractor, to make ongoing associations with two or more parties, including with its co-conspirators, for the purpose of executing essential aspects of the criminal worker exploitation scheme alleged herein.  Defendant Daoud could not successfully conduct the criminal worker exploitation scheme without the associations that formed this enterprise.

152.   The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendant Daoud, including its employees and agents, and (ii) its co-conspirators, Moonlight; Morning Star; and Bisharat, including their employees and agents.

153.  Defendant Daoud and its agents and co-conspirators, each being associated with the enterprise, did unlawfully, knowingly, and intentionally conduct and participate, directly and indirectly, in the conduct, management, and operation of the affairs of the enterprise through a variety of actions including, *inter alia*, the following:

(a)  Organizing the trafficking operation that would bring low cost employees to United States military facilities in Iraq;

(b)  Subcontracting different parts of the trafficking enterprise to different members thereof.

(c)  Establishing a route by which laborers were to be trafficked from their home countries through Jordan to military installations in Iraq;

(d)  Establishing a location for employees to be housed in Jordan while awaiting transfer from Jordan to Iraq;

(e)  Arranging for and transporting the employees into Iraq; and

154.  The enterprise alleged herein was engaged in, and the activities of which affected, interstate and foreign commerce, through a pattern of racketeering activity consisting of numerous indictable predicate acts, including the following, in violation of 18 U.S.C. § 1962 (c) and 18 U.S.C. § 1961(1)(A):

(a)  **Violation of 18 U.S.C. § 1951: Extortion:** Defendant Daoud and its agents and co-conspirators knowingly and willfully committed multiple predicate acts of extortion in violation of 18 U.S.C. § 1951 by wrongfully using

1    threatened force and fear, as described herein, to induce the Nepali Laborers to

2    abandon their property rights to labor free of coercion  These acts of extortion in

3

4    violation of 18 U.S.C. § 1951 constitute "racketeering activity" as defined in the

5    RICO, 18 U.S.C. § 1961(1)(B).

6            (b)    **Violation of 18 U.S.C. § 1581: Peonage:**  Defendant Daoud

7

8    and/or its agents or its co-conspirators knowingly and willfully held the Nepali

9    Laborers with the intent of placing them in a condition of peonage, as described

10

11   herein, to cause the Nepali Laborers to believe that they had no choice but to

12   continue to work for the Defendant Daoud.   These acts of peonage in violation of

13   18 U.S.C. § 1581 constitute "racketeering activity" as defined in the RICO, 18

14

15   U.S.C. § 1961(1)(B).

16           (c)    **Violation of 18 U.S.C. § 1584: Involuntary Servitude:**

17   Defendant Daoud and/or its agents or its co-conspirators knowingly and willfully

18

19   held the Nepali Laborers in involuntary servitude in violation of 18 U.S.C. § 1584

20   by means of a scheme, plan or pattern to cause the Nepali Laborers to believe that

21   failure to work for Defendant Daoud would result in serious harm to the Nepali

22

23   Laborers, as described herein.  These acts of involuntary servitude in violation of 18

24   U.S.C. § 1584 constitute "racketeering activity" as defined in the RICO, 18 U.S.C.

25   § 1961(1)(B).

26           (d)    **Violation of 18 U.S.C. § 1589: Forced Labor:**   Defendant

27

28   Daoud and/or its agents or its co-conspirators knowingly and willfully provided or

obtained the labor or services of the Nepali Laborers in violation of 18 U.S.C. § 1589 by means of a scheme, plan or pattern to cause the Nepali Laborers to believe that failure to work for Defendant Daoud would result in serious harm to the Nepali Laborers, as described herein. These acts of forced labor constitute "racketeering activity" as defined by the RICO, 18 U.S.C. § 1961(1)(B).

