UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RAMCHANDRA ADHIKARI, et al.,    §
                                §
        Plaintiff,              §
                                §
v.                              §    CIVIL ACTION NO. 09-cv-1237
                                §
DAOUD & PARTNERS, et al.,       §
                                §
                                §
                                §
        Defendants.             §

## MEMORANDUM AND ORDER

Pending before the Court is the Motion to Dismiss Plaintiffs' First Amended Complaint ("FAC", Doc. No. 58) filed by Defendants Kellogg Brown & Root, Inc.; Kellogg Brown & Root Services, Inc.; KBR, Inc.; KBR Holdings, LLC; Kellogg Brown & Root, LLC; KBR Technical Services, Inc.; Kellogg Brown & Root International, Inc.; Service Employees International, Inc.; and Overseas Administration Services, Ltd. ("KBR" collectively) (Doc. No. 138). For the following reasons, KBR's Motion must be granted in part and denied in part.

## I.    BACKGROUND

For purposes of this Motion to Dismiss, the Court accepts the factual allegations in Plaintiffs' FAC as true. *Frame v. City of Arlington*, 575 F.3d 432, 434 (5th Cir. 2009). This case is brought by Plaintiff Buddi Prasad Gurung ("Gurung") and the surviving family members of twelve other men: Prakash Adhikari, Ramesh Khadka, Lalan Koiri, Mangal Limbu, Jeet Magar, Gyanendra Shrestha, Budham Sudi, Manoj Thakur, Sanjay Thakur, Bishnu Thapa, and Jhok Bahadur Thapa ("Deceased" collectively). All Plaintiffs are Nepali citizens and currently reside in Nepal.

1

Defendant Daoud & Partners ("Daoud") is a Jordanian corporation. Daoud has entered into a number of contracts with the United States for the provision of services at military bases, including Al Asad Air Base in Iraq. (FAC ¶ 22.) Defendant KBR is a business conglomerate including a parent corporation with its principal place of business in Houston, Texas, and several divisions, subsidiaries, and associated partnerships with pecuniary interests in the outcome of this case. One such KBR subsidiary serves as a contractor with the United States government to perform specific duties at United States military facilities in Iraq. (FAC ¶¶ 23-29.)

The gravamen of the FAC is that, in an effort to fulfill their contractual obligations, Defendants "willfully and purposefully formed an enterprise with the goal of procuring cheap labor and increasing profits" and thereby engaged in human trafficking. (FAC ¶ 54.) Plaintiffs allege that the Deceased, whose ages ranged from 18 to 27, were recruited from their several places of residence in August of 2004 by Moonlight Consultant Pvt, Ltd. ("Moonlight"), a recruiting company based in Nepal. (*Id.* ¶ 62.) Most of the men were told that they would be employed by a luxury hotel in Amman, Jordan. (*Id.* ¶ 63.) Some were told that that they would be working in an American camp. (*Id.*) Although there is no indication that they were told where the camp would be, their family members assumed they were going to the United States. (*Id.*) All of the men were led to believe that they would not be placed in a dangerous location, and that if they found themselves in a dangerous area, they would be sent home at the employer's expense. (*Id.*) They were promised a salary of approximately $500 per month. (*Id.* ¶ 64.) The men and their families incurred substantial debt to pay the brokerage fees in seeking out this employment (*Id.* ¶ 65.)

After they were recruited, Plaintiffs were then transferred to the custody of a Jordanian job brokerage company that operates in Amman called Morning Star for Recruitment and Manpower Supply ("Morning Star"). (*Id.* ¶ 66.) The men were held in Jordan by Daoud and agents of Daoud; all of the men were required to turn over their passports to Daoud. (*Id.* ¶¶ 67-68.) It was there that they first discovered that they were actually being sent to Iraq to work on Al Asad Air Base, north of Ramadi, Iraq. (*Id.* ¶ 70.) Several of the men phoned relatives in Nepal, expressing concern and fear about their futures. (*Id.* ¶¶ 70-71.) At least one of the Deceased informed his family that he and the other men were being kept in a dark room and were unable to see. (*Id.* ¶ 72.) In Jordan, the men were also informed that they would be paid only three quarters of what they were initially promised. (*Id.* ¶ 73.)  Daoud transported the Deceased into Iraq on or about August 19, 2004, via an unprotected automobile caravan of seventeen vehicles. (*Id.* ¶ 75.) They traveled along the Amman-to-Baghdad highway, which was known to be a highly dangerous. (*Id.* ¶¶ 76-81.) Daoud was aware of the significant and well-known risks involved in traveling on this highway at the time Plaintiffs were thus transported. (*Id.*) No security was provided for the caravan. (*Id.* ¶ 81.)

As they were nearing Al Asad base, the two lead cars in which the Deceased were being transported were stopped by a group of men who later revealed themselves to be members of the Ansar al-Sunna Army, an insurgent group in Iraq.  (*Id.* ¶¶ 81-83.) The men told the drivers to leave the Deceased at the checkpoint, and that the Americans would come from the base to pick them up. (*Id.* ¶ 81.)

Between August 20 and August 24, the Ansar al-Sunna Army posted an internet statement that it had captured the Deceased, posted pictures of the Deceased, and sent a

video of ten of the Deceased to the Foreign Ministry of Nepal. (*Id*. ¶¶ 83-86.) Many of the family members of the Deceased saw the images broadcast on Nepali television. In the video, the Deceased described their trip to Iraq, stating that they "were kept as captives in Jordan at first" and were not allowed to return home. (*Id*.) They all stated that they were forced to go to Iraq, and were visibly very frightened. (*Id*.)

On or about August 31, 2004, international media outlets broadcasted video of the Ansar al-Sunna Army executing the Deceased. (*Id*. ¶ 86.) The group beheaded one of the men, and shot the other eleven men in the back of their heads. (*Id*.)

