**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **RAMCHANDRA ADHIKARI, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 09-cv-1237** |
| | § | |
| **DAOUD & PARTNERS, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are two renewed motions to dismiss filed by Defendant Daoud & Partners ("Daoud"). The pending motions are Daoud's Renewed Motion to Dismiss Plaintiffs' First Amended Complaint (Doc. No. 236), and Daoud's Renewed Motion to Dismiss the Cross-Claims brought by Defendants Kellogg Brown & Root, Inc.; Kellogg Brown & Root Services, Inc.; KBR, Inc.; KBR Holdings, LLC; Kellogg Brown & Root, LLC; KBR Technical Services, Inc.; Kellogg Brown & Root International, Inc.; Service Employees International, Inc.; and Overseas Administration Services, Ltd. (collectively, "KBR" or the "KBR Defendants") (Doc. No. 238). The pending motions to dismiss renew and expand upon arguments made in Daoud's original motions to dismiss Plaintiffs' First Amended Complaint and KBR's Cross-Claims (Doc. Nos. 187 and 212, respectively).

After considering the motions, all responses thereto, and the applicable law, the Court finds that Daoud's Motion to Dismiss Plaintiffs' First Amended Complaint must be

granted in part and denied in part. Daoud's Motion to Dismiss KBR's Cross-Claims likewise must be granted in part and denied in part.

## I. BACKGROUND[1]

### A. Plaintiffs' Claims

This case is brought by Plaintiff Buddi Prasad Gurung ("Gurung") and the surviving family members of twelve other men: Prakash Adhikari, Ramesh Khadka, Lalan Koiri, Mangal Limbu, Jeet Magar, Gyanendra Shrestha, Budham Sudi, Manoj Thakur, Sanjay Thakur, Bishnu Thapa, and Jhok Bahadur Thapa (collectively, the "Deceased Plaintiffs"). All Plaintiffs are Nepali citizens and currently reside in Nepal.

Defendant Daoud is a corporation that has entered into a number of contracts with the United States for the provision of services at military bases, including Al Asad Air Base in Iraq ("Al Asad"). (Doc. No. 58, "Pl. Am. Compl." ¶ 22.) Defendant KBR is a business conglomerate including a parent corporation with its principal place of business in Houston, Texas, and several divisions, subsidiaries, and associated partnerships with pecuniary interests in the outcome of this case. One such KBR subsidiary serves as a contractor with the United States government to perform specific duties at United States military facilities in Iraq. (*Id.* ¶¶ 23-29.)

The gravamen of Plaintiffs' First Amended Complaint (the "Complaint") is that, in an effort to fulfill their contractual obligations, Defendants Daoud and KBR "willfully and purposefully formed an enterprise with the goal of procuring cheap labor and increasing profits," and thereby engaged in human trafficking. (*Id.* ¶ 54.) Plaintiffs allege that the Deceased Plaintiffs, whose ages ranged from 18 to 27, were recruited from their

---

[1] For purposes of the pending motions to dismiss, the Court accepts the factual allegations in Plaintiffs' First Amended Complaint and KBR's Cross-Claim as true. *Frame v. City of Arlington*, 575 F.3d 432, 434 (5th Cir. 2009).

places of residence in August of 2004 by Moonlight Consultant Pvt, Ltd., a recruiting company based in Nepal. (*Id.* ¶ 62.) Most of the men were told that they would be employed by a luxury hotel in Amman, Jordan. (*Id.* ¶ 63.) Some were told that that they would be working in an American camp. (*Id*.) Although there is no indication that they were told where the camp would be, the Deceased Plaintiffs' family members assumed that they were going to the United States. (*Id*.) All of the men were led to believe that they would not be placed in a dangerous location, and that, if they found themselves in a dangerous area, they would be sent home at the employer's expense. (*Id*.) They were promised a salary of approximately $500 per month. (*Id.* ¶ 64.) The men and their families incurred substantial debt to pay the brokerage fees in seeking out this employment. (*Id.* ¶ 65.)

After they were recruited, Plaintiffs were then transferred to the custody of Morning Star for Recruitment and Manpower Supply ("Morning Star"), a Jordanian job brokerage company that operates in Amman. (*Id.* ¶ 66.) Morning Star housed Plaintiffs upon their arrival in Jordan and arranged for their transfer to Iraq. (*Id.* ¶ 59.) Morning Star then transferred the Plaintiffs to Daoud. (*Id.*) The men were held in Jordan by agents of Daoud, and were required to turn over their passports to Daoud. (*Id.* ¶¶ 67-68.) It was there that the Plaintiffs first discovered that they were actually being sent to work at Al Asad, north of Ramadi, Iraq. (*Id.* ¶ 70.) Several of the men phoned relatives in Nepal, expressing concern and fear about their futures. (*Id.* ¶¶ 70-71.) At least one of the Deceased Plaintiffs informed his family that he and the other men were being kept in a dark room and were unable to see. (*Id.* ¶ 72.) In Jordan, the men were also informed for the first time that they would be paid only three quarters of what they were initially

promised. (*Id*. ¶ 73.)  Though they wanted to return home to Nepal, rather than proceed into the Iraqi war zone, the men were compelled to proceed to Iraq because of the debts that their families had assumed to pay the brokers. (*Id.* ¶ 74.)

Daoud transported the Deceased Plaintiffs into Iraq on or about August 19, 2004, via an unprotected automobile caravan of seventeen vehicles. (*Id*. ¶ 75.) They traveled along the Amman-to-Baghdad highway, which was known at the time to be a highly dangerous route. (*Id*. ¶¶ 76-81.) Daoud was aware of the significant and well-known risks involved in traveling on this highway at the time Plaintiffs were thus transported. (*Id*.) No security was provided for the caravan. (*Id*. ¶ 81.)

As they were nearing Al Asad, the two lead cars in which the Deceased Plaintiffs were being transported were stopped by a group of men who later revealed themselves to be members of the Ansar al-Sunna Army, an insurgent group in Iraq.  (*Id*. ¶¶ 81-83.) The men told the drivers to leave the Deceased Plaintiffs at the checkpoint, and that the Americans would come from the base to pick them up. (*Id*. ¶ 81.)

Between August 20 and August 24, the Ansar al-Sunna Army posted an internet statement that it had captured the Deceased Plaintiffs, posted pictures of the Deceased Plaintiffs, and sent a video of ten of the Deceased Plaintiffs to the Foreign Ministry of Nepal. (*Id*. ¶¶ 83-86.) Many of the family members of the Deceased Plaintiffs saw the images broadcast on Nepali television. (*Id.*¶ 85.) In the video, the Deceased Plaintiffs describe their trip to Iraq, stating that they "were kept as captives in Jordan at first," were not allowed to return home, and were forced to go to Iraq. (*Id.* ¶ 86.) One man in the video says, "I do not know when I will die, today or tomorrow." (*Id.* ¶ 87.)

On or about August 31, 2004, international media outlets broadcasted video of the Ansar al-Sunna Army executing the Deceased Plaintiffs. (*Id*. ¶ 87.) The group beheaded one of the men, and shot the other eleven men, one by one, in the back of their heads. (*Id*.) The families of the Deceased Victims saw the execution video, which caused them great emotional distress. (*Id.* ¶ 88.) The bodies of the Deceased Plaintiffs were never found. (*Id.* ¶ 89.)

Like the Deceased Plaintiffs, Plaintiff Gurung was recruited from his residence in Nepal. (*Id.* ¶ 91.) He was sent to Delhi, India for twenty days and then went on to Amman, Jordan for another twenty days. (*Id*.) Mr. Gurung was transported to Iraq as part of the same caravan in which the Deceased Plaintiffs were also traveling. (*Id*. ¶ 92.) Mr. Gurung's car was not captured by the insurgents, and he arrived at Al Asad as scheduled. (*Id*. ¶ 93.) There, he was supervised by KBR in his duties as a warehouse loader/unloader. (*Id*.) Upon learning about the death of the Deceased Plaintiffs, Mr. Gurung became frightened and expressed his desire to return to Nepal. He was told by both Daoud and KBR that he could not leave until his work in Iraq was complete. (*Id*. ¶ 94.) After fifteen months, during which he experienced frequent mortar fire without protection, Mr. Gurung was permitted to return to Nepal. (*Id*. ¶¶ 95-96.)

Pursuant to these allegations, Plaintiffs bring causes of action against Defendants under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595; the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), as well as conspiracy to violate the same; the Alien Tort Statute ("ATS"), 28 U.S.C § 1350; and various common law claims including, in particular, negligence claims against KBR.

In 2009, KBR filed a Motion to Dismiss (Doc. No. 138), which the Court granted in part and denied in part in its November 2009 Memorandum and Order (the "2009 Order") (Doc. No. 168). Specifically, the Court denied the motion as to Plaintiffs' TVPRA, ATS, and RICO claims; the Court granted the motion with regard to Plaintiffs' negligence claims, and dismissed those claims as barred by the statute of limitations.

In February, 2011, the Court granted the parties leave to take jurisdictional discovery, declining to rule on the pending motions to dismiss until jurisdictional discover was complete. (Min. Entry, Feb. 11, 2011). On July 29, 2011, after several months of discovery, Daoud filed the pending Renewed Motion to Dismiss Plaintiffs' First Amended Complaint. Daoud moves to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(1), claiming that this Court lacks subject matter jurisdiction to hear these claims, and Federal Rule of Civil Procedure Rule 12(b)(6), alleging that Plaintiffs have failed to state claims upon which relief can be granted.

**B. KBR's Cross-Claims**

In 2010, KBR filed its Cross-Claim against Daoud (Doc. No. 197). KBR's Cross-Claim alleges that, in November 2003, Brown & Root Services, a division of Kellogg, Brown & Root International, Inc., entered into Master Agreement Number GU84-VC-ML00001 (the "Master Agreement") with Daoud for the provision of temporary personnel services in Iraq. (Doc. No. 197 ¶ 10.) This Master Agreement requires Daoud to indemnify and hold harmless KBR from "fines, penalties, or costs of liability" arising from Daoud's failure to comply with the agreement. (Doc. No. 197 ¶ 12.) The Master Agreement also contained "General Conditions," which require Daoud to defend, indemnify, and hold harmless KBR from "any claim, demand, cause of action, injury,

loss, cost damage, or liability of whatever kind and nature…from injury or death of any person or damage to any property arising from or in connection with" sublet work under the contract, regardless of whether or not negligence or strict liability exists. (*Id.*) KBR alleges that Plaintiff Gurung's time may have been billed by Daoud to KBR under this Master Agreement.

In December 2003, Kellogg, Brown & Root Services, Inc. entered into Subcontract Number GU-84-VC-SB10005 (the "Subcontract") with Daoud for the operation of a laundry facility at Al Asad. (*Id.* ¶ 13.) Pursuant to the Subcontract, "Daoud was to provide labor, material, equipment, transportation, insurance, supervision, permits, supplies, documentation, inspection and other things necessary to provide such laundry services." (*Id.*) The "General Conditions" to the Subcontract require the same defense and indemnification as required by the General Conditions to the Master Agreement. (*Id.* ¶ 15.) KBR alleges that the Subcontract governs the relationship between KBR and Daoud and the Deceased Plaintiffs, who were recruited to work in the laundry facility at Al Asad. (*Id.* ¶ 14.)

KBR seeks defense and indemnification based upon the contractual agreements between Daoud and KBR. KBR also asserts claims for common law contribution and indemnification and breach of contract. Daoud filed its Renewed Motion to Dismiss the KBR Defendants' Cross-Claims in July, 2011. (Doc. No. 238.) The Court considers in turn Daoud's two pending renewed motions to dismiss.

## II.    DAOUD'S MOTION TO DISMISS PLAINTIFFS' CLAIMS

Daoud moves to dismiss Plaintiffs' claims for want of personal jurisdiction and, as to a number of Plaintiffs' claims, for failure to state a claim upon which relief can be granted.

### A.  PERSONAL JURISDICTION

#### 1.  Legal Standard

"Absent a rule or statute to the contrary, . . . a federal court [may] exercise jurisdiction over only those defendants who are subject to the jurisdiction of courts of the state in which the court sits."  *Point Landing, Inc. v. Omni Capital Int'l, Ltd.*, 795 F.2d 415, 419 (5th Cir. 1986), *aff'd sub nom. Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987).  Because the Texas long-arm statute is coterminous with the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the Court's constitutional due process inquiry into personal jurisdiction also serves as an inquiry into personal jurisdiction under the Texas long-arm statute. Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041-17.045; *Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 373 (5th Cir. 2003)

To comport with constitutional due process, a plaintiff must show: (1) that the defendant purposefully availed herself of the benefits and protections of forum law, thereby establishing "minimum contacts" with the forum such that the defendant could reasonably have anticipated being haled into court there; and (2) that, under the circumstances, the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Johnston v. Multidata Sys. Intern. Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985), and *Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784 (5th Cir. 1990)).

The minimum contacts requirement can be met through contacts sufficient to confer either general or specific jurisdiction. *Cent. Freight Lines, Inc. v. APA Transp. Corp.*, 322 F.3d 376, 381 (5th Cir. 2003) (citation omitted). General jurisdiction can be exercised when a defendant's contacts with the forum state are substantial, continuous, and systematic. *Id.* at 381. The "continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008).

Specific jurisdiction exists "[w]hen a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Cent. Freight*, 322 F.3d at 381 (citation omitted). Because the Court finds that Daoud's jurisdictional contacts are sufficiently substantial, continuous, and systematic to satisfy general jurisdiction, the Court does not consider whether this case meets the specific jurisdiction requirements.

In cases in which a federal court "draws its authority directly from federal law, and does not borrow from state law," Federal Rule of Civil Procedure 4(k)(2) applies. *Submersible Sys., Inc. v. Perforadora Central, S.A. de C.V.*, 249 F.3d 413, 420 (5th Cir. 2001). Rule 4(k)(2) is measured with reference to the Fifth Amendment, rather than the Fourteenth Amendment. (*Id.*) Where, as here, a defendant does not concede to jurisdiction in another state, the Court may, pursuant to Rule 4(k)(2), consider the defendant's contacts with the United States as a whole, rather than any particular state. *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646 (5th Cir. 2004). Because Rule 4(k)(2) applies to Plaintiffs' federal claims in this case, the relevant forum for considering minimum contacts is the entire United States (rather than the state of Texas).

While the party seeking to invoke the power of the court bears the burden of proving that jurisdiction exists, a *prima facie* showing suffices, and the party need not establish jurisdiction by a preponderance of the evidence. *Love N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006). Moreover, "the Court must resolve all undisputed facts submitted by the plaintiff, as well as all facts contested in the affidavits, in favor of jurisdiction." *Id.* (citing *Wyatt v. Kaplan*, 686 F.2d 276, 280 (5th Cir. 1982)). "'The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery.'" *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir. 1997) (quoting *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985)).

**2. Analysis**

**a. Minimum Contacts**[2]

In *Helicopteros Nacionales de Colombia, S.A. v. Hall*, the Supreme Court illustrated the extent of ties to the forum state required to establish general jurisdiction. In *Helicopteros*, the Supreme Court determined that an out-of-state company's contacts with

[2] At the outset, the Court makes clear its rejection of Daoud's personal jurisdiction challenge to the extent that Daoud suggests that a foreign corporation doing business with a U.S. company overseas may never be subject to personal jurisdiction in the United States. It is well settled that personal jurisdiction does not turn on the physical presence of the defendant in the forum. *See, e.g.*, *Burger King v. Rudzewicz*, 471 U.S. 462, 476-77 (1985) ("Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State."). While "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum," *Burger King*, 471 U.S. at 474 (quoting *Int'l Shoe*, 326 U.S. at 316), "the 'foreseeability' of causing injury in the forum can establish such contacts where 'the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court here.'" *Mwani v. Bin Laden*, 417 F.3d 1 (quoting *Burger King*, 471 at 474.) Recent cases in other federal courts have confirmed that jurisdiction is appropriate over foreign entities doing business with U.S. companies abroad. *See, e.g.*, *Miller v. Harbert Int'l Constr.*, 608 F.3d 871, 887 (D.C. Cir. 2010); *In re S. Afr. Apartheid Litig.*, 643 F. Supp. 2d 423, 435-36 (S.D.N.Y. 2009) (describing failure to anticipate general jurisdiction as "implausible" because "[a] company that does more than $100 million in business with the federal government has deliberately acted within this nation, and the substantial profit generated by those business activities carries with it the burden of submission to the jurisdiction of our federal courts."). The Court thus finds no support for the proposition that personal jurisdiction turns on physical presence in the forum.

Texas were not sufficient to establish general jurisdiction, even though the company sent its chief executive officer to Houston for a contract negotiation, received checks drawn from a Houston bank, purchased equipment from a Texas enterprise, and sent personnel to Texas for training. 466 U.S. 408, 416 (1984). The Supreme Court held that "mere purchases [made in the forum State], even if occurring at regular intervals, are not enough to warrant a State's assertion of [general] jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Id.* at 418. The Supreme Court spoke most recently on the operation of the general jurisdiction test in *Goodyear Dunlop Tires Operations, S.A. et al. v. Brown*, 131 S. Ct. 2846 (2011). In *Goodyear*, the Supreme Court held that there was no general jurisdiction over a non-resident tire manufacturer that did not design, manufacture, or advertise its products in the forum state, had no place of business, employees, registration, or bank accounts in the forum state, and did not solicit business or itself sell or ship tires to customers in the forum state. 131 S. Ct. at 2852.

Since *Helicopteros*, the Fifth Circuit has issued a number of opinions providing guidance on the deliberately fact-based general jurisdiction test. In *Submersible*, the court held that "a Mexican company that has its headquarters in Mexico and that does business almost exclusively in Mexico, [which] made contact with Mississippi only by virtue of its arrangement to construct one marine drilling rig in a shipyard in Mississippi," did not have sufficient contacts with the forum to give rise to general jurisdiction. 249 F.3d at 420. Similarly, in *Johnston*, the court held that general jurisdiction did not exist over a company that had purchased over $5.2 million worth of goods from Texas vendors in the five years preceding the lawsuit. 523 F.3d at 612. The defendant in *Johnston* was also a

party to contracts with a Texas corporation, employed two Texas residents who worked from their homes in Texas, and had a former corporate director who lived in Texas. (*Id.*) The court found general jurisdiction to be lacking because $5.2 million in goods purchased from Texas represented only 1% of the company's total business, one of the company's contracts with a Texas corporation was governed by New York law, the Texas-based employees did not work with Texas customers and reported to supervisors in Canada, and the business director did not conduct board business in Texas. (*Id.*)

Though general jurisdiction requires minimum contacts beyond those in *Submersible* and *Johnston*, the minimum contacts requirement can be met where extensive forum contacts, each of which alone would not satisfy general jurisdiction requirements, are sufficiently extensive when considered together. *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 777 (5th Cir. 1986) (defendant's contacts with the forum demonstrated that his connection to the forum was not "random," "fortuitous," or "attenuated"); *see also Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 570 (2d Cir. 1996) (acknowledging that any one of the defendant's contacts alone would be insufficient to establish general jurisdiction, but that, "when taken together, [the contacts] are sufficient").[3]

In the Fifth Circuit, courts assess general jurisdiction by "evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 610 (5th Cir. 2008); *Asarco. Inc. v. Glenara. Ltd.*, 912 F.2d 784, 787 n.1 (5th Cir. 1990). For general

[3] Daoud's emphasis throughout its briefings that one jurisdictional fact or another does not, on its own, confer jurisdiction, is of limited relevance here, as Plaintiffs base their general jurisdiction argument not on any particular jurisdictional fact, but rather on the cumulative effect of the facts considered in conjunction with one another.

jurisdiction purposes, then, this Court can consider only Daoud's contacts taking place prior to the filing of this lawsuit in August 2008.[4] Daoud's contacts with the United States can broadly be grouped into the following categories: (1) where Daoud does business; (2) Daoud's efforts to obtain U.S. business; (3) Daoud's contracts and other agreements with U.S. entities; (4) Daoud's familiarity with U.S. laws and in U.S. fora; and (5) Daoud's other connections with the United States.

**i. Where Daoud Does Business**

Jurisdictional discovery illuminated the extent to which Daoud derives its business from the United States. Daoud does no business in Jordan, where it is registered as a "non-operating foreign company" prohibited from carrying out any business or commercial activity. (Doc. No. 244, Ex. 2, DP00005490.) Because it cannot conduct business in Jordan, Daoud is not subject to Jordanian taxes, and derives no revenue from Jordanian business. (Doc. No. 244, Ex. 1, "McOwen Decl." ¶¶ 7-16.) Daoud's services are provided exclusively in Iraq (Doc. No. 189, Ex. 1, "Banna Decl." ¶ 6) at U.S. military facilities (McOwen Decl. ¶¶ 7-16.), and most of its transactions are conducted in U.S. dollars. (Doc. No. 244, Exs. 4, 5.) From 2003 to 2008, between 98% and 100% of Daoud's revenue, totaling over $641 million, came from its work as a subcontractor on KBR's contracts with the U.S. Government. (McOwen Decl. ¶¶ 8-16; Ex. 3; Ex. 4.) The

[4] Plaintiffs contend that Daoud's post-filing, pre-service conduct should be considered in analyzing Daoud's jurisdictional contacts. Plaintiffs cite only one federal case within the Fifth Circuit for this proposition, *Praetorian Specialty Ins. Co. v. Auguillard Const. Co., Inc.*, 2010 WL 2026655, at * 8-9 (W.D. La. May 20, 2010), which held that post-filing conduct could be considered in conducting a specific jurisdiction analysis. *Id.* However, the court in *Praetorian* distinguished itself from *Johnston*, 523 F.3d at 610, and *Asarco*, 912 F.2d 784, by emphasizing that those cases limited the relevant jurisdictional time period only for general jurisdiction purposes. *Praetorian*, 2010 WL 2026655, at *7. Because this Court's opinion focuses on general jurisdiction, the Court does not consider whether post-filing conduct may be considered for specific jurisdiction purposes; rather, the Court finds that, as *Praetorian* itself noted, the Fifth Circuit's holdings in *Johnston* and *Asarco* limit the Court's power to consider post-filing conduct for general jurisdiction purposes.

remainder of Daoud's revenue during that time period came from dozens of direct contracts with the U.S. Government and other U.S. military contractors. (McOwen Decl. ¶¶ 12-16, 28-29.)

The percent of Daoud's business derived from forum entities—between 98% and 100%—is striking. In *Kervin v. Red River Ski Area, Inc.*, 711 F. Supp. at 1392 (E.D. Tex. 1989), the court considered the fact that defendant derived 47% of its business from Texas to be a "sobering statistic" in support of jurisdiction. *Cf. Mich. Nat'l Bank v. Quality Dinette*, 888 F.2d 462 (6th Cir. 1989) (considering it a relevant factor in support of general jurisdiction that the defendant derived 3% of its total sales from the forum). As Daoud notes, that it does business with forum residents is not, on its own, sufficient to confer general jurisdiction. *See, e.g.*, *Access Telecom, Inc. v. MCI Telecom. Corp.*, 197 F.3d 694, 717 (5th Cir. 1999) (Mexican corporation's "continuous and systematic contacts" with Texas corporation were insufficient to confer general jurisdiction because the two companies were "do[ing] business *with* each other in these situations, but neither is doing business *in* the other country for jurisdictional purposes").

However, the fact that Daoud's business depends entirely on its relationship with forum entities counsels strongly in favor of general jurisdiction. In *Lakin v. Prudential Securities*, 348 F.3d 704, 709 (8th Cir. 2003), the court premised its finding that the defendant's contacts with the forum were continuous and substantial on the fact that the defendant's $10 million home-equity loan portfolio in the state implied multiyear lending relationships with countless forum residents. Although $10 million was not a large percentage of defendant's business, the court saw the home-equity market in the forum as "central to the conduct of [the defendant's] business." *Id.* at 709-10. In *Provident Nat'l*

*Bank v. Lehman Mgmt. Co.*, 819 F.2d 434, 438 (3d Cir. 1987), the court found that it had general jurisdiction because, while the defendant had no property in the forum and conducted only a small percentage of its business there, "the nature of [the defendant's] contacts with [the forum]…was central to the conduct of its business." *See also Siskind v. Villa Foundation for Education*, 642 S.W.2d 434, 435-37 (Tex. 1982) (finding that the court had personal jurisdiction over an Arizona school where the school admitted that it "could not survive if its enrollment was limited to Arizona residents"). In this case, the centrality of Daoud's forum contacts to its business cannot be overstated—Daoud had essentially no *other* business. It is difficult to conceive of a scenario in which a company could derive 100% of its business from a forum, but lack sufficient forum contacts for general jurisdiction purposes. Indeed, likely as a result of its extensive business with U.S. entities, Daoud has developed a number of other jurisdictional contacts that this Court finds relevant.

**ii. Daoud's Efforts to Obtain U.S. Business**

Jurisdictional evidence demonstrates that Daoud's dependency upon U.S. entities was not a result of coincidence. Daoud obtained much of its $640 million worth of KBR and U.S. Government contracts through submitting solicitations, bids, quotes, and proposals directly to individuals in the United States. (McOwen Decl. ¶¶ 17-21; Doc. No. 244, Exs. 13-A, 13-B.) Daoud targeted its marketing to the U.S. Government and U.S. military contractors (McOwen Decl. ¶¶ 17-21), and outbid several other labor suppliers in order to obtain contracts with KBR (*Id.* ¶ 21, Doc. No. 244, Ex. 14). Daoud's interest in securing U.S. business is evident in its "teaming" contracts with partners DynCorp International LLC ("DynCorp") (headquartered in Virginia), and Beverly Sue Global

Services (BSGS) (headquartered in Texas), which state that Daoud's purpose was to strengthen bids to "enhance the likelihood" that U.S. Government contracts would be awarded to the partners. (McOwen Decl. ¶¶ 17-18; Doc. No. 244, Exs. 11, 12-A.) In correspondence between BSGS and Daoud, the two planned to meet in Houston to develop business opportunities and meet with potential clients—referred to as "our key prospects"—including Fluor Daniels and DynCorp. (Doc. No. 244, Ex. 34.)

Daoud's intentions are also highlighted by its efforts to obtain certifications and approvals to qualify it for U.S. Government contracts and subcontracts. For example, Daoud obtained certification from the U.S. Military Central Command (CENTCOM) as an approved vendor, submitting to quarterly audits and inspections by U.S. military personnel. Once Daoud obtained CENTCOM certification, it highlighted its certified status in its marketing materials and on its website. (McOwen Decl. ¶¶ 60-65).

**iii. Daoud's Contracts and Other Agreements**

Plaintiffs urge that, in addition to revealing the extent of Daoud's business with forum residents, Daoud's numerous contracts with U.S. entities also support an argument that, by expressing its willingness to comply with U.S. law, Daoud waived its right to object to jurisdiction in the United States. Because personal jurisdiction is an individual right, it can be waived, either expressly or by implied consent. *See, e.g.*, *Ins. Corp. of Ir. v. Compagnie des Bauxites*, 456 U.S. 694, 703-04 (1982). Plaintiffs contend that Daoud waived personal jurisdiction through hundreds of agreements with various entities designating an exclusive U.S. forum for dispute resolution.

Daoud's contracts with the U.S. Government, for example, waive "any rights to invoke the jurisdiction of local national courts where [the] contract is performed." The

contracts also "accept the exclusive jurisdiction" of "an appropriate U.S. Federal administrative body or court," or the U.S. Armed Services Board of Contract Appeals and the Court of Federal Claims. (McOwen Decl. ¶¶ 23, 28-29.)

Daoud's contracts with KBR name U.S. fora (most often Texas) as the exclusive fora for dispute resolution. Daoud's contracts with KBR are governed by General Conditions and Special Conditions. (McOwen Decl. ¶¶ 23-24.). All of the contracts that Daoud provided during jurisdictional discovery incorporate a version of the General Conditions which, beginning in 2005, selected Texas as the exclusive forum for dispute resolution. (*See, e.g.*, Doc. No. 244, Ex. 16-A at DP00006619, stating that the "exclusive venue" shall be Houston, Harris County, Texas; *see also* Ex. 16-B at DP00005391.) The Special Conditions, also incorporated into the Daoud-KBR contracts, expressly incorporate and are governed by Defense Federal Acquisition Regulations "DFARS" clause 252.233-7001 (1998), which select a U.S. forum. (McOwen Decl. ¶ 23.) The "Master Agreement" under which Daoud contends that it billed Plaintiff Gurung's time also contains the Special Conditions incorporating DFARS 252.233-7001. (McOwen Decl. ¶ 36.)[5] Moreover, in nearly all of its contracts, Daoud agrees to comply with U.S. laws and regulations. (McOwen Decl. ¶¶ 51-56.) For example, Daoud agrees to "strictly comply with" the OSHA Hazard Communication Standard; Title VII of the Civil Rights Act; the Age Discrimination in Employment Act; the Fair Labor Standards Act; and the Export Administration Regulations of the U.S. Department of Commerce; and forty-two specific Defense Federal Acquisition Regulation Supplement clauses. (*Id.*)

Daoud's contracts with DynCorp, BSGS, and Latham & Watkins also provide for exclusive jurisdiction in the United States. (McOwen Decl. ¶¶ 30-33; Doc. No. 244, Ex.

[5] The Special Conditions provide that they take precedence over the General Conditions.

20 (contract with DynCorp providing for Tennessee forum); Ex. 11 (contract with

DynCorp providing for Virginia forum); Ex. 12-A (contracts with BSGS providing for

Texas forum); Ex. 21 (contract with Latham & Watkins providing for D.C. forum).)

In addition to its contracts, Daoud has executed a number of purchase orders and

confidentiality agreements which provide for exclusive U.S. jurisdiction. (McOwen Decl.

¶ 26; Doc. No. 244, Ex. 18 at KBRJ0009 (providing for mediation or arbitration in

Houston, Texas).)

While Daoud's decision to enter into contracts designating a U.S. forum for

dispute resolution is certainly relevant to the Court's evaluation of the extent to which

Daoud's contacts with the United States are "continuous and systematic," *Int'l Shoe*, 326

U.S. at 317, the Court agrees with Daoud that these contracts are insufficient to constitute

a "waiver of jurisdiction." The two cases that Plaintiffs cite for the proposition that the

designation of an exclusive forum for dispute resolution constitutes a waiver of personal

jurisdiction are not directly applicable here, as both are cases in which the designation of

a forum for dispute resolution was made by the defendant and the plaintiff, not the

defendant and a third party. *See, e.g.*, *Kevlin Servs., Inc. v. Lexington State Bank*, 46 F.3d

13, 15 (5th Cir. 1995) (choice of law provision in a contract between plaintiff and

defendant constitutes waiver of objections to personal jurisdiction); *Rimkus Consulting

Group, Inc. v. Cammarata*, 2007 WL 1520993, at *5 (S.D. Tex. May 22, 2007) (forum

selection clause in contract between plaintiff and defendant demonstrated defendant's

consent to the forum). Thus, while the parties with whom Daoud contracted might be able

to claim that Daoud waived objections to personal jurisdiction based upon these

contracts, that argument is unavailable to Plaintiffs, who were not parties to the contracts.

**iv. Daoud's Familiarity with U.S. Laws and Fora**

In addition to entering into contracts that reflect its amenability to dispute resolution in the United States, Daoud also affirmatively sought out the protection of U.S. laws and was involved in administrative proceedings in the United States. For example, in September 2009, Daoud obtained trademark protection for its business logo from the United States Patent and Trademark Office. (McOwen Decl. ¶¶ 70-72.) While filing a trademark application in the United States does not evidence one's anticipation that it might be sued there, *See Inc. v. Imaso Eyewear Pty, Ltd.*, 167 Fed. App'x. 518, 522 (6th Cir. 2006), the Court finds it at least minimally relevant, in combination with all of Daoud's other jurisdictional contacts, that Daoud sought this protection in the United States. [6]

Daoud also filed a claim in the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-80 and 28 C.F.R. Pt. 14 (McOwen Decl. ¶ 73; Doc. No. 244, Ex. 39).[7] Daoud solicited the service of Insurance Brokers in the United States, ultimately engaging and submitting an application for Defense Base Act ("DBA")

[6] The cases cited by Plaintiffs for the proposition that obtaining trademark protection is a relevant contact in support of personal jurisdiction deal only with specific jurisdiction, and therefore are not directly applicable in the Court's general jurisdiction analysis. *See, e.g.*, *Monster Cable Prods., Inc. v. Euroflex S.R.L.*, 642 F. Supp. 2d 1001, 1009 (N.D. Cal. 2009) (application for trademark registration constitutes substantial contact); *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1416 (Fed. Cir. 2009) (obtaining trademark protection is a relevant contact for specific jurisdiction purposes, as "[i]t stands to reason that one who has sought and obtained a property interest from a U.S. agency has purposefully availed itself of the laws of the United States"); *CytoSport, Inc. v. Cytogenix Sports Labs.*, 2010 WL 5418883, at *5 (E.D. Cal. Dec. 23, 2010) ("By submitting trademark applications for [the related] products to the United States Patent and Trademark Office, … defendant purposefully availed itself of the privilege of doing business in the United States."). As trademark protection is discussed in these cases only as it relates to specific jurisdiction, the cases offer little guidance as to whether a court should consider a defendant's trademark protection for general jurisdiction purposes. Daoud's citation to *Quick Technologies, Inc. v. Sage Group PLC*, 313 F.3d 338, 345 (5th Cir. 2002), for the proposition that the Fifth Circuit does not find trademark applications to be a relevant jurisdictional contact, is similarly unhelpful. In that case, the court was considering specific jurisdiction, and held only that the plaintiff's claims did not arise out of or relate to the defendant's alleged minimum contacts, including trademark protection.

[7] Daoud denies that this claim was filed pursuant to the FTCA. However, Plaintiffs' Exhibit 39, which shows Daoud's application on the Department of Justice's Standard Form 95, is sufficient to persuade the Court that Daoud did file an FTCA claim for property damage.

insurance to U.S. insurance broker Rutherfoord International (McOwen Decl. ¶¶ 74-84). Daoud was involved in the litigation of DBA claims before the Department of Labor (Doc. No. 198, Ex. 2 ¶¶ 3-5). These contacts support Plaintiffs' argument that Daoud purposefully availed itself of the benefits and protections of U.S. laws. *See, e.g.*, *State of S.D. v. Kan. City S. Indus., Inc.*, 880 F.2d at 44 n.10 (finding it relevant for jurisdictional purposes that the defendant "had injected itself, either directly or indirectly, into a number of state administrative proceedings"). Though the Court agrees with Daoud that the filing of an administrative claim does not, by itself, give rise to an assumption that Daoud intended to submit to the jurisdiction of this Court, it finds these jurisdictional contacts to be relevant factors in support of general jurisdiction.

**v. Daoud's Other Connections with the United States**

Daoud has a number of other smaller connections with the United States which, when considered with the above jurisdictional contacts, lend support to the Court's exercise of general jurisdiction. First, Daoud has spent a significant amount of money purchasing goods from the United States. Receipts produced by Daoud during jurisdictional discovery indicate that, during the relevant time frame, Daoud purchased goods from Nestle USA, a United States company, totaling over $1.4 million. (McOwen Decl. ¶¶ 88-89; Doc. No. 244, Ex. 52.) A defendant's purchases from the forum can be a relevant contact for general jurisdiction purposes. *See Coremetrics, Inc. v. Atomic Park.com, LLC*, 370 F. Supp. 2d 1013, 1021 (N.D. Cal. 2005) ($1 million in purchases from the forum state weighs in favor of general jurisdiction); *Theo. H. Davies & Co. v. Rep. of the Marsh. Is.*, 174 F.3d 969 (9th Cir. 1999) (defendant's purchases from the

forum state are relevant for general jurisdiction purposes).The Court finds Daoud's purchases from the United States to be a relevant factor in support of general jurisdiction.

Second, Plaintiffs emphasize Daoud's business travel to and communications with the United States as relevant jurisdictional contacts. Daoud executives made at least three business trips to the United States during the relevant time period. (McOwen Decl. ¶ 67.)[8] Business travel to the forum is primarily relevant to establish specific jurisdiction related to the business travel, *see, e.g., Cent. Freight*, 322 F.3d at 382; *Standard Fittings*, 625 F.2d at 642 (5th Cir. 2003), and the Court finds Daoud's three business trips only minimally relevant in support of general jurisdiction.

Daoud also exchanged a number of e-mails and letters with individuals in the United States during the relevant time period. (McOwen Decl. ¶ 66.)[9] Communications directed at the forum can be considered relevant jurisdictional contacts in support of general jurisdiction. *Hewlett-Packard Co. v. Byd:Sign, Inc.*, 2006 WL 2822151, at *3-4 (E.D. Tex. Sept. 28, 2006) (finding it relevant, for general jurisdiction purposes, that defendant directed numerous emails to employees in its United States office). Daoud counters that communications with a forum are jurisdictionally insignificant where performance of a contract takes place overseas. However, the case cited by Daoud, *Gundle Lining Const. Corp. v. Adams Cnty. Asphalt Inc.*, 85 F.3d 201, 205 (5th Cir.

---

[8] Plaintiffs argue that Daoud made at least seven business trips to the United States during the relevant time period. (McOwen Decl. ¶ 67.) However, three of these trips took place after the filing of Plaintiffs' Complaint, and are therefore jurisdictionally irrelevant. A fourth trip never occurred; Plaintiffs refer to it because it was listed (erroneously) on Daoud's initial interrogatory response. Once Daoud realized the error, it was corrected in Daoud's supplemental interrogatory responses. (Doc. No. 251, at 8.)

[9] The Court cannot discern, from the information provided, the exact number of communications sent to people in the United States during the relevant time period. A chart produced by Plaintiffs demonstrates that Daoud exchanged approximately two hundred (200) emails and letters with individuals based in the United States in 2008. (McOwen Decl. ¶ 66; Doc. No. 244, Ex. 33). Of these communications, 133 were sent during the jurisdictionally relevant time period. (Doc. No. 244, Ex. 33.) While Daoud disputes whether all of the recipients of these communications were actually based in the United States at the time the communications were received, the Court is satisfied by Plaintiffs' allegations that at least a large number of communications were sent to people in the United States during the relevant time period.

1996), holds only that such communications are "insufficient to establish the requisite minimum contacts," not that they are jurisdictionally insignificant or irrelevant. While the Court agrees that general jurisdiction over Daoud cannot be based entirely upon these communications, they are still jurisdictionally relevant, as they help demonstrate the systematic and continuous nature of Daoud's relationship with forum entities.

Finally, Plaintiffs note that Daoud has employed U.S. citizens. Of the five "executive level" employees identified by Daoud in its interrogatory answers, one, the general manager during much of the relevant time period, is American. (Doc. No. 244, Ex. 34.) Daoud also employed at least three other Americans. (Doc. No. 244, Ex. 45, RUTHR000191.)

After considering all of the jurisdictional facts, the Court concludes that Daoud's contacts with the United States are so extensive as to warrant the exercise of general jurisdiction. The Court is not persuaded by Daoud's insistence that this case should be compared to other cases involving foreign corporations performing U.S. Government contracts abroad. Indeed, the general jurisdictional analysis does not center on the type of defendant involved in the case, but rather focuses on whether the constitutional due process requirements are met. Thus, the Court finds Daoud's references to *Lessin v. KBR*, No. 4:05-CV-01852 (S.D. Tex. June 12, 2006), and *Baragona v. KGL Transp. Co.*, 691 F. Supp. 2d 1351 (N.D. Ga. 2009), unavailing.[10] Ultimately, while the Court recognizes

[10] In *Lessin*¸ this Court held that a defendant's ongoing contract with KBR was insufficient to establish general jurisdiction in Texas. The Court noted that "merely contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction," *Lessin*, No. 4:05-CV-01852, slip op. at 6 (quoting *Freudensprung v. Offshore Technical Servs.*, 379 F.3d 327, 344 (5th Cir. 2004)), and that even "the combination of the existence of a contract…communications related to the execution and performance of the contract, and mailing payments to the forum state are insufficient to establish the necessary minimum contacts." *Id.* (*citing Freudensprung*, 379 F.3d at 344). The Court concluded, based upon this precedent, that "[s]imply being hired by a Texas-based corporation to perform services outside the U.S. does not amount to the substantial, continuous and systematic contacts with Texas necessary to establish general

that the "continuous and systematic contacts test is a difficult one to meet," *Submersible*, 249 F.3d at 419, this case exhibits the sort of extensive contacts between defendant and forum that justify, and in fact, require, the Court's exercise of general jurisdiction. Because the Court determines that it has general jurisdiction over Daoud, the Court does not consider whether it has specific jurisdiction or pendent personal jurisdiction.

**b. Traditional notions of fair play and substantial justice**

If a plaintiff successfully makes a *prima facie* showing of minimum contacts, the burden shifts to the defendant to show that traditional notions of fair play and substantial justice would be violated by the exercise of jurisdiction. "To show that an exercise of jurisdiction is unreasonable once minimum contacts are established, the defendant must make a 'compelling case' against it." *Wien Air Alaska v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999) (citing *Burger King*, 471 U.S. at 477)). In determining whether the exercise of jurisdiction would violate traditional notions of fair play and substantial justice, courts looks at five factors: (1) the burden upon the nonresident defendant to litigate in the forum; (2) the interests of the forum; (3) the plaintiff's interest in obtaining convenient and effective relief; and (4) the several states' shared interest in furthering substantive social policies. *Johnston*, 523 F.3d at 615. When foreign defendants are involved, courts "must 'consider the procedural and substantive policies of other *nations* whose interests

---

jurisdiction." *Lessin*, No. 4:05-CV-01852, slip op. at 7. *Lessin* did not deal with a defendant that had derived nearly 100% of its business from the forum; obtained multiple contracts with in-forum clients; or transacted business in the forum including engaging legal services, obtaining insurance, and filing administrative claims. Thus, the Court's holding in *Lessin* offers little guidance here.

The Court is likewise unmoved by Defendant's reference to *Baragona*, 691 F. Supp. 2d 1351. In *Baragona*, the court concluded that it did not have jurisdiction because the defendant had no contacts with the state of Georgia. *Id.* at 1366. As Plaintiffs point out, this case is distinguishable because it is being considered under Federal Rule 4(k)(2). Rule 4(k)(2) was adopted to "correct[] a gap in the enforcement of federal law," by which defendants who lacked sufficient contacts with any particular state forum, but whose contacts with the United States as a whole justified applying federal law, were shielded from jurisdiction in federal courts. Fed. R. Civ. P. 4(k)(2) advisory committee's note. Thus, many of Daoud's contacts with the United States that may be considered under Rule 4(k)(2) would not be considered if this case raised state tort claims, like the claims at issue in *Baragona*, rather than federal law claims.

are affected by the assertion of jurisdiction by the [forum state].' *Id.* (citing *Asahi Metal Indus. Co. v. Superior Court of Ca.*, 480 U.S. 102, 115 (1987)).

As Daoud is not based in the United States, the exercise of personal jurisdiction would likely inflict some burden on the company. The bulk of the relevant witnesses and evidence are likely located in Iraq, Jordan, or Nepal, and the Plaintiffs, Daoud, and non-party co-conspirators are all located abroad. On the other hand, Daoud advertises itself as serving governments worldwide, has also been involved in litigation before the Department of Labor, and will be defending against KBR's claims in the United States, as discussed below. Moreover, the great number of Daoud's contracts selecting a U.S. forum for dispute resolution convince the Court that the burden of litigating here would be far from insurmountable for Daoud. As to the second factor, both the United States and Jordan may have an interest in resolving this case, although Daoud has not made a persuasive argument as to what Jordan's interest might be. The United States undoubtedly has an interest in resolving claims of human trafficking related to a U.S. military facility, paid for by U.S. taxpayers, and in violation of U.S. laws.

The third factor strongly supports jurisdiction in this Court. Plaintiffs' interest in obtaining relief is undeniable and incalculable – the devastation that the Deceased Plaintiffs' families have suffered is beyond question. The efficient resolution of controversies also favors this Court's jurisdiction; this case should be heard in conjunction with KBR's cross-claim, over which the Court has jurisdiction (see below). *Cf. Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 421 (5th Cir. 1993) (holding that it would be fair to exercise jurisdiction over the third-party defendant in

Texas because the Texas forum would bring all the parties into one courtroom for a single resolution of the case).

The United States' interest in furthering substantive social policies—discouraging the types of illegal acts alleged by Plaintiffs—would be furthered by this Court's exercise of personal jurisdiction. As Plaintiffs describe in their First Amended Complaint, trafficking in human beings is of growing international concern. Despite efforts to improve enforcement of anti-trafficking statues at home and abroad, the United States has witnessed an increase of human trafficking, and the most recent estimates find that approximately 800,000 people are trafficked across international borders each year. (Pl. Am. Compl. ¶ 38 (citing United States Department of State, Trafficking in Persons Report (June 2008), at 8).) Congressional findings related to the TVPRA indicate that:

> The involvement of employees and contractors of the United States Government and members of the Armed Forces in trafficking in persons, facilitating the trafficking in persons, or exploiting the victims of trafficking in persons is inconsistent with United States laws and policies and undermines the credibility and mission of United States Government programs in post-conflict regions.

(*Id.*; "Trafficking Victims Protection Reauthorization Act," Pub. L. 109-164 § Sec. 101(2)(10) (2006)). These findings highlight the United States' express interest in adjudicating allegations of human trafficking against military subcontractors.

While Daoud admittedly will be burdened to some extent from having to litigate in the United States, the burden is not so great as to overcome the other factors, all of which make clear that this Court's exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice.

## B. FAILURE TO STATE A CLAIM

### 1. Legal Standard

Pursuant to the Federal Rules of Civil Procedure, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, a complaint must contain sufficient factual matter that, if it were accepted as true, would "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. ---, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim need not give rise to "probability," but need only plead sufficient facts to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). A pleading also need not contain detailed factual allegations, but it must go beyond mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

While the court must accept well-pleaded facts as true, *Iqbal*, 129 S. Ct. at 1950, it should neither "strain to find inferences favorable to the plaintiffs" nor "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'" *R2 Investments LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004)). A court should not evaluate the merits of the allegations, but must satisfy itself only that plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

**2. Analysis**

Daoud moves to dismiss Plaintiffs' common law claims for negligence, false imprisonment, and breach of contract, as well as Plaintiffs' federal RICO and ATS claims.

**a. Common Law Claims**

When a case is transferred from one district court to another pursuant to 28 U.S.C. § 1404, the transferee court must follow the choice-of-law rules of the transferor court. In this case, which was transferred to this Court from the Central District of California, California's choice of law rules apply. *See Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990). California's choice-of-law rules point to Texas law as the appropriate substantive law.[11]

**i. Negligence & False Imprisonment**

Daoud asserts that Plaintiffs' negligence and false imprisonment claims are barred by the two year statute of limitations applicable to such claims. Plaintiffs respond that, because Daoud fraudulently concealed its role in Plaintiffs' case, the limitations period was tolled until March 7, 2008 for claims by the families of the Deceased Plaintiffs against Daoud.[12] "A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." *Jones v. Alcoa, Inc.*, 339 F.3d

[11] California courts apply a "governmental interest" analysis. *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 917 (Cal. 2006). When KBR sought to transfer venue to the Southern District of Texas, it argued that Texas has a strong interest in hearing the dispute because the allegations are against a Texas entity, and because the Subcontract at issue specifies that it shall be governed by Texas law. (Doc. No. 39, at 18.) Neither Plaintiffs nor any other party has argued that California has any interest in applying its law to Plaintiffs' claims.

[12] Because, as Plaintiffs concede, Plaintiff Gurung's negligence and false imprisonment claims must be dismissed pursuant to the reasoning in the Court's 2009 Order, the Court considers only the negligence and false imprisonment claims of the Deceased Plaintiffs.

359, 366 (5th Cir. 2003). The statute of limitations is tolled where a defendant "affirmatively conceals the responsible party's identity" and "a duty to disclose exists." *Carney v. United States*, 2003 WL 21653853, at * 4 (N.D. Tex. Mar. 31, 2003) (citing *Barnhill v. Integrated Health Servs., Inc*., 21 S.W.3d 321 (Tex. Ct. App. 1999, *no writ*).

In this case, while it appears from Plaintiffs' pleadings that the action is barred, the pleadings do raise a basis for tolling. Specifically, Plaintiffs argue that Daoud had a duty to disclose its identity, and that instead Daoud affirmatively concealed it.[13] The duty to disclose arises from the Department of Labor's requirement that employers notify employees of their rights. (McOwen Decl. ¶ 10.) In DBA proceedings, Daoud denied that any employer-employee relationship or prospective employer-employee relationship existed between Daoud and the Deceased Plaintiffs. (*Id.* ¶ 4.) Plaintiffs argue that this denial (coupled with Daoud's later admission that it did employ Plaintiff Gurung) evidences Daoud's failure to notify employees of their rights, provide details on the employer's DBA contact and insurance carrier, and assist employees in filing a DBA claim in the United States. (*Id.* ¶ 10.) Daoud argues that it did not fraudulently conceal its role, but rather that it only denied, as it still does, that any employment relationship existed between Daoud and the Deceased Plaintiffs.

Plaintiffs have clearly alleged that Daoud affirmatively and fraudulently concealed its role in the Plaintiffs' case. If Daoud fraudulently concealed its role, as Plaintiffs allege, then the limitations period would have been tolled until March 7, 2008 for claims by the families of the Deceased Plaintiffs against Daoud. The claims in this case were filed less than six months later. While the Court does not conclude that Daoud

---

[13] This claim is unrelated to the equitable tolling argument asserted in support of Plaintiffs' claims against KBR, which this Court found unavailing in its 2009 Order. (Doc. No. 168, at 31.)

did conceal its role, Plaintiffs' have sufficiently alleged that fact. As such, Plaintiffs' claims against Daoud for negligence and false imprisonment should not be dismissed.

**ii. Fraud and Breach of Contract Claims**

Daoud moves to dismiss Plaintiffs' fraud and breach of contract claims on the basis that such claims are barred by the applicable statute of limitations. As Plaintiffs correctly indicate, the statute of limitations for these claims is four years. *See* Tex. Civ. Prac. & Rem. Code § 16.004(a) (Vernon 2002); *WesternGeco v. Ion Geophysical Corp*., 2009 WL 3497123, at *3 (S.D. Tex. Oct. 28, 2009). In its 2009 Order, this Court found Plaintiffs' RICO claims, to which a four year statute of limitations applies, to be timely. (Doc. No. 168, at 24-26.) For the reasons expressed in its 2009 Order, the Court concludes that Plaintiffs' fraud and breach of contract claims are timely.

As to Plaintiffs' breach of contract claims, Daoud argues that these claims should also be dismissed because "plaintiffs fail to allege the material terms of the contracts supposedly at issue." (Doc. No. 188, at 22 n.29.)[14] Plaintiffs contend that their Complaint does specifically allege the material terms of the contract. The case Daoud cites in support of dismissing Plaintiffs' breach of contract claim, *Baylor Univ. Med. Ctr. v. Epoch Group, L.C.*, holds that "a claim on a written contract must either, (1) quote relevant contractual language; (2) include a copy of the contract as an attachment; or (3) summarize the contract's purported legal effect. 2005 WL 2124126, at *7 (N.D. Tex. Sept. 1, 2005) (citing 5 Wright & Miller § 1235 at 393; Fed. R. Civ. P. Official Form 3).

---

[14] Daoud also asserted that, if the Court were to find that California law applied, then the allegations would be insufficient for failure to state whether the contract at issue was oral or written. (Doc. No. 188, at 22.) As the Court has concluded that Texas law applies to Plaintiffs' common law claims, it need not consider Daoud's California law argument.

Though Daoud is correct that the Deceased Plaintiffs do not quote the contractual language or attach a copy of the contract, the Complaint does summarize the contract's purported legal effect. Specifically, the Complaint states that "[e]ach Deceased Victim, along with Plaintiff Gurung, paid Defendant Daoud and/or its co-conspirators money to secure employment, often incurring a significant debt to do so, as part of the obligations under each employment contract." (Doc. No. 58, ¶ 173.) The Complaint also states that Plaintiffs "were told that their salaries would be approximately $500 per month." (*Id.* ¶ 64.) Finally, the unique facts of this case support a conclusion that the Deceased Plaintiffs' breach of contract claims are sufficiently plead; as the bodies of the Deceased Plaintiffs, and any contracts that may have been in their possession, were never recovered, it appears that the Deceased Plaintiffs' allegations are plead with the greatest level of specificity possible under the circumstances.

As to Plaintiff Gurung, Daoud argues that his breach of contract claim must be dismissed because his contracts with Daoud, which were in writing, require disputes to be resolved in Jordan under Jordanian law. Plaintiffs respond that the contracts produced by Daoud cover only the later part of Mr. Gurung's time at Al Asad, not the initial trafficking. (Doc. No. 198, at 7 n.7.) The question of which contract applies is a factual issue which is inappropriate for resolution in this motion to dismiss. Daoud's motion to dismiss all Plaintiffs' contract claims must be denied.

**b. RICO**

In its 2009 Order, the Court held that Plaintiffs' RICO claims could proceed against KBR. (Doc. No. 168.) In its Renewed Motion to Dismiss Plaintiffs' First Amended Complaint, Daoud argues that, under *Morrison v. Nat'l Austl. Bank*, 130 S. Ct.

2869 (2010), and its progeny, RICO does not apply extraterritorially. Plaintiffs' contend that *Morrison* does not necessarily apply in the RICO context and that, even if it does, RICO does apply extraterritorially in this case.

In *Morrison*, the Supreme Court addresses whether § 10(b) of the Securities Exchange Act of 1934 provides a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges. Writing for the Supreme Court, Justice Scalia begins by repeating the "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" 130 S. Ct. at 2877 (citing *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)). According to the Supreme Court, the Second Circuit, from which *Morrison* was appealed, disregarded this canon of statutory interpretation when it determined that the Exchange Act's silence about § 10(b)'s extraterritorial application permitted the court to "discern" whether Congress would have wanted the statute to apply. "When a statute gives no clear indication of an extraterritorial application," the Supreme Court explains, "it has none." *Id.* at 2878.

*Morrison*'s reasoning does not suggest, and the Court cannot conclude, that the case was meant to be limited to the securities context, or that for some reason RICO should be exempted from its reach. In invalidating the "conduct" and "effects" tests, used by a number of circuits prior to *Morrison* to determine the extraterritorial applicability of various statutes,[15] Justice Scalia writes that "[r]ather than guess anew in each case, we

---

[15] *See, e.g.*, *SEC v. Kasser*, 548 F.2d 109, 116 (3d Cir. 1977), *overruled by Morrison*, 130 S. Ct. 2869; *Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.*, 592 F.2d 409, 421–22 (8th Cir. 1979), *overruled by Morrison*, 130 S. Ct. 2869; *Grunenthal GmbH v. Hotz*, 712 F.2d 421, 424–425 (9th Cir. 1983), *overruled by Morrison*, 130 S. Ct. 2869; and *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 667

apply the presumption [against extraterritoriality] *in all cases*, preserving a stable background against which Congress can legislate with predictable effects." 130 S. Ct. at 2881 (emphasis added). This language unmistakably indicates that *Morrison*'s reasoning applies to the analysis of the extraterritorial application of all statutes, including RICO.

Because *Morrison* applies to RICO, the Court must follow the *Morrison* framework in considering whether RICO applies extraterritorially. The first step is to determine whether RICO is clearly meant to apply abroad. 131 S. Ct. at 2881-83. If it is, the inquiry ends, and Plaintiffs' RICO claim proceeds. If it is not, the Court must then ask whether Plaintiffs' claims actually seek to apply RICO extraterritorially. *Id.* at 2884-86. If the Court determines that Plaintiffs' claims do not seek the extraterritorial application of RICO, then their claim may proceed.

As the Ninth Circuit recently concluded, indication that Congress intended a statute to apply extraterritorially may come from either the text or the context of the statute. *Sarei v. Rio Tinto*, 2011 WL 5041927 at *4 (9th Cir. Oct. 25, 2011). Plaintiffs argue that RICO's statutory text warrants its extraterritorial application in this case. RICO prohibits "racketeering activity," defined as "any act which is indictable" under specified provisions of Title 18, including Sections 1589, 1590, and 1592 (the offense alleged in this case). 18 U.S.C. § 1961. The specified predicate acts include a number that are indictable extraterritorially, and some that can *only* be violated by extraterritorial conduct. For example, acts indictable under 18 U.S.C. § 2332b(g)(5)(B) include § 956(a)(1) (conspiracy to murder, kidnap, or maim persons abroad), § 2332 (violence against U.S. nationals outside the United States); § 2340A (torture outside the United

---

(7th Cir. 1998), *overruled by Morrison*, 130 S. Ct. 2869. This Court utilized both tests in considering KBR's liability under RICO in its 2009 Order. (Doc. No. 168, at 20-22).

States); and § 2423(a) (transporting a minor in foreign commerce for prostitution). Plaintiffs argue that, because RICO includes predicate acts that can *only* be violated by extraterritorial conduct, it is clearly intended to apply abroad, at least as to those predicate acts that are extraterritorially indictable.

Daoud contends that the Second Circuit considered and rejected Plaintiffs' arguments in *Norex Petroleum Ltd. v. Access Indus.*, 631 F.3d 29 (2d Cir. 2010). The Court is not bound to follow *Norex*, but, even if it were, it finds that case to be distinguishable from this one. The plaintiffs in *Norex* argued that RICO may be applied to *all* foreign conduct by foreign actors, simply because *some* of RICO's predicate acts possess an extraterritorial reach. 631 F.3d at 31, 33. In contrast, Plaintiffs in this case argue that RICO applies extraterritorially only to predicate acts that are themselves extraterritorially indictable.[16] The argument here is therefore far narrower. The Court agrees with Plaintiffs that, at least as it relates to predicate acts that are themselves extraterritorially indictable, RICO was clearly intended by Congress to have an extraterritorial reach. Any other conclusion would require the Court to read extraterritorial predicate acts out of RICO, rendering those provisions meaningless. Such a result is not only illogical, but it is manifestly inconsistent with *Morrison*'s emphasis on Congressional intent. 130 S. Ct. at 2877. As the Court has already held that the predicate acts alleged in this case are extraterritorially indictable,[17] it now concludes that RICO applies extraterritorially as to Plaintiffs' claims. Because the Court determines that RICO

[16] This argument was unavailable in *Norex*, as the defendants in that case were not U.S. military contractors, 18 U.S.C. § 3261, and the claims did not fall within 18 U.S.C. § 1596.

[17] In the Court's 2009 Order, the Court held that the predicate acts in this case are indictable extraterritorially through the application of the "the Military Extraterritorial Jurisdiction Act ("MEJA"), 18 U.S.C. § 3261.

applies extraterritorially in this case, the Court need not consider the auxiliary question of whether Plaintiffs are actually seeking to apply RICO extraterritorially.[18]

**c. ALIEN TORT STATUTE**

In its 2009 Order, the Court denied KBR's Motion to Dismiss Plaintiffs' ATS claim, concluding that the state action requirement for ATS claims is not absolute. Specifically, the Court held that the state action requirement does not apply to private acts of human trafficking, as forced labor and human trafficking violate customary norms of international law. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004). Daoud does not reurge KBR's state action argument, but it urges the Court to reverse course and dismiss Plaintiffs' ATS claims in light of the Second Circuit's recent decision in *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010), *cert. granted*. In *Kiobel*, the Second Circuit examined whether domestic or international law should be applied in determining the appropriate targets of ATS liability (that is, who may be sued under the ATS). Concluding that international law supplies the rule of decision on this question, Judge Cabranes applied the *Sosa* standard to the question of whether international law allows for corporate liability, and concluded that there exists no international law norm of corporate civil liability.[19]

As Plaintiffs point out, *Kiobel* is not only inconsistent with this Court's prior holding,[20] but it is inconsistent with the weight of established authority on this issue. The

---

[18] *Cf. European Community v. RJR Nabisco, Inc.*, 2011 WL 843957, at *6 (E.D.N.Y. Mar. 8, 2011) (applying the second step in the *Morrison* analysis, and concluding that the location of a RICO enterprise is the key factor to consider in determining whether a plaintiff seeks to apply RICO extraterritorially).

[19] The Supreme Court has granted certiorari to hear an appeal of the Second Circuit's decision in *Kiobel*. The Supreme Court's resolution of that case, expected by the end of its October 2011 term, should resolve the circuit split on this issue.

[20] Although this Court's 2009 Order did not directly address the issue of whether the ATS gives rise to liability against corporations, such a conclusion was implicit in the Court's holding that Plaintiffs' ATS claims against KBR, a corporation, could proceed.

Seventh, Ninth, Eleventh, and D.C. Circuits have all held that corporate liability is appropriate under the ATS. In a unanimous opinion for the Seventh Circuit, Judge Posner found that "[t]he factual premise of the majority opinion in the *Kiobel* case is incorrect," concluding "we see no objection to corporate civil liability." *Flomo v. Firestone Natural Rubber Co.*, 643 F.3d 1013, 1017-21 (7th Cir. 2011). The D.C. Circuit likewise rejected *Kiobel's* reasoning for, among other blunders, "misinterpreting *Sosa* in several ways, and selectively ignoring the relevant customary international law." *Doe VIII v. Exxon Mobil Corp.*, 654 F.3d 11, 57 (D.C. Cir. 2011). In *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1263 (11th Cir. 2009), the Eleventh Circuit, writing before *Kiobel*, held that "corporate defendants are subject to liability under the ATS and may be liable for violations of the law of nations." Most recently, the Ninth Circuit held that "[t]here is no legitimate basis for [the] position that the [ATS] itself is a complete bar to corporate liability." *Sarei v. Rio Tinto*, 2011 WL 5041927 at *7 (9th Cir. Oct. 25, 2011).

The Court finds *Kiobel* unavailing for a number of reasons, perhaps most obviously its flawed application of *Sosa*. *Sosa* does not address the question of corporate liability under the ATS, and does not purport to require the subjects of ATS liability to derive from customary international law. *See Doe VIII*, 654 F.3d at 41 (citing *Khulumani v. Barclay Nat. Bank, Ltd.*, 504 F.3d 254, 286 (2d Cir. 2007)). In light of the foregoing, the Court concludes that Plaintiffs' ATS claims should not be dismissed.

### C. FORUM NON CONVENIENS

Finally, Daoud argue that "Plaintiffs' claims against Daoud can and should be litigated in Jordan…which is in all events a more appropriate forum for their resolution." (Doc. No. 188, at 19.) While Daoud does not invoke the doctrine of forum non

conveniens by name, the Court thinks it clear from the case law cited and from subsequent briefings that Daoud seeks dismissal on forum non conveniens grounds.

**1. Legal Standard**

A federal court sitting in diversity applies the federal law of forum non conveniens in deciding a motion to dismiss in favor of a foreign forum. *De Aguilar v. Boeing Co.*, 11 F.3d 55, 59 (5th Cir. 1993); *In re Air Crash Disaster Near New Orleans, La.*, 821 F.2d 1147, 1159 (5th Cir. 1987) (*en banc*), *vacated on other grounds sub. nom., Pan Am. World Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989), *reinstated except as to damages by In re Air Crash Disaster Near New Orleans, La.*, 883 F.2d 17 (5th Cir. 1989) (*en banc*). The doctrine of forum non conveniens enables a district court, at its discretion, to decline to exercise jurisdiction "if the moving party establishes that the convenience of the parties and the court and the interests of justice indicate that the case should be tried in another forum." *Karim v. Finch Shipping Co., Ltd.*, 265 F.3d 258, 268 (5th Cir. 2001). Indeed, "the ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." *Koster v. (American) Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 527 (1947).

In analyzing whether to dismiss a case on forum non conveniens grounds, a district court must first consider whether an available and adequate alternative forum exists. If it does, the court then determines which forum is best suited to the litigation. *Karim*, 265 F.3d at 268 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22, 255 (1981)). In assessing whether an available and adequate alternative forum exists, a district court generally considers the following factors: "(1) amenability of the defendant to service of process and (2) availability of an adequate remedy in the alternative forum."

*Karim*, 265 F.3d at 268; *see also Gonzalez v. Chrysler Corp*., 301 F.3d 377, 379-80 (5th Cir. 2002), *cert. denied*, 538 U.S. 1012 (2003); *McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403, 424 (5th Cir. 2001). A forum is adequate and available only if "the entire case and all parties can come within the jurisdiction of that forum" and "the parties will not be deprived of all remedies or treated unfairly." *UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 220-21 (5th Cir. 2009). "If the court concludes that the foreign forum is both available and adequate, it should then consider all of the relevant factors of private interest, weighing in the balance the relevant deference given the particular plaintiff's initial choice of forum." *In re Air Crash*, 821 F.2d at 1165.

**2. Analysis**

The threshold question for the Court is whether Jordan is an available and adequate forum. As Daoud concedes, a forum is not adequate where it does not "permit litigation of the subject matter of the dispute." *El Fadl v. Cent. Bank of Jordan*, 75 F. 3d 668, 677–78 (D.C. Cir. 1996), *abrogated by Samantar v. Yousuf*, 130 S. Ct. 2278 (2010); *see also UNC Lear*, 581 F.3d at 221 (foreign forum available is when entire case can be heard there). As Plaintiffs' expert, Atef Majali, explains, the Jordanian human trafficking law took effect in 2009 and does not apply to Plaintiffs' claims, which predate its enactment. (Doc. No. 198, Ex. 2, "Majali Decl." ¶¶ 8, 13.) Furthermore, Jordanian courts would not consider claims arising out of conduct on a U.S. military installation. (*Id.* ¶ 14.) Plaintiffs thus lack a legal remedy in Jordan. (*Id.* ¶¶ 7, 16.) Daoud's expert states that Jordan recognizes contract and tort claims generally, but fails to attest that there is a cause of action for Plaintiffs' human trafficking claims. (Doc. No. 189, Ex. 3, "Aljazy

Decl." ¶¶ 12–13.) Indeed, Plaintiffs' expert provides several examples of similar trafficking allegations that were not actionable in Jordan. (Majali Decl. ¶¶ 9–11.)

Moreover, Daoud has not carried its burden of showing that "all parties can come within the jurisdiction of" the Jordanian court. *UNC Lear*, 581 F.3d at 221. Specifically, Daoud has not shown that Plaintiffs' claims against the KBR Defendants can or should be similarly transferred, and KBR has expressly stated that it does not consent to jurisdiction in Jordan. (*See* Doc. No. 199, at 21.) "[D]ismissal predicated on *forum non conveniens* requires that all defendants consent or be subject to the alternative forum's jurisdiction." *In re Air Crash*, 821 F.2d at 1165; *Watson v. Merrell Dow Pharmaceuticals*, 769 F.2d 354, 357 (6th Cir. 1985); *Calavo Growers of California v. Generali Belgium*, 632 F.2d 963, 968 (2d Cir. 1980), *cert. denied*, 449 U.S. 1084 (1981). "Courts have denied *forum non conveniens* motions where a related action, requiring much of the same evidence, was pending also in the jurisdiction and could not be dismissed." *Karim*, 265 F.3d at 268 (citing *Argonaut P'ship, L.P. v. Bankers Trustee Co*., 1997 WL 45521, at * 15 (S.D.N.Y. Feb. 4, 1997). Because the Court concludes that no available and adequate alternative forum exists, it need not consider the private or public interest factors, which are only assessed when a court concludes that the foreign forum is both available and adequate. *See In re Air Crash*, 821 F.2d at 1165.

## III. MOTION TO DISMISS KBR'S CROSS-CLAIMS

Daoud moves to dismiss KBR's Cross-Claim for lack of personal jurisdiction and for failure to state a claim.

### A. PERSONAL JURISDICTION

**1. Legal Standard**

Specific jurisdiction, discussed briefly above, exists "[w]hen a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Cent. Freight*, 322 F.3d at 381 (citation omitted). "The non-resident's purposefully directed activities in the forum must be such that he could reasonably anticipate being haled into court in the forum state." *Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010) (citing *Burger King*, 471 U.S. at 474). Specific jurisdiction "requires a sufficient nexus between the non-resident's contacts with the forum and the cause of action." *Clemens*, 615 F.3d at 378-79. Indeed, the non-resident defendant must purposefully avail herself of the privilege of conducting activities in the forum state. *Id.* at 379.

**2. Minimum Contacts**

Daoud argues that neither general nor specific jurisdiction exists for reasons similar to those raised in its Renewed Motion to Dismiss Plaintiff's First Amended Complaint.[21] KBR responds that the following jurisdictional contacts give this Court specific jurisdiction over Daoud: (1) KBR entered into a number of contracts with Daoud which include KBR's "General Conditions" requiring defense and indemnification; (2) KBR personnel in Texas oversaw and supervised Daoud's contracts; and (3) the choice of law provision in the Subcontract selects Texas law. The Court finds that Daoud's alleged

[21] Daoud also argues that the Master Agreement, which it contends provides for the application of Iraqi law, is the only relevant contract in this case. According to Daoud, the Subcontract relied upon by KBR is irrelevant because there is no evidence that Plaintiffs were going to work under that Subcontract. As such, Daoud argues that the Subcontract's choice of law provision (which selects Texas) is irrelevant. KBR correctly responds that the argument over which contract applies is a summary judgment argument, and that, for the purposes of this motion, the Court must accept as true KBR's contention that the Subcontract applies.

breach of its obligation to defend and indemnify KBR arises out of and relates to Daoud's contracts with KBR, which are activities purposefully directed at the forum.

Generally, the Fifth Circuit looks to the place of contractual performance to determine whether the making of a contract with a Texas resident is sufficiently purposeful to satisfy the minimum contacts requirement and create specific jurisdiction. *Jones v. Petty-Ray Geophysical, Geosource, Inc.*, 954 F.2d 1061, 1068 (5th Cir. 1992). Under Texas law, the place of performance of a contractual obligation to defend and indemnify is the place where the party is sued, regardless of the place of performance of other contractual provisions. *See Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 171 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (place of performance is where "the suing took place," regardless of where the "main performance contemplated by the contract" occurs).

The Fifth Circuit has also held that exercising specific jurisdiction is appropriate where a defendant "issued [a] continuing guaranty" to an entity that the defendant knew was located in Houston, Texas, where the "general contract…stipulated that it would be governed by the laws of Texas." *Marathon Metallic Bldg. Co. v. Mountain Empire Constr. Co.*, 653 F.2d 921, 923 (5th Cir. 1981) (per curiam). As a guaranty is "a species of indemnity contract," *Farmers & Merchs. State Bank of Krum v. Reece Supply Co.*, 79 S.W.3d 615, 617 (Tex. App.—Eastland 2002, no pet.), the Court finds that the reasoning applied in *Marathon* applies equally here. Like the guaranty in *Marathon*, Daoud's agreement to defend and indemnify KBR, which continues past the period of the contract, is "an open-ended obligation…to stand good for [plaintiff's] advances." 653 F.2d at 923. And, as in *Marathon*, the effect of Daoud's indemnification agreement was to "cause

business activity, foreseeable by the [defendant], in the forum state." *Id.* KBR has submitted evidence that it would not have subcontracted with Daoud had Daoud not agreed to defend and indemnify KBR. (Doc. No. 216, Ex. 1 ¶ 5.)

Daoud refers to a number of cases in support of its argument that an indemnification agreement is insufficient to establish minimum contacts. For example, Daoud cites *Koll Real Estate Group, Inc. v. Purseley*, 127 S.W.3d 142 (Tex. App.—Houston [1st Dist.] 2003, no pet.), for the proposition that indemnity agreements alone are not sufficient minimum contacts, and *Gessman v. Stephens*, 51 S.W.3d 329, 340 (Tex. App.—Tyler 2001, no pet.), which held that an indemnification agreement was a "speculative contact at best," and did not confer jurisdiction. The Court finds *Koll* and *Gessman* distinguishable. In both, the plaintiffs sought to establish personal jurisdiction on the basis that the defendant had contracted to indemnify a third party. That is, the plaintiffs in those cases were not suing for indemnification or defense, as here, but were asserting personal injury claims, and attempting to use the indemnity agreements between the defendant and another party to establish jurisdiction. Thus, these cases stand for the limited proposition that "an indemnity obligation is not sufficient to establish specific jurisdiction where…the claims asserted are not based on the breach of that obligation." *See Carpenter v. Exelon Corp.*, 2007 WL 3071998, at *2 n.5 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (interpreting *Koll* and other Texas cases considering the effect of indemnity obligations on specific jurisdiction).

Daoud also cites *Hampton/SHL Inv. Co. v. Arnold Indus., Inc.*, 1999 WL 61422, at *4 (N.D. Tex. 1999), for the proposition that an agreement to indemnify is insufficient to establish minimum contacts. While the indemnification agreement in *Hampton/SHL*

was actually an agreement between the plaintiff and the defendant, rendering *Hampton/SHL* marginally more relevant than *Koll* and *Gessman*, Daoud's comparison suffers from the same fundamental flaw. Like the plaintiffs in *Koll* and *Gessman*, the plaintiff in *Hampton/SHL* was not attempting to use the indemnification agreement to establish jurisdiction over a claim for indemnification, but rather was using it to establish jurisdiction over a separate claim. The case is not at all analogous to this case.

Although it does not deal with an agreement to indemnify, the analysis in *Central Freight* proves instructive in this case.[22] In *Central Freight*, the Fifth Circuit found that the defendant had "'reached out' to a Texas corporation…with the deliberate aim of entering into a long-standing contractual relationship." 322 F. 3d at 382. (citing *Burger King*, 471 U.S. at 479-80). The court explained that, by entering into the [agreement], [the defendant] knew that it was affiliating itself with an enterprise based primarily in Texas." *Id.* (comparing the case to *Travelers Health Ass'n v. Virginia ex rel. State Corp. Comm'n*, 339 U.S. 643, 647 (1950) (upholding personal jurisdiction based on the fact that defendant created "continuing obligations" between himself and a resident of the forum)). The Court concluded, based on these facts, that "there can be no question that [the defendant] took 'purposeful and affirmative action' by entering into the [agreement], providing [the plaintiff] with pricing and shipping information, and agreeing to accept shipments by [plaintiff] from Texas for Texas customers that had the clearly 'foreseeable effect of 'causing business activity in the forum state.'" *Id.* (citing *Miss. Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1007 (5th Cir. 1982); *Burger King*, 471

[22] Daoud seeks to distinguish this case from *Central Freight* on the basis that the alleged contractual breach in this case involves defense and indemnification, whereas in *Central Freight* the alleged breach was a demand of payment above the negotiated rate. 322 F.3d at 379. The Court is unpersuaded by Daoud's attempts to distinguish this case, and finds the reasoning in *Central Freight* directly applicable.

U.S. at 476). Similarly, this Court concludes that Daoud entered into its numerous agreements with KBR with the intent to engage in a long-standing contractual relationship with a Texas corporation. Daoud should not be at all surprised that KBR now seeks to enforce the defense and indemnification clauses in those contracts in Texas, the forum in which KBR would most expect to be sued.

**3. Traditional Notions of Fair Play and Substantial Justice**

Daoud argues that, even if sufficient minimum contacts exist, this Court's assertion of personal jurisdiction over Daoud would "offend 'traditional notions of fair play and substantial justice,'" and would therefore be unreasonable as a matter of due process. *Asahi*, 480 U.S. at 113 (quoting *Int'l Shoe*, 326 U.S. at 316). The essence of Daoud's argument is that "[r]equiring a small Jordanian company to litigate claims in Texas—where it has never had *any* presence—to protect any minimal state interest in the KBR Defendants' cross-claims would be unreasonable." (Doc. No. 213, at 15.) Daoud also asserts that it structured its relationship with KBR to provide for the application of Iraqi law, and that nothing in this relationship made it foreseeable that Daoud would be subject to jurisdiction in Texas for indemnity. *Burger King*, 471 U.S. at 474 (holding that "foreseeability…is critical to [the] due process analysis").

The Court cannot agree. In satisfaction of the first factor in the reasonableness analysis, the Court finds that Texas has a "manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King*, 471 U.S. at 473 (quotation omitted.) Similarly, the second factor is satisfied here, as KBR undoubtedly has an interest in obtaining relief in Texas, as opposed to the Middle East, as a great number of KBR documents, witnesses, and attorneys are located here. Judicial

efficiency favors jurisdiction in this Court, as well; it is preferable that all aspects of a dispute are resolved in the same litigation, *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 631 (5th Cir. 1999), and the Court has retained jurisdiction over Plaintiffs' claims against Daoud. The remaining consideration, the burden on Daoud, does not persuade the Court that jurisdiction would be unfair. Daoud is undeniably burdened to some extent by having to litigate claims in Texas as opposed to the Middle East. However, as KBR notes, this burden would be equally felt by KBR were it forced to litigate its claims in the Middle East. *Wien Air Alaska*, 195 F.3d at 216; *Runnels v. TMSI Contractors, Inc.*, 764 F.2d 417, 423 (5th Cir. 1985) ("While it may be less convenient for [the defendant] to defend this suit in Louisiana, we find no reason why such inconvenience to [the defendant] should outweigh the inconvenience to [the plaintiff] of prosecuting the suit in Saudi Arabia."). Finally, the Court finds no merit in the proposition that Daoud could not have foreseen being subject to jurisdiction in Texas for indemnity. The Subcontract that KBR alleges is at issue in this case includes a Texas choice of law provision that, at a minimum, should have alerted Daoud to the fact that it might have to litigate indemnity in Texas.

**B. FAILURE TO STATE A CLAIM**

Daoud argues that KBR fails to state a claim for contractual indemnity because the KBR Defendants in this case are not parties to the indemnification provisions in the Daoud-KBR contracts. Daoud also seeks to dismiss KBR's contractual indemnity and defense claims on the basis that, as a matter of law and public policy, indemnification and defense are not available for the criminal conduct and intentional torts alleged in Plaintiffs' complaint.

Indemnity obligations are "strictly construed" and must be "clearly expressed." *Marathon E.G. Holding Ltd. v. CMS Enterprises Co.*, 597 F.3d 311, 317 (5th Cir. 2010) (citations omitted). Moreover, related corporate entities are only covered by each other's indemnity provisions where expressly provided in the indemnity agreement. *See Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 366-367 (5th Cir. 2009).

The nine entities that comprise the KBR Defendants in this case are: (1) Kellogg Brown & Root, Inc.; (2) Kellogg Brown & Root Services, Inc.; (3) KBR, Inc.; (5) KBR Holdings, LLC; (5) Kellogg Brown & Root LLC; (6) KBR Technical Services, Inc.; (7) Kellogg Brown & Root International, Inc.; (8) Services Employees International Inc.; and (9) Oversees Employment Administration. None of these entities is specifically named in the Master Agreement or the Subcontract. Daoud points out that the Master Agreement was entered into by either "Brown & Root International, Inc." or "Brown & Root Services, Inc." (Doc. No. 197, Ex. A, at 1) (Daoud contends that the Master Agreement is unclear, and that either one of these two scenarios is possible), neither of which is a named defendant in this case. The Subcontract provides that the "general contractor" is "Brown & Root International, Inc.," a division of "Kellogg Brown & Root Services Inc." (Doc. No. 197, Ex. C § 1.3.)

KBR counters that KBR Defendants were, in fact, parties to the Master Agreement and Subcontract, although their names have since changed. As to the Master Agreement, KBR responds to the two possible scenarios raised by Daoud: (1) that the Master Agreement was entered into by "Brown & Root International, Inc.;" or (2) that the Master Agreement was entered into by "Brown & Root Services, Inc." In the first scenario, "Brown & Root International, Inc." is the relevant entity. In that scenario,

Daoud's argument must fail, as "Brown & Root International, Inc." is the former name (and same legal entity) as "Kellogg, Brown & Root International Inc.," a named Defendant in this case. In the second scenario, in which "Brown & Root Services, Inc." is the contractor, Daoud's argument likewise fails. In 2003, when the parties entered into the Master Agreement, "Brown & Root Services, Inc." was a division of "Kellogg, Brown & Root Inc.," a named Defendant in this case that has since been merged into "Kellogg Brown & Root LLC" (another named Defendant in this case). (Doc. No. 216, Ex. 2, "Whatley Decl." ¶¶ 2-3.)

As to the Subcontract, KBR clarifies Daoud's confusion as to why the Subcontract is captioned as one between "Kellogg Brown & Root International, Inc." (a named Defendant in this case) and Daoud, yet names as the contractor "Brown & Root International, Inc." According to KBR, "Brown & Root International, Inc." was renamed "Kellogg Brown & Root International" in 2000, and denotes the same legal entity. (Whatley Decl. ¶ 2.) Thus, the KBR entity that is a party to the Subcontract is also a named defendant in this case. Because a named KBR Defendant is a party to both the Master Agreement and the Subcontract, KBR has standing to seek defense and indemnity based on Daoud's failure to provide the insurance required by these contracts.

Daoud also seeks to dismiss KBR's contractual indemnification and defense claims on the basis that indemnification and defense are not available for the criminal conduct or intentional torts claims alleged in Plaintiffs' complaint both as a matter of law and as a matter of public policy. Under Texas law, a party cannot obtain contractual indemnity for its future criminal misconduct. *Houston Ice & Brewing Co. v. Sneed*, 132 S.W. 387, 388 (Tex. Civ. App. 1910, writ dism'd). Further, a party can obtain contractual

indemnity for liability arising from its own intentional torts *only* for torts that have already occurred at the time of contracting; there can be no contractual indemnification for *prospective* intentional torts. *Oxy USA, Inc. v. Sw. Energy Prod. Co.*, 161 S.W.3d 277, 285-87 (Tex. App.—Corpus Christi 2005, pet. denied).  KBR does not appear to dispute the fact that it cannot obtain contractual defense and indemnity for future criminal misconduct or intentional torts; rather, KBR asserts that it can still seek indemnification on Plaintiffs' claims for "negligence," "negligent hiring," and "negligent supervision," which were dismissed from this case in the Court's 2009 Order after over a year of litigation. The Court agrees that defense and indemnification are available for these claims.

KBR may also seek indemnity under common law principles. As the Court explained in its 2009 Order, KBR's Cross-Claims allege facts that, if true, would establish an agency relationship between KBR and Daoud. (Doc. No. 168, at 29.) Thus, to the extent that an agency relationship exists between Daoud and KBR and KBR is found responsible for Daoud's conduct, KBR may seek indemnification under common law principles.

## IV.    CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** Daoud's Renewed Motion to Dismiss Plaintiffs' First Amended Complaint. Specifically:

- Daoud's motion to dismiss for lack of jurisdiction is denied;

- Daoud's motion to dismiss is granted as to Plaintiff Gurung's negligence and false imprisonment claims;

- Daoud's motion to dismiss is denied as to the Deceased Plaintiffs' negligence and false imprisonment claims; and
- Daoud's motion to dismiss is denied as to Plaintiffs' fraud, breach of contract, RICO, and ATS claims.

The Court also **GRANTS IN PART** and **DENIES IN PART** Daoud's Renewed Motion to Dismiss KBR's Cross-Claims. Specifically:

- Daoud's motion to dismiss for lack of jurisdiction is denied;
- Daoud's motion to dismiss KBR's contractual indemnification and defense claims is granted to the extent that KBR seeks defense and indemnification for criminal conduct or intentional torts;
- Daoud's motion to dismiss is otherwise denied.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 12th day of December, 2011.

THE HONORABLE KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE