REDACTED PUBLIC VERSION

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RAMCHANDRA ADHIKARI *et al.*, | ) | |
| | ) | Civil Action No. H-09-1237 |
| Plaintiffs, | ) | |
| | ) | Judge Keith P. Ellison |
| v. | ) | |
| | ) | |
| DAOUD & PARTNERS *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

PLAINTIFFS' RESPONSE IN OPPOSITION TO
KBR'S MOTION FOR SUMMARY JUDGMENT

REDACTED PUBLIC VERSION - SEALED MATERIAL DELETED

REDACTED PUBLIC VERSION

## TABLE OF CONTENTS

Page

I.    Introduction ................................................................................................. 1

II.   Summary of Argument ............................................................................... 1

III.  Statement of Facts ...................................................................................... 3

      KBR Obtained the Services of Buddhi Gurung and the Deceased Victims,
      Who Were Deceived and Coerced into Service for KBR ............................ 3

      KBR Benefitted from Hiring TCN Laborers ............................................... 7

      KBR Knew Trafficking Was Widespread and Responded by "Squashing"
      Investigations and Firing Whistleblowers ................................................. 8

      KBR Had Plenary Power and Control Over Daoud ..................................... 10

IV.   Standard of Review ................................................................................... 12

V.    Argument .................................................................................................... 13

      A.    TVPRA ............................................................................................ 13

            1.  Ample Evidence Demonstrates KBR's Conduct Was Knowing ......... 14

            2.  KBR Obtained and Recruited Buddhi Gurung and the Deceased Victims ......... 17

            3.  Buddhi Gurung and the Deceased Victims Were Obtained by Coercion,
                Including Serious Harm ........................................................... 18

      B.    Ample Evidence Demonstrates that Daoud Was KBR's Agent .................... 24

      C.    Ample Evidence Demonstrates KBR Is Liable as a Joint Employer ............ 34

      D.    RICO ............................................................................................... 40

            1.  Substantial Evidence of Agency Supports Plaintiffs' Vicarious RICO Claim .... 40

            2.  Substantial Evidence Demonstrates that KBR Benefitted from RICO
                Violations by Daoud, Making Summary Judgment Inappropriate ............ 42

      E.    Ample Evidence Supports Plaintiffs' Additional Theories of Liability ........ 44

            1.  Ratification ........................................................................... 44

            2.  Nondelegable Duty ................................................................. 45

            3.  Negligent Supervision ............................................................ 47

      F.    ATS ................................................................................................ 51

VI.   Summary Judgment Should Not Be Granted When the Non-Moving Party Has Not
      Had an Opportunity for Adequate Discovery ........................................... 53

            1.  Despite diligent efforts, Plaintiffs have not received production of
                information critical to the key issues in this case. .......................... 53

            2.  The limited discovery to date provides a plausible basis for believing that
                additional evidence exists on these key issues. .............................. 55

VII.  Conclusion ................................................................................................. 57

REDACTED PUBLIC VERSION

## <u>GLOSSARY</u>

Gurung Daoud Rog.:  Buddhi Gurung's Responses and Objections to Daoud & Partners (BVI)'s First Set of Interrogatories (July 13, 2012)

Gurung Dep.:  Deposition of Buddhi Gurung (July 20-21, 2012)

Gurung SEII Supp. Rog.:  Buddhi Gurung's Supplemental Responses and Objections to Service Employees International, Inc.'s First Set of Interrogatories Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (May 11, 2012)

Mot.:  KBR's Motion for Summary Judgment

[Plaintiff's Full Name] OAS Rog.:  Plaintiff's Response and Objections to Overseas Administration Service's First Set of Interrogatories Pursuant to Rules 26 and 33 of the Federal Rule of Civil Procedure (September 24, 2012)

SMF:  Statement of Matter of Facts, filed concurrently

REDACTED PUBLIC VERSION

<u>TABLE OF AUTHORITIES</u>

Page(s)

CASES

*Adickes v. S.H. Kress & Co.,*
  398 U.S. 144 (1970)..............................................................................................12

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)..............................................................................................12

*Baker v. Texas & Pac. Ry.,*
  359 U.S. 227 (1959)...................................................................................28, 30, 32

*Barfield v New York City Health & Hosps. Corp.,*
  432 F. Supp. 2d 390 (S.D.N.Y. 2006).................................................................38

*Beliz v. W.H. McLeod & Sons Packing Co.,*
  765 F.2d 1317 (5th Cir. 1985) ...................................................................... passim

*Boire v. Greyhound Corp.,*
  376 U.S. 473 (1964).........................................................................36, 37, 39

*Bristol v. Bd. of Cnty. Comm'rs,*
  312 F.3d 1213 (10th Cir. 2002) .........................................................................35

*Brown v. Miss. Valley State Univ.,*
  311 F.3d 328 (5th Cir. 2002) ............................................................................12

*Bueno v. Mattner,*
  829 F.2d 1380 (6th Cir. 1987) .........................................................................17

*Burlington Indus. v. Ellerth,*
  524 U.S. 742 (1998)..............................................................................................48

*C.R. Adams Trucking, Inc.,*
  262 NLRB 563 (1982), *enfd.,* 718 F.2d 869 (8th Cir. 1983) ................................37

*Cabrera v. Jakabovitz,*
  24 F.3d 372 (2d Cir. 1994)..................................................................................26

*Capitol EMI Music,*
  311 NLRB 997 (1993), *enfd.,* 23 F.3d 399 (4th Cir. 1994) ....................................38

*Cardinal Health Solutions, Inc. v. Valley Baptist Med. Ctr.,*
  643 F. Supp. 2d 883 (S.D. Tex. 2008) ...........................................................26, 34

REDACTED PUBLIC VERSION

TABLE OF AUTHORITIES
(continued)

Page

*Castillo v. Case Farms of Ohio, Inc.*,
    96 F. Supp. 2d 578 (W.D. Tex. 1999)..............................................................30, 35

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...........................................................................................11, 12

*Charles v. Burton*,
    169 F.3d 1322 (11th Cir. 1999) ................................................................................37

*Clark v. Coats & Clark, Inc.*
    929 F.2d 604 (11th Cir. 1991) ..................................................................................12

*Commonwealth v. Hong*,
    158 N.E. 759 (Mass. 1927).................................................................................47, 49

*Community for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989).............................................................................................. passim

*Culwell v. City of Fort Worth*,
    468 F.3d 868 (5th Cir. 2006) ....................................................................................58

*Daly v. Swift & Co.*,
    300 P. 265 (Mont. 1931).....................................................................................47, 50

*David v. Signal Int'l*,
    2012 U.S. Dist. LEXIS 135254 (E.D. La. Sept. 21, 2012) .................................21, 36

*Disney Enters., Inc. v. Esprit Fin., Inc.*,
    981 S.W.2d 25, 1998 Tex. App. LEXIS 3262 (Tex. App. 1998) ...........................44

*Doe v. Exxon Mobil Corp.*,
    654 F.3d 11 (D.C.Cir 2011)......................................................................................54

*Doe v. Reddy*,
    2003 WL 23893010 (N.D. Cal. Aug. 4, 2003) ......................................................22

*Dunn v. Wash. Cnty. Hosp.*,
    429 F.3d 689 (7th Cir. 2005) ............................................................................47, 49

*Escobar v. Baker*,
    814 F. Supp. 1491 (W.D. Wash. 1993).....................................................................18

*Evans v. Dare Lumber Co.*,
    93 S.E. 430 (N.C. 1917).......................................................................48, 49, 50, 53

REDACTED PUBLIC VERSION

## TABLE OF AUTHORITIES
(continued)

**Page**

*Fahs v. Tree-Gold Co-op Growers Inc.*,
    166 F.2d 40 (5th Cir. 1948) ..............................................................36

*Fifth Club, Inc. v. Ramirez*,
    196 S.W.3d 788 (Tex. 2006)..............................................................45

*Fin. Fed. Credit Inc. v. Curtis Excavating, LLC*,
    2009 U.S. Dist. LEXIS 126724 (S.D. Tex. Aug. 17, 2009)...................44

*Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*,
    876 F.2d 1231 (5th Cir. 1989) ..........................................................27

*Flomo v. Firestone Natural Rubber Co.*,
    643 F.3d 1013 (7th Cir. 2011) ..........................................................54

*Freitag v. Ayers*,
    468 F.3d 528 (9th Cir. 2006) ..............................................44, 47, 49

*Galdamez v. Potter*,
    415 F.3d 1015 (9th Cir. 2005) ..................................................47, 52

*Gorczynski v. Nugent*,
    83 N.E.2d 495 (Ill. 1948)..........................................................49, 52

*Grace v. USCAR*,
    521 F.3d 655 (6th Cir. 2008) ..........................................................35

*Graves v. Lowery*,
    117 F.3d 723 (3d Cir. 1997)......................................................35, 38

*Headley v. Church of Scientology Int'l*,
    687 F.3d 1173 (9th Cir. 2012) ..........................................................24

*Hilton Int'l Co. v. NLRB*,
    690 F.2d 318 (2d Cir. 1982)..............................................................33

*Hinojosa v. Johnson*,
    277 F. App'x 370 (5th Cir. 2008) ......................................................55

*Hodgson v. Griffin & Brand, Inc.*,
    1972 U.S. Dist. LEXIS 14394 (S.D. Tex. Mar. 31, 1972)................47, 48

*Hodgson v. Griffin & Brand, Inc.*,
    471 F.2d 235 (5th Cir. 1973) ............................................35, 36, 37, 39

REDACTED PUBLIC VERSION

TABLE OF AUTHORITIES
(continued)

Page

*Hodgson v. Okada,*
   472 F.2d 965 (10th Cir. 1973) ......................................................................37

*In re West,*
   46 N.E.2d 760 (Mass. 1943) ........................................................................48

*Isquith ex rel. Isquith v. Middle S. Utils., Inc.,*
   847 F.2d 186 (5th Cir. 1988) .......................................................................12

*Kemether v. Pennsylvania Interscholastic Athletic Ass'n,*
   15 F. Supp. 2d 740 (E.D. Pa. 1998) .............................................................28

*Kiwanuka v. Bakilana,*
   844 F. Supp. 2d 107 (D.D.C. 2012) ...............................................18, 23, 36

*Lathers v. Penguin Industries, Inc.,*
   687 F.2d 69 (5th Cir. 1982) .........................................................................46

*Lockard v. Pizza Hut,*
   162 F.3d 1062 (10th Cir. 1998) ..............................................................47, 48

*Makousky v. Wing King Three, Inc.,*
   2005 U.S. Dist. LEXIS 38260 (M.D. Fla. Dec. 20, 2005) .........................35

*Mantiply v. United States,*
   2012 U.S. Dist. LEXIS 143460 (W.D. La. Aug. 20, 2012).............30, 31, 32

*Meyer v. Holley,*
   537 U.S. 280 (2003) .....................................................................................25

*Montalvo v. Larchmont Farms,*
   2009 WL 4573279 (D.N.J. Dec. 3, 2009) ....................................................17

*Morante v. Am. Gen. Fin. Ctr.,*
   157 F.3d 1006 (5th Cir. 1998) .....................................................................27

*Moreno v. Poverty Point Produce, Inc.,*
   243 F.R.D. 265 (S.D. Tex. 2007)......................................................26, 29, 32

*Mukhtar v. Castleton Serv. Corp.,*
   920 F. Supp. 934 (S.D. Ind. 1996) ...............................................................28

*N.L.R.B. v. Aldworth Co,*
   124 F. Supp. 2d 268 (D.N.J. 2000) .........................................................37, 38

REDACTED PUBLIC VERSION

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Nipponkoa Ins. Co. v. Globeground Servs.*,
    2007 U.S. Dist. Lexis 61173 (N.D. Ill. Aug. 17, 2007) ........................................................30

*NLRB v. United Ins. Co.*,
    390 U.S. 254 (1968) ...........................................................................................................31

*NLRB v. Western Temp. Servs., Inc.*,
    821 F.2d 1258 (7th Cir. 1987) .............................................................................................35

*Ochoa v. J.B. Martin & Sons Farms*,
    287 F.3d 1182 (9th Cir. 2002) ..................................................................................... passim

*Olney Sav. & Loan Asso. v. Trinity Banc Sav. Asso.*,
    885 F.2d 266 (5th Cir. 1989) ...............................................................................................44

*Penton v. Am. Bankers Ins. Co.*,
    114 F. App'x 622 (5th Cir. 2004) .........................................................................................44

*People ex rel. Price v. Sheffield Farms-Slawson-Decker Co.*,
    121 N.E. 474 (N.Y. 1918) ..................................................................................47, 48, 50, 52

*Prunty v. Arkansas Freightways, Inc.*,
    16 F.3d 649 (5th Cir. 1994) .................................................................................................44

*Purtell v. Philadelphia & Reading Coal & Iron Co.*,
    99 N.E. 899 (Ill. 1912) .................................................................................................47, 50

*Reyes v. Remington Hybrid Seed Co.*,
    495 F.3d 403 (7th Cir. 2007) ...............................................................................................37

*Rivas v. Fed. de Asociaciones Pecuarias*,
    929 F.2d 814 (1st Cir. 1991) ...............................................................................................35

*Rutherford Food Corp. v. McComb*,
    331 U.S. 722 (1947) .....................................................................................................36, 39

*Sarei v. Rio Tinto PLC*,
    671 F.3d 736 (9th Cir. 2011) ...............................................................................................54

*Schoenbaum v. Firstbrook*,
    405 F.2d 215 (2d Cir. 1968) ................................................................................................58

*Sharp v. City of Houston*,
    164 F.3d 923 (5th Cir. 1999) ..........................................................................................48, 52

REDACTED PUBLIC VERSION

## TABLE OF AUTHORITIES
(continued)

Page

*Shukla v. Sharma,*
   2012 U.S. Dist. LEXIS 18392 (E.D.N.Y. Feb. 4, 2012)........................................23

*Slater v. Judson Constr.,*
   2010 Conn. Super. LEXIS 3220 (Conn. Super. Ct. Dec. 14, 2010) ........................48

*Sosa v Alvarez-Machain,*
   542 U.S. 692 (2004)..............................................................................................53

*Stripling v. Jordan Prod. Co.,*
   234 F.3d 863 (5th Cir. 2000) ..........................................................................26, 28

*Torres-Lopez v. May,*
   111 F.3d 633 (9th Cir. 1997) ..........................................................................35, 37

*Townsend v. Goodyear Tire & Rubber Co.,*
   481 F. Supp. 2d 610 (N.D. Tex. 2007) ..................................................................45

*United States v. Bradley,*
   390 F.3d 145 (1st Cir. 2004)................................................................18, 20, 22

*United States v. Kozminski,*
   487 U.S. 931 (1988)..............................................................................................18

*United States v. Bibbs,*
   564 F.2d 1165 (5th Cir. 1977) ..............................................................................23

*United States v. Calimlim,*
   538 F.3d 706 (7th Cir. 2008) ................................................................................21

*United States v. Dann,*
   652 F.3d 1160 (9th Cir. 2011) ........................................................................21, 23

*United States v. Farrell,*
   563 F.3d 364 (8th Cir. 2009) ..........................................................................22, 23

*United States v. Mussry,*
   726 F.2d 1448 (9th Cir. 1984) ..................................................................20, 22, 23

*United States v. Nnaji,*
   447 F. App'x 558 (5th Cir. 2011) ..........................................................................20

*United States v. Sung Bum Chang,*
   237 F. App'x 985 (5th Cir. 2007) ..........................................................................20

REDACTED PUBLIC VERSION

TABLE OF AUTHORITIES
(continued)

Page

*United States v. Thomas,*
    377 F.3d 232 (2d Cir. 2004)................................................................................24

*United States v. Veerapol,*
    312 F.3d 1128 (9th Cir. 2002) ..........................................................................22

*Usery v. Pilgrim Equip. Co.,*
    527 F.2d 1308 (5th Cir. 1976) ................................................................... passim

*Vincent v. Riggi & Sons,*
    285 N.E.2d 689 (N.Y. 1972).............................................................................52

*Virgo v. Riviera Beach Assocs.,*
    30 F.3d 1350 (11th Cir. 1994) .........................................................................38

*Wilson v. Good Humor Corp.,*
    757 F.2d 1293 (D.C. Cir. 1985).................................................................45, 46

*Winfrey v. San Jacinto Cnty.,*
    2012 U.S. App. LEXIS 15589 (5th Cir. July 27, 2012).............................12, 55, 59

*Wirtz v. Lone Star Steel Co.,*
    405 F.2d 668 (5th Cir. 1968) ..........................................................36, 37, 48, 52

**STATUTES**

Alien Tort Statute ("ATS"), 28 U.S.C. § 1350 ............................................................53

Ill. Child Labor Act of 1903 .......................................................................................50

National Labor Relations Act, 29 U.S.C. §§ 158, 160.................................................38

Racketeer Influence and Corrupt Organizations Act, 18 U.S.C. § 1962(c)..................40

Trafficking Victims Protection Act,
    18 U.S.C. §§ 1590, 1592, 1594.......................................................... passim
    22 U.S.C. § 7101 ....................................................................................13, 18

REDACTED PUBLIC VERSION

## TABLE OF AUTHORITIES
### (continued)

Page

OTHER AUTHORITIES

FED. R. CIV. P. 56(d) ................................................................................ passim

H.R. Rep. No. 106-939 (2000) (Conf. Rep.) .........................................................19, 20

International Trafficking in Women and Children, Hearings Before the Subcommittee on Near Eastern and South Asian Affairs of the Committee on Foreign Relations, United States Senate, 106th Congress (Feb. 22 and Apr. 4, 2000) [cited as *Hearing on Int'l Trafficking*] ......................................................................................................19, 20

*World Bank Official Sentenced for Lying*, WASH. POST (July 4, 2010).........................................23

Order, ECF No. 168 (Nov. 3, 2009) ...........................................................................47

RESTATEMENT (SECOND) OF AGENCY § 14N .................................................................25

RESTATEMENT (SECOND) OF AGENCY § 2(3) ................................................................24

RESTATEMENT (SECOND) OF AGENCY § 220(2)(h)...........................................................28

RESTATEMENT (SECOND) OF TORTS § 427 (1965)..........................................................45

U.S. Dep't of State, *Trafficking in Persons Report*, June 2003 ....................................46

U.S. Dep't of State, *Trafficking in Persons Report*, June 2004 ....................................46

U.S. Dep't of State, *Trafficking in Persons Report*, June 2008 ....................................46

REDACTED PUBLIC VERSION

## I.    INTRODUCTION

Despite the very limited discovery of KBR to date, substantial evidence demonstrates that KBR was well aware that laborers from Nepal and other poor countries were being trafficked against their will into the war zone in Iraq.  KBR also knew that Daoud had engaged in trafficking and that the pipeline of workers it received from Daoud was tainted by this problem. It knew this at the time Buddhi Gurung and the twelve deceased Nepalis were trafficked into Iraq.  At all times, KBR tightly controlled the recruitment, supply, retention and repatriation of third country national laborers on its LOGCAP contract and had authority to regulate the use of labor brokers, prohibit passport confiscation, ban charging recruitment fees, and prevent the imposition of new, lower-wage, contracts on workers after their arrival,

Instead, KBR repeatedly fired whistleblowers and squashed investigations of the abusive practices.

The prohibitions on human trafficking at the heart of Plaintiffs' complaint sweep much more broadly than the crabbed view KBR asks this Court to accept.  Under the TVPRA and ATS, KBR is directly liable for recruiting and obtaining trafficked labor.  In addition, KBR may be held accountable based on traditional theories of liability, including agency and the joint employer doctrine.  The evidence available to date demonstrates that KBR is liable under each of these theories and full discovery will further demonstrate the viability of Plaintiffs' claims. Plaintiffs also renew their Motion for a Continuance Under Fed. R. Civ. P. 56(d), Dkt. 375, as summary judgment is inappropriate where adequate discovery has not been had.

## II.    SUMMARY OF ARGUMENT

Most of the KBR Defendants' Motion for Summary Judgment focuses solely on the Complaint's direct RICO claims against KBR.  As those claims have been voluntarily dismissed with prejudice, KBR's arguments concerning direct RICO claims against it are moot.

As to the remainder of the claims against KBR, summary judgment should be denied. Ample evidence exists in the record that KBR violated the TVPRA and ATS by obtaining and recruiting Buddhi Gurung and the Deceased Victims by coercion, including threat of serious harm. Moreover, the record is replete with evidence that Daoud was KBR's agent, and that KBR exercised plenary control over the manner and means by which Daoud recruited, employed and retained TCN labor. As such, KBR is liable for the acts of Daoud that come within this principal-agent relationship, including TVPRA, RICO and ATS violations. Furthermore, the evidence shows that KBR acted as a joint employer of the Deceased Victims and Buddhi Gurung, meaning that KBR is responsible, jointly and severally, for violations of these statutes committed by either Daoud or KBR against their employees. Additionally, the evidence in the record demonstrates that KBR ratified Daoud's actions and had a non-delegable duty to ensure that foreign laborers serving KBR were safely employed and not victims of trafficking. Such ratification and failure to perform this non-delegable duty also make KBR liable for Plaintiffs' injuries under the TVPRA, RICO and ATS. Lastly, there is sufficient evidence in the record that KBR negligently supervised Daoud by failing to use reasonable diligence and oversight that would have prevented the trafficking of the Deceased Victims and Buddhi Gurung. Finally, with regard to the ATS claims, the Supreme Court is considering the exact issue posed by KBR, making resolution of this question premature until the Court's expected ruling later this year.

Each of these theories of liability is amply supported by the limited discovery exchanged to date, precluding judgment as a matter of law. KBR's Motion for Summary Judgment must be denied. To the extent that the Court believes additional evidence is needed in support of these theories, particularly given that no depositions of any of the Defendants or their witnesses has yet occurred and document discovery is still ongoing, Plaintiffs renew their motion pursuant to Rule

REDACTED PUBLIC VERSION

56(d) seeking a continuance of Plaintiffs' response to this motion until such time as discovery

has been completed.

III.     **STATEMENT OF FACTS**

Plaintiffs dispute KBR's presentation of the facts at issue in this case.  Even without

complete discovery, the available evidence shows the following:

**KBR Obtained the Services of Buddhi Gurung and the Deceased Victims, Who Were
Deceived and Coerced into Service for KBR**

In 2004,


**REDACTED**



At the time of the Deceased Victims' deaths, KBR had obtained their services

KBR's agent and co-employer, Daoud, was responsible for arranging their transportation to Al

Asad Airbase along with Buddhi Gurung and dozens of other Nepalis.  SMF ¶71.

Yet neither the Deceased Victims nor Buddhi Gurung consented to work for KBR in Iraq

or went willingly into Iraq.  SMF ¶¶60-70.

The Deceased Victims had been promised work in Jordan and traveled there expecting to

work in a variety of food service and cleaning positions.  SMF ¶60.  Plaintiff Buddhi Gurung

REDACTED PUBLIC VERSION

was promised a job in America.  SMF ¶61.  All had paid large recruitment fees and they and

their families had gone deep into debt to arrange the anticipated jobs.  SMF ¶63

### REDACTED

But after their arrival in Jordan, Buddhi's and the Deceased Victims' passports were

confiscated.  SMF ¶65.  Another worker who traveled from Nepal with several of the Deceased

Victims confirmed that they were locked in a building in Jordan, their passports were

confiscated, and they could not leave.  Decl. of Sanjay Prasad Raut ¶¶12-17 ("No one could get

out").  In desperation, several of the Deceased Victims called home to ask for help and money.

SMF ¶67.  But before they could finish their requests, the lines went dead.  SMF ¶66.  One of the

victim's fathers sent another son to a nearby city to wire money, but although he went to several

banks, he could not wire the money because there hadn't been time to obtain, and he had no way

of obtaining, necessary information such as a receiving bank or routing information.  *Id.*

The Deceased Victims and Buddhi Gurung were vulnerable to deception and coercion, as

most had never worked or traveled outside of Nepal and some had never worked off of their

families' subsistence farms.  SMF ¶62.  With large debts in Nepal, no access to money or their

passports, and no local knowledge of Jordan, the men had no way out.  SMF ¶66.  In their last

recorded words, the Deceased Victims reported that they had been trapped in Jordan and then

forced to go to Iraq.  SMF ¶67 (Ex. 159: Budhan Kumar Shah Sudi's last recorded words explain

that he had been kept in Jordan for one and a half months and was forcibly sent to Iraq against

his wishes).  Buddhi Gurung repeatedly stated that he did not wish to go to Iraq and asked for his

passport back over and over again, but it was not returned to him.  SMF ¶¶65-68

REDACTED PUBLIC VERSION

**REDACTED**

Under duress, he ultimately signed an employment contract and, in a state of fear and desperation, was coerced to go to Iraq. SMF ¶¶69-70

**REDACTED**

Similarly, Sanjay Raut, another Nepali laborer, stated that "one evening, around 11pm, vehicles came to the compound … At one point we stopped. At that time, we learned we were at the Iraq border. I did not know we were going to Iraq. I did not want to go." Decl. of Sanjay Raut at ¶¶20-23.

The caravan of vehicles carrying Buddhi, the Deceased Victims, and dozens of other Nepali employees of KBR and Daoud departed Amman late at night and crossed into Iraq on August 19, 2004. SMF ¶¶70-72, 86. Before they reached their destination at the KBR worksite, the Deceased Victims were taken hostage by an insurgent group. After being held hostage for more than ten days, they were violently killed. SMF ¶72.

Buddhi Gurung survived the journey to Al Asad Airbase but, once there, was subjected to abusive living and working conditions; his passport was again confiscated; and he was not permitted to leave for more than one year. SMF ¶¶73-76, 86. He was compelled to work for KBR twelve hours a day, every day of the week. SMF ¶76. The food was inadequate; the housing was crowded and had no place for personal belongings; the bathroom often had no running water. *Id.* Buddhi told both KBR and Daoud personnel that he wanted to leave, but neither assisted him. SMF ¶75.

REDACTED PUBLIC VERSION

In particular, Plaintiffs dispute KBR's mischaracterization of Buddhi Gurung's testimony about his treatment in Jordan, Baghdad, and at Al Asad.  Mot. at 7, 12.[1]

REDACTED

---

[1]     KBR points out that Buddhi was "free to move about" in Delhi.  Mot. at 14.  Buddhi still believed he was heading to America at that time and therefore there was no reason for the traffickers to limit his freedom.

[2]     Furthermore, there is no Nepali Embassy in Jordan (either now or at the time of Buddhi Gurung's trafficking).  Instead, there is only an "Honorary Consulate of Nepal in Jordan," staffed by a Jordanian and without, according to its website, a physical address.  *See http://embassy-finder.com /nepal_in_amman_jordan* (last visited 10/21/2012).

[3]     KBR wrongly contends that Gurung contradicted the Complaint's allegation that he informed both KBR and Daoud personnel that he wanted to go home and was rebuffed.  Mot. at 16.

6

REDACTED PUBLIC VERSION

REDACTED

## KBR Benefitted from Hiring TCN Laborers

The military awarded KBR the LOGCAP III contract, pursuant to which KBR provided support services including sanitation, food services, operations and maintenance, laundry, and morale, welfare and recreation in Iraq.  SMF ¶35.  KBR required a large and steady supply of labor to fulfill its obligations and faced great pressure to meet staffing requirements.  SMF ¶¶38-39.  Iraqi labor was difficult to procure due to security risks, and Daoud itself even explained to KBR that "it is not easy to find people willing to go to Iraq at this time [July 2004]" and expressed concern that new prohibitions on working in Iraq would make it difficult to procure labor.  *Id.*

KBR relied heavily on TCN subcontract workers to meet its LOGCAP staffing needs, and the use of Nepali workers, who were paid significantly less than other third country nationals, made them particularly cost effective and provided a profit incentive to KBR.

SMF ¶¶36-41.

REDACTED PUBLIC VERSION

## KBR Knew Trafficking Was Widespread and Responded by "Squashing" Investigations and Firing Whistleblowers

Both before and after the events of this case, KBR knew of the exact conduct alleged here —that workers had been promised jobs elsewhere and transported against their will to Iraq—and knew that Daoud in particular had a history of abuses.  Evidence of such knowledge includes:

- Complaints and inquiries to KBR from the U.S. government expressed concern that third country nationals had been trafficked to Iraq.  SMF ¶42.  Such inquiries prompted _____. protests by KBR that investigation of such allegations would be "time consuming."  *Id.*  Even when KBR confirmed that acts tantamount to trafficking had occurred, such as retention of TCN passports, KBR explained that such practices were justified to prevent employees from being "able to freely move about," and to prevent the TCNs from obtaining more lucrative jobs.  *Id.*

### REDACTED

- In response to an Inspector General inquiry, KBR acknowledged that it "receives daily complaints from unknown persons that cover a wide range [of] issues from poor quality food and unsanitary conditions to physical abuse, restraint, and withholding of salary."  SMF ¶50.

- 

### REDACTED

- United States Service Members on site repeatedly complained to KBR about trafficking and Daoud, including: 1) an August 2004 complaint by Lieutenant Colonel Huston of the United States Marine Corps that Daoud "has slave labor working for them" at Al Asad, after which time, Colonel Huston initiated an NCIS investigation of "subcontractor hiring practices"; and 2) a 2004 complaint by a U.S. Marine Corps Sergeant provided to KBR that Nepali TCNs at Al Asad were coerced by excessive recruitment fees, not adequately fed, and not provided sufficient clothing.  SMF ¶44.

- Duane Banks — an auditor under contract to KBR at Al Asad—complained to KBR about the treatment of TCN workers by Daoud, including the Nepali men in this case, describing the circumstances as "deplorable."  SMF ¶45.  He reported that the men had been trafficked into Iraq, that their passports were confiscated upon arrival and that they were being forced to work at Al Asad against their will.  Decl. of Duane Banks ¶¶4-5.  In response, the KBR managers proposed to get "Duane out of there" and promptly instructed their subcontractor to "pull the guy out."  SMF ¶¶45, 57.

- Michael Henson, a KBR labor supervisor at Al Asad Airbase, learned that many of the third country nationals at Al Asad were not free to leave; they had been tricked into coming to Iraq, were paid less than promised, and their passports had been confiscated.  Decl. of

REDACTED PUBLIC VERSION

Michael Henson ¶¶13-17. He also observed that the third country nationals worked for months without a day off, lived in overcrowded conditions and had insufficient food. *Id.* at ¶¶ 9-14. When Henson complained to his KBR supervisors, he was told to "mind his own business" and then promptly transferred away. *Id.* at ¶¶18-19. He believes his transfer was directly related to his refusal "to remain silent about the treatment of TCNs at Al Asad." *Id.* at ¶19.

- Another KBR employee recommended to management that "we need to dump D&P as our master broker," saying "enough is enough" after reports that Daoud employees were left stranded at the base for months after attempting to quit their jobs and were found by U.S. Marines "attempting to buy some food." SMF ¶49. These men reported that for four months "they have not been paid, they have not been receiving food, and that KBR doesn't care what happens to them." *Id.* An NCIS investigator following up on the incident stated that the USMC on Al Asad "is developing a file against KBR" and that some of the allegations include "running slave labor camps." *Id.*

- Repeated media inquiries to KBR put the company on notice about allegations of trafficking of laborers who ultimately performed work for KBR. SMF ¶46.

- Third country national employees themselves reported these issues to KBR and expressly sought KBR's assistance, but were denied. SMF ¶¶53, 75; Decl. of Sanjay Prasad Raut ¶¶ 25-29.

REDACTED

KBR knew that the group of Nepali men that included Buddhi Gurung and the Deceased Victims were victims of deceptive recruitment, had their original contracts withheld and were paid less than promised. SMF ¶53. KBR knew that Plaintiff Buddhi Gurung and other Nepali workers supplied by Daoud wanted to leave Iraq and had reported to KBR that they were being held against their will. *Id.*

Instead of assisting these TCNs, KBR repeatedly warned its employees and U.S. military personnel to "stay in their lane" and not to report misconduct by subcontractors or intervene on

REDACTED PUBLIC VERSION

behalf of subcontract workers.  ¶¶25, 57, 59; Decl. of Michael Henson ¶¶16-19.  When a senior

KBR manager learned that NCIS had been asked to "conduct an investigation of our

subcontractors' hiring practices" as the result of complaints by United States Marines that "D&P

has slave labor working for them," he reported up the chain seeking senior management help

because "***We need to squash this immediately***."  SMF ¶57.

**KBR had Plenary Power and Control Over Daoud**

 The limited discovery produced to date demontrates that KBR had plenary control over

Daoud's recruitment and employment of TCNs at Al Asad.  Indeed, at all times KBR had the

authority to prohibit: 1) the charging of recruitment fees to third country nationals; 2) the use of

unlicensed or unauthorized labor brokers; 3) subcontractors from confiscating and retaining the

passports of third country nationals; 4) withholding copies of employment agreements from the

employees; and 5) new, lower wage contracts from being imposed on the third country nationals

after their arrival.  SMF ¶13;     **REDACTED**

 KBR also controlled the exit door and had at all times the authority to

repatriate the third country national workers, but chose not to do so.  SMF ¶¶16, 24.  The

available evidence further shows that:

- KBR provided specific labor requirements for TCN workers (*e.g.*, experience, qualifications, personnel backgrounds, staffing levels and medical examinations) and Daoud met them. SMF ¶4;

- KBR monitored Daoud closely, keeping close tabs on the recruitment process of TCNs and maintaining the right to inspect and audit Daoud's records.  SMF ¶5;

- KBR knew Daoud was recruiting and transporting workers from overseas, even urging the hire of developing world laborers because KBR believed such laborers "show up every day on time and work," SMF ¶¶6, 9;

- KBR knew Daoud was using a chain of labor brokers to assist in recruitment and   SMF ¶11.  **REDACTED**

REDACTED PUBLIC VERSION

**REDACTED**

- KBR had "complete direction, management and control" of the TCN employees supplied by Daoud, including: 1) direct supervision of the TCNs (indeed, working alongside Daoud's TCN workers); 2) setting the work hours and locations for the TCNs; 3) determining the pay and time-keeping procedures of TCNs; 4) the authority to ensure that the workers were in fact paid; 5) the authority to hire and fire third country nationals; 6) providing the tools and equipment to TCNs; 7) determining the living and working conditions of the TCNs (*e.g.*, designating rest and break areas, providing identification badges, providing food, providing emergency medical treatment and controlling the number of people who lived in each housing unit). SMF ¶¶14-22; Decl. of Michael Henson ¶¶2-7; Decl. of Sanjay Prasad Raut ¶¶25-27.

- KBR had control over Daoud's retention of TCN passports **REDACTED**

    SMF ¶23.

    In addition to tightly controlling the recruitment process and the provision of labor, KBR also had the authority to and did exercise control over Daoud more generally and in other aspects of their relationship. During the relevant time period, Daoud worked solely for KBR, earning between 98% and 100% of its revenue from its work as a subcontractor on KBR's contract with the U.S. Government. SMF ¶27. Daoud's work was a regular and key part of KBR's business, and KBR closely supervised Daoud, disallowing discretion in the performance of Daoud's duties. SMF ¶¶29-34. KBR controlled details large and small, from imposing requirements on transportation procedures to and from the worksite, **REDACTED**

## IV.   STANDARD OF REVIEW

Summary judgment is an extreme remedy that is only available if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The inquiry performed is a "threshold

11

REDACTED PUBLIC VERSION

inquiry" to determine whether there are genuine factual issues that "may reasonably be resolved

in favor of either party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250 (1986). "If

reasonable minds could differ as to the import of the evidence," the motion must be denied. *Id.*

at 250-51.

The moving party "always bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323;

*Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 198-99 (5th Cir. 1988). It is never

enough to conclusorily assert that the plaintiff has no evidence. *Id.* at 328 (Justice White,

concurring); *Clark v. Coats & Clark, Inc.* 929 F.2d 604, 607-08 (11th Cir. 1991).

Any doubt as to the existence of a genuine issue for trial should be resolved against the

moving party and the inferences to be drawn from the underlying facts must be viewed in the

light most favorable to the opposing party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-59

(1970). Defendants do not meet this burden here. Plaintiffs present sufficient evidence to

require that the issues in this case be determined by a jury. *Anderson*, 477 U.S. at 250.

In addition, summary judgment should not be granted when the opposing party has not

had an opportunity for adequate discovery. *See Winfrey v. San Jacinto Cnty.*, 2012 U.S. App.

LEXIS 15589, at *35-38 (5th Cir. July 27, 2012); *Brown v. Miss. Valley State Univ.*, 311 F.3d

328, 334 (5th Cir. 2002). As explained in more detail below, *infra* pp 53-58, Plaintiffs

respectfully renew their Motion for a Continuance under FED. R. CIV. P. 56(d) filed September

19, 2012, ECF No. 375, attached hereto as Ex. 273.

REDACTED PUBLIC VERSION

## V.    <u>ARGUMENT</u>

### A.    TVPRA

    Ample evidence and substantial authority supports Plaintiffs' claims under the TVPRA.

KBR argues that it is not liable because KBR did not know the men were trafficked; KBR did

not obtain or recruit the men; and KBR did not employ force, threats, or any other means of

coercion.  Mot. at 20-21, 33-34.  KBR finds no support in the text, legislative history or caselaw

for its crabbed reading of the statute.  KBR's conduct satisfies the elements of the statute: it was

knowing, *infra* pp. 14-17; KBR obtained and recruited the men, *infra* pp. 17-18; and the men

were procured through the use of the precise nonviolent and coercive practices the TVPRA was

enacted to prohibit, *infra* pp. 18-24.  In addition, as demonstrated below, *infra* pp 24-40, KBR

cannot escape liability by blaming Daoud, because ample evidence demonstrates that Daoud was

KBR's  agent and joint employer.

    Congress enacted the Trafficking Victims Protection Act in order "to combat trafficking

in persons, . . . to ensure just and effective punishment of traffickers, and to protect their

victims." 22 U.S.C. § 7101(a).  In § 1595, Congress authorized civil actions by "[a]ny individual

who is a victim of a violation of section 1589, 1590, or 1591" against the perpetrator in an

appropriate district court.  Plaintiffs' claims satisfy the requirements of §§ 1589 and 1590.

    Congress recognized that "[t]rafficking in persons is increasingly perpetrated by

organized, sophisticated criminal enterprises," 22 U.S.C. § 7101(b)(8), and adopted broad

language covering every aspect of the trafficking chain.  To that end, § 1590 imposes liability on

"whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person

for labor or services" in violation of Chapter 77 of Title 18 (including, *inter alia*, 18 U.S.C. §§

1592 and 1594).  18 U.S.C. § 1590(a).  Section 1589 is similarly broad, and imposes liability on

whoever knowingly obtains the labor or services of a person by specified means including threats

13

REDACTED PUBLIC VERSION

or a plan, pattern or scheme involving serious harm or physical restraint.  Even given the extremely limited discovery to date, substantial evidence exists regarding KBR's direct participation in the trafficking scheme that brought the Nepali men to Al Asad, precluding judgment as a matter of law.

### 1.     Ample Evidence Demonstrates KBR's Conduct Was Knowing

The available evidence illustrates that KBR's conduct was knowing.  SMF ¶¶42-57.  Well before and precisely at the time of the events of this case, KBR knew of the exact conduct alleged here – that third country national workers had been promised jobs elsewhere and transported against their will to Iraq; were paid lower wages than promised; had their passports confiscated; were charged additional fees along the way; and were compelled to stay because they and their families were in debt to labor recruiters.  KBR also knew that Daoud in particular had a history of abuses.  Indeed, KBR knew that these men in particular were victims of trafficking.  SMF ¶53.

For example, the U.S. government expressed concern in June 2004 that third country nationals were victims of "financial blackmail" as they were "hired by brokers promising jobs only in Kuwait, charging them for job placement and then forcing them to go into Iraq or be discharged with no reimbursement."  SMF ¶42.  A United States Marine Corps sergeant complained in 2004 that Nepali third country nationals at Al Asad Airbase were coerced by excessive recruitment fees and reported that "the subcontractor that hired these people is called D&P."  SMF ¶¶47, 50.  Third country national employees themselves reported these kinds of issues to KBR and expressly sought KBR's assistance, but were denied.  SMF ¶¶53, 57; Decl. of Sanjay Prasad Raut ¶¶25-29.  Media reports and KBR's own investigations put KBR on notice of the conduct at issue in this case.  SMF ¶¶42, 45-53, 57.

REDACTED PUBLIC VERSION

## REDACTED

Indeed, a KBR employee recommended to management that "we need to dump D&P as our master broker," saying "enough is enough" after reports that Daoud employees were left stranded at the base for months after attempting to quit their jobs and were found by U.S. Marines "attempting to buy some food." SMF ¶49.  These men reported that for four months "they have not been paid, they have not been receiving food, and that KBR doesn't care what happens to them." *Id.*

Indeed, KBR knew that these men in particular were victims of trafficking.  KBR knew that Daoud's August 2004 shipment of Nepali laborers—the group that included both Buddhi Gurung and the Deceased Victims—had (1) had their contracts taken away from them; and (2) been paid "far less money" than they had been promised.  SMF ¶53.

## REDACTED

KBR knew that, as a matter of routine, Daoud confiscated their passports upon arrival.  SMF ¶¶45, 48, 77.  In fact, KBR justified the passport confiscation by arguing it was necessary to prevent third country nationals from being "able to freely move about," and to prevent them from obtaining more lucrative jobs.  SMF ¶¶42, 48.  KBR knew that Plaintiff Buddhi Gurung and other Nepali workers supplied by Daoud wanted to leave Iraq.  SMF ¶53.  Because KBR knew that 12 of the Nepalis had been killed while being transported to their jobs at the base, SMF, it is entirely likely that KBR knew that in the hostage video made by the insurgents and widely broadcast the men stated that they had been held against their will, tricked, and coerced into going to Iraq.  SMF ¶¶53, 72.

15

REDACTED PUBLIC VERSION

That same month, Lieutenant Colonel Huston of the United States Marine Corps complained that Daoud "has slave labor working for them" at Al Asad, after which time, Colonel Huston initiated an NCIS investigation of "subcontractor hiring practices." SMF ¶44. Lt. Col. Huston was reacting, in part, to the situation of the Nepali workers. *Id.* Also in August, Duane Banks, an auditor under contract to KBR at Al Asad observed overcrowded and squalid conditions in the third country national camp. Decl. of Duane Banks at ¶4. He also learned that third country nationals had been trafficked, that their passports had been confiscated upon arrival at Al Asad, and that they were being forced to work against their will. He complained to his supervisors. SMF ¶45; Decl. of Duane Banks ¶¶8-12. Shortly thereafter Michael Henson, a KBR labor supervisor at Al Asad Airbase, also learned that many workers were not free to leave; they had been tricked into coming to Iraq, were paid less than promised, and their passports had been confiscated. Decl. of Michael Henson ¶¶12-15. He observed that the third country nationals worked for months without a day off, lived in overcrowded conditions and had insufficient food. *Id.* at ¶¶8-9. Mr. Henson, too, complained to his KBR supervisors. *Id.* at ¶¶ 18-19; SMF ¶45.

In response to these reports, KBR managers proposed to get "Duane out of there" and promptly instructed their subcontractor to "pull the guy out" (SMF ¶¶45, 57); told Mike Henson to "mind his own business" and then promptly transferred him away (SMF ¶¶45, 57; Decl. at ¶¶ 18-19); and worked to "squash" the NCIS investigation "immediately" (SMF ¶57).

**REDACTED**

Case 4:09-cv-01237 Document 405 Filed on 10/23/12 in TXSD Page 28 of 35

employment, travel, living conditions or treatment"; "moving victims around"; and "holding and/or transporting people against their will." SMF ¶56.

Moreover, as referenced, *infra* and in Plaintiffs' renewed 56(d) Motion, Plaintiffs seek discovery of, *inter alia*, the men to whom Buddhi Gurung reported he wished to leave Al Asad; KBR managers Bob Gerlach and David Poe; the men, including Bill Jonas, to whom Duane Banks provided information; and other persons with relevant knowledge identified on Plaintiffs' list of custodians, submitted on March 9, 2012, ECF No. 294.

> 2.      **KBR Obtained and Recruited Buddhi Gurung and the Deceased Victims**

KBR plainly obtained Buddhi Gurung and the Deceased Victims, and had done so at the time of their deaths. SMF ¶¶58, 59.


**REDACTED**



**REDACTED**


This conduct constitutes "obtaining" under both 18 U.S.C. § 1590 (which incorporates attempted obtaining pursuant to § 1594) and § 1589. KBR is also plainly liable for recruiting the men. The term "recruit" includes accepting the benefits of recruitment by others, which subjects the employer to liability. *See, e.g., Bueno v. Mattner*, 829 F.2d 1380, 1383 (6th Cir. 1987); *Montalvo v. Larchmont Farms*, 2009 WL 4573279 *10 (D.N.J. Dec. 3, 2009); *Escobar v. Baker*, 814 F. Supp. 1491, 1502-03 (W.D. Wash. 1993).

The TVPRA does not require each Defendant to have committed every act in the

trafficking chain for liability to attach.  Rather, section 1590 imposes liability on "whoever" acts

"by any means."   Similarly, section 1589 requires "threats of serious harm," but not by each and

every defendant, or a "scheme, plan or pattern" intended to cause a person to believe they would

suffer serious harm.  Here, KBR obtained and recruited the men knowing that Daoud had

threatened them with serious harm and confiscated their passports; the men were physically

restrained by virtue of the isolation of the base and the lack of available transportation and were

victims of a scheme, plan, or pattern intended to promise the men lucrative jobs, isolate and

indebt them, pay less than promised, and cause them to believe they had no choice but to provide

labor or services for KBR.

### 3.    Buddhi Gurung and the Deceased Victims Were obtained by Coercion, Including Serious Harm

One of the primary motivations in enacting the TVPA was to redefine forced and

involuntary labor to include labor that is procured through the use of nonviolent and coercive

practices.  *See* 22 U.S.C. § 7101(b)(4), (5), (13).  Expressing concern about the "increasingly

subtle methods of traffickers," Congress deliberately responded to *United States v. Kozminski*,

487 U.S. 931 (1988), by expressly providing that threat of "serious harm," including

psychological or financial harm, is sufficient, and evidence of physical coercion is not

required.  *See United States v. Bradley*, 390 F.3d 145,150 (1st Cir. 2004) (vacated on *Booker*

grounds); *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 114-115 (D.D.C. 2012) (Congress

specifically addressed *Kozminski* and rejected it as too narrow); H.R. Conf. Rep. No. 106-939 at

100-01 (2000) (TVPRA intended to address *Kozminski* by providing tools to combat forms of

exploitation "that do not rise to the level of involuntary servitude as defined in *Kozminksi*" and

explicitly stating that physical harm and threats of force need not be demonstrated as modern

REDACTED PUBLIC VERSION

traffickers may "restrain their victims without physical violence or injury"). Numerous

individuals testified before Congress about how many individuals are trafficked as a result of

"trickery." *Hearing on Int'l Trafficking* at 26 (statement of Inez, a trafficking survivor)

(describing how she was tricked and then forced into prostitution); *see also id.* at 16 (statement

of Frank E. Loy, Under Sec'y of State for Global Affairs). Once the victim has been deceived

into traveling to another country, the "traffickers strip [the] trafficking victim of his/her

identification documents, passport, and immigration papers as a means of control and coercion."

*Hearing on Int'l Trafficking* at 80-81 (statement of William R. Yeomans, Chief of Staff, Civil

Rights Div., Dep't of Justice). Without these papers, victims are "captured" because they "lack . .

. any sort of power or ability" and believe they have no alternative but to follow the instructions

of the traffickers. *Hearing on Int'l Trafficking* at 82 (statement of Sen. Brownback). Senator

Wellstone, the sponsor of one of the Senate versions of the TVPA, described such practices as

among the abuses the bill was meant to stop. 106 Cong. Rec. S7781-82 (statement of Sen.

Wellstone) ("Seeking financial security, "many innocent persons are lured by traffickers' false

promises of a better life and lucrative jobs abroad. However, upon arrival in destination

countries, these victims are often stripped of their passports and held against their will . . . .").

Moreover, in applying the provisions of the act, Congress instructed the courts to

consider the "individual circumstances of victims that are relevant in determining whether a

particular type or certain degree of harm or coercion is sufficient to maintain or obtain a victim's

labor or services, including the age and background of the victims." H. Conf. Rep. 106-939, at

101. In particular, trafficked individuals may be "particularly susceptible to coercion because of

their unfamiliarity with [the destination country's] language, laws, and customs." *Hearing on*

*Int'l Trafficking* at 80 (statement of William R. Yeomans, Chief of Staff, Civil Rights Div., Dep't of Justice).

Courts hold that the methods of coercion present here (passport confiscation, financial pressure, and physical isolation) satisfy the serious harm requirement of the TVPRA, particularly where, as here, the victims are particularly susceptible to coercion because they are poor, unskilled, in a strange land, and unfamiliar with the language and customs.

Substantial evidence demonstrates that KBR knew that Daoud held the Nepali men's passports. SMF ¶¶48, 77. At all times, KBR had the authority to require Daoud to return the passports,          **REDACTED**          SMF ¶¶13, 23. Indeed, KBR defended the practice of withholding the passports on the grounds it prevented the workers from obtaining other jobs, SMF ¶¶42, 48, and benefitted from the practice. SMF ¶¶35-41. This Circuit holds that passport confiscation is sufficient to show coercion because a jury could infer that holding a passport "was an effort to keep the victim at the [defendant's] home." *United States v. Nnaji*, 447 F. App'x 558 (5th Cir. 2011); *see also United States v. Sung Bum Chang*, 237 F. App'x 985, 986 (5th Cir. 2007) (Chang held women's passports); *Bradley*, 390 F.3d at 152-4; *United States v. Mussry*, 726 F.2d 1448 (9th Cir. 1984) (passport confiscation and surrender of airplane tickets shows coercion); *see also* 18 U.S.C. § 1592; SMF ¶¶74, 80

**REDACTED**

In particular, where, as here (SMF ¶66), defendants told workers that they would have to pay a substantial additional sum to obtain the return of their passports, that is sufficient to constitute both

20

REDACTED PUBLIC VERSION

psychological coercion and threat of serious financial harm. *Nuñag-Tanedo,* 790 F. Supp. 2d 1134, 1144, 1146 (C.D. Cal. 2011); *see also United States v. Dann,* 652 F.3d 1160, 1171 (9th Cir. 2011).

Courts also find that a recruitment scheme that involves the payment of fees by the employee is coercive. In *David v. Signal,* after Indian workers began to arrive at Signal's site in Louisiana, the ultimate employer (Signal) learned about the significant fees the workers had paid to recruiters and about their green card expectations. 2012 U.S. Dist. Lexis 114247, *42 (E.D. La. 2012). The plaintiffs argued that Signal's decision to continue to bring in additional workers via the defendant recruiters, all the while knowing about the recruitment fees, made the company liable in the scheme. *Id.* While the court declined to certify the claims for Rule 23 class treatment, the claims went forward on an individual basis as the court found the scheme could be sufficiently coercive. *Id.* Similarly, a court found serious harm where Filipino teachers and their families went into debt in order to pay recruitment fees to obtain jobs in the United States and, if they lost the jobs, would be unable to pay back the debt, which was a large sum in the Philippines: "it is not surprising that Plaintiffs not only wanted but *needed* to continue working in the program." *Nuñag-Tanedo,* 790 F. Supp. 2d at 1146 (emphasis in original); *see also United States v. Calimlim,* 538 F.3d 706, 711 (7th Cir. 2008) (not being able to send money to family back home constituted a "serious harm"). Here, the families of the Nepali men had gone deep into debt, **REDACTED** in order to access the promised jobs in Jordan and the United States—debt that they would have been unable to pay back unless they complied with the traffickers' demands to go to Iraq. SMF ¶63; see also Decl. of Sanjay Raut ¶ 17 ("We were too poor"). As in *David v. Signal,* KBR continued to bring in third country nationals all the while knowing of this pattern of coercion. SMF ¶¶ 47, 51

REDACTED

53, 78. A jury could reasonably infer that KBR's conduct constituted intentional participation in the scheme.

KBR overlooks additional evidence that Courts have found to be significant. For example, the isolation of the base is itself coercive and constitutes physical restraint. It was impossible for the third country nationals to leave without permission from KBR and the area surrounding the base was extremely dangerous. SMF ¶¶ 53, 54, 75.[4] In many cases, the victims have been far less isolated, working as kitchen staff in restaurants or computer workers in San Francisco (*Doe v. Reddy*, 2003 WL 23893010 (N.D. Cal. Aug. 4, 2003)); at motels and fast-food restaurants (and going bowling) in South Dakota (*United States v. Farrell*, 563 F.3d 364 (8th Cir. 2009)); or running errands and dropping children off at school in Walnut Creek, California (*Dann*). Courts routinely emphasize the importance of evaluating the circumstances and the vulnerabilities of the victim in each case. *E.g., Farrell*, 563 F.3d at 374 ("workers arrived in the United States with very little money and were entirely dependent upon the Farrells for their housing and transportation"); *Bradley*, 390 F.3d at 152-4 (conditions that make the victim especially vulnerable bear on whether labor was obtained by forbidden means); *United States v. Veerapol*, 312 F.3d 1128, 1133 (9th Cir. 2002) (noting that scheme targeted people like the victim: "poor, non-English speaking, illegal alien whose reasonable feelings of coercion the jury must take into account"); *Mussry*, 726 F.2d at 1453 (was relevant that "the Indonesian servants generally had almost no education, were unskilled, spoke little, if any, English and had never been outside Indonesia").

---

[4] The fact that the scheme involved loading the men into cars that arrived in the middle of the night and without warning is also coercive. SMF ¶70; Decl. of Sanjay Raut ¶ 20.

REDACTED PUBLIC VERSION

Buddhi's occasional access to amenities at the base where he was forced to labor is immaterial to whether he was threatened with serious harm. *Criminal* convictions have been obtained – and sustained – on less severe facts than the facts here. For example, in *Farrell*, 563 F.3d 364, the Eighth Circuit sustained the conviction of motel owners for trafficking of workers from the Philippines. The Filipino workers were taken bowling by American co-workers, obtained second jobs at fast food restaurants, stayed in unlocked rooms in Oacomoa, South Dakota, and maintained contact with their families, including taking a vacation to the Philippines and returning to the motel. *Id.*; *see also Shukla v. Sharma*, 2012 U.S. Dist. LEXIS 18392 (E.D.N.Y. Feb. 4, 2012) (upholding trafficking conviction where victim had own telephone, called his wife, ordered adult films and dialed (900) sex numbers, regularly interacted with others at a New York Ashram and began an independent astrology business). In *Nuñag-Tanedo*, 790 F. Supp. 2d at 1144, the court rejected Defendants' argument that "teaching high school math and science hardly qualifies" as trafficked labor. Many domestic servitude cases have involved trafficked victims in wealthy suburbs. *E.g.*, *Dann*, 652 F.3d at 1171 (criminal conviction of Bay Area real estate agent for trafficking nanny); *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107; *see also World Bank Official Sentenced for Lying*, WASH. POST (July 4, 2010) (trafficking took place at home of World Bank official in wealthy Washington suburb). Here, the fact that Buddhi Gurung was occasionally treated to a Subway sandwich by co-workers does not undercut his claims where he otherwise worked 12 hour days seven days a week for one dollar an hour, was under fed, and lived in crowded conditions described as "deplorable" by KBR's own employees. SMF ¶¶50, 55, 76; *see also* SMF ¶44 (U.S. Marines describe providing food, clothing and hygiene gear to Nepali workers at Al Asad because the living conditions for the workers were "so horrible").[5]

_____

[5]     KBR makes much of the termination of Buddhi Gurung's employment, but of course termination,

REDACTED PUBLIC VERSION

Given the paucity of evidence KBR proffered in its motion, summary judgment cannot be granted. Ample evidence of coercion has been proffered by Plaintiffs.

## B.    Ample Evidence Demonstrates that Dauod Was KBR's Agent

KBR's statement that "KBR dealt with Dauod at arm's length and had no involvement, much less an operational or managerial role, in the recruitment and deployment of laborers," Mot. at 27, is contradicted by substantial evidence. To the contrary, KBR had Dauod on a short leash. The limited discovery produced by KBR thus far demonstrates that KBR reserved the right to exercise, and in practice did in fact exercise, control over Dauod sufficient to subject KBR to vicarious liability under the ATS, TVPRA, and RICO for the acts of its agent. In particular, KBR had the authority to exercise control over Dauod's recruitment and supply of the laborers in this case, including the use of labor brokers, passport confiscation, charging recruitment fees, and confiscation of the original employment contracts. KBR also had the authority to prohibit new, lower-wage, contracts from being imposed on the third country nationals after their arrival,                    **REDACTED**

KBR argues that it cannot be held liable for Dauod's conduct because Dauod was an independent contractor, KBR Motion at 30, but that status does not foreclose a finding that Dauod was an express or implied agent of KBR. RESTATEMENT (SECOND) OF AGENCY § 2(3)

or even opportunity to escape, does not preclude a finding that a person was trafficked or held in involuntary servitude. E.g., *Mussry*, 726 F.2d at 1454; *United States v. Bibbs*, 564 F.2d 1165, 1168 (5th Cir. 1977) ("During the years slavery existed in this country, slaves often worked in the fields and went into town with little direct supervision, thereby offering them opportunities to escape. Yet it is beyond argument that the slaves were held in involuntary servitude."); *Nuñag-Tanedo*, 790 F. Supp at 1146 (Defendants' argument that Plaintiffs tried to avoid being fired and therefore were not subject to forced labor "actually cuts against Defendants" as Plaintiffs had to keep working to support families and repay debts); *David*, 2012 U.S. Dist. Lexis at *48.
KBR's reliance on *Headley v. Church of Scientology Int'l*, 687 F.3d 1173 (9th Cir. 2012) (*J.* O'Scannlain), is misplaced. In *Headley*, the Ninth Circuit Court of Appeals held that two former members of the Church of Scientology failed to state a claim for a violation of the TVPRA. *Id.* at 1181. Unlike Buddhi Gurung and the Deceased Victims, the plaintiffs in Headley admitted they did not feel they were being held against their will at the time and focused their allegations on the social stigma they would experience from other members if they left the Church. *Id.* at 1176-78.