REDACTED PUBLIC VERSION

("An independent contractor . . . may or may not be an agent."); *United States v. Thomas*, 377 F.3d 232, 238 (2d Cir. 2004) (same); *see also Ochoa v. J.B. Martin & Sons Farms*, 287 F.3d 1182, 1189-92 (9th Cir. 2002) (labor recruiter, which was an independent contractor, was an agent of the employer).

A hired party is an "agent" when the hiring party has the "right to control the manner and means by which the product is accomplished."[6] *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989); *Ochoa*, 287 F.3d at 1190 (explaining that the "fundamental criterion" for determining whether an agency relationship exists "is the extent of control the principal exercises or may exercise over the agent") (citation omitted); RESTATEMENT (SECOND) OF AGENCY § 14N ("One who contracts to act on behalf of another and subject to the other's control except with respect to his physical conduct is an agent and also an independent contractor.").

Evidence that KBR reserved the right to exercise, or in practice did exercise, control over Daoud would subject KBR to vicarious liability under the ATS, TVPRA and RICO for the acts of its agent. *See Meyer v. Holley*, 537 U.S. 280, 285 (2003) ("It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents . . . ."). For this reason, Plaintiffs have long sought to obtain discovery of documents that would enable them to fully evaluate these factors. Plaintiffs have not yet had that opportunity. *Infra* pp. 53-58; Ex. 273 (Rule 56(d) Motion and Affidavit). Evidence produced thus far in discovery, however, demonstrates that KBR had the authority to and did in fact exercise control over Daoud, including, in particular, over the recruitment, supply and retention of temporary workers, SMF ¶4-26, 30-34, precluding judgment as a matter of law. Moreover,

---

[6]     This is the common law test for agency, and KBR contends that the common law of agency applies. Mot at 30.

generally speaking, the question of whether an agency relationship exists is a question of fact to be resolved by the jury. *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 870 (5th Cir. 2000); *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 (2d Cir. 1994).

In determining whether a principal retained the right to control, courts look to a variety of indicators, including: whether the task performed is part of the regular business of the hiring party; whether the hired party worked predominantly for, and was dependant on, the hiring party; whether the relationship had an extended duration; the principal's right to dictate the means and details of the process by which the hired party accomplished the task; the power to inspect the agent's progress or receive reports; the power to set standards for acceptable service quality; the power to make suggestions or recommendations; the power of the principal to give the agent interim instructions once work has begun that go beyond the power to order the work stopped or resumed; the power of supervision over the agent's employees; and whether the task could be accomplished without specialized skill, such as the process of hiring migrant laborers. *See, e.g., CCNV* 490 U.S. at 751; *Cardinal Health Solutions, Inc. v. Valley Baptist Med. Ctr.*, 643 F. Supp. 2d 883, 887-89 (S.D. Tex. 2008); *see also Ochoa*, 287 F.3d at 1190-92 (labor recruiter was an agent of the employer because, among other things, the employer "possessed the power to give [the recruiter] instructions, and to expect that its instructions would be followed," the process of hiring migrant labor did not require labor broker to be highly educated or skilled, and the relationship between the recruiter and the employer was ongoing).

While courts consider these factors and others, the ultimate question is whether the hiring party possesses the right to control the manner and means by which a task is performed. *See, e.g., Moreno v. Poverty Point Produce, Inc.*, 243 F.R.D. 265, 271 (S.D. Tex. 2007) (plaintiffs established that labor recruiters were agents of employer because, *inter alia*, employer dictated

"how many workers to hire, when to hire them for, where to send them, and what information to include in their employment agreements").  The test focuses on whether the hiring party has the right and power to control, not whether he regularly avails himself of that right.  *Morante v. Am. Gen. Fin. Ctr.*, 157 F.3d 1006, 1009 (5th Cir. 1998) ("It is the right of control, and not the actual exercise of control, which is determinative."); *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989) ("Control *or the right to control* is vital to such agency relationships.") (emphasis added).  "[T]he lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1312 (5th Cir. 1976).[7]

KBR retained the right to control all aspects of Daoud's performance, from start to finish, and especially in the recruitment, retention, and release of third country national workers.  KBR treated Daoud as its agent and the two parties built a lasting and co-dependent business relationship on that basis.

Under the LOGCAP contract, KBR provided laundry, sanitation, and dining services to the United States military.  SMF ¶35, Ex. 88.  A stable labor supply was a crucial and regular part of providing those services, and KBR contracted with Daoud to supply that workforce.  SMF ¶¶ 1, 2, 6.  Prior to 2004, KBR entered into, *inter alia*, an Agency Agreement with Daoud in Jordan and a Master Agreement in Iraq appointing Daoud as KBR's sole source for laborers at the Al Asad Airbase.  SMF ¶3.  The labor provided by Daoud was integral to KBR's success.  SMF ¶¶23, 29, 39, Ex. 20 (KBR manager indicates that KBR's success "is heavily dependant upon D&P succeeding"); Ex. 31 at KBRE0005786 (KBR report indicating that D&P labor

---

[7]     *Fruge v. Parker Drilling Co.*, on which KBR relies, is inapplicable here because it applied Louisiana law.  *See* 337 F.3d 558, 561 (5th Cir. 2003).  Further, that case is distinguishable because the relevant contract provided that the principal would have "no direction or control" over the independent contractor or its employees.  *Id.* at 564.  By contrast, KBR retained considerable control over Daoud both under their Master Agreement and in practice.  SMF ¶¶1-34.

shortage caused delays in services for the U.S. Marine Corps).  Similarly, Daoud depended on KBR for business, earning between 98% and 100% of its income from KBR contracts in Iraq. SMF ¶27.  Daoud was hired for the duration of KBR's prime contract with the U.S. Army.  SMF ¶28,    **REDACTED**    Where, as here, the task performed is part of the hiring party's regular business, an agency relationship is evident.  *See CCNV*, 490 U.S. at 731 n. 27; *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1328 (5th Cir. 1985) (agency relationship supported by the fact that agent's laborers' task (vegetable harvesting) was "merely a phase of the normal operation" of principal's business (vegetable farming and shipping)); *Mukhtar v. Castleton Serv. Corp.*, 920 F. Supp. 934, 941 (S.D. Ind. 1996); *Kemether v. Pennsylvania Interscholastic Athletic Ass'n*, 15 F. Supp. 2d 740, 761 (E.D. Pa. 1998); RESTATEMENT (SECOND) OF AGENCY § 220(2)(h); *see also Baker v. Texas & Pac. Ry.*, 359 U.S. 227, 228 (1959) (evidence tending to show that "work was part of the maintenance task of the railroad" made agency question one for the jury).  This factor weighs even more strongly towards a finding of agency where, as here, the relationship between the parties lasted for an extended duration.  *CCNV*, 490 U.S. at 751-52 (an agency relationship is evident where the relationship between the parties is of an extended duration); *Stripling*, 234 F.3d at 871 ("ongoing relationship" contributed to finding of agency); *Usery*, 527 F.2d at 1314.  The fact that Daoud's labor recruitment relationship with KBR was an integral part of both companies' business and was created to last for the duration of KBR's prime contract with the U.S. Army weighs in favor of agency.

The heart of this ongoing business relationship was Daoud's recruitment of laborers to supply to KBR in Iraq.  Because the task was essential to KBR's success under the lucrative LOGCAP contract, KBR exercised tight control over Daoud's recruitment and supply of

laborers.  Daoud had no discretion over how many workers, when to provide them, or what type of worker to provide.  KBR provided specific labor requirements and Daoud met them.  SMF ¶¶4, 17, 30,                                                    Daoud recruited and mobilized workers specifically for KBR.  SMF ¶4, Ex. 2, KBRE0003585;

**REDACTED**                              . *CCNV*, 490 U.S. at 751 (lack of hired party's discretion over when to work contributes to a finding of agency); *Beliz*, 765 F.2d at 1328 (labor contractor not independent where it "recruited the workers in the crew specifically to work" for the farm); *Ochoa*, 287 F.3d at 1190 (fact that principal "dictated the timing of [independent contractor's] recruiting in Arizona and transportation to New York" supported finding of agency).  KBR required Daoud to investigate the prospective employee's "personnel backgrounds" and to certify that they were not, *inter alia*, suspected terrorists or former high ranking officials of the Ba'ath Party.  SMF ¶4,                              KBR also required a medical examination,

**REDACTED**

KBR required Daoud to carry out these specific requirements, monitored the results, and demanded prompt completion of KBR's demands.  SMF ¶5,

**REDACTED**

**REDACTED**                                                    This level of

direction and control supports a finding of agency.  *See, e.g.*, *Moreno*, 243 F.R.D. at 271 (labor

recruiter an agent where he was provided with information regarding how many workers to hire,

when to hire them, and to have the workers provide documentation); *Nipponkoa Ins. Co. v.

Globeground Servs.*, 2007 U.S. Dist. Lexis 61173, at *14 (N.D. Ill. Aug. 17, 2007) (finding

agency where one party established number of and schedules for employees and required that the

employees have particular qualifications and perform up to standards); *see also Baker*, 359 U.S.

at 228-29 (evidence showing that railroad "exercised directive control over the details of the job

performed" made agency an issue for determination by the jury).

KBR not only had the authority to control *which* workers Daoud recruited, it also

controlled the *means* of recruitment, including the use of labor brokers, the levying of

recruitment fees, and the confiscation of passports.  SMF ¶¶13, 23, 30-34.  KBR at all times had

the authority to prohibit the use of unauthorized labor brokers, limit the charging of recruitment

fees, and require the return of workers' passports.  SMF ¶¶13, 23.

**REDACTED**

KBR also at all times had the authority to

require that copies of the original employment agreement be provided to the employee and to

prohibit new, lower-wage, contracts from being imposed on the third country nationals after their

arrival, ¦       **REDACTED**

Again, KBR's authority to control the

means of Daoud's recruitment process strongly supports a finding of agency.  *Usery*, 527 F.2d at

1312 (control of "every major aspect" of the work compelled finding of agency); *Mantiply v.

United States*, 2012 U.S. Dist. LEXIS 143460, at *8 (W.D. La. Aug. 20, 2012) (physician an

REDACTED PUBLIC VERSION

agent where employer instructed him to provide certain information to patients, specified when he could perform surgery, and set the hours of his clinical duties); *see also Baker*, 359 U.S. at 228-29. *Cf. Castillo v. Case Farms of Ohio, Inc.*, 96 F. Supp. 2d 578, 593 (W.D. Tex. 1999) (agency agreement to recruit workers includes authority to do all things "proper, usual, and necessary to exercise that express authority" and principal can be held liable for violations committed in those activities).

Attendant to the recruitment process, KBR also closely monitored the transportation and arrival of the third country nationals. SMF ¶¶7-10, 31, 57, Ex. 22 (email from Daoud manager to KBR personnel reporting on transport of Nepali laborers into Iraq); Ex. 35 (KBR report documenting the arrival of 71 new TCN laborers).

REDACTED

KBR required, for example, that all of Daoud's personnel wear specified personal protective equipment while traveling off the military base. SMF ¶31. This level of control supports a finding of agency. *NLRB v. United Ins. Co.*, 390 U.S. 254, 259 (1968) (principal's imposition of regular procedures contributed to finding of agency); *Mantiply*, 2012 U.S. Dist. LEXIS 143460, at *8 (fact that individual had to abide by employer's "policies and procedures" contributed to finding of agency).

Once the workers were obtained on site, KBR continued to exercise control over both the third country national workers Daoud supplied and Daoud's own management. On the job sites, KBR had "complete direction, management and control" over the TCNs' work. SMF ¶¶14-26. Indeed, the men "did not have much contact with Daoud," as they were supervised by and worked side-by-side with KBR personnel. SMF ¶¶18, 26; Decl. of Sanjay Prasad Raut. KBR set

REDACTED PUBLIC VERSION

the salaries for the third country nationals.  SMF ¶15.  KBR controlled the workers' day to day

conditions including hours, work locations, and breaks, and also provided them with the tools for

their work.  SMF ¶¶19-22, Ex. 2 (KBR has "flexibility to change their job assignments at will").

KBR could directly hire Daoud's third country national workers after a specified period of time.

SMF ¶17,                              .  *See Ochoa*, 287 F.3d at 1193 n.4 (provision that

principal may directly hire labor provided by recruiter supports finding of agency).

And central to this case, KBR controlled the exit door: KBR could release the laborers at

any time.  SMF ¶24.  KBR also controlled how Daoud managed its third country national

employees by supplying time sheets Daoud was required to use,

**REDACTED**                              and intervening to ensure that the workers

were paid.  SMF ¶¶15, 32-34.

Significantly, KBR also controlled and had the ability to fire and re-assign Daoud

management, as well as to assign them additional tasks.  SMF ¶33,

**REDACTED**                              KBR's

decisive control over Daoud's employees and managers weighs in favor of agency.  *E.g.*, *CCNV*

*v. Reid*, 490 U.S. at 751 (where "the hiring party has the right to assign additional projects to the

hired party," this supports an agency relationship); *Nipponkoa*, 2007 U.S. Dist. Lexis 61173, at

*14 (finding agency where principal established number of and schedules for the independent

contractor's employees and required that the employees have particular qualifications and

perform up to standards); *Moreno*, 243 F.R.D. at 269, 271 (finding agency relationship where

contractor directed its employees on how and where to do the work only after frequent

conferencing with principal); *Mantiply*, 2012 U.S. Dist. LEXIS 143460, at *8 (physician an

agent where employer specified his hours, required him to submit a weekly timesheet,

REDACTED PUBLIC VERSION

determined his lunch time, and set the days and times of his clinical duties and surgeries); *see also Baker*, 359 U.S. at 228-29.

An agency relationship is further supported by the fact that Daoud's task—to provide laborers—did not require specialized skill. When an independent contractor's task does not require specialized skill, this factor weighs in favor of agency. *Hilton Int'l Co. v. NLRB*, 690 F.2d 318, 321 (2d Cir. 1982) (cited in *CCNV*, 490 U.S. at 751 n.19); *see also Ochoa*, 287 F.3d at 1190-91. The process of hiring and transporting labor does not require a high level of education or specialized skill. *Id.* The "logistical challenges" involved in transporting laborers are "logistical skills . . . required in differing degrees for virtually any job." *Id.* at 1191.

Finally, the existence of the agency relationship is clear from the financial structure of the parties' relationship, as KBR controlled the major determinants of Daoud's profit. KBR paid Daoud under the master labor agreement based on a per-hour-per-laborer rate, where KBR controlled the number of laborers and their hours. SMF ¶4                     In addition, Daoud's costs were reimbursed by KBR, including "wages, [s]ocial taxes, [u]nemployement, [i]ncome [t]axes . . . transport and accommodation allowances." *Id.* This payment structure supports a finding of agency. *See Usery*, 527 F.2d at 1313 (finding an agency relationship where the "major determinants" of an agent's profit were regulated by the principal); *Beliz*, 765 F.2d at 1328 (finding an agency relationship where the agent's profit was "not based on his risk of loss of capital investment or his entrepreneurial skill but was simply a piece-rate override," determined by factors "directly controlled" by the principal); *see also CCNV*, 490 U.S. at 753 (payment of a flat rate upon completion of the project weighs against agency, while payment of a per-laborer rate supports it).

REDACTED PUBLIC VERSION

In sum, the limited discovery to date demonstrates that KBR exercised extensive control over Daoud—control over Daoud's managers, control over third country nationals, control over recruitment, control over transportation, control over the termination and release of workers. Some control KBR always possessed but only belatedly exercised.  KBR possessed control over Daoud for many years, during which Daoud performed a regular and essential part of KBR's business.  The evidence collected thus far firmly demonstrates that KBR possessed control over the "manner and means" by which Daoud performed its contract and that Daoud was never "entirely free to do the work in [its] own way." *CCNV v. Reid*, 490 U.S. at 751 ("manner and means"); *Cardinal Health*, 643 F. Supp. 2d at 888 ("not entirely free").

The evidence cited by KBR is plainly insufficient to meet its burden on summary judgment. Mot. at 32.  KBR cites just two news articles (which KBR itself criticizes as hearsay), a disciplinary record, and the same contract between KBR and Daoud cited by Plaintiffs.  None of these documents weigh against finding an agency relationship here.  To the extent KBR may argue that Daoud exercised control over some tasks, it was minor and was always subject to KBR's supervision and veto should KBR choose to step in.  Daoud's role fell far short of "real independence." *Pilgrim*, 527 F.2d at 1312.  KBR firmly controlled the relevant conduct in this case.

In short, substantial evidence in support of finding an agency relationship precludes summary judgment in this case.

## C.    Ample Evidence Demonstrates KBR Is Liable as a Joint Employer

Congress has enacted many remedial statutes, including the Agricultural Worker Protection Act, the Fair Labor Standards Act, and now the Trafficking Victims Protection Act, intended to protect vulnerable individuals from exploitation.  These statutes seek to eliminate abusive labor practices by making those in a position to uphold minimum standards responsible

REDACTED PUBLIC VERSION

for doing so.  The persons most likely to be subject to exploitation are often recruited by one entity, usually a labor broker, but obtained by and working for another legally accountable business.  To address that situation, Courts developed a variety of common law doctrines, foremost among them the joint employer doctrine.  As *Castillo*, 96 F. Supp. 2d at 588-89, explained, "[b]y hiring (and thereby shifting liability to) intermediary 'independent contractors' to recruit and/or oversee workers, agricultural owners have, at times, sought to create a buffer between themselves and their workers. . . .  In the interests of justice, however, courts have frequently 'pierced' this independent contractor 'veil' with the invocation of the 'joint employer doctrine.'" (citations omitted).  Courts developed the joint employer doctrine specifically to ensure that the ultimate employer does not escape liability.  *Id.*[8]  Indeed, labor and employment remedial statutes all permit more than one employer to be found jointly responsible for violations of the statute, either explicitly in the statute or implicitly based on case law or regulation.  The list includes the Age Discrimination in Employment Act, *see, e.g., Rivas v. Fed. de Asociaciones Pecuarias*, 929 F.2d 814, 819-21 (1st Cir. 1991); Americans with Disabilities Act, *see, e.g., Bristol v. Bd. of Cnty. Comm'rs*, 312 F.3d 1213, 1218-19, (10th Cir. 2002); Fair Labor Standards Act, *see, e.g., Griffin & Brand,* 471 F.2d at 238; Family and Medical Leave Act, *see, e.g., Grace v. USCAR*, 521 F.3d 655, 665-71 (6th Cir. 2008); Migrant and Seasonal Agricultural Workers Protection Act, *see, e.g., Torres-Lopez v. May*, 111 F.3d 633, 638-44 (9th Cir. 1997); National Labor Relations Act, *see, e.g., NLRB v. Western Temp. Servs., Inc.*, 821 F.2d 1258, 1266-67 (7th Cir. 1987); Pregnancy Discrimination Act, *see, e.g., Makousky v. Wing King Three, Inc.*, 2005 U.S. Dist. LEXIS 38260, at *5-7 (M.D. Fla. Dec. 20, 2005); Title VII, *see, e.g., Graves v.*

---

[8]     In *Castillo*, the recruitment followed a similar pattern to that in this case:  plaintiffs were recruited in Texas to work in Ohio, and upon arriving "discovered that the actual terms and conditions of their employment, transportation, and housing in Ohio did not coincide with the promises made to them in Texas." *Id.* at 586.  The defendant there, as here, argued it could not be held liable for the conduct of its labor recruiter.

*Lowery*, 117 F.3d 723, 729 (3d Cir. 1997). Multiple employers are routinely held responsible, jointly and severally, for the violations found in these statutes.

In *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947), the Supreme Court looked to the coverage of the employer-employee relationship under the Labor and Social Security Acts to determine that a joint employer, the slaughterhouse, could be liable under the FLSA along with the labor broker who recruited and placed workers at the slaughterhouse, holding "[w]here the work done, in its essence, follows the usual path of an employee, putting an 'independent contractor' label does not take the worker from the protection of the Act." In *Rutherford*, a slaughterhouse supplying boned beef to the army contracted with an independent contractor, Reed, to supply boners to work at the plant. Although Reed was responsible for hiring and paying the boners, the Court looked at the circumstances as a whole, including that the boners worked at the slaughterhouse, did not move from one slaughterhouse to another, and a "managing official of the plant kept close touch on the operation," to find the slaughterhouse jointly employed the boners and was therefore jointly liable for Reed's violations of the Fair Labor Standards Act. *Id.* at 730; *see also Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964); *Hodgson v. Griffin & Brand, Inc.*, 471 F.2d 235, 238 (5th Cir. 1973) (independent contractor status of labor brokers/crew leaders does not negate possibility that Griffin & Brand is joint employer of harvest workers); *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669-70 (5th Cir. 1968); *Fahs v. Tree-Gold Co-op Growers Inc.*, 166 F.2d 40, 44-45 (5th Cir. 1948) (utilizing joint employer doctrine to determine scope of coverage under Social Security Act). The TVPRA uses the phrase "obtain the labor or services of a person," which is not further defined, not "employ," the term used in the FLSA, but surely "obtain the labor or services of a person" is at least as broad as "employ." Courts have consistently found that the TVPRA imposes liability on those

REDACTED PUBLIC VERSION

who employ trafficked workers.  *E.g.*, *Kiwanuka*, 844 F. Supp. 2d 107; *David v. Signal Int'l*,

2012 U.S. Dist. LEXIS 135254.

To determine whether a party is a joint employer, courts look to the total employment

situation, and consider whether the employment takes place on the premises of the company;

how much control the company could exert over the employees; whether the company has the

power to fire, hire, or modify the employment condition of the employees; whether the service

rendered requires a special skill; and whether the employee worked for others.  *See, e.g.*, *Boire*,

376 U.S. at 481; *Griffin & Brand*, 471 F.2d at 238; *Lone Star Steel Co.*, 405 F.2d at 669.

Courts routinely find that growers and the labor brokers who provide migrant farm

workers to the growers are joint employers.  *See, e.g.*, *Reyes v. Remington Hybrid Seed Co.*, 495

F.3d 403 (7th Cir. 2007) (Easterbrook, J.) (citing *Rutherford Food*, 333 U.S. 722); *Charles v.

Burton*, 169 F.3d 1322 (11th Cir. 1999); *Torres-Lopez*, 111 F.3d 633; *Beliz.*, 765 F2d 1317;

*Griffin & Brand*, 471 F.2d at 238; *Hodgson v. Okada*, 472 F.2d 965 (10th Cir. 1973).  These

joint employers were held liable for their co-employers use of pesticide without proper training

(*Reyes*); failure to obtain insurance for the automobile transporting the workers (*Charles*); and

failing to pay wages (*Griffin & Brand* and *Okada*).

The NLRB has expertise in determining when a joint employer is liable for a co-

employer's labor relations, and the courts have upheld the NLRB's rule that joint employers are

generally jointly liable for labor violations.  *See, e.g.*, *Moore-Duncan ex-rel. N.L.R.B. v.

Aldworth Co*, 124 F. Supp. 2d 268, 295 (D.N.J. 2000).  It does not matter which entity employed

the individual who committed the labor law violation; both entities are liable for the infraction.

*C.R. Adams Trucking, Inc.*, 262 NLRB 563, 569 (1982), *enfd.*, 718 F.2d 869 (8th Cir. 1983).  For

example, where one of two joint employers instructs employees to falsify their applications for

REDACTED PUBLIC VERSION

union membership, both joint employers are liable for the violation of the National Labor Relations Act. *Id.* Similarly, where one employer threatens the employees with loss of benefits if they vote for the union, both employers are liable. *Moore-Duncan*, 124 F. Supp. 2d at 282, 293.[9] A joint employer can only escape liability under the NLRA if it "takes no part in the daily direction of the employees, does not participate in their oversight, and has no representatives at the worksite." *See Capitol EMI Music*, 311 NLRB 997, 1000 (1993), *enfd.*, 23 F.3d 399 (4th Cir. 1994). The National Labor Relations Board pointed out in *Capitol EMI* that where "each joint employer has representatives at the worksite, even if only on an occasional basis . . . each joint employer is in a position to hear of, inquire into, and investigate reports of its coemployer's unlawful actions. Ascribing vicarious liability to the joint employer in these circumstances requires it to undo or otherwise remedy unlawful actions of which it is in the best position to know and from which it might gain advantage." *Id.* at 999; *see also Graves v. Lowery*, 117 F.3d 723, 729 (3d Cir. 1997) (holding that joint employer may be liable for sexual harassment by other employer); *Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1359-61 (11th Cir. 1994) (same); *Barfield v New York City Health & Hosps. Corp.*, 432 F. Supp. 2d 390, 394 (S.D.N.Y. 2006) (Bellevue hospital liable for overtime worked by nurse from referral agency although hospital told her "the referral agencies bore responsibility for paying her overtime").

     KBR is plainly a joint employer of the third country nationals, as each and every factor, as well as the overall circumstances, supports finding joint employment under the circumstances here. SMF ¶¶14-26. Most significantly, KBR had "complete direction, management and

---

[9]    *Moore-Duncan* concerned 29 U.S.C. § 160(j) which provides that the NLRB has the power to petition for relief if "any person has engaged in or is engaging in an unfair labor practice . . . ." *Id.* at 280. Unfair labor practices are defined in 29 U.S.C. §158, and include, for example "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." The TVPRA similarly imposes liability on "whoever" "obtains by any means any person for labor or services in violation of this chapter." The Chapter (Chapter 77) prohibits obtaining the labor or services of any person by such means as confiscating passports, threats of serious harm, or physical restraint.

control" over the third country national laborers.  SMF ¶¶4-26, Ex. 1

REDACTED

In fact, the third country nationals were supervised solely by KBR employees, and not by Daoud at all.  SMF ¶18, REDACTED

Decl. of Sanjay Prasad Raut ¶¶24-25 (third country national workers "did not have much contact with anyone from Daoud").  Joint employment has been found where a party exercised far less control, such as where a party "took part in setting up work schedules . . . and in directing the work of the employees in question," *Boire*, 376 U.S. at 895-96, or gave instructions to the crew leaders, who passed them on to the workers, *Griffin & Brand*, 471 F.2d at 238.  Indeed, KBR employees worked alongside Buddhi at KBR's warehouse, which further supports finding joint employment.  SMF ¶26; *see Beliz*, 765 F.2d at 1328 (finding joint employment where regularly engaged employees were doing the same work).  In addition, the employment took place on KBR's premises and KBR set the work hours and determined work locations.  SMF ¶¶19, 20.  KBR also determined other conditions of employment. SMF ¶¶17-18, 21-22.  This factor supports joint employment.  *See Rutherford*, 331 U.S. at 725; *Boire*, 376 U.S. at 475.  KBR had the authority to fire, hire, and modify the employment conditions of the third country nationals. SMF ¶16, Ex. 2 ("Remember that you are the employer... you can terminate them at will."); SMF ¶19, Ex. 2 (KBR has "flexibility to change their job assignments at will"), SMF ¶24.  As in *Boire*, 376 U.S. at 475, this factor supports joint employment.  The services rendered by the third country nationals, as in *Rutherford*, 331 U.S. at 730, did not "depend for success upon the initiative, judgment or foresight" of the laborers, but were menial, physical labor.  This factor supports joint employment.  *Id.*  Finally, the third country nationals did not work for any other employer besides KBR and Daoud, further supporting joint employment.  *Id.*

REDACTED PUBLIC VERSION

There is no dispute that all of the factors and the totality of the circumstances support finding KBR was a joint employer of the third country nationals.  No factor weighs against.

KBR jointly employed laborers with Daoud, knowing that Daoud had confiscated and held their passports, charged them additional fees, and paid them less than they had been promised.  SMF ¶¶45-48.  KBR also knew that the workers had gone into debt to obtain their jobs and could not leave the base on their own.  SMF ¶¶47, 53.  KBR had, at all times, the authority to return the passports, prohibit labor broker fees, require the original contracts be honored, and otherwise comply with the requirements of the TVPRA.  SMF ¶¶23-24.  Instead of doing so, KBR attempted to squash any outside investigations, fired whistleblowers and told the third country nationals who sought help that they must deal with Daoud.  SMF ¶¶25, 57.  KBR reaped the benefits.  SMF ¶¶35-41.

The TVPRA imposes liability on "whoever" knowingly obtains the labor or services of a person "by any means" (§ 1590) or "by means of any scheme, plan or pattern" (§ 1589) involving serious harm, including economic harm, or physical restraint.  Permitting joint employers to escape liability under the TVPRA, particularly where, as here, KBR knew and benefitted from its co-employers wrongful conduct, would frustrate the purposes of statute:  to protect victims and eliminate incentives for trafficking.  As Courts in the Fifth Circuit did decades ago, in the context of migrant workers, this Court should apply the joint employer doctrine to the trafficked workers in this case.

**D.    RICO**

   **1.    Substantial Evidence of Agency Supports Plaintiffs' Vicarious RICO Claim**

At Plaintiffs' request, this Court dismissed Plaintiffs' direct RICO claims against KBR on September 25, 2012.  *See* Order, Sept. 25, 2012 (ECF No. 383).  The only remaining RICO claim

against KBR is Count VI, vicarious violation of 18 U.S.C. § 1962(c).  To prevail on their vicarious RICO theory against KBR, Plaintiffs must show that Daoud or another participant in the human trafficking enterprise was an agent of KBR.  As set forth above, *supra* pp. 24-34, Plaintiffs have shown by ample evidence that Daoud was KBR's agent for the purposes of obtaining and providing laborers in Iraq in 2004 and 2005.  Thus, despite the very limited discovery of this issue to date, Plaintiffs have satisfied their burden to show a material dispute of fact as to the Defendants' agency relationship.

As to the underlying predicate racketeering activities (human trafficking, forced labor, and document servitude), KBR wrongly contends that Plaintiffs failed to show any pattern of racketeering activity by any participant in the trafficking enterprise.  Mot. at 24.  To the contrary, despite the fact that discovery has been extremely limited to date, ample evidence demonstrates that:

- **REDACTED**

-

- **REDACTED**

- The key players in this association-in-fact engaged in deceptive and coercive conduct in order to keep the supply of workers coming, including deceiving workers about their destination, charging exorbitant fees, confiscating and withholding passports, paying lower-than-promised wages, refusing workers' requests to leave, and threatening and retaliating against workers who spoke up about their mistreatment.  SMF ¶¶60-80, 85.

- The association and its pattern of recruitment activities was durable and spanned a period of years from at least 2004 until 2008 and beyond.  SMF ¶¶83-86.

REDACTED PUBLIC VERSION

Plaintiffs' factual showing is more than sufficient to raise a genuine dispute of fact as to Daoud's association with a human trafficking enterprise and its participation in the conduct of that enterprise's affairs through a pattern of racketeering activity.

> **2.    Substantial Evidence Demonstrates that KBR Benefitted from RICO Violations by Daoud, Making Summary Judgment Inappropriate**

KBR argues that "even if Daoud was KBR's agent," KBR cannot be held liable under RICO because KBR "did not benefit from any RICO violation by Daoud." Mot. at 32. This argument is premised on KBR's assertion that it was reimbursed by the U.S. Army for all costs that KBR was charged by subcontractors, so KBR received no economic benefit from cheap, trafficked labor. This argument is unavailing because KBR did in fact benefit from the trafficked labor in multiple ways. The record is replete with evidence of the pressure KBR was under to maintain a large and steady supply of labor in order to fulfill its obligations to the military. SMF ¶¶38-39, Ex. 21 ("critical staff shortages on the B-sites" in August 2004); Ex. 22 (KBR manager inquiring "any news on the staff shortages?"); Ex. 23 (personnel needs: laborers); Ex. 24 (same); Ex. 99 (personnel needs: plumbers and carpenters);

**REDACTED**

Ex. 31 at KBRE0005786 (Daily Summary Report reporting in May 2004 "D&P has been severely short of labor for weeks");

**REDACTED**

By misleading laborers about where they would be working and not permitting the laborers to leave at will, KBR and Daoud were able to find recruits more quickly and maintain

REDACTED PUBLIC VERSION

staffing levels.  Thus, KBR was able to meet the sudden and overwhelming demand of its

client—the Army—for manual labor in a war zone.  SMF ¶¶35-41, Ex. 20 (Daoud explains "it is

not easy to find people willing to go to Iraq at this time" July 2004); Ex. 18 (Iraqi labor difficult

to procure due to security risks); Ex. 17 (difficulty in obtaining sufficient staffing); Ex. 32 at

KBRE0005940 (KBR managers described the impact of third country nationals leaving as

"profound" and concluded that the failure to retain the workers "paints a bleak picture");

REDACTED

    *see also* Ex. 32 at KBRE0005941("it is not as easy as many would think to replace a

DFAC service provider without impacting the mission").

    Indeed, had KBR not obtained sufficient labor, it would not have been able to meet its

obligations under the contract.

REDACTED

    KBR relied heavily on third country national subcontract workers to meet its LOGCAP

staffing needs, and the use of Nepali workers, who were paid significantly less than other third

country nationals, made them particularly cost effective.  SMF ¶¶6-7, 40-41, Ex. 1-2.  The

LOGCAP contract was on a "cost-plus-award-fee" basis, providing a profit incentive to KBR to

meet its contractual obligations on time and keep its overall costs low.  SMF ¶36,

REDACTED

    Plainly, KBR did in fact derive a benefit.

REDACTED PUBLIC VERSION

**E.    Ample Evidence Supports Plaintiffs' Additional Theories of Liability**

Even assuming, arguendo, that no agency relationship existed between Daoud and KBR,

KBR's motion must be denied because ample evidence demonstrates that KBR ratified the

trafficking and forced labor of Plaintiffs; that KBR had a nondelegable duty to ensure that any

laborers working on KBR's behalf were safely employed during the war; and that KBR

negligently supervised Daoud.

          **1.    Ratification**

Ratification occurs where a principal fails to repudiate the prior unauthorized or unlawful

acts of a third party and chooses instead to receive the benefits of those acts after acquiring full

knowledge of them. *Penton v. Am. Bankers Ins. Co.*, 114 F. App'x 622, 625 (5th Cir. 2004);

*Prunty v. Arkansas Freightways, Inc.*, 16 F.3d 649, 653 (5th Cir. 1994). Although the doctrine is

most frequently applied to the unauthorized acts of an agent, an agency "relation is not necessary

to cause the ratification to be effective." *Disney Enters., Inc. v. Esprit Fin., Inc.*, 981 S.W.2d 25,

31, 1998 Tex. App. LEXIS 3262 (Tex. App. 1998) (citing Restatement (Second) of Agency § 85

(1958)); *see also Olney Sav. & Loan Asso. v. Trinity Banc Sav. Asso.*, 885 F.2d 266, 270 (5th

Cir. 1989) (ratification of fraudulent contract); *Fin. Fed. Credit Inc. v. Curtis Excavating, LLC*,

2009 U.S. Dist. LEXIS 126724, at *14-16 (S.D. Tex. Aug. 17, 2009) (ratification of forged

promissory note); *Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006) (ratification of third party

sexual harassment).

KBR ratified Daoud's misconduct because it chose to continue to receive the benefit of

coerced and trafficked labor even though it was well aware that Daoud was trafficking human

beings to fulfill its contract with KBR. KBR had extensive knowledge of trafficking activities by

Daoud and its other subcontractors. SMF ¶¶42-59. Nonetheless, KBR continued to retain the

benefits of Daoud's human trafficking by retaining laborers who had already been trafficked and

REDACTED PUBLIC VERSION

continuing to receive new laborers from Daoud knowing that they might have been trafficked. SMF ¶¶35-41. Because KBR was aware that Daoud was bringing trafficked labor to Iraq and KBR retained the benefit of that labor, KBR ratified Daoud's misconduct and is liable.

### 2. Nondelegable duty

Alternatively, KBR is liable because KBR had a nondelegable duty to protect laborers in a war zone. "[A] person that hires an independent contractor to perform inherently dangerous work has a nondelegable duty to assure the work is performed safely." *Townsend v. Goodyear Tire & Rubber Co.*, 481 F. Supp. 2d 610, 618 (N.D. Tex. 2007) (quoting *Lathers v. Penguin Industries, Inc.*, 687 F.2d 69, 73 (5th Cir. 1982). A nondelegable duty exists when an independent contract is hired to do "work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which [the employer contemplates or has reason to contemplate when making the contract." RESTATEMENT (SECOND) OF TORTS § 427 (1965) (quoted in *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 795 (Tex. 2006)).

In *Wilson v. Good Humor Corp.*, the District of Columbia Circuit reversed a directed verdict where the district court had concluded that defendant Good Humor "was insulated from all liability" for the acts of its ice cream truck operators because the operators were independent contractors. *Wilson v. Good Humor Corp.*, 757 F.2d 1293, 1297 (D.C. Cir. 1985). Rejecting the district court's conclusion, the D.C. Circuit explained that "one of the most important exceptions" to the independent contractor rule is for "inherent[ly] danger[ous]" activities. *Id.* The D.C. Circuit held that "plaintiffs should be able to go to the jury" to determine whether, under the "fact-specific, particular circumstances," the defendant "knew or had reason to know that its street vending operation was likely to create . . . a peculiar risk to children absent special precautions." *Id.* at 1303-04.

45

Like the plaintiffs in *Wilson v. Good Humor*, Plaintiffs in this case have presented evidence sufficient to create a genuine, material dispute for the jury regarding KBR's nondelegable duty, because KBR had reason to know and contemplate that human trafficking and forced labor were dangers inherent in employing laborers in a war zone. War and conflict create opportunities for trafficking because they hamper anti-trafficking efforts, *e.g.*, U.S. Dep't of State, *Trafficking in Persons Report*, June 2003, p. 166; U.S. Dep't of State, *Trafficking in Persons Report*, June 2004, p. 266, and the link connecting war with human trafficking and forced labor is well known. *E.g.*, U.S. Dep't of State, *Trafficking in Persons Report*, June 2008, p. 19. The Coalition Provisional Authority was concerned with human trafficking in Iraq within a year of the war's beginning. U.S. Dep't of State, *Trafficking in Persons Report*, June 2004, p. 251 (By the first half of 2004, "[t]he CPA alerted U.S. personnel in Iraq to the possible emergence of trafficking in persons . . . ."). Human trafficking is a danger inherent in war and, because KBR should have known or contemplated the risk, KBR had a nondelegable duty to protect third parties, including the victims in this case.

KBR's nondelegable duty covers the victims in this case, even though the victims were Daoud's employees. Generally, under Texas law, an employer's liability for a contractor's performance of an inherently dangerous activity extends only to injuries suffered by third parties, and not those of the contractor's employees. *Lathers*, 687 F.2d at 73. However, application of that rule to those who had no real free or informed choice over whether to become employees, as is true of trafficking victims, would produce an absurd result. The Deceased Victims and Buddhi Gurung became Daoud's employees because they were tricked and coerced to work against their will. KBR's liability should not be circumscribed where, as here, the victims became "employees" in violation of the TVPRA.

REDACTED PUBLIC VERSION

### 3.     Negligent Supervision

Where a remedial statute is enacted for the protection of a class of vulnerable employees, it creates a duty on the employer to ensure a workplace free of the oppressive or exploitative condition. *See, e.g., Dunn v. Wash. Cnty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005); *Purtell v. Philadelphia & Reading Coal & Iron Co.*, 99 N.E. 899 (Ill. 1912). An employer may not escape liability merely because part or all of the oppressive act is carried out by a third party, such as a customer or an independent contractor. *See, e.g., Galdamez v. Potter*, 415 F.3d 1015, 1022 (9th Cir. 2005); *Commonwealth v. Hong*, 158 N.E. 759, 759 (Mass. 1927). Under the statute, the employer has a duty to adequately supervise the workplace, including its independent contractors and other third-parties, to eliminate the condition. *See, e.g., Lockard v. Pizza Hut*, 162 F.3d 1062, 1073-1074 (10th Cir. 1998); *People ex rel. Price v. Sheffield Farms-Slawson-Decker Co.*, 121 N.E. 474, 476 (N.Y. 1918). If, as a result of the employer's negligent supervision, the prohibited act or condition is allowed to occur, the employer may be held directly liable for violating the statute.[10] *See, e.g., Freitag*, 468 F.3d at 538; *Daly v. Swift & Co.*, 300 P. 265, 268 (Mont. 1931); *Hodgson v. Griffin & Brand, Inc.*, 1972 U.S. Dist. LEXIS 14394, at *4 (S.D. Tex. Mar. 31, 1972).

To impose statutory liability based on an employer's negligent supervision, a plaintiff must first show that the employer knew or with reasonable diligence should have known of the oppressive or exploitative condition.[11] *See, e.g., Burlington Indus. v. Ellerth*, 524 U.S. 742, 759

---

[10]     Because this liability for negligent supervision is imposed directly under the statute, a plaintiff is not required to plead state common law negligent hiring, supervision, or retention causes of action. *See, e.g., Dunn*, 429 F.3d 689 (no common law negligence claims were pled). Consequently, this Court's dismissal in 2009 of Plaintiffs' common law negligence claims, including negligent hiring and negligent supervision, *see* Order, ECF No. 168 (Nov. 3, 2009), does not affect Plaintiffs' ability to argue that KBR should be held directly liable under the TVPRA for its negligent supervision and retention of Daoud.

[11]     Such liability for negligent supervision is consistent with statutes requiring knowledge because an employer may not avoid liability by choosing to ignore credible evidence of statutory violations and

REDACTED PUBLIC VERSION

(1998); *Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999) (citing *Williamson v. City of Houston*, 148 F.3d 462, 464 (5th Cir. 1998))); *Hodgson v. Griffin & Brand, Inc.*, 1972 U.S. Dist. LEXIS 14394, at *4; *see also Slater v. Judson Constr.*, 2010 Conn. Super. LEXIS 3220, 19 (Conn. Super. Ct. Dec. 14, 2010) (denying summary judgment because genuine issue of material fact existed regarding whether employer knew or should have known that its independent contractor had employed a minor in a prohibited activity).

Second, the employer must have had adequate control over either the work environment or the contractor such that it could have prevented the oppressive or exploitative condition. *See, e.g.*, *Lockard*, 162 F.3d at 1073-1074 ("An employer who condones or tolerates the creation of such an environment should be held  liable regardless of whether the environment was created by a co-employee or a nonemployee, since the employer ultimately controls the conditions of the work environment"); *Freitag*, 468 F.3d at 538 ("[E]mployers are liable for harassing conduct by non-employees 'where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct. . . . This theory of liability is grounded not in the harassing act itself – i.e., inmate misconduct – but rather in the employer's 'negligence and ratification' of the harassment through its failure to take appropriate and reasonable responsive action."); *Gorczynski v. Nugent*, 83 N.E.2d 495, 499 (Ill.

---

declining to investigate further. *See, e.g.*, *Wirtz*, 405 F.2d at 670 (employer violated statute imposing liability for the knowing transport of goods produced in violation of labor laws where employer "could and should have known" of such violation but instead adopted "ostrich-like attitude" and chose not to investigate reports of non-compliance by independent contractor); *In re West*, 46 N.E.2d 760, 764 (Mass. 1943) (employer liable for knowingly violating child labor laws; "If a person confronted with a state of facts closes his eyes in order that he may not see that which would be visible and therefore known to him if he looked, he is chargeable with knowledge of what he would have seen had he looked."); *Evans v. Dare Lumber Co.*, 93 S.E. 430, 432 (N.C. 1917) (defendant was liable for its independent contractor's use of child labor where defendant "could have seen, and did see, that he was under the prescribed age"); *People ex rel. Price*, 121 N.E. at 476 ("[T]he duty to inquire existing, there is no safety in ignorance if proper inquiry would avail.").

REDACTED PUBLIC VERSION

1948); *Evans v. Dare Lumber Co.*, 93 S.E. 430, 431 (N.C. 1917).  As Judge Posner observed in

*Dunn*, 429 F.3d at 691, "employers have an arsenal of incentives and sanctions (including

discharge) that can be applied to affect conduct.  It is the use (or failure to use) these options that

makes an employer responsible—and in this respect independent contractors are no different

from employees."

Contrary to KBR's assertions, a statutory duty may require a principal to exercise

adequate supervision of its independent contractors or face liability.  For example, under statutes

enacted to abolish the similar early twentieth century scourge of exploitative child labor, the fact

that a child was hired, employed, and supervised by an independent contractor was not a defense

to liability under the statute.  *See, e.g., Commonwealth v. Hong*, 158 N.E. at 759; *Evans*, 93 S.E.

at 432.  Because child labor statutes impose an absolute and non-delegable duty on employers to

eliminate child labor in the workplace, [12] *see Purtell*, 99 N.E. 899; *People ex rel. Price*, 121 N.E.

at 476, employers have a duty to adequately supervise their independent contractors to prevent

such exploitation.  *See, e.g., Daly*, 300 P. at 268 (even though defendant corporation had no

control over the child's employment by the independent contractor and could not have

discharged him, it nevertheless had a statutory duty to prevent such labor by exercising its ability

to prohibit the independent contractor from proceeding with the child's labor); *Evans*, 93 S.E. at

431 (holding employer liable for independent contractor's use of child labor because employer

had the "unquestioned right to terminate the contractor's employment at will").  By holding

employers equally accountable with their independent contractors for violations of child labor

---

[12]     Although child labor statutes varied by state, most prohibited an employer from employing or
permitting or suffering the employment of a minor.  *See, e.g., Purtell*, 99 N.E. at 902 (Child Labor Act of
1903 § 1: "No child under the age of fourteen years shall be employed, permitted or suffered to work . . .
."); *Price.*, 121 N.E. at 476 (N.Y. Labor Law § 162:  "no child under the age of fourteen years shall be
*employed or permitted to work in or in connection with* any mercantile . . . establishment specified in the
preceding section.").  The TVPRA uses the phrase "Whoever knowingly provides or obtains the labor or
services of a person," which is similarly broad.

laws, the statutes ensured that all those in a position to prevent the exploitative labor of children would have an incentive to do so.  Like earlier child labor statutes, the purpose of the TVPRA is to prevent absolutely the use of coerced and involuntary labor by holding accountable those who have the power to stop it.  In this case, there is sufficient evidence from which a jury could conclude that KBR knew that its labor contractors, including Daoud, had engaged in coercive, deceptive, and abusive labor practices indicative of trafficking.  *See* SMF ¶¶42-53.  KBR also had knowledge of specific and serious misconduct by Daoud.  *See* SMF ¶¶49-53. The breadth of the allegations of human trafficking received by KBR put KBR on notice that its subcontractors, including Daoud, were violating the TVPRA.  SMF ¶¶42-53.  Even if this court were to find, however, that such allegations were insufficient to constitute knowledge under the TVPRA, they nonetheless triggered KBR's duty to exercise reasonable diligence by investigating further.  *See, e.g., Wirtz,* 405 F.2d at 670 (employer who was aware of allegations of violations by its independent contractor had responsibility to conduct the "further investigation necessary to ascertain the facts"); *Galdamez,* 415 F.3d at 1022 (once employer learns of third-party harassment of employees, it has a duty to investigate and remedy it); *Vincent v. Riggi & Sons,* 285 N.E.2d 689, 694 (N.Y. 1972) (an employer "is required to exercise proper vigilance to discover" whether the statute is being violated); *Gorczynsk,* 83 N.E.2d at 499.  Rather than investigate these repeated allegations, KBR discouraged reports of abuse, including by reprimanding or disciplining those who attempted to make reports. SMF ¶57.

       KBR's assertion, therefore, that Buddhi's attempts to inform its employees that he wanted to return to Nepal were insufficient to provide it with knowledge that he had been trafficked, Mot. at 34, is incorrect as a matter of law because KBR already had a duty, based on the extensive reports of trafficking it had received before Buddhi's arrival, *see* SMF ¶¶42-57, to

REDACTED PUBLIC VERSION

investigate its own working conditions and provide for its employees' protection. *See Sharp*,

164 F.3d at 931-32 (failure to create effective reporting system); *Price*, 121 N.E. at 475. KBR's

failure to implement an adequate system of reporting and detection based on its pre-existing

knowledge of trafficking by its subcontractors, including Daoud, justifies holding it liable for

those employees who were later trafficked, like Buddhi.

Finally, KBR had extensive control over Daoud that would have allowed KBR to prevent

the trafficking of Buddhi Gurung and the Deceased Victims. As described in more detail in the

agency section, *see supra* Section V.B, KBR exercised extensive control over the recruiting

process. In particular, it had the ability to prohibit **REDACTED**

Daoud from engaging in common trafficking practices, such as retaining employees' passports

and using brokers that charge recruiting fees. SMF ¶¶13, 30-34. And KBR had the key right of

control available to all employers who hire independent contractors — it had the "unquestioned

right to terminate the contractor's employment at will." *Evans*, 93 S.E. at 431. KBR could,

therefore, have prevented any further trafficking of employees by ending its contracts with those

independent contractors that relied on trafficked labor, and entering into new contractors with

companies that followed the law. Thus, just like the employer in *Evans*, KBR is liable because it

chose to continue to employ a contractor that it knew was violating the law.

**F.   ATS**

This Court has already determined that Plaintiffs' claims under the Alien Tort Statute, 28

U.S.C. § 1350 ("ATS") are cognizable under *Sosa v Alvarez-Machain*, 542 U.S. 692 (2004).

Defendant KBR makes two arguments for summary judgment on Plaintiffs' ATS claims.

REDACTED PUBLIC VERSION

First, KBR argues that Plaintiffs' ATS claims fail for the same evidentiary reasons as plaintiffs TVPRA claims. These arguments are refuted in section V.A., *supra*. There is ample evidentiary support for Plaintiffs' ATS claims.

Second, KBR argues that the presumption against extraterritoriality limits the scope of the ATS to acts occurring on U.S. soil. No court has ever accepted this argument. Every Circuit to consider this issue has found the ATS to apply to conduct occurring outside the territory of the United States. *See, e.g., Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 20-28 (D.C.Cir 2011); *Flomo v. Firestone Natural Rubber Co.*, 643 F.3d 1013, 1025 (7th Cir. 2011); *Sarei v. Rio Tinto PLC*, 671 F.3d 736, 744-47 (9th Cir. 2011).

On October 1, 2012, the Supreme Court heard argument in *Kiobel v. Royal Dutch Petroleum*, No 10-1491. The questions presented in *Kiobel* include whether corporations can be sued under the ATS and whether and in what circumstances the ATS applies to conduct occurring on the territory of a foreign sovereign. Thousands of pages of briefs have been filed in the Court on these questions and the Court is expected to issue a ruling between now and June 2013. The Supreme Court was not receptive to KBR's extraterritoriality argument. *See, e.g.*, Sup. Ct Tr. at 24–28 (Justice Scalia casting doubt on application of presumption against extraterritoriality: "I believe strongly in the presumption against extraterritorial application, but do you know of any other area where extraterritorial application only means application on the territory of a foreign country and not application on the high seas?"). No matter what the Supreme Court decides, its ruling will control these issues in this case, including the extraterritoriality issue KBR raises here.

REDACTED PUBLIC VERSION

## VI.   SUMMARY JUDGMENT SHOULD NOT BE GRANTED WHEN THE NON-MOVING PARTY HAS NOT HAD AN OPPORTUNITY FOR ADEQUATE DISCOVERY

Plaintiffs renew their Rule 56(d) motion for a continuance. *See* Dkt. 375.  Summary judgment should not be granted unless the opposing party has had an opportunity for adequate discovery. *Winfrey v. San Jacinto Cnty.*, 2012 U.S. App. LEXIS 15589, at *35-38 (5th Cir. July 27, 2012) (reversing grant of summary judgment because record inadequately spoke to material issue and non-moving party had not had a "full and fair opportunity" to conduct discovery); *Hinojosa v. Johnson*, 277 F. App'x 370, 378 (5th Cir. 2008) (same).

Plaintiffs have not received adequate discovery on four issues critical to summary judgment:  (1) KBR's authority over Daoud & Partners; (2) KBR's knowledge of the unlawful trafficking operation; (3) the profits and benefits KBR received from the trafficking operation; and (4) KBR's acts and omissions.  In fact, Plaintiffs have received a total of just 5,249 electronic documents from the 9 KBR Defendants.[13]  Despite Plaintiffs' efforts to compromise, KBR has inhibited Plaintiffs' ability to gather essential evidence while simultaneously contending that Plaintiffs lack evidence to prove their claims.  This Court should therefore grant Plaintiffs' request for a continuance under FED. R. CIV. P. 56(d) and order KBR to comply with its discovery obligations.

### 1.   Despite diligent efforts, Plaintiffs have not received production of information critical to the key issues in this case.

Plaintiffs' First Document Requests, which were served on KBR on January 21, 2010, asked for documents likely to lead to admissible evidence on the four key areas in dispute:  (1) KBR's authority over Daoud & Partners (*see, e.g.*, Request Nos. 24, 25, 29(k), 35, and 36); (2)

---

[13]   Plaintiffs' records indicate that KBR has produced 40,552 pages of electronic information, which amounts to just 5,249 electronic documents – including duplicates.  KBR's total document production, including non-electronic documents, documents produced for personal jurisdiction discovery, 19,000 pages of laundry logs, and multiple duplicate lengthy contract attachments totals roughly 76,000 pages.

REDACTED PUBLIC VERSION

KBR's knowledge of the unlawful trafficking operation (*see, e.g.*, Request Nos. 9, 13, 16, and 19); (3) the profits and benefits KBR received from the trafficking operation (*see, e.g.*, 18, 29(i) and (l), and 42); and (4) KBR's acts and omissions (*see, e.g.*, Request Nos. 2, 9, 13, 16, and 28). Plaintiffs repeatedly attempted to work with KBR to narrow their electronic search terms, identify discrete categories of non-electronic documents for production, or reduce discovery costs through a 502(d) order, to no avail.  *See, e.g.* Letter from A. Fryszman to Billy Donley, Counsel for the KBR Defendants (June 15, 2012) (identifying discrete categories of non-electronic documents); E-mail from A. Fryszman to M. Mengis (July 24, 2012, 10:46 AM EST) (proposing entry of a 502(d) order).

Despite their efforts, Plaintiffs have not received production of documents in KBR's possession most likely to be relevant to these key issues in the case.  For example, with regard to KBR's relationship with Daoud, KBR has not produced documents in response to queries targeted to agency or KBR's authority over Daoud's work.[14]  Nor has KBR produced documents responsive to queries that included the term "labor broker" or queries targeted to passport confiscation, or retaliation against individuals for reporting abuse.

KBR has flatly refused to answer interrogatories or produce documents relevant to these key issues, no matter how narrowly tailored the request.  For example,

**REDACTED**

---

[14]   KBR asserted at the September 25, 2012 hearing that Plaintiffs had not selected queries including the term "Daoud" for production.  That is incorrect.  Plaintiffs requested production of documents responsive to terms including "Daoud" and "D&P," almost two years ago.  Letter of M. McOwen to M. Mengis (Jan. 18, 2011).  Plaintiffs again requested terms including "Daoud" on July 26, 2011, and explicitly noted that Plaintiffs did not yet have the names of the relevant Daoud employees and that therefore the Daoud terms could not be finalized.  Letter of A. Fryszman to M. Mengis (July 26, 2011); *see also* Status Conference Tr. 23, May 30, 2012 (KBR attorney Mr. Lowes:  "I don't know what else to limit 'Daoud' with.").  Every set of queries submitted by Plaintiffs to KBR has included terms for Daoud and its employees.

REDACTED PUBLIC VERSION

**REDACTED**

One of Plaintiffs' interrogatories had asked KBR to identify employees with knowledge of "the labor broker who provided Buddhi Gurung to Daoud" and to describe their communications with that broker. Pl. Chittij Limbu's First Set of Interrogs. No. 6. KBR refused to answer. KBR Defendants' Objection & Resp. to Pl. Chittij Limbu's First Set of Interrogs. at 11. Witnesses Michael Henson and Duane Banks both reported abuses of the Nepali third country nationals during the time period relevant to this case. Decl. of Duane Banks ¶¶3-7; Decl. of Michael Henson ¶¶8-13. Plaintiffs requested documents related to the two men. KBR refused to produce the documents. KBR's Objection & Resp. to Pls.' Third Request for Produc.

> **2.      The limited discovery to date provides a plausible basis for believing that additional evidence exists on these key issues.**

Many of the documents already produced refer to other related or similar documents, providing a plausible basis for believing that additional evidence exists and should be produced. *See Fennell*, 393 F. App'x at 155. With regard to the relationship between KBR and Daoud, for example,

**REDACTED**

**REDACTED**

**REDACTED**

REDACTED PUBLIC VERSION

**REDACTED**

Finally, Plaintiffs seek additional discovery over whether the employees to whom Buddhi

reported that he wanted to go back to Nepal reported to management; KBR's system, if any, for

enabling TCN laborers to report complaints or concerns regarding such abuses; the complaints

and concerns submitted by TCNs through this system; and KBR's responses to such complaints

and concerns, all of which is information that is clearly in KBR's possession.

KBR has identified — but not produced — many more documents that are potentially

responsive to Plaintiffs' requests.  For example, at the September 2012 status hearing before this

Court, counsel for KBR provided the Court handouts indicating that KBR has run queries

identifying electronic documents potentially responsive to Plaintiffs' requests for production.

But the underlying documents themselves have not been produced.  Plaintiffs have received lists

of the number of responsive documents — not the documents themselves.  Discovery of these

and similar documents is essential so that Plaintiffs can have a full and fair opportunity to prove

their claims.  Such discovery is particularly necessary where the information sought is solely in

possession of the other party, including, where, as here, a key issue to be proved is Defendants'

own knowledge and corporate relationships.  *Culwell v. City of Fort Worth*, 468 F.3d 868, 873

(5th Cir. 2006); *Schoenbaum v. Firstbrook*, 405 F.2d 215, 218 (2d Cir. 1968).

KBR's electronic production contained documents responsive to queries covering

scarcely seven of the forty-eight document requests served by Plaintiffs.  KBR also restricted the

number of custodians whose files it would search and searched the files of only nine custodians

(one of the ten custodians cherry-picked by KBR had no documents).  These custodians did not

REDACTED PUBLIC VERSION

include the individuals identified on KBR's own Rule 26 disclosures (listing 30 KBR employees) or the persons with knowledge of investigations or inquiries regarding abuse of third country nationals, including human trafficking (listing 24 KBR employees).  *See* KBR Defs' Obj. & Resp. to Pl. Koiri's First Set of Interrogs. Related to ESI Custodians.  Moreover, KBR's production from even these limited queries and custodians has been inadequate.

REDACTED

That relevant documents from KBR's own cherry picked custodians were produced by Daoud, but not KBR, further illustrates the deficiencies in KBR's production. Plaintiffs currently have two motions pending before this court to compel KBR to produce these documents; a third, related to a handful of hotline reports, was recently granted.  Resp. and Cross Mot. to Compel, ECF No. 294 (Mar. 9, 2012); Pls.' Mot. to Compel Three Limited Categories of Non-Electronic Docs., ECF No. 359 (Sept. 11, 2012); Pls. Mot. to Compel the Produc. of KBR's Ethics Hotline Reports, ECF No. 328 (Aug. 2, 2012).

Rule 56(d) is designed to guard against the premature grant of summary judgment by "'safeguard[ing] non-moving parties from summary judgment motions that they cannot adequately oppose'" due to insufficient discovery.  *Winfrey*, 2012 U.S. App. LEXIS 15589, at *35-36 (quoting *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010)).  For this reason, "Rule 56(d) discovery motions are 'broadly favored and should be liberally granted.'"  *Id.*  Plaintiffs' receipt of just 5,249 electronic documents is a far cry from the full and fair discovery necessary to adequately oppose KBR's motion for summary judgment, and this Court should therefore grant Plaintiffs' a continuance and order KBR to comply with its discovery obligations.

## VII.   <u>CONCLUSION</u>

For these reasons, KBR's Motion for Summary Judgment should be denied.

REDACTED PUBLIC VERSION

October 23, 2012                              Respectfully submitted,


                                             /s/ Agnieszka M. Fryszman
                                             Agnieszka M. Fryszman, Attorney-In-Charge
                                             (admitted *pro hac vice*)
                                             Matthew K. Handley (*pro hac vice*)
                                             Maureen E. McOwen (*pro hac vice*)
                                             Alysson Ford Ouoba
                                             Thomas N. Saunders
                                             COHEN MILSTEIN SELLERS
                                               & TOLL PLLC
                                             1100 New York Avenue, N.W.
                                             West Tower, Suite 500
                                             Washington, D.C. 20005-3964
                                             Telephone: 202-408-4600
                                             Facsimile:  202-408-4699

                                             Paul L. Hoffman
                                             Catherine Sweetser
                                             SCHONBRUN, DESIMONE, SEPLOW,
                                               HARRIS & HOFFMAN LLP
                                             723 Ocean Front Walk
                                             Venice, CA 90291
                                             Telephone: 310-396-0731
                                             Facsimile: 310-399-7040

REDACTED PUBLIC VERSION

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 23rd day of October, 2012, a true and

accurate copy of Plaintiffs' Response in Opposition to KBR's Motion for Summary Judgment,

the Declaration of Sanjay Prasad Raut, the Declaration of Duane Banks, the Declaration of

Michael Henson, the Statement of Material Facts, and the exhibits thereto, were filed under seal

with the Court via the Court's sealed Electronic Filing System:

/s/ Agnieszka M. Fryszman
Agnieszka M. Fryszman, Attorney-In-Charge
(admitted *pro hac vice*)
COHEN MILSTEIN SELLERS
 & TOLL PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005-3964
Telephone: 202-408-4600
Facsimile:  202-408-4699