REDACTED PUBLIC VERSION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

RAMCHANDRA ADHIKARI *et al.*,      )
                                    )
            Plaintiffs,             )      Civil Action No. H-09-1237
                                    )
      v.                            )      Judge Keith P. Ellison
                                    )
DAOUD & PARTNERS *et al.*,          )
                                    )
            Defendants.             )
                                    )

## STATEMENT OF MATERIAL FACTS

### KBR Controlled the Recruitment of Third-Country Nationals

1.      ~~Under the Master Agreement for Temporary Personnel Services, the contractual~~ arrangement was for Daoud to hire workers for KBR's operations in Iraq.

2.      KBR made Daoud the *only* approved source for obtaining labor at Al Asad Airbase. Ex. 2, KBRE0003585.

3.      ~~KBR and Daoud had a long history of contracting to supply laborers to KBR,~~ including another Agency Agreement and ~~~~ that predated their contracts in Iraq. *E.g.*,

                        **REDACTED**

            Ex. 172, KBRE0006926 (referencing Daoud "Agency Agreement").

4.      **KBR provided specific labor requirements and Daoud met them.** KBR provided its requirements to Daoud "for each person required," including the experience and qualifications desired.                        Ex. 2, KBRE0003585 ("if we require special skills or abilities,

REDACTED PUBLIC VERSION

we need to put that in to the requisition as a requirement so they recruit suitable individuals");
*see also id.* (in order to obtain the third-country national workers, KBR would "prepare a
requisition . . . do a Work Release . . . and order the people from D&P"). KBR noted that "They
do not have folks in hand ready to go." *Id.* Rather, Daoud recruited individuals on a case-by-
case basis as KBR requested. *Id.*;    **REDACTED**

KBR directed Daoud to investigate the "personnel backgrounds" of prospective
employees and to certify that the prospective employees were not, *inter alia*, suspected terrorists
or former high ranking officials of the Ba'ath Party.

**REDACTED**

KBR also required a medical examination,

**REDACTED**

KBR paid Daoud under the master labor agreement based on a per-hour-per-laborer rate,
where KBR controlled the number of laborers and their hours.                             In
addition, Daoud's costs were reimbursed by KBR, including "wages, [s]ocial taxes,
[u]nemployement, [i]ncome [t]axes . . . transport and accommodation allowances."

5.      **KBR monitored Daoud closely.** KBR required Daoud to carry out these specific
requirements, monitored the results, and demanded prompt completion of KBR's demands. *See*

REDACTED PUBLIC VERSION

**REDACTED**

KBR had the right to

**REDACTED**

inspect and audit Daoud's records.

6.      **Obtaining workers for KBR's operations through international recruitment, transportation to and from Iraq, and housing on site were essential to KBR's ability to meet its obligations under its U.S. military contracts.** As described in more detail below, paragraphs 38-39, KBR faced severe labor shortages. *E.g.*, Ex. 17, KBRE0000328 (difficulty in obtaining sufficient staffing); Ex. 18, KBRE0036927; Ex. 19, DP00046975 (KBR email to Daoud discussing "serious staff deficiencies"); Ex. 20, KBRE0002783 (Daoud explains "it is not easy to find people willing to go to Iraq at this time" in July 2004); Ex. 21, KBRE0014689 (KBR food services supervisor reporting "critical staff shortages on the B-sites" and seeking quick action so subcontractor can proceed with recruiting); Ex. 22, KBRE0013977 (KBR manager inquiring "any news on the staff shortages?"); Ex. 23, KBR0005785 (personnel needs:  laborers) Ex. 25, KBR0002904 (personnel needs:  electricians); Ex. 26, DP00043452 (KBR requests 34 class-I workers, Daoud transmits request to broker Ali Al Nadi with a stated preference for Nepalis with English skills and driver's licenses); Ex. 143, DP00046984 (KBR to Daoud, August 2004:  "We need a solution to the laundry labor issue right now."); *see also* Ex. 27, KBRE0031353 (if unpaid workers quit "it would put us in dire straights").  During the relevant time period, KBR was experiencing "massive under staffing problems" and repeatedly expressed these concerns to Daoud.  Ex. 28, DP00050617 at DP00050618 ("The staffing issue needs to be addressed as well.  We are under staffed in both dfacs . . . .");  Ex. 29, DP00047074 (expressing concern about "massive under staffing problems").

REDACTED PUBLIC VERSION

7.    **KBR required Daoud to meet specific staffing levels.**  *E.g.,*

REDACTED                              ; Ex. 31, KBRE0005781 at

KBRE0005786 (reporting in May 2004 that "D&P has been severely short of labor for weeks,

causing delays in facilitating maintenance services for the Marines"); Ex. 32, KBRE0005940 at

KBRE0005941 ("it is not as easy as many would think to replace a DFAC service provider

without impacting the mission"); Ex. 22, KBRE0013977 (KBR administrator explains "I have

contacted Tony and Yazan [of Daoud] for an immediate response to the staffing problem"); *id.* at

KBRE00013978 (17 Nepali employees are ready to fly in to Al Asad as "They are currently all

in Amman").

8.    **KBR kept close count of the staffing numbers.**  *E.g.,* Ex. 33, KBR0002865 ("D&P has

approx. 45 TCN new hires schedule[d] to arrive on B1 within the next couple days."); Ex. 35,

KBR0003220 (D&P – 71 new TCN laborers arrived); Ex. 36, KBR0003244 ("D&P received

90+ laborers"); Ex. 37, KBR0004822 ("Senior D&P Manager Returned from extended business

trip with 77 new hire laborers for use throughout B Sites"); Ex. 22, KBRE0013977 (KBR

manager inquiring "any news on the staff shortages?").

9.    **KBR knew Daoud was recruiting and transporting workers from overseas.**  KBR

knew that Daoud was recruiting the workers from many different countries and transporting

them to Iraq. Ex. 20, KBRE0002784 (KBR urging hire of TCNs:  "Indians and Filipinos show

up every day on time and work");

REDACTED                              ; Ex. 32, KBRE0005940 (KBR Team

Leader reporting that 99% of the TCN work force is from Philippines, India, Pakistan, Sri Lanka

and Nepal);

REDACTED

REDACTED PUBLIC VERSION

. Recruiting and transporting workers from overseas was integral to obtaining laborers in Iraq. *E.g.*, Ex. 12, KBRE0008098 (to self-perform a dining subcontract, KBR would require international recruitment, transportation, housing, and medical screening for TCNs);                                                        ¶ 5.

10.

### REDACTED

11.    **KBR knew Daoud was using a chain of labor brokers to assist in recruitment.** *E.g.,*

### REDACTED

; Ex. 2, KBRE0003585 ("D&P then recruits people through their sources"); Ex. 40, KBRE0013477 (KBR reports that Nepali workers will be transported off base by "a bus from the Labor broker or D&P"); Ex. 41, KBRE0008335 (KBR manager participates in phone call to the labor broker that helped recruit the workers supplied to KBR and Daoud); Ex. 42, KBRE0035708 (request from Philippines Labor Attache to verify Daoud contract and affiliation with labor brokers 4Catering and Raja Morcos; KBR responds that "it is KBR's best interest" that "subcontractors can facilitate timely recruiting of TCNs to staff their subcontracts to KBR"); Ex. 43, KBRE0031745 (news reports of trafficked and mistreated Indian workers hired by KBR "through five levels of subcontractors and employment agents").

12.

### REDACTED

**REDACTED**

13.     **KBR controlled the means by which Daoud recruited workers.**  KBR at all times had the authority to prohibit the charging of recruitment fees to third-country nationals and to require the use of licensed or authorized labor brokers, but

**REDACTED**

KBR also at all times had the authority to prohibit subcontractors from confiscating and retaining the passports of third-country nationals and requiring that copies of the original employment agreement be provided to the employee, but

*Id.*  KBR also had the authority to prohibit new, lower wage, contracts from being imposed on the third-country nationals after their arrival, but

*Id.*                       **REDACTED**

**KBR had complete control over the third-country national workers**

14.     **KBR had "complete direction, management and control" of the third-country national workers.**                 **REDACTED**

The Master Agreement for Temporary Personnel Services, the contract pursuant to which the Nepali Laborers were supplied, specifies that the laborers "will work under the complete direction, management and control" of KBR.

15.     **KBR determined the pay of the third-country nationals.**  KBR set the hourly rates for TCN laborers (for class I unskilled laundry, warehouse, grounds and cleaner employees:  no more than $6.65 an hour).                 KBR also supplied the time sheets for

REDACTED PUBLIC VERSION

**REDACTED**

recording the hours worked.

Ex. 46, KBR036556 (timesheets for Buddhi

Gurung signed by KBR Supervisor);                                  KBR also had the authority to

ensure that the workers were in fact paid. *E.g.*, Ex. 48, KBRE0014557;

16.    **KBR had authority to hire and fire third-country nationals.**  KBR had the right to

terminate Daoud's TCNs at any time.                        *see also* Ex. 2, KBRE0003585

("Remember that **you are the employer . . . you can terminate them at will**.") (emphasis

added);                                  **REDACTED**

; Ex. 52, KBRE0017085

(contemplating firing Daoud workers, depending on impact on KBR); *see also* Ex. 53,

KBRE0002919 (regarding release of workers allegedly held by Daoud, KBR responds "we have

eyeballs on the whole thing" and "are personally eyeballing this every step of the way").

17.    **KBR reserved the right to screen and evaluate personnel before accepting a**

**candidate for employment.**

**REDACTED**

**REDACTED**

After

480 hours of work (less than six weeks at the standard rate of 84 hours per week), KBR had the

right to employ the subcontract workers directly with no further remuneration to Daoud.

7

REDACTED PUBLIC VERSION

REDACTED

18.     **KBR directly supervised the third-country nationals.**  The third-country nationals were supervised by KBR employees, not by Daoud.

REDACTED

Ex. 46, KBR036556 (timesheets for Buddhi Gurung signed by KBR Supervisor);

REDACTED

; Ex. 250, Buddhi Gurung SEII Supp. Rog. No. 3, 19, 22 (May 11, 2012); Ex. 62, KBR0002400 (Aug. 8, 2004 site report: due to subcontractor pull-out, "KBR staff has assumed role of running Al Asad Laundry"); Ex. 63, KBR0002806 (Aug. 28, 2004 site report for Al Asad: "D&P has provided 37 laborers working at the laundry); Decl. of Michael Henson ¶¶ 1-7 (filed concurrently); Ex. 144, KBRE0030542 (KBR security technician job description: to oversee 20-30 subcontracted third-country nationals).

Indeed, one Nepali laborer who was supplied to KBR by Daoud explained: "I worked with men from KBR . . . . I did not have much contact with anyone from Daoud."  Decl. of Sanjay Prasad Raut ¶ 24-27 (filed concurrently).

19.     **KBR set work hours and locations.**  KBR required that the TCN laborers be available "at times and locations specified" by KBR.

; Ex. 2, KBRE0003586 (KBR has "flexibility to change their job assignments at will").

8

20.    **The work was performed at KBR locations.**  Work performed pursuant to KBR's

contracts with Daoud was performed at KBR locations including its warehouses, laundry

facilities, and other sites.

REDACTED

21.    **KBR provided the tools and equipment.**  Mr. Gurung was provided a hard hat for

working in the warehouse.  Ex. 252, Buddhi Gurung Objections & Resp. to KBR's First Req. for

Admission, Resp. No. 145 (July 16, 2012).

22.    **KBR determined other living and working conditions.**  KBR designated rest and break

areas, provided identification badges, provided food, and provided emergency medical treatment.

REDACTED

REDACTED

The employees, including

Mr. Gurung, were housed at Al Asad Airbase.

REDACTED

23.    **KBR had control over Daoud's retention of TCN passports.** KBR had the authority

to,                        require Daoud to return TCN passports.

REDACTED

REDACTED PUBLIC VERSION

REDACTED

REDACTED

24.    **KBR had control over the release of TCN employees.**  Documents produced by Daoud

illustrate that KBR had the right to, and did, control the exit door.

Ex. 2, KBRE0003585 ("Remember that you are the employer … you can terminate them at

will.");

REDACTED

Ex. 52, KBRE0017085

(contemplating firing Daoud workers, depending on impact on KBR); Ex. 75, KBRE0017725

(KBR supervises Daoud in permitting workers to leave Iraq in July 2004); *see also*

REDACTED

25.    **KBR directed employee-related complaints to Daoud.**  KBR repeatedly warned its

employees and U.S. military personnel to "stay in their lane" and not to report misconduct by

subcontractors or intervene on behalf of subcontract workers. Ex. 76,  PLAINTIFF_002746

(formal reprimand to KBR employee accused of "getting out of [his] lane" in matters related to

the treatment of subcontract employees); Ex. 77, KBRE0014247 (in response to inquiry from

Marine Corps officer accusing Daoud of hiring "slave labor," KBR managers assert that it is not

REDACTED PUBLIC VERSION

"any of his business"); Ex. 41, KBRE0008335 (contractor removed from project and "reminded" of his non-disclosure agreement after raising concerns about treatment of TCN workers); Ex. 251, Buddhi Gurung Daoud Rog. No. 10 (July 13, 2012);

**REDACTED**

Decl. of Michael Henson ¶¶ 17-19.

26.     **KBR employees worked in close proximity to Daoud TCNs.**  *E.g.*, Decl. of Michael Henson ¶¶ 2-7 ("I worked side-by-side with the [TCN] men in my crews."); Ex. 81, KBRE0018017 (chart illustrating KBR personnel supervising and working alongside subcontract workers in KBR dining facilities);

**REDACTED**

Ex. 46, KBR036556 (timesheets for Buddhi Gurung signed by KBR Supervisor);

**REDACTED**

**KBR Controlled Daoud's Performance of the Subcontracts**

In addition to tightly controlling the recruitment process and the provision of labor, KBR also had the authority to and did exercise control over Daoud more generally and in other aspects of their relationship.

27.     **Daoud worked almost exclusively for KBR.**  Between 98% and 100% of Daoud's revenue from 2003 to 2008 came from its work as a subcontractor on KBR's contract with the U.S. Government.  Letter from Scott Watson to Agnieszka Fryszman, Aug. 9, 2011;

REDACTED PUBLIC VERSION

REDACTED

REDACTED

28.    **The contract relationship was of long-term duration.**  Daoud's labor recruitment

relationship with KBR was signed in November 2003, shortly after the Iraq war began, and

created to last for the duration of KBR's prime contract with the U.S. Army.  The Master

Agreement provides that it "shall be in effect from the date of execution by both parties until the

completion and/or termination of [KBR]'s prime contract with [the United States Army]."

29.    **Daoud's work was an essential and regular part of KBR's business and KBR closely**

**supervised Daoud.**  Daoud's provision of labor was a key part of KBR's logistics support

mission for the United States military.  *See, e.g.,*

REDACTED

Ex. 33, KBR0002865 (KBR Project

Manager reported that he "engaged in serious talks with D&P regarding their performance"); Ex.

31 at KBRE0005786 (KBR Report that D&P labor shortage caused "delays in facilitating

maintenance services for the Marines"); Ex. 32 at KBRE0005941(KBR manager explaining "it is

not as easy as many would think to replace a DFAC service provider without impacting the

mission").

REDACTED PUBLIC VERSION

30.     **Daoud worked under KBR's oversight and lacked discretion in the performance of its duties.**  KBR was in charge of staffing levels, Daoud could only hire numbers and categories as requested.  Ex. 22, KBRE0013977; *see also*

REDACTED

REDACTED
                                                                          KBR had the right to inspect and audit Daoud's records.

31.     **KBR imposed requirements on transportation procedures.**  KBR required Daoud, if crossing a border to enter Iraq, to coordinate with the KBR transportation department to travel with the KBR convoy.                     Ex. 93, KBRE0003526.  Personnel in the convoy were required to wear specified Protective Body Armor.  *Id.*

REDACTED

32.     **KBR specified the forms and/or format of Daoud's record-keeping and administration.**

REDACTED

REDACTED

REDACTED PUBLIC VERSION

REDACTED

33.   **KBR controlled Daoud's managers and supervisors.**  KBR had the right to remove Daoud's managers.  Ex. 97, KBRE0039807 (instructing Daoud to remove its Site Manager at location B6).  KBR tasked issues to Daoud managers

REDACTED

KBR specifically supervised Daoud's handling of third-country national issues.  Ex. 53, KBRE0002919; Ex. 41, KBRE0008335.

34.   **KBR controlled the minutiae of Daoud's performance.**  KBR provided detailed directives controlling even insignificant details of Daoud's subcontract work, and Daoud complied.

REDACTED

**KBR Benefitted from TCN Labor Trafficked into Iraq by its Agents**

35.   The military awarded KBR the LOGCAP III contract, pursuant to which KBR provided support services including sanitation, food services, operations and maintenance, laundry, and morale, welfare and recreation in Iraq.   REDACTED

36.   The LOGCAP contract was on a "cost-plus-award-fee" basis, providing a profit incentive to KBR to meet its contractual obligations on time and keep its overall costs low.

REDACTED

14

REDACTED PUBLIC VERSION

REDACTED

37.

REDACTED

38.     **KBR required a large and steady supply of labor to fulfill its obligations.** *E.g.*, Ex. 21, KBRE0014689 ("critical staff shortages on the B-sites" August 2004); Ex. 22, KBRE0013977 (KBR manager inquiring "any news on the staff shortages?" August 2004); Ex. 23, KBR0005785 (personnel needs:  laborers, September 2004); Ex. 25, KBR0002904 (personnel needs:  electricians, October 2004); Ex. 99, KBR0000319 (personnel needs: plumbers and carpenters, August 2004); Ex. 100, KBR0001860 (personnel needs:  laborers and an administrative assistant, July 2004);     REDACTED

39.     **KBR faced great pressure to meet staffing requirements.**   KBR managers described the impact of third-country nationals leaving as "profound" and concluded that the failure to retain the workers "paints a bleak picture."  Ex. 32, KBRE0005940; *see also* Ex. 89, KBRE0007342 (Nepalis reported to KBR that they lacked medical treatment and were denied promised salaries; KBR responds that "this will affect over 50% of our labor in the Class I and III(B)."); Ex. 20, KBRE0002783 (Daoud explains "it is not easy to find people willing to go to Iraq at this time" July 2004); Ex. 18, KBRE0036927 (Iraqi labor difficult to procure due to security risks); Ex. 17, KBRE0000328 (difficulty in obtaining sufficient staffing);

REDACTED PUBLIC VERSION

REDACTED

Ex.
31 at KBRE0005786 (Daily Summary Report reporting in May 2004 "D&P has been severely short of labor for weeks, causing delays in facilitating maintenance services for the Marines.");

REDACTED

*see also* Ex. 32 at KBRE0005941("it is not as easy as many would think to replace a DFAC service provider without impacting the mission").

40.   **The KBR Defendants paid significantly lower wages for third-country national workers supplied by Daoud than to U.S. workers and set maximum wage rates for third-country national workers in its contracts with Daoud.** *See, e.g.,*

REDACTED

Ex. 102, KBRE0013514; Ex. 173, KBRE0006991 at KBRE0006994 (describing TCN labor contracts as "important" to "the success of KBR's support to the client" under LOGCAP and estimating their total value at $70,974,566.18).

41.   **Nepali workers were particularly cost effective, as they were paid significantly less than other third-country nationals.** Ex. 102, KBRE0013514 (explaining why Nepalis are paid less: "all wages are based on their countries[ ] economy . . . all nationalities are paid differently depending on their origin").

**KBR Knew Trafficking Was Widespread and Responded by "Squashing" Investigations and Firing Whistleblowers**

REDACTED PUBLIC VERSION

42.     **The United States notified and warned KBR that trafficking and mistreatment of TCNs had occurred and continued to occur.**  In June 2004, well before the events at issue in this case, the United States government expressed concern that third-party nationals had been trafficked to Iraq. Ex. 107, KBRE0008376 & Ex. 108, KBRE0008385 (United States reporting that "Drivers are hired by brokers promising they would only work in Kuwait, charging them for job placement and then forcing them to go into Iraq or be discharged with no reimbursement."). The United States called a meeting with "Recruiting Practices and Free Will" on the agenda and handed out an Information paper stating its concern that "Drivers hired by brokers to work in Kuwait [are] being financially blackmailed to cross the border against their will." *See also* Ex.

**REDACTED**

The United States Inspector General asked KBR to respond "in 48 hours" to allegations about passports being taken from TCNs in early 2005. Ex. 109, KBRE0005990.  Although the government directed KBR to conduct an "investigation of ALL subcontractors under KBR supervision," Ex. 109, KBRE0005990 (emphasis in original), KBR protested that an investigation into all of its subcontractors would be "time consuming," and instead looked into only one subcontractor. Ex. 110, KBRE0005991 at KBRE0005992.  KBR confirmed that this subcontractor had retained TCN passports but explained that the practice was justified to prevent employees from being "able to freely move about," *id.* at 91, and to prevent the TCNs from obtaining more lucrative jobs. *Id.* at 92 (TCN laborers are "enticed" by salaries "more than twice" what they are currently earning and may leave if passports are not withheld).

REDACTED PUBLIC VERSION

43.

**REDACTED**

see also Ex. 118, KBRE0014066 (reporting U.S. government investigation into trafficking and forced labor launched at the request of the Indian government, May 2004).

44.     **United States service members on site repeatedly complained to KBR about "slave labor" and Daoud.**  In August, 2004, at the time of the events in this suit, KBR managers complained that "KBR has been accused of running a 'Slave Labor Camp' on Al Asad by different USMC commanders on Al Asad."  Ex. 112, KBRE0019753.  At that time, Lieutenant Colonel Huston of the United States Marine Corps complained that Daoud "has slave labor working for them" at Al Asad and initiated a NCIS investigation of "subcontractor hiring practices."  Ex. 112, KBRE0019753                        Ex. 114, KBRE0019196.  *See also* Ex. 77, KBRE0014247 ("apparently LTC Holston the FFP OIC got involved, he actually came over to the D&P compound and talked to [KBR managers] Gerlach and Hazzard and stated that D&P was hiring slave labor and that from now on the USMC would require a copy of D&P employees contracts before they will be issued badges").  Lt. Colonel Huston was reacting, in part, to the treatment of the Nepali laborers at Al Asad in September 2004.  *Id.*

A different United States Marine Corps sergeant complained in 2004 that Nepali third-country nationals at Al Asad Airbase were coerced by excessive recruitment fees, not adequately fed, and not provided sufficient clothing.  Ex. 115, KBRE0008133.  He noted that Marines at Al Asad were supplying the workers with "hygiene gear," clothing, and food "so that they can at

REDACTED PUBLIC VERSION

least eat more than 1 meal a day." *Id.* His complaint was forwarded to KBR managers. Ex. 115, KBRE0008133.

**45.    KBR's own employees and auditors repeatedly complained to KBR about the treatment of third-country nationals, including trafficking.** Duane Banks, an auditor under contract to KBR at Al Asad, complained about the treatment of third-country national workers by Daoud, including the Nepali men in this case, describing the circumstances as "deplorable." Ex. 41, KBRE0008340. Mr. Banks described "overcrowded and squalid living conditions"; stolen wages; confiscation of passports; forced labor; and sexual harassment, and he communicated those issues to his superiors and KBR management. Decl. of Duane Banks ¶¶ 4-12 (filed concurrently). Mr. Banks complained in writing about working conditions, Daoud "not living up to their end of the bargain," mistreatment ("D&P figures that since these people are from poor countries that they can just treat them anyway they feel like, and they are"), and about the failure to pay the workers. Ex. 41, KBRE0008340. An auditor, he also complained that Daoud was not submitting adequate paperwork with its invoices and was still being paid. *Id.* In response, the KBR managers proposed to get "Duane out of there." Ex. 41, KBRE0008335. Moreover, Mr. Banks was flown to Kuwait where he met with Bill Jonas of KBR, Houston, and a KBR investigator from Houston, where he told them directly of the mistreatment of TCNs. Mr. Jonas responded to this information by threatening to have Mr. Banks fired. Decl. of Duane Banks ¶¶ 11-12.

Michael Henson worked for KBR at Al Asad Airbase in Iraq in 2005. Decl. of Michael Henson ¶ 2. He directly supervised third-country nationals supplied by Daoud, who complained to him that they had been "tricked or forced into coming to Iraq"; "promised large salaries before they left their home countries" and then "forced to sign employment contracts en route to Al

REDACTED PUBLIC VERSION

Asad for much less"; threatened with arrest and detention; deprived of access to their passports; and "subjected to overcrowded living quarters, low quality meals and insufficient quantities of food" compatible with their normal diets and religious restrictions. *Id.* ¶¶ 9-15. Mr. Henson reported these facts to his KBR superiors. *Id.* ¶ 17. KBR retaliated against Mr. Henson by reassigning him to another base where he had little authority and reduced contact with TCNs. *Id.* ¶¶ 17-19.

46. **Repeated media inquiries put KBR on notice.** KBR was also put on notice by media inquiries. Time Magazine contacted KBR in May 2004 to investigate allegations that 30 Indian men had been recruited to work in Kuwait, but upon arrival in Kuwait City were picked up by bus and driven to a military camp: "it was only after several hours that the workers realized they were in Iraq." Ex. 116, KBRE0006858. The reporter requested KBR's comment on the Indian government complaint that "Indian nationals who wished to leave were unable to do so and were being compelled to continue to remain in Iraq against their will." *Id.* The New York Times contacted KBR regarding four men who paid $1,700 to a recruiting company in Bombay for jobs in Kuwait but were instead taken to Iraq where they were paid less than promised. Ex. 116, KBRE0006851. Days later, two newspaper articles were circulated among KBR staff with further details about the allegations, as well allegations concerning other Indian workers. Ex. 117, KBRE0008051-52 (describing employee who was told that if he left early, his return airfare would not be paid); Ex. 118, KBRE0014066 (describing Indian government protests); Ex. 119, KBRE0002232 ("men tricked into taking up 'lucrative jobs' in Kuwait" but instead taken to Iraq to work for foreign contractors); Ex. 120, KBRE0016784 (KBR circulates news reports of "18 Indian workers in Iraq . . . held there against their will by a Jordanian catering company for more than two months"); *see also* Ex. 121, KBRE0005900 (Arab Times articles about Pakistani men

REDACTED PUBLIC VERSION

"recruited in Pakistan to work in Kuwait but when they arrived on June 16, 2003, they were sent

to Iraq … they claimed the company promised the KD 55 salary but they were being paid

between KD 30-40, noting some of them have not been reportedly paid for months"); Ex. 75,

KBRE0017725 (in response to BBC article about Indian workers held by Daoud against their

will in July 2004, KBR supervises Daoud's release of those workers); Ex. 120, KBRE0016784.

47.      **KBR knew the workers it employed had been charged recruitment fees that were**

**described as "financial blackmail."**  *E.g.*, Ex. 115, KBRE0008135 (A U.S. marine reported

that "the subcontractor that hired these people is called D&P.  They paid on average a 1000

dollars to get employed by them and they were promised 400 dollars a month for two years");

Ex. 116, KBRE0006851 (discussing recruitment fees); Ex. 107, KBRE0008376 & Ex. 108,

KBRE0008385; Ex. 118, KBRE0014066 (Reuters article found in KBR files reporting that

Indian men paid $1,800 to obtain jobs in Kuwait paying a promised $400 a month, but were

instead taken to Iraq); Ex. 117, KBRE0008051; Ex. 43, KBRE0031745; Ex.145, KBRE0006846-

50; Decl. of Michael Henson ¶ 12.

> The State Department Trafficking in Persons Report described the problem as follows:
>
> There is no rational basis for requiring low-skilled workers to pay fees;
> recruitment agencies in source countries and labor agencies in demand countries
> are paid commissions by employers who have demanded the services of low-
> skilled foreign workers. By seeking to extract payments from workers themselves,
> labor companies are "double-dipping"—and imposing a heavy debt burden that
> contributes to bonded labor or involuntary servitude. Research on involuntary
> servitude among migrant contract workers finds a strong link between forced
> labor conditions and the heavy fees or debt imposed on workers by labor
> recruitment agencies in the source country.

Ex. 146, PLAINTIFF_002273-93 at PLAINTIFF_002282 (U.S. Department of State, 2006

Trafficking in Persons Report); *see also id.* at PLAINTIFF_002293 (Department of Defense

REDACTED PUBLIC VERSION

investigation revealed evidence of "deceptive hiring practices and excessive recruitment fees" charged of third-country national workers in Iraq).

48.     **KBR knew the third-country nationals' passports had been taken.**  In response to a request by the Inspector General that KBR respond "in 48 hours" to allegations about passports being taken from TCNs in early 2005, Ex. 109, KBRE0005990, KBR confirmed that passports were withheld to prevent TCNs from being "able to feely move about" and so they can't obtain more lucrative jobs when offered higher wages elsewhere.  Ex. 110, KBRE0005991-92.  KBR had known about the coercive confiscation of third-country nationals' passports since at least early 2004.  *E.g.*, Ex. 116, KBRE0006851 (KBR response to inquiries regarding withholding passports among TCNs); Ex. 117, KBRE0008051 (same); Decl. of Duane Banks ¶ 5; Decl. of Michael Henson ¶ 15.

REDACTED

REDACTED

There is also evidence that KBR was confiscating passports of its own, direct-hire third-country national employees.  *E.g.*, Ex. 174, KBRE0004700 at KBRE0004703.

49.     **KBR knew that Daoud in particular had a history of abuses.**  A KBR employee recommended to management in 2004 that "we need to dump D&P as our master broker" after saying "enough is enough."  Ex. 122, KBRE0013426;                                  The

REDACTED PUBLIC VERSION

recommendation came after reports that Daoud employees were left stranded at the base for months after attempting to quit their jobs and were found by U.S. marines "attempting to buy some food." Ex. 122 at KBRE0013427. The men reported that for four months "they have not been paid, they have not been receiving food, and that KBR doesn't care what happens to them." *Id.* A KBR manager described to his supervisors that the men were stranded on the base for four months without being paid or fed. Ex. 124, KBRE0016780. One of the men was trying to get home to a daughter suffering from kidney failure hospitalized in Sri Lanka. *Id.* An NCIS investigator following up on the incident stated that the USMC on Al Asad "is developing a file against KBR" and that some of the allegations include "running slave labor camps." *Id.*; *see also* Ex. 32, KBRE0005941 (D&P camp conditions are "relatively poor"); Ex. 41, KBRE0008340 (in 2004, KBR contract auditor reported that "a company by the name of Daoud and Partners" was mistreating third-country nationals and not living up to the promises it had made to the workers regarding pay);

**REDACTED**

**REDACTED**

; Ex. 125, KBRE0031867 (KBR manager states in July 2004 that repeated complaints by Daoud TCNs (people Daoud "picked . . . up for us to fill our labor need") about not being able to leave Iraq are "becoming a real problem"); Ex. 175, KBRE0004226 (March 2004, "KBR investigated possibility that various female workers for D&P were being pressured into having sex with one of the D&P supervisors"); Ex. 43, KBRE0031744-46 (July 2004, KBR manager forwards to Daoud news article about mistreatment of workers);

REDACTED PUBLIC VERSION

REDACTED

. Ex. 176, KBRE0039810 (May 2004 KBR letter to Daoud citing concern that Daoud failed to pay the employees).

**50.      KBR knew the living conditions were substandard.**  KBR knew that the third-country nationals' living conditions were substandard and in particular knew that the conditions at the Daoud camp were substandard. *See, e.g.*, Ex. 32, KBRE0005941 (KBR Team Leader noting living conditions for Daoud's TCNs are "relatively poor" in October 2004 and that "it is important to realize that TCN on-site has a shelter and food, but that is it" because subcontractors do not provide other facilities in the staff camps); Ex. 115, KBRE0008133 (KBR managers discuss an October 2004 report by a United States marine corps sergeant that Daoud was not providing adequate food, clothing or shelter to TCNs from Nepal, that the Marines were "supporting the people from Napal [sic] and India completely with all their hygene [sic] gear and winter clothing" and "trying to get them prepackaged food so they can at least eat more than 1 meal a day . . . . I can't believe that they would treat these people so horrible."); Ex. 32, KBRE0005942 (KBR food service  manager writes that subcontract employees face "poor living conditions" and that "Not enough employees to do the mission, means they are overwork [sic] and shorthanded"); Ex. 17 at KBRE0000330 (Dec. 2003, KBR deflected questions from NBC Nightly News about cramped living conditions for TCNs hired to work kitchen jobs);

REDACTED

In October 2004, a KBR manager pointed out that "staff camp monitoring by KBR QC is not performed for unknown reasons.  Such responsibility, when administered correctly, may improve living conditions of TCN and help relieve the stress." Ex. 32, KBRE0005941.  In