IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RAMCHANDRA ADHIKARI, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. 09-cv-1237 |
| v. | § | |
| | § | |
| DAOUD & PARTNERS, *et. al.*, | § | JUDGE KEITH P. ELLISON |
| | § | |
| Defendants. | § | |
| | § | |

---

**KBR DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF
KBR'S MOTION FOR SUMMARY JUDGMENT AND
RESPONSE TO PLAINTIFFS' DISCOVERY STATUS REPORT**

*REDACTED PUBLIC COPY
MATERIAL UNDER SEAL DELETED PURSUANT TO
CONFIDENTIALITY ORDER AND AGREEMENT*

---

Billy M. Donley
State Bar No. 05977805
Michael W. Mengis
State Bar No. 13941040
BAKER & HOSTETLER LLP
1000 Louisiana, Suite 2000
Houston, Texas 77002-5018
Telephone:  713.751.1600
Facsimile:   713.751.1717

OF COUNSEL:
Mark Lowes
State Bar No. 12636300
Vice President for Litigation
Kellogg Brown & Root, LLC
601 Jefferson Street, Suite 3720
Houston, Texas  77020
Telephone: 713.753.8635
Facsimile: 713.753.3443

David B. Rivkin, Jr. (pro hac vice)
D.C. Bar No. 394446
Lee A. Casey (pro hac vice)
D.C. Bar No. 447443
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, D.C.  20036
Telephone:  202.861.1500
Facsimile:   202.861.1783
ATTORNEYS FOR KBR DEFENDANTS

# TABLE OF CONTENTS

Page

INTRODUCTION .......................................................................................................... 1

ARGUMENT ................................................................................................................. 2

I.    Plaintiffs Have No Admissible and Sufficient Evidence in Support of Their Claims Against KBR ................................................ 2

    A.    Plaintiffs Have Failed to Adduce Evidence for Each and Every Nepali Worker Sufficient to Defeat Summary Judgment ................................................................................ 2

    B.    Additional Evidence, Available to Plaintiffs from the Start, Demonstrates that at Least Three of the Nepali Workers Expected to Work in Iraq ............................................. 4

    C.    Plaintiffs' Proffer a Video and its Transcript as Inadmissible Hearsay ................................................................ 5

        1.    The Kidnapping Video Does Not Contain Present Sense Impressions Admissible Under FRE 803(1) ........... 6

        2.    The Kidnapping Video Does Not Contain "Excited Utterances Under FRE 803(2)." ....................................... 7

        3.    The Kidnapping Video Does Not Contain "Dying Declarations" Admissible Under FRE 804(b)(2) .............. 8

            (a)    The Nepali Workers' statements were not made with the required belief in imminent death ...................................................................... 8

            (b)    The Nepali Workers' statements do not relate to the cause or circumstances of imminent death .................................................... 11

        4.    The Kidnapping Video Is Not Offered Against The Party That Wrongfully Caused The Declarants' Unavailability ................................................................. 13

        5.    The Kidnapping Video Does Not Fall Within The Residual Hearsay Exception .......................................... 14

    D.    Plaintiffs' New Declarations Are Irrelevant and Inadmissible ................................................................ 17

i

        E.      Plaintiffs' Other Additional Evidence Is Not Probative of
                Unlawful Coercion ................................................................... 21

    II.     Depositions of KBR Personnel Cannot Possibly Cure Plaintiffs'
            Failure of Evidence.............................................................................. 27

    III.    Summary Judgment Is Appropriate at This Time ............................. 29

CONCLUSION.............................................................................................. 29

CERTIFICATE OF SERVICE ..................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Broadway v. City of Montgomery,*
  530 F.2d 657 (5th Cir. 1976) ............................................................................25

*C. Freight Lines, Inc. v. N.L.R.B.,*
  653 F.2d 1023 (5th Cir. 1981) ..........................................................................15

*David v. Signal Int'l, LLC,*
  2012 U.S. Dist. LEXIS 114247 (E.D. La. Jan. 4, 2012)..............................3, 4

*Doe ex rel. Doe v. Dallas Indep. Sch. Dist.,*
  220 F.3d 380 (5th Cir. 2000) ............................................................................23

*Enplanar, Inc. v. Marsh,*
  11 F.3d 1284 (5th Cir. 1994) ............................................................................29

*Evers v. Gen. Motors Corp.,*
  770 F.2d 984 (11th Cir. 1985) ..........................................................................25

*Freeman v. Texas Dep't of Criminal Justice,*
  369 F.3d 854 (5th Cir. 2004) ..............................................................................1

*Freihage v. U.S.,*
  56 F.2d 127 (9th Cir. 1932)...............................................................................12

*Garza v. Delta Tau Delta Fraternity Nat.,*
  948 So.2d 84 (La. 2006) ....................................................................................10

*Huff v. White Motor Corp.,*
  609 F.2d 286 (7th Cir. 1979) ............................................................................15

*In re Corrugated Container Antitrust Lit.,*
  756 F.2d 411 (5th Cir. 1985) ............................................................................16

*Int'l Shortstop, Inc. v. Rally's, Inc.,*
  939 F.2d 1257 (5th Cir. 1991) ..........................................................................29

*Jones v. Oklahoma,*
  236 P.2d 102 (Okl.Cr.App. 1951)....................................................................12

*Mattox v. U.S.,*
  146 U.S. 140 (1892) .........................................................................................8, 9

*Meade v. Commonwealth,*
    7 S.W.2d 1052 (Ky. App. 1928) ...................................................................11

*Miller v. Stovall,*
    573 F. Supp. 2d 964 (E.D. Mich. 2008) ..................................................10, 13

*Puckett v. State,*
    97 S.W.2d 214 (Tex. Crim App. 1936) ........................................................11

*Rock v. Huffco Gas & Oil Co.,*
    922 F.2d 272 (5th Cir. 1991) ..........................................................................7

*S.E.C. v. First City Fin. Corp., Ltd.,*
    890 F.2d 1215 (D.C. Cir. 1989) ....................................................................14

*Shepard v. U.S.,*
    290 U.S. 96 (1933) ..........................................................................................9

*Shepard v. U.S.,*
    62 F.2d 683 (10th Cir. 1933) ..........................................................................9

*Strange v. Saia Motor Freight Line, Inc.,*
    531 F. Supp. 2d 773 (E.D. La. 2007)........................................................9, 13

*Tidwell v. State,*
    47 S.W. 466 (Tex. Crim. App. 1898) ...........................................................11

*Trethewey v. DeKalb Cnty.,*
    662 F. Supp. 246 (N.D. Ga. 1987) .................................................................9

*U.S. v. Alarcon-Simi,*
    300 F.3d 1172 (9th Cir. 2002) ....................................................................7, 8

*U.S. v. Angleton,*
    269 F. Supp. 2d. 878 (S.D. Tex. 2003)........................................9, 10, 12, 13

*U.S. v. Bailey,*
    581 F.2d 341 (3d Cir. 1978) ........................................................................16

*U.S. v. Demmitt,*
    706 F.3d 665 (5th Cir. 2013) ..........................................................................5

*U.S. v. El-Mezain,*
    664 F.3d 467 (5th Cir. 2011) ..................................................................15, 16

*U.S. v. Etheridge,*
    424 F.2d 951 (6th Cir. 1970) ........................................................................12

*U.S. v. Farley,*
 992 F.2d 1122 (10th Cir. 1993) ....................................................................................14

*U.S. v. Houlihan,*
 871 F. Supp. 1495 .........................................................................................................9

*U.S. v. Layton,*
 549 F. Supp. 903 (N.D. Cal. 1982) ..............................................................................12

*U.S. v. Lemonakis,*
 485 F.2d 941 (D.C. Cir. 1973) .....................................................................................13

*U.S. v. Lentz,*
 282 F. Supp. 2d 399 (E.D. Va. 2002) ............................................................................6

*U.S. v. Love,*
 592 F.2d 1022 (8th Cir. 1979) .....................................................................................15

*U.S. v. Mathis,*
 559 F.2d 294 (5th Cir. 1977) .......................................................................................15

*U.S. v. Phillips,*
 219 F.3d 404 (5th Cir. 2000) .......................................................................................15

*U.S. v. Polidore,*
 690 F.3d 705 (5th Cir. 2012) .....................................................................................6, 7

*U.S. v. Rivera-Figueroa,*
 149 F.3d 1 (1st Cir. 1998)...............................................................................................9

*U.S. v. Roberson,*
 124 Fed.Appx. 860 (5th Cir. 2005) ..............................................................................15

*U.S. v. Shields,*
 497 F.3d 789 (8th Cir. 2007) .......................................................................................10

*U.S. v. Thevis,*
 665 F.2d 616 (5th Cir. 1982) .......................................................................................15

*U.S. v. Walker,*
 410 F.3d 754 (5th Cir. 2005) .......................................................................................16

*Williams v. Gen. Motors Corp.,*
 656 F.2d 120 (5th Cir. 1981) .............................................................................18, 21, 28

**STATUTES**

18 U.S.C. § 1589(a) ...........................................................................................................21

18 U.S.C. § 1595(a) ...................................................................................................21

**OTHER AUTHORITIES**

FED. R. CIV. P. 56(d) .................................................................................................29

FED. R. EVID. 80[7] ..................................................................................................15

FED. R. EVID. 403 ..................................................................................................9, 11

FED. R. EVID. 802 ......................................................................................................5

FED. R. EVID. 802(b)(2) ........................................................................................10, 12

FED. R. EVID. 803(1) ..................................................................................................6

FED. R. EVID. 803(2) ..................................................................................................7

FED. R. EVID. 803(b)(2) ............................................................................................11

FED. R. EVID. 804 ..................................................................................................9, 11

FED. R. EVID. 804(b)(2) ..........................................................................................8, 11

Glen Weissenberger, *Federal Rules of Evidence 804: Admissible Hearsay from an Unavailable Declarant*, 55 U. CIN. L. REV. 1079 (1987). ...............................9, 11

Mueller & Kirkpatrick § 8:134...................................................................................14

Defendants KELLOGG BROWN & ROOT, INC.; KELLOGG BROWN & ROOT SERVICES, INC.; KBR, INC.; KBR HOLDINGS, LLC; KELLOGG BROWN & ROOT LLC; KBR TECHNICAL SERVICES, INC.; KELLOGG BROWN & ROOT INTERNATIONAL, INC.; SERVICE EMPLOYEES INTERNATIONAL, INC.; and OVERSEAS ADMINISTRATION SERVICES, LTD (hereinafter "KBR Defendants" or "KBR") hereby file this Supplemental Brief in Support of KBR's Motion for Summary Judgment and Response to Plaintiffs' Discovery Status Report [Doc. Nos. 495 and 496], as follows:

## INTRODUCTION

Plaintiffs singularly fail to "set forth specific facts showing a genuine issue for trial," the standard they *must* meet to avoid summary judgment in KBR's favor. *Freeman v. Texas Dep't of Criminal Justice*, 369 F.3d 854, 860 (5th Cir. 2004). They cannot "satisfy this burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Id.* But Plaintiffs have nothing more. KBR's Reply Brief in support of its Motion for Summary Judgment ("KBR's Reply" [Doc. No. 529]) demonstrates, on a worker-by-worker basis, that the Plaintiffs adduce no evidence that any of the Nepali Workers were subject to unlawful coercion, that KBR had knowledge that any of the Nepali Workers were subject to unlawful coercion, or that KBR was engaged in or aware of any kind of international human trafficking scheme.[1]

---

[1] Capitalized terms used herein have the same meaning as in the Glossary of KBR's Reply Brief in Support of Its Motion for Summary Judgment, Doc. No. 529, at page v.

Despite the additional time granted by the Court, Plaintiffs refuse to respond to KBR's worker-by-worker breakdown of their evidence, instead filing a "Discovery Status Report" ("DSR", [Doc. Nos. 495 and 496]) asserting once again they possess "considerable evidence in support of their claims." DSR at 2.  But, as shown below, the "considerable evidence" proffered by Plaintiffs consists entirely of inadmissible hearsay, immaterialities, and cumulative statements.[2]   Plaintiffs' allegations are not supported by fact and further discovery would be futile.  As a result, KBR is entitled to summary judgment in its favor.

<u>ARGUMENT</u>

**I.     Plaintiffs Have No Admissible and Sufficient Evidence in Support of Their Claims Against KBR.**

As demonstrated in KBR's Reply, Plaintiffs have not met their burden to set forth evidence showing both that the Nepali Workers were subject to unlawful coercion and that KBR knew as much.  Certainly, none of the "additional evidence" attached to and discussed in the Plaintiffs' DSR alters that conclusion.

**A.     Plaintiffs Have Failed to Adduce Evidence for Each and Every Nepali Worker Sufficient to Defeat Summary Judgment.**

Throughout the entire course of this litigation, Plaintiffs have sought to meet their burden of proof by claims and "evidence" of trafficking or forced labor in Iraq generally, without providing evidence that KBR or Daoud engaged in any wrongful

---

[2] The documents and declarations filed with Plaintiffs' DSR have not been offered in opposition to KBR's Motion for Summary Judgment.   KBR is addressing the limitations of those documents and declarations here, however, out of an abundance of caution and because those documents and declarations are part of the record in this case to the extent they have been attached to other pleadings.

conduct with regard to each individual Nepali Worker. This, however, is the burden they must meet to avoid summary judgment. This is not a class action. Even if it were, however, the human trafficking and forced labor allegations central to Plaintiffs' case are singularly ill-suited to class treatment, as the court in *David v. Signal Int'l, LLC*, 2012 U.S. Dist. LEXIS 114247 (E.D. La. Jan. 4, 2012) recently held.

*David v. Signal Int'l, LLC*, on which Plaintiffs incorrectly rely in opposing KBR's Motion for Summary Judgment, *see* Resp. at 21, involved trafficking, forced labor, and RICO claims brought by 7 Indian nationals who came to work in the United States. The men were recruited by American labor brokers on behalf of Signal, a company providing services to the Gulf of Mexico offshore drilling industry and seeking to expand its labor pool in the wake of Hurricane Katrina. The men complained that, upon arrival, they were housed (and charged for that housing) in a substandard and unsanitary camp, did not receive the "green cards" they had been promised, were given the undesirable and dangerous tasks Americans would not perform, and that "they were left with no choice but to endure the unpleasant and abysmal condition at Signal or go back to India financially bankrupt and socially scarred." 2012 U.S. Dist. LEXIS 114247, at **44-45.

The court refused plaintiffs' request to certify a class (of approximately 500) because individual issues predominated, particularly with respect to their TVPRA and RICO claims. With regard to forced labor, the court reasoned that the statute requires an individualized assessment of whether a particular plaintiff provided his labor *involuntarily* or not: "one cannot determine whether the defendant's actions

3

coerced or forced the victim to provide labor without looking to the specific victim involved." *Id.* at **71-72. It would, in other words, "be inimical to the concept of damage recovery in civil litigation to simply ignore the question of whether the individual Plaintiff was in fact injured by the defendant's conduct." *Id.* at *76. The court reached similar conclusions on plaintiffs' trafficking and RICO claims. *Id.* at *81 and *112.

Plaintiffs cannot, therefore, avoid summary judgment without providing sufficient evidence of forbidden coercion with regard to each and every Nepali Worker and in this they have, once again, utterly failed.

### B. Additional Evidence, Available to Plaintiffs from the Start, Demonstrates that at Least Three of the Nepali Workers Expected to Work in Iraq.

The evidence available to Plaintiffs makes clear that at least three of the Nepali Workers fully expected to work in Iraq. This is particularly plain from the Adhikari letter's discussion of his route to Iraq, and his ultimate destination can have been no surprise to his family, the letter's intended recipients.

This point is consistent with contemporaneous reports in the *Nepali Times* and *The Himalayan Times* website—which Plaintiffs' Attorneys might have found through a Google search of their clients' names—that the Nepali Workers' families knew that they would be working in Iraq. Doc. No. 529, Exhibit 1 (reporting the statement of one of the Nepali Workers' fathers that his son went to Iraq "to strike it rich"); Doc. No. 529, Exhibit 2 (reporting that one of the Nepali Workers' fathers stated, "I sent him to Iraq as I had heard that one could earn good money there and

the situation was okay."). These materials directly contradict Plaintiffs' key narrative that the Nepali Workers were trafficked, through trickery, into Iraq.

### C. Plaintiffs' Proffer a Video and its Transcript as Inadmissible Hearsay.

Plaintiffs' proffered propaganda video and transcript is unreliable and inadmissible on its face. REDACTED



. This is precisely the kind of unreliable evidence that Federal Rule of Evidence ("FRE") 403 and the rule against hearsay, FRE 802, exist to exclude. *U.S. v. Demmitt*, 706 F.3d 665, 672 (5th Cir. 2013). ("The hearsay rule stands as a bulwark against unreliable testimony, and thus hearsay exceptions and exclusions have been carefully crafted.").

Similarly, there can be no question that the statements at issue are proffered as inadmissible hearsay, subject to no exception. Each of the statements is an "oral assertion" made by a declarant outside of testimony that the Plaintiffs "offer[] in

---

[3] Plaintiffs' Original Complaint was brought on behalf of the families of twelve Nepali Workers and Buddi Gurung. The Complaint was later dismissed as to one Nepali Worker Rajendra Shrestha by his family members Renuka Karki Shrestha, Ram Kumar Shrestha and Nirmaya Shrestha. [Doc. No. 379].

evidence to prove the truth of the matter asserted in the statement."   FRE 801. Accordingly, they are inadmissible unless some exception applies.   FRE 802. Indeed, the Plaintiffs do not actually *argue* that these statements are admissible, instead simply *asserting* that they are present sense impressions, excited utterances, and statements under the belief of imminent death.   DSR at 3.   These assertions are incorrect.

1.    **The Kidnapping Video Does Not Contain Present Sense Impressions Admissible Under FRE 803(1).**

The Nepali Workers' statements are not "present sense impressions" because they do not recite sensory impressions and concern alleged events that were not "present."   The exception applies only where the declarant's statement (1) "describe[s] and explain[s] events that he personally witnessed" and (2) is made "contemporaneously with his observation of the events—i.e., while he was observing the events or very soon thereafter."   *U.S. v. Polidore*, 690 F.3d 705, 720 (5th Cir. 2012).   REDACTED

.   *Compare* DSR, Ex. 1, *with Polidore*, 690 F.3d at 708-09 (911 caller described activity that he saw on the street); *see also U.S. v. Lentz*, 282 F. Supp. 2d 399, 413 (E.D. Va. 2002) (statements inadmissible because "they merely report on a past event and do not exemplify any state of mind that [the declarant] may have had at the time").

Furthermore, these statements are not *present* impressions.   "The basis for this hearsay exception 'relies on the contemporaneousness of the event under

6

consideration and the statement describing that event.  Because the two occur almost simultaneously, there is almost no likelihood of a deliberate or conscious misrepresentation.'"  *Polidore*, 690 F.3d at 720 (quoting *Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 280 (5th Cir. 1991)).  In other words, there must be "no time for declarant to consciously manipulate the truth."  *Rock*, 922 F.3d at 280 (internal quotation marks and citation omitted).  On that basis, the Fifth Circuit has held that accident reports filed two days after an alleged oil rig accident were not present sense impressions because they were not "filed immediately following [the] alleged accident."  *Id.* REDACTED

████████████████████████████████████████████████████

████████████████████████████.

### 2.    The Kidnapping Video Does Not Contain "Excited Utterances Under FRE 803(2)."

REDACTED

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████    The exception requires (1) "some occurrence, startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting"; (2) "the utterance must have been before there had been time to contrive and misrepresent, *i.e.*, while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance"; and (3) the "utterance must relate to the circumstances of the occurrence preceding it."  *U.S. v. Alarcon-Simi*, 300 F.3d 1172, 1175 (9th Cir. 2002) (internal quotation marks and emphasis

omitted).  Thus, the "trauma" of an unexpected arrest does not render admissible an out-of-court statement regarding the crime of arrest.  *Id.* REDACTED

REDACTED .

> **3.  The Kidnapping Video Does Not Contain "Dying Declarations" Admissible Under FRE 804(b)(2).**
>
> > **(a)  The Nepali Workers' statements were not made with the required belief in imminent death.**

REDACTED

The "dying declaration" exception is limited to persons who believe themselves to have suffered mortal wounds so that death was imminent and certain because the "certain expectation of almost immediate death will remove all temptation to falsehood and enforce as strict adherence to the truth as the obligation of an oath could impose."  *Mattox v. U.S.*, 146 U.S. 140, 152 (1892).

Accordingly, the declarant must be "under a sense of impending death," which may be evidenced "from what the injured person said; or from the nature and extent of the wounds inflicted being obviously such that he must have felt or known that he could not survive; as well as from his conduct at the time and the communications, if any, made to him by his medical advisers, if assented to or understandingly acquiesced in by him."  *Id.* at 151.  The key factor "is the impression of almost immediate dissolution, and not the rapid succession of death."

*Id.* Thus, "if the circumstances do not satisfactorily disclose that the awful and solemn situation in which he is placed is realized by the dying man because of the hope of recovery, [the declaration] ought to be rejected." *Id.* at 152. More colorfully, the declarant "must have spoken with the consciousness of a swift and certain doom." *Shepard v. U.S.*, 290 U.S. 96, 99 (1933).[4]

REDACTED

. In *U.S. v. Houlihan*, 871 F. Supp. 1495, 1497 n.1, the court rejected "out of hand" the government's argument "that, once a declarant had been threatened with death his later statements were admissible as 'dying declarations,'" deeming it "inventive." In *Trethewey v. DeKalb Cnty.*, 662 F. Supp. 246, 248 (N.D. Ga. 1987), the court held that a victim's statements that she had relied on the government to protect her after receiving "terroristic threats" were not dying declarations.

In addition, Plaintiffs fail to show that the Nepali Workers believed their deaths "to be imminent," *Shepard v. U.S.*, 62 F.2d 683, 685 (10th Cir. 1933), with

---

[4] Under modern practice, dying declarations may be solicited, such as by asking questions. *Federal Rules of Evidence 804,* 55 U. CIN. L. REV. at 1110-11. However, "[w]here it appears . . . that the interrogative technique was unduly burdensome or leading, so as to raise reasonable suspicions about the statement's accuracy, the trial court should exclude the statement under Rule 403," which allows a court to exclude evidence the probative value of which is "substantially outweighed" by its danger of "unfair prejudice." *Id.*; *cf. U.S. v. Rivera-Figueroa*, 149 F.3d 1, 5 (1st Cir. 1998) (although "the district court cannot exclude a dying declaration merely because the judge thinks that it is unreliable," it can apply Rule 403). Of course, "[t]he burden of proving the admissibility of a dying declaration rests with the party seeking to introduce the statement." *Strange v. Saia Motor Freight Line, Inc.*, 531 F. Supp. 2d 773, 775 (E.D. La. 2007) (citing *U.S. v. Angleton*, 269 F. Supp. 2d. 878, 884 (S.D. Tex. 2003)).

"no hope of recovery." *Angleton*, 269 F. Supp. 2d at 885; *see also U.S. v. Shields*, 497 F.3d 789, 793 (8th Cir. 2007). "The Supreme Court has emphasized that a dying declaration must be made not in contemplation of possible or even likely death, but in the face of imminent and apparently certain death; that is, the statement must be made in the 'shadow of impending death.'" *Miller v. Stovall*, 573 F. Supp. 2d 964, 996 (E.D. Mich. 2008) (quoting *Shepard*, *supra*). Failure to satisfy these requirements was, for example, the express reasoning for refusing to admit suicide notes under the dying declaration exception. *See Angleton*, 269 F. Supp. 2d at 885 (listing cases). In most of those cases, the suicide followed the note by days, not hours, or the timing was uncertain.[5]

---

[5] Similarly, the Louisiana Supreme Court, applying that state's version of Rule 802(b)(2) (its language is, in relevant respects, identical to the federal rule's), has rejected the contention that a true "dying declaration" may *ever* precede the physical injury that caused the apprehension of death:

> The likelihood of death, the awareness of eventual death, or the intention to eventually inflict death on one's self is not enough to place the declarant in the elevated sense of solemnity envisioned by the jurisprudence or the relevant codal provision . . . . When the declaration precedes the mortal wound, the decedent's motivation is at best questionable, a condition that robs the statement of the reliability derived from belief in an impending death.

*Garza v. Delta Tau Delta Fraternity Nat.*, 948 So.2d 84 (La. 2006); *see also Miller*, 573 F. Supp. 2d at 996 (noting that this is an open issue under the federal rule). The court's rationale was that, "[a]bsent a mortal wound at the time of the statement, the statement lacked the 'circumstantial probability of trustworthiness' required for admission as a dying declaration." 948 So.2d at 97. Regarding mortal fear, *cf. U.S. v. Shields*, 497 F.3d 789, 793 (8th Cir. 2007) (even "severe" wounds do not suffice).

Moreover, there is no authority that a mere threat of death may inspire the apprehension of "swift and certain doom" FRE 804(b)(2) requires. ▊REDACTED▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊

Additionally, the statements at issue were coerced and, therefore, lack another hallmark of a dying declaration—"spontaneity." *See* Glen Weissenberger, *Federal Rules of Evidence 804: Admissible Hearsay from an Unavailable Declarant*, 55 U. Cin. L. Rev. 1079, 1110-11 (1987); *cf. Puckett v. State*, 97 S.W.2d 214, 246 (Tex. Crim App. 1936) (noting requirement that declarant "was neither persuaded nor coerced to make any declaration"); *Meade v. Commonwealth*, 7 S.W.2d 1052, 1054 (Ky. App. 1928) (same); *Tidwell v. State*, 47 S.W. 466, 467 (Tex. Crim. App. 1898) (same). ▊REDACTED▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊. Accordingly, these statements should be excluded under both FRE 803(b)(2) because they are not proper dying declarations and FRE 403 because they have little probative value and are unduly prejudicial.

### (b)   The Nepali Workers' statements do not relate to the cause or circumstances of imminent death.

"It has been clearly established by the authorities that statements of facts and circumstances not immediately connected with the act of killing, but relating to previous and subsequent, independent, and distinct transactions, are not admissible

as dying declarations." *Freihage v. U.S.*, 56 F.2d 127, 132 (9th Cir. 1932).  On that basis, the court reversed a conviction premised on a dying declaration recounting how, on previous occasions, the defendant had beaten and raped the declarant.  *See also Jones v. Oklahoma*, 236 P.2d 102, 110 (Okl.Cr.App. 1951) (exception "does not legalize any statement by the declarant of the past transaction out of which the difficulty grew," but "only such acts or statement[s] done or uttered at the time of the final fatal encounter and catastrophe, and which tend to shed light on it").

Thus, under FRE 802(b)(2), "only statements directly related to the cause and circumstances of the declarant's death are admissible." *Angleton*, 269 F. Supp. 2d at 885.  In *U.S. v. Layton*, 549 F. Supp. 903 (N.D. Cal. 1982), the court refused to admit a tape recording by dead cult leader Jim Jones, made shortly before he and his followers committed suicide, that stated, "I don't know who killed the congressman. But as far as I'm concerned, I killed him."  This case is notable because the "congressman," Rep. Leo Ryan, had visited the cult to investigate it, precipitating a mass suicide that included the declarant.  In *U.S. v. Etheridge*, 424 F.2d 951, 966-67 (6th Cir. 1970), the court admitted a dying declaration as to the cause of the declarant's murder ("because he knew too much about some bank robbing").  Finally, in *Angleton*, 269 F. Supp. 2d at 888, the court declined to admit a suicide note stating that the declarant had in fact committed a murder for which his brother had been convicted because it did not relate to the suicide:

> Roger Angleton's statements that Robert Angleton was not involved in
> Doris Angleton's murder do not relate to the cause of Roger Angleton's
> suicide. The only statement in this note that is potentially admissible
> as a dying declaration is Roger Angleton's statement that "I killed
> Doris Angleton, I feel very bad." This statement, however, does not

> directly attribute Roger Angleton's suicide to guilt about Doris
> Angleton's murder. A statement about past events, rather than about
> the cause or circumstances of death, is not a dying declaration, unless
> those events explain the predicament that brought the declarant to
> death's door.

*Id.*; *see also U.S. v. Lemonakis*, 485 F.2d 941, 957 n.24 (D.C. Cir. 1973) (noting that a declarant's suicide note exonerating the defendant was inadmissible because it did not concern the causes or circumstances of the declarant's death); *Strange*, 531 F. Supp. 2d at 776 (excluding suicide note because it was not clear that the note's reference to "pain and stress" referred to the specific circumstances that led the declarant to take his life); *Miller*, 573 F. Supp. 2d at 996 (excluding suicide note where "portions of the letter" related to the declarant's motivation to take his life, but those implicating the defendant did not do so directly).



REDACTED

. They are, therefore, inadmissible hearsay and insufficient to avoid summary judgment.

### 4. The Kidnapping Video Is Not Offered Against The Party That Wrongfully Caused The Declarants' Unavailability.

The Kidnapping Video also is not admissible as a "statement offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the

declarant's unavailability as a witness, and did so intending that result."   FED 804(b)(6).   Here, the intent requirement is central: "Intent envisions purpose, and means that the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable, and only if the defendant knows at the very least that what he is doing, or what he is not doing, will likely have the effect of making the witness unavailable."  Mueller & Kirkpatrick § 8:134.

Accordingly, this exception is inapplicable for at least three reasons.  First, there is no indication that KBR intended to cause the Nepali Workers' unavailability.  In fact, the Plaintiffs allege the opposite: that, far from intending that the Workers be killed en route to Al Asad, KBR sought to procure their labor.  Second, KBR could not possibly have had any intent at the time of the Workers' deaths because it could not have anticipated that they possessed any evidence and could or would testify against KBR.  Third, the Plaintiffs do not allege that KBR played any role (or acquiesced) in the insurgents' actions.

### 5.    The Kidnapping Video Does Not Fall Within The Residual Hearsay Exception.

Finally, the Kidnapping Video is not admissible under the "residual hearsay exception."  This exception provides for the admission of *reliable* statements that fall outside of the enumerated exceptions to the rule against hearsay and is available only "in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice." *U.S. v. Farley*, 992 F.2d 1122, 1126 (10th Cir. 1993); *see also S.E.C. v. First City Fin. Corp., Ltd.*, 890 F.2d 1215 (D.C. Cir. 1989);

14

*Huff v. White Motor Corp.*, 609 F.2d 286 (7th Cir. 1979); *U.S. v. Love*, 592 F.2d 1022 (8th Cir. 1979); *U.S. v. Phillips*, 219 F.3d 404, 419 n. 23 (5th Cir. 2000).

The Fifth Circuit has explained that the residual exemption must be applied, if at all, with care:

> In both civil and criminal cases, our common law heritage has always favored the presentation of live testimony over the presentation of hearsay testimony by the out-of-court declarant . . . . Rule 80[7] was designed to encourage the progressive growth and development of federal evidentiary law by giving courts the flexibility to deal with new evidentiary situations which may not be pigeon-holed elsewhere. Yet tight reins must be held to insure that this provision does not emasculate our well-developed body of law and the notions underlying our evidentiary rules.

*U.S. v. Mathis*, 559 F.2d 294, 299 (5th Cir. 1977). The Fifth Circuit will reverse application of this exemption when "not in harmony with the general purposes of the Federal Rules." *Id.*

This means, in particular, that the "proffered statement must have 'equivalent circumstantial guarantees of trustworthiness' as statements falling within the recognized exceptions." *U.S. v. Thevis*, 665 F.2d 616, 629 n.9 (5th Cir. 1982) (quoting Senate report); *see also C. Freight Lines, Inc. v. N.L.R.B.*, 653 F.2d 1023, 1026 (5th Cir. 1981) (an "extra-judicial statement must have circumstantial guarantees of trustworthiness equivalent to those listed [for] former testimony, belief of impending death, statement against interest, and personal or family history"); *U.S. v. Roberson*, 124 Fed.Appx. 860, 863 (5th Cir. 2005) (unpublished). Accordingly, the proponent of evidence "bears a heavy burden to come forward with indicia of trustworthiness and probative force." *Id.* (citing *Phillips*, 219 F.3d at 419 n.23); *U.S. v. El-Mezain*, 664 F.3d 467, 498 (5th Cir. 2011) (same). And "[i]n order

15

to find a statement trustworthy, a court must find that the declarant of the . . . statement was particularly likely to be telling the truth when the statement was made." *Id.* (citing *Phillips, supra*).

"[T]he trustworthiness of a statement should be analyzed by evaluating not only the facts corroborating the veracity of the statement, but also the circumstances in which the declarant made the statement and the incentive he had to speak truthfully or falsely." *U.S. v. Bailey*, 581 F.2d 341, 349 (3d Cir. 1978); *see also In re Corrugated Container Antitrust Lit.*, 756 F.2d 411, 415 (5th Cir. 1985) (grand jury testimony made under oath was not trustworthy because it "lack[ed] the expurgation of confrontation and cross-examination" and "the grant of use immunity might occasion or encourage the conscious or unconscious embellishment of the recollection of the witness"); *El-Mezain*, 664 F.3d at 500 (refusing to admit documents where "nothing in the documents or the record show[ed] that the declarants in these documents were especially likely to be telling the truth," so that the court "cannot say that there was little to gain from further adversarial testing"); *U.S. v. Walker*, 410 F.3d 754, 758 (5th Cir. 2005) (refusing to admit videotaped interview where declarant "was not under oath, was being interviewed by police at a police station, and was facing the threat of criminal charges" and so "had every incentive to lie").

Here, the statements are untrustworthy and have no probative value. 

REDACTED

.  This evidence includes the contemporaneous reports in the *Nepali Times* and *The Himalayan Times* noted above, showing that at least some of the Nepali Workers' families knew that they would be working in Iraq.  *See infra* at 1.A.

In these circumstances, where the need for "further adversarial testing" is plain, application of the residual exception is inappropriate.[6]

## D.    Plaintiffs' New Declarations Are Irrelevant and Inadmissible.

The Plaintiffs proffer four declarations by former KBR employees – Terri Hobbs, Nonette Joachim, Rebecca Durham, and Todd Thorpe – to support their demand for additional discovery and yet more supplemental briefing.[7]   None of these individuals, however, have personal knowledge of anything that may have happened to the Nepali Workers, which only underscores the absence of any evidence that supports Plaintiffs' actual claims against KBR.  To be clear: none of these declarations (1) mention any of the Nepali Workers; (2) describe any conduct alleged to have been experienced by the Nepali Workers; and (3) assert that KBR

---

[6] For all of the above reasons, KBR has moved to strike this video and transcript from the record.   *See* KBR Defendants' Objections to and Motion to Strike Declarations and Documents Attached to Plaintiffs' Opposition to KBR's Motion for Sanctions ("KBR's Motion to Strike", [Doc. No. 530]), at 15-25.

[7] For all of the reasons described above, KBR has moved to strike the declarations of Terri Hobbs, Nonette Joachim, Rebecca Durham, and Todd Thorpe from the record. *See* KBR Defendants' Objections to and Motion to Strike Declarations and Documents Attached to Plaintiffs' Opposition to KBR's Motion for Sanctions ("KBR's Motion to Strike", [Doc. No. 530]), at 4-10.

had any knowledge of any coercion directed at the Nepali Workers. One of the declarants (Thorpe) apparently never even visited Al Asad. This kind of circumstantial evidence is simply not probative of Plaintiffs' claims. *See Williams v. Gen. Motors Corp.*, 656 F.2d 120, 130 (5th Cir. 1981) (Circumstantial evidence must "serve[] the general purpose of supporting the asserted proposition and excluding other propositions.").

Even overlooking this lack of personal knowledge relating to any of the Plaintiffs' claims, none of these declarants claim personal knowledge of *any* unlawful coercion directed at *any* TCN. To the contrary, their statements show that the rigors of life in a war zone were shared by all present there, TCN and non-TCN alike. They say, for example, that the TCNs worked long hours, but acknowledge working the very same hours. DSR, Ex. 11, at ¶11 (Joachim "also worked twelve-hour days, seven days a week . . . ."). They say that the TCNs were not allowed to wander freely on a military base in a war zone, but acknowledge that their own movements were also restricted. DSR, Ex. 12, at ¶16 (Durham states that no one could "leave the base without authorization."). They say that the TCNs had to travel on unsafe roads, but acknowledge that they, non-TCN workers, traveled those highways even more frequently. *Id.* at ¶17 (Durham states that it was a "daily occurrence" that KBR employees "had to leave the base" and felt "fear and anxiety" when doing so.). And they say that the TCNs were at risk of attack even on base, but acknowledge that non-TCN workers faced the very same risk. *Id.* at ¶18 (Durham states than "an IED hit close by the [Morale, Welfare, and Recreation] facility" that TCNs were apparently unable to use.).

Finally, Plaintiffs' new declarants' statements regarding TCNs and their treatment consist almost entirely of hearsay and conclusory assertions that Plaintiffs do not even claim would be admissible.  For example, Hobbs states that she learned of the matters of which she claims "personal knowledge" through, for example: "conversations with foreign workers," a "story" told to her by TCNs, and rumors that she heard on base.  DSR, Ex. 10, at ¶¶3, 5, 6.  And she asserts in conclusory fashion that TCNs "were treated like slaves," without describing what this treatment may have been other than stating that they "had little time for recreation."  *Id.* at ¶4.  She also asserts that KBR had knowledge of trafficking in general due to "media interest," without even attempting to explain what this knowledge may have been.  *Id.* at ¶7.  None of Hobbs's representations concerning the treatment of TCNs, *id.* at ¶¶3-6, would be admissible or competent to defeat summary judgment if Plaintiffs were to offer them for that purpose, which they understandably have not.  Her other representations are simply irrelevant. *Id.* at ¶¶1, 2, 7, 8.

Similarly, Joachim claims "personal knowledge" of matters of which she learned through things that TCNs "told" her, TCNs' complaints, things that KBR co-workers told her that they had been told by TCNs, and rumors that she heard on base. DSR, Ex. 11, at ¶¶14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 25. Many of Joachim's statements are plainly conclusory, such as that it was "incredibly cruel" that TCNs did not have the opportunity to vacation outside of Iraq, *id.* at ¶11, that KBR "supervised" TCNs, ¶17, and that she "observed pervasive signs of human trafficking," not one of which is identified in her declaration, ¶26. As with Hobbs,

none of Joachim's representations concerning the treatment of TCNs, *id.* at ¶¶11-16, 18-22, 26, would be admissible or competent to defeat summary judgment if Plaintiffs were to offer them for that purpose, which they have not.   Her other representations are equally irrelevant.

Durham's declaration is similarly rife with hearsay and conclusory assertions.   She lacks any personal knowledge, of TCNs' treatment prior to their arrival at Al Asad and much of their treatment while at Al Asad, instead relying on things she was told by others.   DSR, Ex. 12, at ¶¶9-12, 18, 19-20, 22, 23.   Other of her statements are conclusory, such as that TCNs "were made to work long hours every day performing manual labor under stressful conditions," *id.* at ¶13, that there "was a lot of illegal conduct going on," ¶19, that she somehow "came to realize that the TCNs passports had been taken to keep the TCNs there against their will[8]," ¶24, and that there was "an atmosphere of sleaziness" around Daoud, ¶25.   Durham's representations concerning the treatment of TCNs would be either inadmissible or immaterial to the Plaintiffs' claims and so could not defeat summary judgment if Plaintiffs were to offer them for that purpose.

---

[8] As fully briefed in KBR's Motion for Summary Judgment and Reply in Support, the mere fact that Plaintiffs assert (with no evidence to prove same) that the Nepali Workers' passports were held does not evidence coercion for numerous reasons, including because there can be legitimate reasons for holding a passport.  REDACTED
 *See* Deposition of Bindeshore Singh Koiri, pages 145-46, attached to Plaintiffs' Response to KBR's Motion for Sanctions. [Doc. No. 505].

Finally, Thorpe's declaration is entirely immaterial because the declarant does not even purport to have knowledge of any events at Al Asad or involving persons at Al Asad.  DSR, Ex. 12, at ¶1.  Indeed, his limited personal knowledge solely concerns TCNs' living conditions on other bases that, in addition to not being probative of unlawful coercion, is not relevant to any claim in this litigation.  *Id.* at ¶¶4-18.  And even these representations are rife with hearsay.  *Id.* at ¶¶4-7, 18.  What remains is Thorpe's bare assertion that, "[i]n [his] view, the TCNs were treated like slaves."  *Id.* at ¶3.  In sum, each of Thorpe's representations is immaterial, inadmissible, or otherwise incompetent to defeat summary judgment in KBR's favor.

### E. Plaintiffs' Other Additional Evidence Is Not Probative of Unlawful Coercion.

There is nothing at all new, or at all supportive, of Plaintiffs' claims in the other additional evidence – in the form of deposition testimony regarding alleged promises of work in Jordan, that some of the Nepali Workers telephoned family members asking for additional funds to return home, and that family members borrowed money to cover brokerage fees – Plaintiffs proffer in the DSR.  As a matter of law, it is the Plaintiffs' burden to show, *inter alia*, that each of the Nepali Workers individually were subject to unlawful coercion and that KBR procured or attempted to procure their labor knowing as much.  18 U.S.C. §§ 1589(a), 1595(a).  The bulk of what the Plaintiffs proffer is not direct evidence that speaks to the facts at issue in this case, but circumstantial evidence that is plainly irrelevant and therefore incapable of establishing any fact.  *Williams*, 656 F.2d at 130.

First, rather than set forth evidence that is probative of either of these things, the Plaintiffs seek to show that some of the Nepali Workers may have been expecting to work in Jordan before they were ultimately offered work in Iraq and that some of them (or their families) took out loans to finance their work abroad. DSR, Exs. 2, 3, 4, 5, 17.  But as explained in KBR's Reply in support of its summary judgment motion, these showings would not be probative of unlawful coercion, only the normal and legitimate change of circumstances or duties that may mark any employment relationship.  *See* KBR Reply at § I, A.1, B (discussing cases).  ███████ REDACTED

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████  *See* Section I B above.

Second, the Plaintiffs muster a single out-of-context quotation from the final day of Buddi Gurung's deposition before returning to earlier parts of his testimony that they have already briefed.  DSR at 6-7.  This belated attempt to make hay of Gurung's testimony is no more successful than their earlier, similar attempts because Gurung's testimony does not recount any unlawful coercion.  *See* KBR Reply at § I.C.3.  But the Plaintiffs were wise to skip over the remainder Gurung's latest testimony.  ███ REDACTED

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[9] KBR's Renewed and Supplemental Motion for Protection.  Doc. No. 498.



. Given these

disclosures, among many others, it is clear that Gurung has no claim against

KBR.[10]

---

[10] In responding to KBR's motion for sanctions, Plaintiffs have produced a new statement, signed by Gurung, directly contradicting his prior deposition testimony. Doc. No. 505, Exhibit 58. Under the sham-affidavit doctrine, however, a party "may not manufacture a genuine issue of material fact by submitting an affidavit that impeaches prior testimony without explanation." *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000).

The new Gurung declaration is clearly intended to walk back his sworn testimony and sow confusion over its content. Doc. No. 505, Exhibit 58, ¶¶ 3-5. The declaration states he "told various KBR employees that I was at Al Asad against my will and that I wanted to go home" and that "Bill," "Donovan," and unnamed "other KBR employees" told him he "had to stay until my [his] work in Iraq was complete." *Id.*, ¶¶ 2-5. Rather than clarifying the facts, these artfully-vague statements suggest, but neglect to actually state, that any KBR employee told Gurung that he had no choice but to remain in Iraq. *Id.*, ¶¶ 3-5.

The Gurung Declaration attached to Plaintiffs' opposition to KBR's motion for sanctions contradicts his prior deposition and is, therefore, nothing but a sham to fabricate an issue of fact that is contradicted by the declarant's prior testimony and is not sufficient summary judgment evidence. For the above reasons, KBR has moved to strike it from the record. *See* KBR's Motion to Strike, Doc. No. 530 at 25-26.

Third, the two telephone conversations that the Plaintiffs discuss are plainly inadmissible hearsay.  *See* DSR at 4-5.  Again, instead of arguing for their admissibility, the Plaintiffs merely assert it.  *Id.* at 5.  ██████ REDACTED ██████

████████████████████████████████████████████████

████████████████████████████████████████████████.

They are hearsay and, in the case of the conversation recounted by Satya Sah, double hearsay.  *See* DSR, Ex. 6, at 61 (describing his brother's statements regarding an agent's statements).

Indeed, Plaintiffs (wisely) do not even claim that these calls evidence coercion.  Rather, they suggest that "[t]his testimony is consistent with the Declaration of Sanjay Raut," on which they also rely.  Sanjay Raut's Declaration, however, is rife with hearsay and statements not based on his personal knowledge: "A labor recruiter told me . . . I was promised . . . They [third persons] were all expecting . . . . Pralad Giri said . . . . I remember that Sanjay, Budhan, Manoj, and Lalan told me . . . . During our stay in Jordan we [third persons] were . . . . [the men from KBR] told me. . . He said . . . we [third persons] were . . . we [third persons] learned . . . they told me . . . ." *See* DSR, Ex. 8, ¶¶ 4, 5, 9, 10, 15, 16, 17, 23, 25, 28. These statements which seek to offer testimony about what third-persons said, thought, or experienced are not within Raut's personal knowledge, are inadmissible, and are not competent summary judgment evidence.

Raut's declaration is also conclusory.  For example, he asserts that he was "recruited to work in Jordan," but fails to provide any description of such alleged recruitment.  *Id.*, ¶ 2.  Similarly, Raut states that the workers stayed in a house

surrounded by a wall with a locked gate and that they were "locked in" *id.*, ¶12-14, but he does not state that he or the others ever sought to leave, were ever denied permission to leave, or were ever otherwise prevented from leaving, only that the gate was locked at some point—in fact, any such implication is contradicted by Raut's statement that the workers were told they could purchase tickets home. *Id.*, ¶ 17.  He also claims that a man at the airport in Jordan "took our passports."  He does not, however, identify the man or who he worked for, and also does not say whether and when the passports were returned.  Such allegations have no probative value. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) (citing, *inter alia*, *Broadway v. City of Montgomery*, 530 F.2d 657, 660 (5th Cir. 1976)) ("[C]onclusory allegations [in an affidavit] without specific supporting facts have no probative value.")[11]

This is particularly true in light of the fact that the Nepali Workers were shown in a series of photographs evidently made by their Iraqi captors holding their passports before the cameras.  These photographs were produced by Plaintiffs as documents bates numbered P_2689-2702, and attached to Plaintiffs' Response to KBR's Motion for Summary Judgment as Exhibits 168 and 169.  [Doc. No. 401-2].

Finally, the three emails discussed by Plaintiffs, out of what they characterize as a "significant document production" by Daoud, are cumulative of the email traffic regarding payroll and other issues that they discussed at length in

---

[11] KBR has also moved to strike Raut's declaration from the record for these reasons.  *See* KBR Motion to Strike, Doc. No. 530 at 3-4.

their Opposition to KBR's summary judgment motion and (even if taken at face value despite their plain inadmissibility) provide no evidence of KBR's alleged knowledge of human trafficking or forced labor, as described in detail in KBR's Reply in Support of its Motion for Summary Judgment.

To begin with, none of the emails mention or refer to any of the Nepali Workers or even appear to concern events at Al Asad.  The first, from August 10, 2004, simply reports the general complaints of "approximately 30" Daoud employees and requests Daoud's response, noting that KBR had not attempted to determine the validity of the complaints.  DSR, Ex. 14.  Among the complaints reported are pay- and payroll-related issues, lack of medical leave, and fear of retaliation for reporting complaints.  *Id.*  None of these are substantiated, and, in any case, none constitute unlawful coercion sufficient to sustain a forced labor claim.  *See* KBR Reply at § I.A.  Moreover, this email, having been sent by Daoud, is hearsay if proffered as evidence of KBR's knowledge and hearsay twice over if proffered as evidence of the truth of the complaints.

The second email, from June 2006, substantially post-dates the events at issue in this case and so is immaterial to KBR's knowledge of any trafficking.  DSR, Ex. 15.  Regardless, it does not even suggest unlawful coercion or trafficking, but only a labor dispute in which some workers have stopped work to demand higher wages that they say they were promised.  *Id.*  If proffered as evidence of KBR's knowledge, this email is hearsay, and if proffered as evidence of the truth of the workers' complaints, it is hearsay twice over.

26

The third email reports that TCNs at some sites (not Al Asad) did not have access to Morale, Welfare, and Recreation facilities in December 2004. DSR, Ex. 15. According to the email, TCNs had access to such facilities previously, but those facilities had been repurposed to other uses as the size of the labor force in Iraq grew.  *Id.*  The email suggests that "Rec Rooms and Internet" for TCNs could help to reduce tensions at these sites.  *Id.*  This email, having been sent by Daoud, is hearsay if proffered as evidence of KBR's knowledge and hearsay twice over if proffered as evidence of the truth of any of its factual assertions.

In sum, despite the Plaintiffs' bluster, their investigations and Daoud's "significant document production" have yielded nothing in support of their claims against KBR.   Plaintiffs have no more evidence today supporting the central elements of their case than when they responded to KBR's summary judgment motion and when they filed this lawsuit—*which is none*.

## II.   Depositions of KBR Personnel Cannot Possibly Cure Plaintiffs' Failure of Evidence.

There is no possibility that the depositions that Plaintiffs cite as justifying an additional period of discovery could possibly cure their failure to adduce evidence that the Nepali Workers were ever subject to unlawful coercion.  The twelve Nepali Workers were kidnapped by insurgents and never arrived at Al Asad. REDACTED

---

[12] KBR's Renewed and Supplemental Motion for Protection.  Doc. No. 498.

27

REDACTED          Accordingly, KBR personnel can have no personal knowledge of any coercion directed at those workers.

Indeed, this material suffers from the same obfuscation that has characterized the Plaintiffs' claims from the beginning of this suit.  To the extent Plaintiffs have adduced evidence of human trafficking, it is not evidence related or relevant to how these particular, individual Nepali Workers came to be in Iraq. Thus, for example, Plaintiffs rely on a series of U.S. Department of State, Trafficking in Persons Reports (June 2003, 2004, 2008) as "evidence" that "KBR had reason to know and contemplate that human trafficking and force labor were dangers inherent in employing laborers in a war zone."  Response in Opposition to KBR's Motion for Summary Judgment, at 46.  This is a *non sequitur*; these reports do not say that all men, most men, or (in particular) *these men* who traveled to work in Iraq were in fact trafficked.  Indeed, those same reports identify serious trafficking problems in dozens of countries including, for example, Canada, which was classified in 2008 as a "tier I" "transit and destination country" for trafficked persons.  U.S. Dep't of State Trafficking in Persons Report, June 2008, at 86.  This surely does not mean that any foreign worker brought to Canada, or who transited through Canada, has been trafficked or enslaved.  This kind of "evidence" is simply not probative of Plaintiffs' specific allegations.  *See Williams*, 656 F.2d at 130 (Circumstantial evidence must "serve[] the general purpose of supporting the asserted proposition and excluding other propositions.").

REDACTED

28

REDACTED

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████. Even were KBR personnel to corroborate all of the factual representations in Gurung's deposition testimony, the result would be the same.

## III.   Summary Judgment Is Appropriate at This Time.

The Plaintiffs' Rule 56(d) motion therefore remains without merit because they cannot "demonstrate[] to the district court with reasonable specificity how the requested discovery pertain[s] to the pending motion." *Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1291 (5th Cir. 1994) (citations omitted).  Their burden is to "show how the additional discovery will defeat the summary judgment motion, that is, will create a genuine dispute as to a material fact," but the Plaintiffs "simply rely on vague assertions that additional discovery will produce needed, but unspecified facts." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991) (citations omitted).  Although asserting an entitlement to additional discovery and identifying specific depositions that they seek to take, Plaintiffs do not even attempt to explain how these activities would create a genuine dispute as to any material fact.  Such empty assertions can be no barrier to summary judgment at this time.

<u>CONCLUSION</u>

The Plaintiffs' highly atypical attempt to place additional exhibits before the Court without formally requesting that those materials be considered in opposition to KBR's pending summary judgment motion is consistent with the lack of admissible, probative evidence that has been the hallmark of their claims since they filed this lawsuit.  The Plaintiffs do not attempt to respond directly to KBR's

worker-by-worker dissection of their exhibits because they have nothing to say.  In these circumstances, no additional discovery, with its attendant burdens on KBR, is warranted.[13]  Summary judgment is warranted.

Respectfully submitted,

 /s/ MICHAEL W. MENGIS
BILLY M. DONLEY
State Bar No. 05977085
MICHAEL W. MENGIS
State Bar No. 13941040
BAKER & HOSTETLER LLP
1000 Louisiana St., Suite 2000
Houston, Texas 77002
Telephone: 713.751.1600
Facsimile: 713.751.1717

OF COUNSEL:

MARK LOWES
State Bar No. 12636300
Vice President for Litigation
Kellogg Brown & Root, LLC
601 Jefferson Street, Suite 3720
Houston, Texas  77002
Telephone: 713.753.8635
Facsimile: 713.753.3443

DAVID B. RIVKIN, JR. (pro hac vice)
District of Columbia Bar No. 394446
LEE A. CASEY (pro hac vice)
District of Columbia Bar No. 447443
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W., Suite 1100
Washington, DC 20036
Telephone: 202.861.1500
Facsimile: 202.861.1783

*Attorneys for KBR*

---

[13] KBR does not move at this time to strike the exhibits to the DSR because Plaintiffs have not proffered them in opposition to KBR's summary judgment motion.  Should the Plaintiffs do so, and to the extent that the Court considers such declarations and documents as part of Plaintiffs' summary judgment evidence, KBR moves to strike those exhibits for, *inter alia*, the reasons stated herein and in KBR's Objections to and Motion to Strike Declarations and Documents Attached to Plaintiffs' Opposition to KBR's Motion for Sanctions, Doc. No. 530.  The Motion to Strike is expressly incorporated herein as if set forth in full.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 9, 2013, a true and accurate copy of the preceding Motion was electronically filed with the Court and served on counsel of record for all parties via the Court's ECF filing system.

/s/    Michael W. Mengis
Michael W. Mengis