(e)    **Violation of 18 U.S.C. § 1590: Trafficking:** Defendant Daoud and/or its agents or its co-conspirators knowingly and willfully recruited, harbored, transported, provided, or obtained the Nepali Laborers for labor or services in violation of 18 U.S.C. § 1590 through the use of fraud and coercion for the purpose of subjecting the Nepali Laborers to peonage, involuntary servitude and forced labor, as described herein. Defendant Daoud, aided and abetted by its co-conspirators, engaged in acts of trafficking to acquire cheap labor that would allow Daoud to fulfill contracts to provide labor for United States military facilities. These acts of human trafficking constitute "racketeering activity" as defined by the RICO, 18 U.S.C. § 1961(1)(B).

(f)    **Violation of 18 U.S.C. § 1592: Unlawful Conduct with Respect to Documents in Furtherance of Trafficking:** Defendant Daoud and/or its agents or its  co-conspirators knowingly and willfully concealed, removed, confiscated, or possessed the Nepali Laborers's passports in the course of the violations described herein, in violation of 18 U.S.C. § 1592(a). Defendant Daoud and/or its co-conspirators performed the acts described herein, with intent to violate

18 U.S.C. §§ 1581, 1584, 1589, or 1590 in violation of 18 U.S.C. § 1592(b) and to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the Nepali Laborers's liberty to move or travel, in order to maintain the labor or services of the Nepali Laborers, when the Nepali Laborers were or had been victims of a severe form of trafficking in persons, as defined by 22 U.S.C. § 7102(8)(B). These acts of unlawful conduct with respect to documents in furtherance of trafficking constitute "racketeering activity" as defined in the RICO, 18 U.S.C. § 1961(1)(B).

(g)    **Violation of Cal. Penal Code § 518: Extortion:** Defendant Daoud and/or its agents or its co-conspirators knowingly and willfully committed multiple predicate acts of extortion in violation of Cal. Penal Code § 518 by wrongfully using force or fear, as described herein, to induce the Nepali Laborers to abandon their property rights to labor free of coercion  These acts of extortion in violation of Cal. Penal Code § 518 constitute "racketeering activity" as defined by the RICO, 18 U.S.C. § 1961(1)(A).

(h)    **Violation of Cal. Penal Code § 207(C): Kidnapping:** Defendant Daoud and/or its agents or its co-conspirators knowingly and willfully committed kidnapping in violation of Cal. Penal Code § 207(c) by hiring, persuading, or seducing by false promises or misrepresentations the Nepali Laborers with the intent to employ the Nepali Laborers without their free will and consent, as described herein.  These acts of kidnapping in violation of Cal. Penal

1    Code § 207(c) constitute "racketeering activity" as defined by the RICO, 18 U.S.C.

2    § 1961(1)(A).

3

4        155.    In the conduct of its pattern of racketeering activity as set forth above,

5    the enterprise regularly moved goods and people across foreign borders and

6    therefore was engaged in foreign commerce.

7

8        156.    The enterprise engaged in and affected interstate commerce because,

9    *inter alia*, it contracted with the United States Department of Defense to provide

10   employment services, among other services, on United States military facilities in

11

12   Iraq.   In the course of negotiating and finalizing said contracts, members of the

13   enterprise passed money through the United States banking system.

14

15       157.    The predicate acts of criminal racketeering activity described above

16   amounted to a common, ongoing course of conduct intended to cause and in fact

17   causing the Nepali Laborers to be illicitly trafficked into Iraq, proximately causing

18   death for twelve of the Nepali men. Each such racketeering activity was related,

19

20   having (1) common participants; (2) the same victims, including Nepali Laborers;

21   and (3) the same purpose and result of benefiting Defendant and/or its agents or co-

22   conspirators at the expense of Plaintiffs.

23

24       158.    The predicate acts constituting a pattern of racketeering activity also

25   were interrelated in that, without the acts of forced labor, the Defendant and other

26   parties to the scheme would not have kidnapped and trafficked the Nepali Laborers,

27

28   held them in a condition of peonage and involuntary servitude, unlawfully

1  concealed, removed, confiscated, or possessed their passports, or extorted their

2
3  rights to labor free of coercion.

4  Defendant Daoud and/or its agents or its co-conspirators engaged in the pattern of

5  racketeering activity alleged herein for the purpose of conducting the affairs of the

6
7  enterprise, which is separate and distinct.  Such acts of racketeering activity have

8  been continuous and related, having been part of the Defendant Daoud's and/or its

9  agents' or co-conspirators' regular way of doing business through the enterprise.

10
11      159.  As a direct and proximate result of Defendant Daoud's and/or its

12  agents' or co-conspirators' conduct and participation in the conduct of the affairs of

13  the enterprise through the said racketeering conspiracy, Plaintiffs were injured in

14
15  their property and person, including by loss of wages, the ability to provide for their

16  family in Nepal and pain and suffering.

17      160.  On information and belief, Defendant Daoud was an agent of the KBR

18
19  Defendants at the time Defendant Daoud was participating in the human trafficking

20  enterprise.  The KBR Defendants and Daoud had several contracts related to work

21  to be performed on United States military installations in Iraq, including the Al

22
23  Asad Air Base near Ramadi, Iraq.  As the principal in an agent-principal

24  relationship, the KBR Defendants may be held liable under the RICO statute for

25  activities of its agent, Defendant Daoud, that violated the RICO statute.

26
27      161.  The KBR Defendants were distinct from the enterprise.

28      162.  The KBR Defendants benefited from the human trafficking enterprise

through the enterprise's unlawful procurement of cheap labor to fulfill construction and other needs on United States military facilities in Iraq.

163.   The KBR Defendants have vicariously violated the RICO statute through the illicit enterprise activities of its agent, Daoud, and other members of the enterprise, as described in full detail above.

164.   By virtue of these violations of 18 U.S.C. § 1962(c), the KBR Defendants are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT VII**
**Alien Tort Claims Act, 28 U.S.C. § 1350**
**(Against all Defendants)**

165.   Plaintiffs reallege and incorporate by reference the allegations set forth above as if set forth fully here.

166.   Plaintiffs are aliens.

167.   Defendants' actions as set forth above constitute the torts of trafficking in persons, involuntary servitude, forced labor, and slavery.

168.   Trafficking in persons in a modern day form of slavery, and along with involuntary servitude and forced labor constitutes a tort in violation of the law of nations and/or in violation of treaties of the United States.

169.   Defendants' actions as set forth above constitute the torts of prolonged detention, and/or false imprisonment, which also constitute torts in violation of the

1   law of nation and/or in violation of the treaties of the United States.

2   170.   The law of nations includes the Universal Declaration of Human

3

4   Rights, G.A. Res. 217A (Ill.), U.N. Doc. A/810, at 71 (1948); the International

5   Covenant on Civil and Political Rights, Dec. 19, 1966, 999 U.N.T.S. 171, 61 I.L.M.

6   368; the Slavery Convention on the Abolition of Slavery, the Slave Trade and

7

8   Institutions and Practices Similar to Slavery, Sept. 7, 1956, 18 U.N.T.S. 3201, 266

9   U.N.T.S. 3; the International Labour Organisation (ILO) on Fundamental Principles

10  and Rights at Work, International Labour Conference (ILC) 86th Sess., June 19,

11

12  1998, § 2(c), 37 I.L.M. 1233; the Convention Concerning Forced or Compulsory

13  Labour, June 28, 1930, 39 U.N.T.S. 55; and the Convention Concerning the

14

15  Abolition of Forced Labour, June 25, 1957, 320 U.N.T.S. 291.

16  171.   Plaintiffs suffered injuries as a result of these actions by Defendants.

17                          **COUNT VIII**
                           **Breach of Contract**
18                          **(Defendant Daoud)**

19  172.   Plaintiffs reallege and incorporate by reference all of the preceding

20
    paragraphs as if set forth herein.
21

22  173.   Defendant Daoud and/or its co-conspirators entered into a valid

23  employment contract with each of the Deceased Victims and Plaintiff Gurung.

24
    174.   Each Deceased Victim, along with Plaintiff Gurung, paid Defendant
25

26  Daoud and/or its co-conspirators money to secure employment, often incurring

27  significant debt to do so, as part of the obligations under each employment contract.

28

COHEN, MILSTEIN,
SELLERS & TOLL
P.L.L.C.
ATTORNEYS AT LAW

Case No: 08-cv-05626 RGK(AJWx)              - 54 -              FIRST AMENDED COMPLAINT

175.   Defendant Daoud failed to provide the work conditions promised in said contracts, refusing to pay the wage required pursuant to the contracts, forcing the Deceased Victims and Plaintiff Gurung to travel to Iraq in an unsafe and unprotected caravan, and, in the case of those assured of work in Jordan, forcing the Deceased Victims and Plaintiff Gurung to travel to Iraq to work even though many were promised work in Amman, Jordan.

176.   Through such actions that demonstrate a failure to comply with the terms and conditions of employment promised to the Deceased Victims and Plaintiff Gurung, Defendant Daoud and/or its co-conspirators breached employment contracts entered into with the Deceased Victims and Plaintiff Gurung.

177.   As a result of Defendant Daoud's violations of these employment contracts, the Deceased Victims and Plaintiff Gurung suffered damages.

### COUNT IX
### Common Law Fraud
### (Defendant Daoud)

178.   Plaintiffs reallege and incorporate by reference all of the preceding paragraphs as if set forth herein.

179.   Defendant Daoud and its co-conspirators and/or agents acted to recruit the Deceased Victims and Plaintiff Gurung through false representations about the facts, including, *inter alia*, the location of the work to be performed, the nature of the work, the employer, the amount of compensation, the work conditions, and the risk to their lives and safety.  Most of the Deceased Victims were told that they

were going to work at a five star hotel in Amman, Jordan. Defendant Daoud had no such plans to find the workers employment in Jordan. Those who were not told that they would be working in Amman, were instead told that they would be working in an American Camp. Their family members assumed they were going to the United States. Instead, Defendant Daoud intended to ship the Deceased Victims and Plaintiff Gurung to a military base in Iraq in order to meet the goals of contracts Daoud had signed with the Department of Defense and one or more of the KBR Defendants.

180. The Defendant and/or its co-conspirators made these representations for the purpose of inducing the Deceased Victims and Plaintiff Gurung to rely on them.

181. Defendant Daoud knew representations made to the Deceased Victims and Plaintiff Gurung were false, and that the Deceased Victims and Plaintiff Gurung would not agree to travel to Jordan if they knew they were to be forced into unsafe employment in Iraq.

182. The Deceased Victims and Plaintiff Gurung reasonably relied on the false representations made by Defendant Daoud and its agents and/or co-conspirators. This reliance occurred in ignorance of the falsity of the representations made by Defendant Daoud and its agents and/or co-conspirators.

183. The false representations Defendant Daoud and/or its co-conspirators made to the Deceased Victims and Plaintiff Gurung, along with the Deceased

Victims and Plaintiff Gurung's reliance thereon, lead directly to the injuries the Deceased Victims and Plaintiff Gurung suffered.

### COUNT X
### False Imprisonment
### (Defendant Daoud)

184.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs as if set forth herein.

185.    Defendant Daoud acted with malicious intent to confine the Deceased Victims and Plaintiff Gurung in Jordan, and later to compel them into the caravan of cars into Iraq.

186.    The Deceased Victims and Plaintiff Gurung were conscious of the confinement imposed upon them by Daoud and/or its co-conspirators, and tried to contact families in Nepal for assistance.

187.    The Deceased Victims and Plaintiff Gurung did not consent to the confinement imposed upon them by Defendant Daoud and/or its co-conspirators.

188.    Daoud and/or its co-conspirators had no authority to confine the Deceased Victims and Plaintiff Gurung and restrict their ability to leave Jordan, nor was the confinement imposed upon the Deceased Victims and Plaintiff Gurung otherwise privileged.

As a result of Defendant Daoud's actions, and those of its co-conspirators, the Deceased Victims and Plaintiff Gurung suffered severe emotional distress and injury, including the forced transportation to Iraq, where the Deceased Victims

1  were kidnapped and killed.

2                                  **COUNT XI**
                                    **Negligence**
3                            **(Against All Defendants)**

4       189.   Plaintiffs reallege and incorporate by reference all of the preceding

5
6  paragraphs as if set forth herein.Defendants had a duty of reasonable care toward

7  the Deceased Victims and Plaintiff Gurung to ensure that neither Defendants nor

8
9  their agents engaged in conduct leading to or likely to lead to foreseeable harm, , as

10  described herein.  Defendants failed to use due care to protect the Deceased Victims

11  and Budhi Gurung from foreseeable  harm.

12
13      190.   Defendants had a duty to the Deceased Victims and Plaintiff Gurung to

14  take ordinary care to ensure that personnel whom Defendants retained to perform

15  services, were not unfit, incompetent or otherwise dangerous to the Deceased

16
17  Victims and Plaintiff Gurung.

18      191.   At all relevant times, Defendants and/or their agents, had the power,

19  ability, authority and duty to stop engaging in the conduct described herein and to

20
21  intervene to prevent or prohibit such conduct.

22      192.   Defendants and/or their agents breached the duty of care that they

23  owed the Deceased Victims and Plaintiff Gurung.   In engaging in the conduct

24
25  alleged herein, including the retention of personnel, Defendants and/or their agents

26  have not acted as ordinarily prudent and careful persons would act in similar

27  circumstances.

28

1  Defendants and/or their agents' breach of the duty of care that they owed the

2  Deceased Victims and Plaintiff Gurung is the proximate cause of their damages, as

3

4  alleged herein.

5                              **COUNT XII**
                              **Negligent Hiring**
6                          **(Against All Defendants)**

7      193.  Plaintiffs reallege and incorporate by reference all of the preceding

8  paragraphs as if set forth herein.

9

10     194.  The KBR Defendants and/or their agents selected, hired, retained

11  and/or contracted with Daoud to perform work and provide services for KBR

12  facilities in Iraq.  Daoud and/or its agents selected, hired, retained and/or contracted

13

14  with recruiting agencies to hire manpower for services for KBR facilities in Iraq.

15     195.  The KBR Defendants had a duty to the Deceased Victims and Plaintiff

16  Gurung to take reasonable care to ensure that Daoud was not unfit, incompetent or

17

18  otherwise dangerous to Plaintiffs.  Daoud had a duty to the Deceased Victims and

19  Plaintiff Gurung to take reasonable care to ensure that its recruiters were not unfit,

20  incompetent or otherwise dangerous to Plaintiffs.

21

22     196.  Despite actual or constructive knowledge of these characteristics, the

23  KBR Defendants hired, retained, and/or contracted with Daoud to provide services

24  at its facilities in Iraq.  At the time that the KBR Defendants selected, hired,

25

26  retained and/or contracted with Daoud and at all other relevant times, the KBR

27  Defendants knew or reasonably should have known that Daoud personnel were

28

unfit, incompetent, and/or dangerous and that, as a result, would intentionally and/or negligently harm, did harm and would continue to harm the Deceased Victims and Plaintiff Gurung, as alleged herein.

197.  Despite actual or constructive knowledge of the characteristics of the recruiting companies, Daoud hired, retained, and/or contracted with the recruiting companies to provide services.  At the time that Daoud selected, hired, retained and/or contracted with these recruiting companies and at all other relevant times, Daoud knew or reasonably should have known that the recruiting companies were unfit, incompetent, and/or dangerous and that, as a result, would intentionally and/or negligently harm, did harm and would continue to harm the Deceased Victims and Plaintiff Gurung, as alleged herein.

198.  The KBR Defendants failed to exercise reasonable care in selecting, hiring, retaining and contracting with Daoud whom the KBR Defendants and/or their agents retained to perform work.  The KBR Defendants breached their duty to the Deceased Victims and Plaintiff Gurung, who suffered harm and injury.

199.  Daoud failed to exercise reasonable care in selecting, hiring, retaining and contracting with recruiting companies whom Daoud and/or its agents retained. Daoud breached its duty to the Deceased Victims and Plaintiff Gurung, who suffered harm and injury.

200.  As a direct and proximate result of these violations, the Deceased Victims and Plaintiff Gurung suffered injuries as further alleged herein.

201.  As a direct and proximate result of Defendants' negligent selection, hiring, retention and contracting, the Deceased Victims and Plaintiff Gurung have suffered injuries entitling them to damages in amounts to be proven at trial.

## COUNT XIII
### Negligent Supervision
### (Against the KBR Defendants)

202.  Plaintiffs reallege and incorporate by reference all of the preceding paragraphs as if set forth herein.

203.  When engaging in the wrongful conduct alleged herein, Daoud was acting as an employee and/or agent of the KBR Defendants.

204.  The KBR Defendants had a duty to the Deceased Victims and Plaintiff Gurung to take reasonable care to ensure that Daoud personnel whom the KBR Defendants supervised, were not unfit, incompetent or otherwise dangerous to the Deceased Victims and Plaintiff Gurung.

205.  The KBR Defendants exercised control over the operative details of the services provided by Daoud personnel.

206.  The KBR Defendnants also had the authority to supervise, prohibit, control, and/or regulate Daoud personnel so as to prevent these acts and omissions from occurring.  The KBR Defendants also had the ability to halt Daoud's work contract until such time as the tortious conduct alleged herein were stopped and/or prevented.

207.  The KBR Defendants knew or reasonably should have known that the

Daoud personnel would create a risk of harm and actually harm or otherwise violate the Deceased Victims's and Plaintiff Gurung's rights, and that, as a direct and proximate result of those violations, the Deceased Victims and Plaintiff Gurung would suffer injuries as alleged herein.

208.   The KBR Defendants knew or reasonably should have known that unless they intervened to protect the Deceased Victims and Plaintiff Gurung and properly supervise, prohibit, control and/or regulate the conduct described herein, Daoud personnel would perceive their acts and omissions as being ratified and condoned.

209.   The KBR Defendants failed to exercise due care by failing to supervise, prohibit, control or regulate Daoud personnel.   The KBR Defendants breached their duty to the Deceased Victims and Plaintiff Gurung, who suffered harm and injury.

210.   As a direct and proximate result of the KBR Defendants' negligent supervision of Daoud personnel, the Deceased Victims and Plaintiff Gurung have suffered injuries entitling them to damages in amounts to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray that this Court will enter an order:

(a)  Entering judgment in favor of each of the Plaintiffs on all counts of the Complaint;

(b)  Awarding each of the Plaintiffs damages, including compensatory and punitive damages;

(c)  Granting judgment in favor of Plaintiffs and against Defendants on claims brought under RICO as set forth in Counts II through VI, and awarding each of the Plaintiffs treble damages;

(d)  Granting each of the Plaintiffs equitable relief, permanently enjoining Defendants from further engaging in abuses against Plaintiffs and their fellow laborers;

(e)  Awarding each of the Plaintiffs the costs of suit including reasonable attorneys' fees, and

(f)  Granting such further relief as this Court deems just and equitable.

Dated:        December 22, 2008

Respectfully submitted,

Paul L. Hoffman
SCHONBURN DESIMONE SEPLOW
HARRIS & HOFFMAN LLP
723 Ocean Front Walk
Venice, CA 90291
Tel: 310-396-0731
Fax: 310-399-7040

Agnieszka M. Fryszman
Matthew K. Handley

COHEN, MILSTEIN,
SELLERS & TOLL
P.L.L.C.
ATTORNEYS AT LAW

Case No: 08-cv-05626 RGK(AJWx)          - 63 -          FIRST AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Maureen E. McOwen
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, D.C.  20005
Tel:  202-408-4600
Fax: 202-408-4699

Attorneys for Plaintiffs