Like the Deceased, Plaintiff Gurung was recruited from his residence in Nepal. (*Id*. ¶ 91.) He was sent to Delhi, India for twenty days and then went on to Amman, Jordan for another twenty days. (*Id*.) Gurung was transported to Iraq in one of the cars of the caravan in which the Deceased were also traveling. (*Id*. ¶ 92.) Gurung's car was not captured by the insurgents, and he arrived at Al Asad base as scheduled. (*Id*. ¶ 93.) There, he was supervised by KBR in his duties as a warehouse loader/unloader. (*Id*.) Upon learning about the death of the Deceased, Gurung became frightened and expressed his desire to return to Nepal. He was told by both Daoud and KBR that he could not leave until his work in Iraq was complete. (*Id*.) After fifteen months, during which he experienced frequent mortar fire without protection, Gurung was permitted to return to Nepal. (*Id*. ¶¶ 95-96.)

Plaintiffs allege that KBR knew or should have known prior to August 2004 of the circumstances under which the men were being brought to Iraq to work for them. KBR was repeatedly told by the workers brought to Iraq from India, Sri Lanka, and Nepal that they did not want to come to Iraq and that they were not informed in advance

that they were being brought there. (*Id.* ¶ 98.) Furthermore, Daoud was previously involved in an incident in which eighteen Indian laborers were forcibly kept in a camp in Fallujah where they worked, although they had quit their jobs months before. (*Id.* ¶ 102.)

In addition, KBR knew of complaints made by the workers during their time in Iraq regarding their safety and security, and the provision of food, water, and health care. (*Id.* ¶ 100.) Finally, Plaintiffs allege that KBR had the authority to terminate all subcontractors who mistreated employees, unlawfully compelled employees to perform work, or unlawfully compelled employees to remain somewhere against their will. (*Id.* ¶ 101.)

Pursuant to these allegations, Plaintiffs bring causes of action against Defendants under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595; the Racketeering Influenced and Corrupt Organizations Act  ("RICO"), 18 U.S.C. § 1962(c), as well as conspiracy to violate the same; the Alien Tort Statute ("ATS"), 28 U.S.C § 1350; and various common law claims including, in particular, negligence claims against KBR. KBR now moves to dismiss these actions pursuant to Federal Rule of Civil Procedure 12(b)(1), claiming that this Court lacks subject matter jurisdiction to hear these claims, and Rule 12(b)(6), alleging that Plaintiffs have failed to state a claim upon which relief can be granted. This case was initially filed in the United States District Court for the Central District of California, but was transferred to this Court pursuant to KBR's motion.

## II.      STANDARD OF REVIEW

### A.      FED. R. CIV. P. 12(b)(1)

The court must dismiss a case when the plaintiff fails to establish subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). "It is incumbent on all federal courts to dismiss an action whenever it appears that subject matter jurisdiction is lacking." *Stockman v. Federal Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (internal quotation marks and citation omitted). The burden of establishing federal jurisdiction rests on the party seeking the federal forum. *Stockman*, 138 F.3d at 151.

**B.     FED. R. CIV. P. 12(b)(6)**

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. ---, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

6

defendant is liable for the misconduct alleged. *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not be sufficient. *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 555).

## III.    TVPRA

### A.    Extraterritoriality

KBR's first objection to Plaintiffs' claims under the TVPRA is that this Court lacks jurisdiction to hear these claims under the principle of extraterritoriality. Although 18 U.S.C. Section 1596 grants U.S. courts "extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under Sections 1581, 1583, 1584, 1589, 1590, or 1591," which comprise the substantive provisions of the TVPRA, KBR points out that this provision had not been enacted at the time that the alleged offenses occurred. Thus, argues KBR, Plaintiffs are relying on substantive provisions of the TVPRA that were not applicable outside of U.S. territory during the period in question. Although Section 1596 now grants this Court jurisdiction to hear extraterritorial claims under the TVPRA, KBR argues that the presumption against retroactive application of statutes bars this Court from relying on Section 1596 to adjudicate events occurring before its enactment.

A statute that impairs vested substantive rights under existing laws or creates new obligations or duties with respect to events already past are subject to a presumption against retroactivity. *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 947 (1997) (citations omitted).  In *Hughes Aircraft*, the Court found that an amendment

to the jurisdictional provision of the False Claims Act ("FCA") permitting certain private parties, in addition to the government, to bring suits, could not be applied retroactively. *Id.* at 949. The Court reasoned that, because these private plaintiffs had different incentives for bringing suit than did government officials, applying the provision retroactively subjected defendants to new disability. *Id.*

Subsequently, however, in *Republic of Austria v. Altmann*, 541 U.S. 677 (2004), the Court held that an amendment to the Foreign Sovereign Immunities Act ("FSIA") that effectively enlarged federal court jurisdiction to hear certain claims against foreign sovereigns could be applied retroactively because it did not affect substantive rights. The Court distinguished *Hughes Aircraft*, stating:

> When a "jurisdictional" limitation adheres to the cause of action in this fashion—when it applies by its terms regardless of where the claim is brought—the limitation is essentially substantive. In contrast, the FSIA simply limits the jurisdiction of federal and state courts to entertain claims against foreign sovereigns. The Act does not create or modify any causes of action.

*Id.* at 695 n.15. The Court then looked to the purpose of FSIA and went on to explain that "[t]he principal purpose of foreign sovereign immunity has never been to permit foreign states and their instrumentalities to shape their conduct in reliance on the promise of future immunity from suit in United States courts." *Id.* at 696.

The instant proceeding is more analogous to *Republic of Austria* than to *Hughes Aircraft*. As with *Republic of Austria*, this Court does not deprive Defendants of any vested right in applying Section 1596 to the events alleged in Plaintiffs' FAC. The Defendants do not now, nor did they in 2004, have the right to traffic human beings at home or abroad. Furthermore, unlike the jurisdictional provision at issue in *Hughes Aircraft*, Section 1596 does not create any additional duties for, or obligations upon,

8

Defendants. Regardless of the extent of this Court's jurisdiction to hear claims, the passage of the TVPRA plainly created an express public duty to refrain from acts of trafficking. That a defendant, subject to the laws of the United States, chose to commit a criminal act in a location where this Court may not have had jurisdiction does not alter the criminality of the act itself. Section 1596, which explicitly recognizes this Court's jurisdiction over extraterritorial TVPRA claims, only enlarges jurisdiction of courts within the United States, but does not change the operative substantive laws. Thus, the concerns surrounding retroactive application of this statute do not apply.

Furthermore, to find that Section 1596 did not apply retroactively would contravene the purpose of the TVPRA. While the substantive provisions of the TVPRA, which were in place when the alleged acts took place, did not explicitly apply extra-territorially until the passage of Section 1596, human trafficking is by nature an "international" crime; it is difficult clearly to delineate those trafficking acts which are truly "extraterritorial" and those which sufficiently reach across U.S. borders. Accordingly, the thrust of the TVPRA would be severely undermined by a holding that U.S. defendants who gained commercial advantage in this country through engaging in illegal human trafficking were free from liability, so long as the trafficking acts themselves took place outside of American borders. Therefore, the Court finds that the traditional presumption against the retroactive application of statutes would contravene the clear purpose of the TVPRA, and would inappropriately absolve those who could in fact be guilty of violating its provisions.

KBR further contends that, by choosing to extend jurisdiction over alleged TVPRA criminal offenses but declining expressly to include Section 1595, which allows

for civil remedies under the TVPRA, Congress manifested its intent not to authorize extraterritorial civil claims. (Def. Mot. at 16.) This argument is unavailing. Section 1596 identifies the substantive criminal provisions of the TVPRA and expands the circumstances under which they can be enforced. The civil remedies authorized by Section 1595 attach when any claim is properly brought before a court of law. In this case, therefore, Section 1595 remedies are triggered because, as discussed above, Plaintiffs bring this case pursuant to this Court's statutorily granted jurisdiction. This is consistent with the structure of the statute, which contains substantive criminal provisions enforceable through civil remedies. To hold that the jurisdictional grant of Section 1596 excludes the remedies provided in Section 1595 would be both illogical and in contravention of the purpose of the statute.

Finally, KBR argues that to hold that Section 1596 applies retroactively would violate constitutional guarantees against ex post facto laws, because the TVPRA is a criminal statute that merely "piggy-backs" civil remedies. (Def. Mot. at 16.) The Ex Post Facto Clause's prohibition is triggered only by a statute that criminally punishes an act that was not criminal when committed, makes the punishment for a crime more burdensome after its commission, or deprives a criminally charged person of a defense that was available when the act was committed. *Wilson v. Lensing*, 943 F.2d 9 (5th Cir. 1991) (citing *Collins v. Youngblood*, 497 U.S. 37 (1990)). Changes in the manner in which a criminal case is adjudicated, as opposed to changes in the substantive law of crimes, do not violate the Ex Post Facto Clause. *Collins*, 497 U.S. at 45.

Here, as previously discussed, the kind of human trafficking in which Plaintiffs claim that Defendants engaged was criminal at the time that the alleged incidents

occurred. Section 1596 did nothing to alter or expand the criminality of the actions themselves. Therefore, a conclusion that Section 1596 applies to this case does not violate the Ex Post Facto Clause of the Constitution.

### B.  Sufficiency of Pleadings

KBR also contends that Plaintiffs' TVPRA allegations fail because they do not allege facts sufficient to support their claims. Under *Iqbal* and *Twombly*, a plaintiff must plead facts in its complaint that make the allegations facially plausible. *Iqbal*, 129 S. Ct. at 1949. Pleadings that offer no more than conclusory allegations and which track the language of the statute itself are insufficient. *Id.* (quoting *Twombly*, 550 U.S. at 555).

In this case, Plaintiffs' pleadings meet the *Iqbal* standard. Plaintiffs have sufficiently alleged facts to make out claims under Section 1595 and the substantive provisions of the TVPRA.[1] Plaintiffs' complaint alleges that KBR actively participated in and knowingly benefited from a venture that involved forced labor and trafficking. (FAC ¶¶ 97-103.) Plaintiffs further allege facts that make these claims plausible. In the FAC, they allege that the Deceased were misled and deceived into working in a dangerous area, held in a dark room, had their passports taken away, and were transported against their will along a knowingly dangerous route, all while being told that they could not return to their home country. They further allege that KBR knew this was occurring, both through statements and complaints made by laborers brought to Iraq, as well as through previously publicized complaints and incidents involving Daoud. *Id.* They also allege that

---

[1] 18 U.S.C. Section 1595(a) provides: "An individual who is a victim of a violation may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees." Thus, in this case, Plaintiffs must allege and provide support for the contention that Defendants participated in or knowingly benefited from forced labor (Section 1589) or trafficking (Section 1590).

KBR deliberately formed an enterprise with the purpose of trafficking cheap labor to U.S. military installations in Iraq in order to earn a profit, and that they performed concrete acts to further this purpose. (FAC ¶¶ 131-36.) Whether these allegations, if proven, will lead to a Plaintiffs' verdict is irrelevant at this stage. Under *Iqbal*, all that is required at this pleading stage is that the claims made by Plaintiffs are plausible, not that they show probability of success. By providing significant, though not indisputable, factual support for their allegations of trafficking, Plaintiffs meet that burden in this case.

## IV.    ALIEN TORT STATUTE

KBR also avers that Plaintiffs' claims under the Alien Tort Statute ("ATS") fail because they do not allege state action, they are not cognizable under *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004), and they are preempted by claims brought under the TVPRA.

### A.    State Action

While some circuits require that any claims brought under the Alien Tort Statute allege state action, other circuits have explicitly recognized exceptions to this requirement. In *Kadi v. Karadzic*, 70 F.3d 232, 239 (2d Cir. 1995), the Second Circuit held that, for certain categories of action, including genocide, the scope of the law of nations is not confined solely to state action but reaches conduct of private individuals. Other circuits have since elaborated upon this finding. *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1266-67 (11th Cir. 2009) (stating that "plaintiffs need not plead state action for claims of torture and murder perpetrated in the course of war crimes"); *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 188 (2d Cir. 2009) (finding that a private individual will be held liable under the ATS if he "acted in concert with" the state, that is,

"under color of law") (citations omitted); *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 741 (9th Cir. 2008) (holding that the district court correctly found that defendants were not "States or State-like organizations" for purposes of international law or crimes against humanity under ATS); *Doe v. Unocal Corp.*, 963 F. Supp. 880, 891-892 (C.D. Cal. 1997) (noting that "forced labor, is among the handful of crimes . . . to which the law of nations attributes individual liability" such that state action is not required). The Fifth Circuit has yet to address this precise issue.

In light of this precedent, this Court recognizes that the state action requirement under the ATS is not absolute. KBR argues that, to the extent that courts have recognized any exception to the state action requirement for ATS claims, they have done so only in instances where the crimes alleged by the plaintiff were so grave as to rise to the level of war crimes or genocidal acts. According to KBR, the crimes alleged here fall significantly short of this level. Plaintiffs do not deny that courts have regularly required that claims brought under the ATS allege some form of state action. Rather, they argue that state action is a requirement only for claims for which state action is an element of the law of nations violation that gives rise to the ATS claim. In other words, whether a claim against a private individual is actionable under the ATS is determined by the nature and requirements of the underlying offense. This argument is consistent with the widely accepted notion that slave trade, which is traditionally carried out by private actors, does not require state action in order to constitute a violation of the law of nations. *See, e.g.*, RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 404; Supplementary Convention on the Abolition of Slavery, the Slave Trade and Institutions and Practices Similar to Slavery, 1956, art. 3 § 1, Sept. 7, 1956, 18 U.S.T. 3201, 226 U.N.T.S. 3 (prescribing

penalties for "persons" convicted of various forms of slavery). Plaintiffs' argument finds further support in recent ATS case law. *See Kadic v. Karadzic*, 70 F.3d 232, 241 (2d Cir. 1995) (finding that, because evolving standards of international law govern who is within the ATS jurisdictional grant, courts must examine the offense of which the private defendant is accused in determining ATS actionability); *Beanal v. Freeport-McMoRan, Inc.*, 969 F. Supp. 362, 371 (E.D. La. 1997) (finding that state action is not required for all international torts covered by the ATS, as certain conduct, like genocide, violates the law of nations whether committed by a state or private actor).

This Court finds Plaintiffs' arguments and reasoning to be based on sound principle. Although, as Plaintiffs point out, federal courts of appeal have explicitly found exceptions to the state action requirement only in the context of genocide or war crimes, this Court recognizes that internationally accepted prohibitions on those acts are not limited to states, but also extend to private individuals. Accordingly, ATS claims for violations of those offenses do not require state action. The law cited above makes it clear that the state action requirement is not inherent to the ATS; rather, its frequent and consistent application by courts for claims brought under the ATS stems from the fact that, for the majority of crimes recognized as universal norms and international law, the accused actor must be a state. Thus, to the extent that Plaintiffs can show that *private* acts of trafficking have become universally prohibited, the ATS state action requirement does not apply.

As elaborated upon further below, Plaintiffs have in fact met that burden. It is apparent from the findings of both judicial and academic authorities, discussed later in this Memorandum and Order, that human trafficking and forced labor, whether

committed by states or private individuals, have been recognized as violations of *jus cogens* norms, and therefore fall within the jurisdictional grant of the ATS.

### B.      Cognizable under *Sosa*

Claims cognizable under the ATS statute are those that are "specific, universal, and obligatory" international legal norms. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004). In *Sosa*, the Court stated that, when deciding whether an alleged norm of international law is sufficiently definite that violation thereof will support cause of action under the ATS, the court, in absence of any treaty, or of any controlling executive or legislative act or judicial decision, must resort to

> the customs and usages of civilized nations and, as evidence of these, to works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.

*Id.* at 734 (quoting *The Paquete Habana,* 175 U.S. 677, 700 (1900)). Furthermore, "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Id.* at 732-33. The existence of a norm or customary international law is one determined, in part, by reference to the custom or practices of many states and the broad acceptance of that norm by the international community. *Abdullahi v. Pfizer, Inc.*,  562 F.3d 163, 176 (2d Cir. 2009). Furthermore, whether the treaty that embodies the alleged crimes is self-executing is relevant to, but not determinative of, the question of whether the norm permits ATS jurisdiction. *Id.* It is important to distinguish between those claims that are not actionable under the ATS because this Court lacks jurisdiction, from those that should be dismissed

due to insufficient pleadings. *See John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1006 (S.D. Ind. 2007) (finding that "to establish subject matter jurisdiction under the ATS it should be sufficient that plaintiffs allege an arguable violation of the law of nations," which is different from whether they adequately plead a violation of the law of nations).

Plaintiffs cite to several documents of international consensus that prohibit the modern forms of forced labor alleged in the FAC. (FAC ¶ 170.)  Plaintiffs also point to numerous international conventions which prohibit human trafficking. (*Id.*) Numerous courts within the United States have found trafficking, forced labor, and involuntary servitude cognizable under ATS. *See, e.g.*, *Licea v. Curacao Drydock Co., Inc.*, 584 F. Supp. 2d 1355 (S.D. Fla. 2008) (finding that alleged forced labor and international human trafficking of plaintiff by operator of a drydock facility constituted violations of international law); *In re World War II Era Japanese Forced Labor Litigation*, 164 F. Supp. 2d 1160, 1179 (N.D. Cal. 2001) (holding that forced labor violates the law of nations); *Doe v. Unical Corp.*, 963 F. Supp. 880, 892 (C.D. Cal. 1997) (allegations that defendants participated and benefited from forced labor sufficient to establish jurisdiction under the ATS).

The Court finds this sufficient to establish that the trafficking and forced labor alleged in this FAC qualify as universal international norms under *Sosa*, such that they are actionable under ATS.  The Declaration of Professor William J. Aceves, in which he describes the overwhelming consensus regarding the status of forced labor and trafficking as international crimes, only provides further support for this conclusion. (Pl. Resp., Ex.

15.)[2] In their FAC, Plaintiffs allege that they were deceived and coerced into traveling to Iraq to work for KBR, thereby making them victims of human trafficking and forced labor. Whether these crimes have been sufficiently pled is a separate issue with no bearing upon this Court's jurisdiction to consider the claims. Thus, this Court has jurisdiction to consider Plaintiffs' ATS claims.

## C.   TVPRA Preemption

KBR further alleges that Plaintiffs' ATS claims are preempted by those brought pursuant to the TVPRA. Because few courts have addressed preemption specifically in the context of the TVPRA, it is helpful to look to the case law addressing this very issue with respect to the Torture Victim Protections Act ("TVPA").

There is a clear divide among circuits as to the preemptive effect of the TVPA on claims brought under ATS. According to some circuits, the enactment of the TVPA did not diminish the scope of the ATS in any way. *See Kadic v. Karadzic*, 70 F.3d 232, 241 (2d Cir. 1995) ("[t]he scope of the Alien Tort Act remains undiminished by enactment of the Torture Victim Act"); *Aldana v. Del Monte Fresh Produce, Inc.*, 416 F.3d 1242, 1250 (11th Cir. 2005) (finding that plaintiff may bring distinct claims under both the TVPA and the ATS). The Seventh Circuit, however, disagrees with this finding. *See Enaharo v. Abubakar*, 408 F.3d 877, 885 (7th Cir. 2005) (finding that creation of a specific statutory cause of action under the TVPA preempts ATS claims).

---

[2] The Court has considered Defendant's Motion to Strike Professor Aceve's Declaration (Doc. No. 148). In light of the fact that *Sosa* anticipates that courts may look to jurists and commentators for evidence as to the content of international law, *Sosa*, 542 U.S. at 734, and that courts routinely use declarations of academic experts to assist them in deciding upon subject matter jurisdiction under the ATS, this Court finds that this Motion should be denied. Nonetheless, based on the international agreements and case law cited by Plaintiffs, the Court finds that Professor Aceve's Declaration is not necessary to its determination that the crimes alleged in Plaintiffs' FAC create actionable claims under the ATS.

We choose to adopt the reasoning of the Second and Ninth Circuits in holding that the TVPRA and the ATS provide separate and distinct causes of action for the alleged crimes. Particularly at this preliminary stage in the litigation, Plaintiffs should be given the chance to proceed on both theories in order to assess over the course of discovery which best captures the nature of the events that took place, and the remedies that are sought.

## V.   RICO CLAIMS

KBR objects to Plaintiffs' RICO claims on numerous grounds. Each of these objections will be considered in turn:

### A.   Subject Matter Jurisdiction

KBR first asserts that this Court lacks subject matter jurisdiction over these claims, because RICO does not allow for subject matter jurisdiction over alleged foreign conduct with only foreign effects.[3] Courts have created two basic tests for subject matter jurisdiction in RICO actions that involve activity abroad: the "conduct" test, which in essence asks whether the fraudulent conduct that forms the alleged violation occurred in the United States, and the "effects" test, which asks whether conduct outside the United States has had a substantial adverse effect on American investors or securities markets. *Robinson v. TCI/US W. Commc'ns Inc.*, 117 F.3d 900, 905 (5th Cir. 1997).

### 1.   Extraterritorially Indictable RICO offenses

---

[3] In their Response, Plaintiffs aver that extraterritorial concerns do not apply in this case, because the Al Asad base is "subject to the exclusive control and authority of the United Nations Multinational Force-Iraq," citing *Rasul v. Bush*, 542 U.S. 466, 480 (2004). (Pl. Resp. at 13-14.) While the Court has misgivings about the applicability of *Rasul* to the specific circumstances of this case, we find it unnecessary to reach this question. As a significant portion of the events and conduct that make up the alleged RICO violation took place outside of the Al Asad base, we find that, regardless of the status of the base, it is necessary to perform an extraterritorial RICO analysis. Furthermore, because we do not reach this question, we also find it unnecessary to consider KBR's Motion to Strike the declaration of Maureen E. McOwen and the exhibit attached thereto—a chart comparing U.S. jurisdiction and control at U.S. military bases in Iraq, Cuba, and Bermuda. The Court did not consider this evidence in its analysis.

As a preliminary matter, Plaintiffs argue that the predicate acts of which the FAC alleges Defendants are guilty are extraterritorially indictable, thereby making the conduct/effects analysis unnecessary with respect to their RICO claims. RICO applies to any act that is indictable under specified provisions of Title 18, including 18 U.S.C. Sections 1589, 1590, and 1592, the offense alleged here. 18 U.S.C. § 1961. Plaintiffs aver that the Military Extraterritorial Jurisdiction Act ("MEJA"), 18 U.S.C. § 3261, renders the offenses on which their RICO claims are predicated extraterritorially indictable, thereby removing the extraterritoriality concerns of the alleged RICO violations. MEJA provides:

> Whoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States while employed by or accompanying the Armed Forces outside the United States . . . shall be punished as provided for that offense."

18 U.S.C. § 3261(a). KBR does not controvert Plaintiffs' assertion that, if the offenses upon which the RICO claims are predicated are extraterritorially indictable, then extraterritoriality concerns do not apply to their RICO claims. Instead, KBR attempts to limit MEJA's applicability to those federal statutes that reference the "special maritime and territorial jurisdiction" of the United States. This Court finds that imposing such a limitation is inappropriate. As Plaintiffs point out, MEJA indictments have been issued and upheld for violations of federal statutes of general applicability, or those enacted pursuant to Congress's enumerated powers as opposed to U.S. special maritime and territorial jurisdiction. (*See* Pl. Supp. Brief, Doc. No. 167, at 7.) Sections 1589, 1590, and 1592, as federal laws of general applicability, could, under MEJA, therefore also extend

extraterritorially to parties employed by the United States Armed Forces, including KBR. This Court therefore holds that, because the alleged predicate offenses can be indicted extraterritorially, the RICO allegations at issue here are not subject to extraterritoriality limitations indicated in the conduct and effects tests. Nonetheless, because of MEJA's novelty and the relatively limited contexts in which it has been applied, we will now proceed through the conduct and effects analysis so as to avoid resting our jurisdictional finding on a relatively murky area of the law.

### 2. Conduct Test

As to the conduct test, circuits are divided as to the nature of the conduct necessary to establish jurisdiction. The Second and District of Columbia Circuits have adopted a more restrictive position in which the domestic conduct must have been "of material importance" to or have "directly caused the acts complained of." *Robinson*, 117 F.3d at 905 (citing *Itoba Ltd. v. Lep Gr. PLC*, 54 F.3d 118, 122 (2d Cir. 1995); *Zoelsch v. Arthur Anderson & Co.*, 824 F.2d 27, 31-33 (D.C. Cir. 1987); *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1045-46 (2d Cir. 1983); *IIT v. Cornfeld*, 619 F.2d 909, 918-21 (2d Cir. 1980) (remaining citations omitted)). The Third, Eighth, and Ninth Circuits, on the other hand, generally require some "lesser quantum of conduct," and look to whether the domestic conduct is significant to, rather than the direct cause of, the alleged crimes. *Id.* (citing *Butte Mining PLC v. Smith*, 76 F.3d 287, 290-91 (9th Cir. 1996); *Grunenthal GmbH v. Hotz*, 712 F.2d 421, 424-25 (9th Cir. 1983); *Cont'l Grain (Australia) Pty. Ltd. v. Pac. Oilseeds, Inc.*, 592 F.2d 409, 420-21 (8th Cir. 1979); *SEC v. Kasser*, 548 F.2d 109, 114 (3d Cir. 1977); *Travis v. Anthes Imperial, Ltd.*, 473 F.2d 515, 524 (8th Cir. 1973)). In *Robinson*, the Fifth Circuit expressly adopted the more restrictive test of the

Second Circuit. *Id.* at 906. Thus, in evaluating the case at hand, we look to whether KBR's domestic conduct was of material importance to, or the direct cause of, the crimes alleged by Plaintiffs.

Here, we cannot find that the conduct test is met. Although, as Plaintiffs point out, it seems that much of the decision making as to KBR contracting was within the United States, the Court finds these actions significantly remote from the alleged acts of trafficking, which occurred between and among Nepal, Jordan, and Iraq. Indeed, according to KBR in its Motion to Transfer Venue (Doc. No. 39), it was only the umbrella contract governing KBR's operation of various military bases in Iraq that was managed in the United States; KBR's subsequent subcontract with Daoud was executed in Iraq. (Def. Mot., Doc. No. 39, at 11.) Plaintiffs offer no facts or evidence to contradict this assertion; this Court therefore accepts it as true. Because the RICO allegations primarily involve the decision making structure between and among KBR, Daoud, and other parties located abroad who are not named in this litigation, we cannot say that the management decisions made in the United States were the direct cause of, or were material to, the alleged harms experienced by Plaintiffs. Thus, the conduct test is not met in this case.

### 3.       Effects Test

We must now look to whether Plaintiffs have satisfied the effects test for extraterritorial jurisdiction. The effects test provides for jurisdiction whenever there are "substantial effects within the United States." *North-South Fin. Corp. v. Al-Turki*, 100 F.3d 1046, 1051 (2d Cir. 1996). The court in *North-South Finance* was careful to distinguish between substantial effects and "remote and indirect effects." *Id.*

KBR cites to several cases to support its contention that Plaintiffs must be actually injured within the United States for the effects test to be met. However, unlike the circumstances of those cases, this case does not involve fraudulent acts concerning securities in which the harms are primarily economic in nature. (Def. Mot. at 5.) *See Norex Petrol. Ltd. v. Access Indus., Inc.*, 540 F. Supp. 2d 438 (S.D.N.Y. 2007); *Interbew v. Edperbrascan Corp.*, 23 F. Supp. 2d 425 (S.D.N.Y 2007). The RICO statute is designed to punish organized criminal activity, the effects of which can be physical and/or economic in nature. That these foreign Plaintiffs experienced the physical effects of the alleged RICO crimes outside of this country is therefore not dispositive in determining whether the effects test has been met, if the economic harms of the alleged violation did reach across American borders.

Accordingly, this Court must examine the domestic effects and determine if they were, in fact, sufficiently substantial. The effects that Plaintiffs allege in this case are that "the supply of cheap labor benefited the RICO participants, which disadvantaged their competitors for [Department of Defense] contracts and impacted the U.S. labor market, and the jobs were not offered to U.S. workers." (Pl. Resp. at 16.) In addition, Plaintiffs point to the fact that the alleged RICO enterprise passed money through the U.S. banking system, and that the contracts were funded by U.S. taxpayers. *Id.*

Taking these allegations as true, as the Court must, this case presents a large American business allegedly engaged in racketeering activity. More specifically, we note that the FAC describes an American defendant engaged in labor trafficking on a systematic, widespread scale. The American defendant gained substantial economic benefit through this activity, and this gain occurred at the expense of other American

companies bidding for the same government contracts. Finally, the alleged rackeeting activity occurred in furtherance of a public purpose, namely the U.S. occupation in Iraq. Regardless of whether these allegations prove true, this Court nonetheless finds that Plaintiffs have sufficiently alleged substantial effects within the United States such that this court may exercise jurisdiction over these claims.

### B.   RICO Standing

KBR further objects to Plaintiffs' RICO claims on the grounds that Plaintiffs lack RICO standing. A plaintiff has RICO standing if he has been "injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 483 (1985). Lost property is not equated with legally protected property rights in procedural due process analysis; what is required is a legal entitlement to business relations unhampered by schemes prohibited by the RICO predicate statutes. *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 (9th Cir. 2002). Plaintiffs in this case allege that, as a result of KBR's conduct, Plaintiffs were compelled to pay out-of-pocket fees to Defendants, suffered a reduction in promised wages, and were prevented from obtaining alternative employment. (FAC ¶¶ 65, 69, 73, 74.)

We find these allegations of financial loss sufficient to establish RICO standing. The Fifth Circuit has recognized that alleged victims of trafficking violations have RICO standing for claims of denied wages. *See Abraham v. Smith*, 480 F.3d 351 (5th Cir. 2007) (reaching the question of whether RICO allegations based on alleged trafficking were sufficiently pled). Thus, the Deceased, in addition to Gurung, would have had standing to bring these claims for relief had they survived.

Instead, Plaintiffs, aside from Gurung, bring this case on behalf of their deceased relatives. The most persuasive authority as to whether the family members of the Deceased have standing to assert these claims is from the Fourth Circuit. It has expressly upheld a number of district court opinions finding that RICO claims survive the death of the injured party. *Faircloth v. Finesod*, 938 F.2d 513, 518 (4th Cir. 1991) (noting that "civil RICO claims do not abate upon the death of the injured party") (citing cases). Although the Fifth Circuit has yet to address this precise issue, we find no reason to reject this principled reasoning.

In addition, there is proximate causation in this case, because the allegations assert financial losses resulting from Defendants' alleged acts of trafficking, not from the untimely death of the Deceased at the hands of terrorists. It is clear from this case, and others brought in other circuits, that the statutory requirements for standing under RICO are not so rigorous as to render Plaintiffs' allegations inadequate.

### C.   Statute of Limitations

KBR also objects to Plaintiffs' RICO claims as a violation of the four-year statute of limitations. This limitation begins to run as soon as Plaintiffs "knew or should have known about this injury." *Rotella v. Wood*, 147 F.3d 438, 439-40 (5th Cir. 1998), *aff'd*, 528 U.S. 549, 555-58 (2000).

Here, KBR alleges that the statute of limitations began to run on either August 19, 2004, or August 24, 2004, the day that the laborers were informed that they were being taken to Iraq, and the day that the Foreign Ministry received the video in which ten of the Deceased stated that they were forcibly taken to Iraq, respectively. Thus, KBR alleges

that Plaintiffs, in bringing this action on August 27, 2008, missed the statute of limitation by three days.

This Court takes note of the fact that more typical cases under RICO involve acts of ongoing securities fraud in which the plaintiffs are not subject to any form of restricted movement, and are often sophisticated participants in commerce. Here, the Deceased were killed before having any significant contact with their family members regarding the circumstances that led them into the custody of terrorists. We cannot assume that, on August 24, 2004 the day the video was sent to the Nepali government, the family members of the Deceased were immediately aware of it or knew of the facts presented in Plaintiffs' RICO claims. In fact, as Plaintiffs point out in their Response, the alleged trafficking enterprise was deliberately concealed by at least some of Defendants, who deceived both Plaintiffs' families as well as the Nepali government into thinking that the men were being taken to Jordan. Such concealment is further evidence of the improbability that the families of the Deceased were sufficiently certain as to their sons' situations to initiate legal proceedings on August 24. (Pl. Resp. at 24.) In addition, Gurung has alleged that, although he was working in Iraq for some time, he was not permitted to leave or travel such that he could take legal action upon realizing that he was the victim of trafficking. We cannot find, in light of the restrictions placed upon his freedom of movement, that the statute of limitations began to run while Gurung was still being held in Iraq. *Cf. Wallace v. Kato*, 549 U.S. 384, 388 (2007) (finding that the limitations for a Section 1983 action began to run when the alleged false imprisonment ended).

Accordingly, this Court cannot find, on the present record, that August 19 and 24, 2004 are the relevant dates from which the statute of limitations should be measured. On August 19, 2004, the men themselves became aware that they were being sent to Iraq, but were prevented from acting upon this knowledge because of the continuing acts of trafficking. On August 24, 2004, it became known to the Nepali government that the Deceased had been captured, but the family members presumably remained unaware of the circumstances that brought them to that tragic situation. This Court finds that, in light of the notably small margin by which KBR asserts that the limitation has been breached, we can conclusively find that Plaintiffs did not become aware of their injuries until after August 27, 2004, and thus there is no statute of limitations violation in this case.

**D.    Plaintiffs Failure to Plead a Violation under Section 1962(c)**

In order successfully to bring an action under RICO, Plaintiffs must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

**1.    Allegations of an Association-In-Fact Enterprise**

KBR contends that Plaintiffs failed adequately to allege an association-in-fact enterprise. In the recent case of *Boyle v. United States*, 129 S. Ct. 2237 (2009), the Supreme Court clarified the pleading standard for alleging an association-in-fact under RICO. There, the Court found that the enterprise was required to have structure, but it need not have an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engaged. *Boyle*, 129 S. Ct. at 2244. In other words, it need not have a hierarchical structure or a chain-of-command. *Id.* An association-in-fact is merely "a group of persons associated together for a common purpose of engaging in a

course of conduct." *Id.* at 2243-44. By alleging that the alleged RICO enterprise acted to fulfill Department of Defense contracts through engaging in a "pattern of racketeering activity for the common illegal purpose of providing trafficked labor at a low cost," Plaintiffs have alleged that KBR was part of a unit that, even absent any decision making structure, worked cooperatively and illegally to achieve that goal. (FAC ¶¶ 132-33.) That they allege no facts to suggest that KBR had any actual contact with Moonlight or Morningstar is of no moment; the allegations that KBR actively associated themselves with Daoud is enough to establish that they were acting as part of an enterprise to achieve a common purpose: the provision of cheap labor for the fulfillment of the government contract.

### 2.    "Racketeering Activity"

Racketeering activity must consist of two or more predicate acts that "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). One method of alleging continuity is to show that the offenses are part of an entity's "regular way of doing business." *Id.* at 241-43. The Court finds that Plaintiffs have sufficiently alleged that KBR regularly employed laborers brought to Iraq against their will. Aside from Plaintiff Gurung, who was in Iraq for the full fifteen months of his contract, Plaintiffs name another Nepali laborer, Sarad Sapkota, who was allegedly brought to Iraq against his will in 2003. (FAC ¶ 98.) They further allege that Sapkota was brought there with ninety other laborers from Sri Lanka and Nepal, who were there under similar circumstances. (*Id.* ¶ 99.) We find these allegations sufficiently plead that bringing in cheap laborers against their will was part and parcel of KBR's operation at Al Asad base. Thus, the pleading requirements for continuity are met.

KBR further alleges that Plaintiffs have not met the standard of *Iqbal* and *Twombly* in alleging the predicate acts necessary for a RICO claim. As KBR points out, the predicate crimes that Plaintiffs allege in their complaint involve the common elements of coercion, deception, and force. (Def. Mot. at 12.)

In accordance with the finding that Plaintiffs have sufficiently pled a violation of the TVPRA, this Court also finds that the predicate acts under RICO have been sufficiently alleged. That Plaintiffs were deceived over the course of their journey to Iraq is made clear; they were all told they would be employed at either a hotel in Jordan or in an area where there would be no danger to their lives. (FAC ¶ 63.) Plaintiffs also allege elements of force and coercion. Plaintiffs incurred extreme financial debt to arrange their promised employment opportunities, they were required to turn over their passports when they arrived in Jordan, and were kept in a room so dark they were unable to see. (FAC ¶ 65, 68, 72.) Plaintiff Gurung was specifically told in Iraq, upon expressing his fear and desire to return home, that he could not leave until his employment was over. (FAC ¶ 94.) The fact that physical force is not explicitly alleged in the Complaint should not be given the weight that KBR assigns it. "Conduct other than the use, or threatened use, of law or physical force may, under some circumstances, have the same effect as the more traditional forms of coercion—or may even be more coercive." *U.S. v. Mussry*, 726 F.2d 1448, 1453 (9th Cir. 1984). That these factual allegations may not be sufficient conclusively to prove the elements of force or coercion is irrelevant; what is significant to the Court at this stage is that they make the predicate acts alleged by Plaintiff plausible.

### 3.    Sufficiency of Plaintiffs' pleadings under Section 1962(d)

To be guilty of a RICO conspiracy, the conspirator must agree "to the objective of a violation of RICO; he need not agree personally to violate the statute." *U.S. v. Marmolejo*, 89 F.3d 1185, 1196 (5th Cir. 1996). "A conspirator must intend to further an endeavor which, if completed, would satisfy all the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997).

In this case, Plaintiffs allege that, in subcontracting with Daoud, KBR willfully entered into an agreement with another party to benefit from and to further the goal of procuring cheap labor and increasing profits. Plaintiffs point out that the predicate acts alleged in their briefs required recruitment, transportation, retention, and supervision. Plaintiffs further allege KBR's knowledge of the recruiting and transporting, and their active participation in the retention and supervision. (FAC ¶¶ 94-102.) These allegations sufficiently allege a violation under 18 U.S.C. Section 1962(d).

### 4.     Vicarious Liability Under RICO

KBR also seeks to dismiss Plaintiffs' alternative theory of KBR's vicarious RICO liability for the actions of Daoud. At this preliminary stage, the FAC does allege facts that would establish an agency relationship between KBR and Daoud. Plaintiffs point out that a contractual relationship existed between KBR and Daoud. KBR is correct that a contract does not automatically create a principal-agent relationship. *See Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 778-79 (5th Cir. 2006); *Avondale Indus. v. Int'l Marine Carriers*, 15 F.3d 489, 494 (5th Cir. 1994). However, because the only burden on Plaintiff at this pleading stage is one of plausibility, the contractual relationship between KBR and Daoud, combined with Plaintiffs'

additional allegations that "KBR had the authority to supervise, prohibit, control, and/or regulate Daoud personnel," meet the *Iqbal* standard in establishing a principal-agent relationship. (FAC ¶ 206.)

## VI.    NEGLIGENCE CLAIMS

KBR avers that Plaintiffs' common law negligence claims should be dismissed as violating the applicable two-year statute of limitations.[4] Because the limitations period on Plaintiffs' negligence claims is two years shorter than that under RICO, the rationale used there will not apply to these claims.

Plaintiffs argue that this Court should invoke the "extraordinary circumstances" doctrine to apply equitable tolling to these negligence claims. (Pl. Resp. at 24-25.) It is true that, in cases of violent civil war or authoritarian regimes, courts have applied equitable tolling to claims brought by plaintiffs unable to vindicate their legal rights because of unrest and instability. *See Jean v. Dorelien*, 431 F.3d 776, 780 (11th Cir. 2005) (citing cases). However, such cases differ in material respects. Most notably, they involve civil unrest at the hands of authoritarian governments that directly prohibited the plaintiffs from bringing their claims to light. *See, e.g., Hilao v. Estate of Marcos*, 103 F.3d 767, 773 (9th Cir. 1996) (tolling statute of limitations for claims of torture, disappearance, and summary execution against former Philippine dictator Ferdinand Marcos until he left power and the country regained democratic rule); *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1146-48 (E.D. Cal. 2004) (tolling statute of limitations during and after El Salvadorian civil war due to fear of retaliation from military, government, and death squads if plaintiffs were to bring litigation in United States); *Doe v. Unocal Corp.*,

---

[4] California Code of Civil Procedure Section 335.1 and Texas Civil Practice and Remedies Code Section 16.003 impose an identical two-year limitations period for personal injuries attributable to the wrongful act or neglect of another.

963 F. Supp. 880, 897 (C.D. Cal. 1997) (stating that ATCA and TVPA claims "should be tolled" during Burmese dictatorship based on plaintiffs' alleged inability to "obtain access to judicial review" in Burma and the "threat of reprisal from [the government]" if plaintiffs attempted to access courts in the United States). While Plaintiffs point out that Nepal was mired in a civil war between the Nepali government and Maoist rebels that lasted until November of 2006, they allege no facts which suggest that this war had a direct and significant impact on the ability of litigants to bring civil claims, particularly against an American company with no connections to the fighting. They allege nothing to suggest that Plaintiffs were prohibited from traveling or were otherwise cut off from the information necessary for them to learn of Defendants' actions for two full years following the death of their sons. Indeed, the "limited contact with the outside world" which Plaintiffs do allege seems more a product of Plaintiffs' geographic location and economic circumstances, rather than the civil conflict itself. Geographic location and personal hardship cannot provide the sole basis for tolling an otherwise applicable statute of limitations.

In addition, because Plaintiffs maintain the possibility of legal recourse through their human rights claims under the TVPRA, the ATS, and RICO, this Court cannot view this as a compelling case for equitable tolling of Plaintiffs' negligence claims under state law. Barring these claims on statute of limitations grounds does not leave Plaintiffs without legal recourse. Thus, in light of the two-year statute of limitations, this Court finds that Plaintiffs' negligence claims against KBR must be dismissed.

## VII.   CONCLUSION

In light of the foregoing, KBR's Motion to Dismiss is hereby **GRANTED IN PART** and **DENIED IN PART**.


**IT IS SO ORDERED**.

**SIGNED** this 3rd day of November, 2009.


KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE