# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| RAMCHANDRA ADHIKARI, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 09-cv-1237 |
| | § | |
| DAOUD & PARTNERS, et al., | § | FILED UNDER SEAL |
| | § | |
| Defendants. | § | |

---

## MEMORANDUM AND ORDER

---

Pending before the Court is Defendant KBR's Motion for Summary Judgment (Doc. Nos. 346; 347) and Supplemental Motion for Summary Judgment (Doc. Nos. 561; 562), and Defendant Daoud & Partners' ("Daoud") Motion for Judgment on the Pleadings. (Doc. No. 570.)

After considering the motions, all responses thereto, and the applicable law, the Court finds and holds that KBR's Motion for Summary Judgment (Doc. Nos. 346; 347) must be **GRANTED IN PART AND DENIED IN PART.** KBR's Supplemental Motion for Summary Judgment (Doc. Nos. 561; 562) must be **GRANTED IN PART AND DENIED IN PART.** Daoud's Motion for Judgment on the Pleadings (Doc. No. 570) must be **GRANTED.**

## I.    BACKGROUND

This case is brought by Plaintiff Buddi Prasad Gurung ("Gurung") and the surviving family members of twelve other men: Prakash Adhikari, Ramesh Khadka,

Lalan Koiri, Mangal Limbu, Jeet Magar, Gyanendra Shrestha, Budham Sudi, Manoj Thakur, Sanjay Thakur, Bishnu Thapa, and Jhok Bahadur Thapa (collectively, the "Deceased Plaintiffs"). All Plaintiffs are Nepali citizens and currently reside in Nepal.

Defendants Kellogg Brown and Root, Inc.; Kellogg Brown & Root Services, Inc.; KBR, Inc.; KBR Holdings, LLC; Kellogg Brown & Root LLC; KBR Technical Services, Inc.; Kellogg Brown & Root International, Inc.; Service Employees International, Inc.; and Overseas Administration Services, Ltd. (collectively "KBR") is a business conglomerate including a parent corporation with its principal place of business in Houston, Texas, and several divisions, subsidiaries, and associated partnerships with pecuniary interests in the outcome of this case. One such KBR subsidiary serves as a contractor with the United States government to perform specific duties at United States military facilities in Iraq. (Doc. No. 58, *hereinafter* "First Amended Complaint", ¶¶ 23-29.)

### A. Plaintiffs' Allegations

The gravamen of Plaintiffs' Complaint is that, in an effort to fulfill their contractual obligations, Defendants Daoud and KBR "willfully and purposefully formed an enterprise with the goal of procuring cheap labor and increasing profits," and thereby engaged in human trafficking. (*Id.* at ¶ 54.) The complaint alleges that the Deceased Plaintiffs, whose ages ranged from 18 to 27, were recruited from their places of residence in August 2004 by Moonlight Consultant Pvt. Ltd., a recruiting company based in Nepal. (*Id*. at ¶ 62.) Most of the men were told that they would be employed by a luxury hotel in Amman, Jordan. (*Id*. at ¶ 63.) Some were told that that they would be working in an American camp. (*Id*.) Although there is no indication that they were told where the camp

would be, the Deceased Plaintiffs' family members assumed that they were going to the United States. (*Id.*) All of the men were led to believe that they would not be placed in a dangerous location, and that, if they found themselves in a dangerous area, they would be sent home at the employer's expense. (*Id.*) They were promised a salary of approximately $500 per month. (*Id.* at ¶ 64.) The men and their families incurred substantial debt to pay the brokerage fees in seeking out this employment. (*Id.* at ¶ 65.)

After they were recruited, the Deceased Plaintiffs were then transferred to the custody of Morning Star for Recruitment and Manpower Supply ("Morning Star"), a Jordanian job brokerage company that operates in Amman. (*Id.* at ¶ 66.) Morning Star housed the Deceased Plaintiffs upon their arrival in Jordan and arranged for their transfer to Iraq. (*Id.* at ¶ 59.) Morning Star then transferred the Deceased Plaintiffs to Daoud. (*Id.*) The men were held in Jordan by agents of Daoud, and were required to turn over their passports to Daoud. (*Id.* at ¶¶ 67-68.) It was there that the Deceased Plaintiffs first discovered that they were actually being sent to work at Al Asad, north of Ramadi, Iraq. (*Id.* at ¶ 70.) Several of the men phoned relatives in Nepal, expressing concern and fear about their futures. (*Id.* at ¶¶ 70-71.) At least one of the Deceased Plaintiffs informed his family that he and the other men were being kept in a dark room and were unable to see. (*Id.* at ¶ 72.) In Jordan, the men were also informed for the first time that they would be paid only three quarters of what they were initially promised. (*Id.* at ¶ 73.) Although they wanted to return home to Nepal, rather than proceed into the Iraqi war zone, the men were compelled to proceed to Iraq because of the debts that their families had assumed to pay the brokers. (*Id.* at ¶ 74.)

Daoud transported the Deceased Plaintiffs into Iraq on or about August 19, 2004, via an unprotected automobile caravan of seventeen vehicles. (*Id*. at ¶ 75.) They traveled along the Amman-to-Baghdad highway, which was known at the time to be a highly dangerous route. (*Id*. at ¶¶ 76-81.) As they were nearing Al Asad, the two lead cars in which the Deceased Plaintiffs were being transported were stopped by a group of men who later revealed themselves to be members of the Ansar al-Sunna Army, an insurgent group in Iraq. (*Id*. at ¶¶ 81-83.) The men told the drivers to leave the Deceased Plaintiffs at the checkpoint, and that the Americans would come from the base to pick them up. (*Id*. at ¶ 81.)

Between August 20 and August 24, the Ansar al-Sunna Army posted an internet statement that it had captured the Deceased Plaintiffs, posted pictures of the Deceased Plaintiffs, and sent a video of ten of the Deceased Plaintiffs to the Foreign Ministry of Nepal. (*Id*. at ¶¶ 83-86.) Many of the family members of the Deceased Plaintiffs saw the images broadcast on Nepali television. (*Id.* at ¶ 85.) In the video, the Deceased Plaintiffs describe their trip to Iraq, stating that they "were kept as captives in Jordan at first," were not allowed to return home, and were forced to go to Iraq. (*Id.* at ¶ 86.) One man in the video says, "I do not know when I will die, today or tomorrow." (*Id.* at ¶ 87.)

On or about August 31, 2004, international media outlets broadcasted video of the Ansar al-Sunna Army executing the Deceased Plaintiffs. (*Id*. at ¶ 87.) The group beheaded one of the men, and shot the other eleven men, one by one, in the back of their heads. (*Id*.) The families of Deceased Victims saw the execution video, which caused them great emotional distress. (*Id.* at ¶ 88.) The bodies of the Deceased Plaintiffs were never found. (*Id.* at ¶ 89.)

Like the Deceased Plaintiffs, Plaintiff Gurung was recruited from his residence in Nepal. (*Id*. at ¶ 91.) He was sent to Delhi, India for twenty days and then went on to Amman, Jordan for another twenty days. (*Id*.) Gurung was transported to Iraq as part of the same caravan in which the Deceased Plaintiffs were also traveling. (*Id*. at ¶ 92.) Gurung's car was not captured by the insurgents, and he arrived at Al Asad as scheduled. (*Id*. at ¶ 93.) There, he was supervised by KBR in his duties as a warehouse loader/unloader. (*Id*.) Upon learning about the death of the Deceased Plaintiffs, Gurung became frightened and expressed his desire to return to Nepal. He was told by both Daoud and KBR that he could not leave until his work in Iraq was complete. (*Id*. at ¶ 94.) After fifteen months, during which he experienced frequent mortar fire without protection, Gurung was permitted to return to Nepal. (*Id*. at ¶¶ 95-96.)

Pursuant to these allegations, Plaintiffs bring claims for relief against Defendants under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595; the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), as well as conspiracy to violate the same; the Alien Tort Statute ("ATS"), 28 U.S.C § 1350; and also assert various common law claims including, in particular, negligence claims on the part of KBR.

### B. Defendants' Motions

In 2009, KBR filed a Motion to Dismiss (Doc. No. 138), which the Court granted in part and denied in part in its November 2009 Memorandum and Order (the "2009 Order") (Doc. No. 168). Specifically, the Court denied the motion as to Plaintiffs' TVPRA, ATS, and RICO claims; the Court granted the motion with regard to Plaintiffs' negligence claims, and dismissed those claims as barred by the statute of limitations.

The Court held oral argument on KBR's pending Motion for Summary Judgment (Doc. Nos. 346; 347) in April 2013. KBR's Supplemental Motion for Summary Judgment (Doc. Nos. 561; 562), and Daoud's Motion for Judgment on the Pleadings (Doc. No. 570) were filed subsequently.

## II.    LEGAL STANDARD

To grant summary judgment, the Court must find that the pleadings and evidence show that no genuine issue of material fact exists, and therefore the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The party moving for summary judgment must demonstrate the absence of any genuine issue of material fact; however, the party need not negate the elements of the nonmovant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1997). If the moving party meets this burden, the nonmoving party must then go beyond the pleadings to find specific facts showing there is a genuine issue for trial. *Id.* "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted).

Factual controversies should be resolved in favor of the nonmoving party. *Liquid Air Corp.*, 37 F.3d at 1075. However, "summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Id.* at 1076 (internal quotations omitted). Importantly, "[t]he nonmovant cannot satisfy his summary judgment burden with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence." *Diaz v. Superior Energy Services, LLC*, 341 Fed.Appx. 26, 28 (5th Cir. 2009) (citation omitted). The Court should not, in the absence of proof, assume that the nonmoving party

could or would provide the necessary facts. *Liquid Air Corp.*, 37 F.3d at 1075. As the Supreme Court has noted, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.    EVIDENTIARY OBJECTIONS

Before the Court delves into the merits of KBR's Motion for Summary Judgment and Supplemental Motion for Summary Judgment, and Daoud's Motion for Judgment on the Pleadings, it must first resolve evidentiary objections. These have been raised in KBR's Motion to Strike (Doc. Nos. 433, 436); Daoud's Objections and Request to Strike Plaintiffs' Third-Party Declarations (Doc. No. 434); and KBR's Objections to and Motion to Strike Declarations and Other Documents Attached to Plaintiffs' Supplemental Response. (Doc. No. 563.)

### A.  Daoud's Objections and Request to Strike (Doc. No. 434)

Daoud seeks to strike three declarations Plaintiffs have filed in support of their response to KBR's Motion for Summary Judgment. Daoud alleges these declarations contain inadmissible hearsay and speculation.

First, Daoud asserts that Duane Banks's ("Banks") declaration contains numerous references to statements by "people," without identifying who these people are. Banks was an independent auditor employed by Navigant Consulting to provide contract administration services for KBR at Al Asad Air Base in August 2004. (Doc. No. 405-5, ¶ 1.) Essentially, Banks's job was to review and audit time sheets and purchase orders KBR submitted to the United States Military under contracts between those two entities. (*Id.*)

Though Banks's duties did not include matters relating to TCNs, shortly after arriving at Al Asad, people approached him to tell him about abuse and mistreatment of TCNs at Al Asad. (*Id.* at ¶ 2.) Banks's declaration repeats statements made by KBR and Daoud employees about the employment and working conditions of third country nationals ("TCN"), which fall within their scope of work. Such statements by KBR and Daoud employees are an admission of a party opponent. The Court finds that Banks's declaration is admissible.

Second, Daoud argues that Michael Henson's ("Henson") declaration should be struck because it is unsigned and refers to statements by TCNs without identifying the TCN's names. Henson was a labor supervisor for KBR from March 2005 through July 2005. His observations of the working and living conditions are based on his personal knowledge (found in Henson Decl. Para. 9-11, 14, 19). The statements found in Hensen's Declaration Paragraphs 5, 8, 12, 13, 15, and 16 are inadmissible as hearsay since they are simply repeated statements made by TCNs. Those paragraphs will be stricken from Hensen's Declaration. Furthermore, Plaintiffs should cure Henson's declaration by submitting a signed version.

Third, Daoud argues that Sanjay Raut's ("Raut") declaration is inadmissible because it contains statements made by third parties. Raut is a Nepali citizen who was recruited to work in Jordan but ended up working for KBR in Jordan. He traveled with, and was subjected to the same conditions as, four of the Deceased Plaintiffs. Therefore, when Raut testifies from personal knowledge, it is admissible. However, Paragraph 16 of Raut's declaration, which states "I remember that Sanjay, Budhan, Manoj, and Lalan told

me they wanted to go home" is inadmissible hearsay. Paragraph 16 will be stricken from Raut's declaration.

### B. KBR's Motions to Strike (Doc. Nos. 433, 436, 563)

KBR has filed a Motion to Strike as to evidence Plaintiffs filed with their Response to KBR's Motion for Summary Judgment. (Doc. Nos. 433, 436.) KBR has also filed a Motion to Strike Declarations and Other Documents Attached to Plaintiffs' Supplemental Response to KBR's Motion for Summary Judgment. (Doc. No. 563.)

In its Motion to Strike evidence attached to Plaintiffs' Supplemental Response, KBR argues that Plaintiffs' translator declarations are not competent summary judgment evidence. The Fifth Circuit requires an indication of a translator's skill beyond self-supporting claims. *Cruz v. Aramark Servs., Inc.*, 213 Fed. App'x 329, 334 (5th Cir. 2000). Plaintiffs have used Swati Sharma ("Sharma") as one of the interpreters. Sharma demonstrates her competency in the Nepali language by asserting that she was born in Kathmandu, Nepal, is a native speaker of Nepali, and has worked at the Supreme Court of Nepal and the United Nations in Nepal. Sharma also demonstrates her competency in the English language by asserting that she graduated from law school in the United States and has extensive work history in the United States. The Court is satisfied with Sharma's qualifications as a Nepali interpreter. Furthermore, the Court is satisfied with Sharma's independence and competency as an interpreter even though she is employed by the firm who represents Plaintiffs.

KBR also argues that Cortne Edmonds ("Edmonds") is not qualified to act as a translator. Edmonds works for an independent translation service, TransPerfect Legal Solutions, Inc., the same translation service that the Defendants retained for several

recent depositions. TransPerfect is the world's largest privately owned language services provider and has provided translation services to law firms and courts for twenty years. The Court is satisfied with the qualifications of Edmonds as a translator.

Second, KBR challenges Plaintiffs' TCN declarations. These are seven declarations from Nepali citizens who traveled with and/or were held in Jordan with the Deceased Plaintiffs. Arguments on these declarations were made before the Court at a hearing on April 11, 2013. The declarations were made from personal knowledge. Any statements regarding job expectations or statements by Defendants are admissible as they demonstrate the men's reliance on these statements rather than for the truth of the matter asserted. Statements made by Defendants are also admissible as admissions by party opponents. The TCN declarations are admissible.

Third, KBR argues that declarations of former KBR employees are not competent summary judgment evidence. KBR challenges Henson and Banks' declarations, which have been addressed above. As for the remaining declarations, the witnesses have sufficient personal knowledge from working at KBR. These declarations are admissible.

Fourth, KBR seeks to strike Buddi Prasad Gurung's declaration. Gurung has submitted a written statement that clarifies a previous point of confusion. At this time, Gurung's declaration is permitted. At trial, Defendants can seek to impeach Gurung's testimony.

As for the remaining objections in KBR's two Motions to Strike, the Court does not find a need to address each objection at this time. Based on Plaintiffs' submission of curative evidence (Doc. No. 555), uncontested evidence in the record, and admissible

evidence that survives unmeritorious objections, the Court finds there is a genuine issue of material fact for the surviving claim.

## IV.     ANALYSIS

### A.  ATS Claim

As already noted, Plaintiffs have asserted claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350. This claim is governed by the recent Supreme Court decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (U.S. 2013). In *Kiobel*, Nigerian nationals residing in the United States sued Dutch, British, and Nigerian corporations pursuant to the ATS, alleging that corporations aided and abetted Nigerian government in committing violations of the law of nations in Nigeria. The Supreme Court held that "the presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts that presumption." *Id.* at 1669. In other words, Plaintiffs may not seek relief for violations of the law of nations occurring outside the United States. The Supreme Court quoted Justice Story, "No nation has ever yet pretended to be the custos morum of the whole world . . . ." *Id.* at 1668 (*quoting United States v. The La Jeune Eugenie,* 26 F.Cas. 832, 847 (No. 15,551) (C.C.Mass. 1822)). In *Kiobel*, "all the relevant conduct took place outside the United States." *Id.* The Supreme Court explained that, even where the claims "touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Id.* The Court also discussed corporations, stating that corporations are often present in many countries, but a "mere corporate presence" in the United States is insufficient.

Following the Supreme Court's decision in *Kiobel*, summary judgment on the ATS claim must be granted for both Defendants KBR and Daoud. Claims against Daoud

are "foreign cubed" – foreign plaintiffs have sued a foreign defendant based on conduct that occurred in a foreign country. *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2894, n. 11 (2010) (defining foreign cubed as "actions in which (1) foreign plaintiffs [are] suing (2) a foreign issuer in an American court for violations of American securities laws based on securities transactions in (3) foreign countries."). Daoud is a Jordanian company with no presence in the United States. The conduct underlying Plaintiffs' ATS claim is entirely foreign. This Plaintiffs' ATS claims are precisely what *Kiobel* seeks to bar.

Although KBR is a U.S. national, the Supreme Court held in *Kiobel* that a "mere corporate presence" in the United States was not sufficient to rebut the presumption against extraterritoriality. The Supreme Court has now provided further illustration of "mere corporate presence." A few days after *Kiobel*, the Court vacated and remanded a Ninth Circuit decision that had allowed extraterritorial ATS claims to proceed. *Rio Tinto PLC v. Sarei*, 569 U.S. ---, 2013 WL 1704704 (April 22, 2013). In *Rio Tinto*, foreign plaintiffs sued foreign defendants who had "substantial operations in this country," including "assets of nearly $13 billion – 47% of which are located in North America." *Sarei v. Rio Tinto PLC*, 671 F.3d 736, 744 (9th Cir. 2011). Even this degree of corporate presence was not enough to overcome the presumption of extraterritoriality when the alleged torts had occurred outside the United States. As in this case, KBR's corporate presence is not enough to overcome the presumption. Plaintiffs have not demonstrated sufficient domestic conduct by KBR to "displace the presumption." Since all relevant conduct by Daoud and KBR occurred outside of the United States, summary judgment on Plaintiffs' ATS claim must be granted for KBR and Daoud.

### B. RICO Claim

In its 2009 Order, the Court held that Plaintiffs' RICO claims could proceed against KBR. *Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674, 694 (S.D. Tex. 2009). Following the Supreme Court's decision in *Morrison*, this Court again held that, even under *Morrison*, RICO was clearly intended by Congress to have an extraterritorial reach when the predicate acts are themselves extraterritorially indictable. (Doc. No. 273, p. 33.) The Court now revisits its previous holdings in light of *Kiobel*.

Although this Court is not bound by the holdings of courts in other circuits, they are informative. It appears that post-*Morrison* courts have uniformly held that RICO does not apply extraterritorially. *United States v. Chao Fan Xu*, 706 F.3d 965, 974 (9th Cir. 2013), *as amended on denial of reh'g* (Mar. 14, 2013) ("Other courts that have addressed the issue have uniformly held that RICO does not apply extraterritorially.") (citations omitted). *See also Sorota v. Sosa*, 842 F. Supp. 2d 1345, 1348 (S.D. Fla. 2012*)* (finding that the Eleventh Circuit's pre-*Morrison* holding that RICO may apply extraterritorially was no longer correct after *Morrison.* The court stated, "the Court agrees with the post-*Morrison* decisions cited above uniformly holding that RICO does not apply extraterritorially."); *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 913 (C.D. Cal. 2011) ("the Court concludes that RICO does not apply extraterritorially."); *European Cmty. v. RJR Nabisco, Inc.*, 02-CV-5771 NGG VVP, 2011 WL 843957 (E.D.N.Y. Mar. 8, 2011), *reconsideration denied*, 02-CV-5771 NGG VVP, 2011 WL 1463627 (E.D.N.Y. Apr. 15, 2011) ("Therefore, in light of *Morrison*, this silence prohibits any extraterritorial application of RICO."). Though not reaching the issue of RICO's application extraterritorially, a court in this district recently noted that "in the RICO context, multiple

courts have held that predicate acts in foreign countries in violation of statutes with extraterritorial reach are insufficient to rebut the presumption against extraterritoriality of the encompassing statute." *Asadi v. G.E. Energy (USA), LLC*, CIV.A. 4:12-345, 2012 WL 2522599 (S.D. Tex. June 28, 2012) (Atlas, J.), *aff'd sub nom. Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620 (5th Cir. 2013).

*Kiobel* reiterates *Morrison*, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Morrison*, 130 S.Ct. at 2878. With such a clear holding from the Supreme Court, this Court cannot read the language of RICO to overcome the presumption against extraterritoriality. No language within RICO clearly indicates that Congress intended the statute to be applied extraterritorially. Plaintiffs argue that the Military Extraterritorial Jurisdiction Act ("MEJA") is another basis for overcoming the presumption. However, MEJA does not establish extraterritorial jurisdiction for any underlying RICO predicate. As stated in the 2009 Order, this Court is not willing to rest on the "murky area of law" that is MEJA to overcome the presumption against extraterritoriality. *Adhikari*, 697 F. Supp. 2d at 689. The Court reconsiders its previous holding in light of recent Supreme Court developments and finds that it is not clear that Congress intended RICO to apply extraterritorially. In line with other courts who have considered the issue, this Court concludes that RICO does not apply extraterritorially.

In its previous Order, the Court did not need to apply the second step of *Morrison* and address whether Plaintiffs are actually seeking to apply RICO extraterritorially. (Doc. No. 273, p. 34.) Now that the Court finds RICO does not apply extraterritorially, it is appropriate to turn to the second step of *Morrison*. Plaintiffs argue that its RICO claims

"arguably require no extraterritorial application" because the alleged acts orbited a U.S. military facility. (Doc. No. 593 p. 50.) However, the Court previously stated that, because "a significant portion of the events and conduct that make up the alleged RICO violation took place outside of the Al Asad base, we find that, regardless of the status of the base, it is necessary to perform an extraterritorial RICO analysis." *Adhikari*, 697 F. Supp. 2d at 688. Daoud is a Jordanian company (First Amended Complaint ¶ 22) whose "services are provided exclusively in Iraq." (Doc. No. 273, pp. 13, 24.) The majority of the events and conduct that make up the alleged RICO violation take place outside of the base. In fact, the Deceased Plaintiffs never made it to the military base. The Court finds that Plaintiffs' RICO claim impermissibly seeks to apply RICO extraterritorially. Therefore, judgment on the RICO claim must be granted for both KBR and Daoud.

### C. TVPRA Claim

Plaintiffs assert claims under the Trafficking Victims Protection Act ("TVPRA"), 18 U.S.C. §§ 1590, 1592, 1594 and 22. U.S.C. § 7101.

### 1. TVPRA Claim Against Daoud

Daoud argues that Section 1596 of the TVPRA cannot be applied to Daoud without exceeding the statute's extraterritorial limits. Section 1595 provides "extra-territorial jurisdiction over any offense . . . if – (1) an alleged offender is a national of the United States or an alien lawfully admitted for permanent residence …; or (2) an alleged offender is present in the United States, irrespective of the nationality of the alleged offender." 18 U.S.C. § 1596. Daoud argues that, since it is not a U.S. national or permanent resident and has never been in the United States, Plaintiffs cannot bring a TVPRA claim against it.

Plaintiffs argue that "present in the United States" does not mean physical presence. (Doc. No. 593, p. 38.) This interpretation goes against the plain language meaning of the statute. If Plaintiffs' reading of § 1596(a)(2) were adopted, it would make § 1596(a)(1) superfluous. The plain meaning of § 1596(a)(2) is clear. The offender must be present in the United States for a TVPRA claim to be brought. Daoud was not present and has never been present in the United States. Therefore, Plaintiffs' TVPRA claim against Daoud must be dismissed.

### 2. Applicability of TVPRA After *Kiobel*

KBR argues that the TVPRA has no clear indication of any extraterritorial application to overcome the *Kiobel* presumption. However, this is an inappropriate reading of *Kiobel*. Unlike the ATS, which was silent about extraterritorial application, the TVPRA is expressly extraterritorial. 18 U.S.C. § 1596. Section 1596 states that "the courts of the United States have extra-territorial jurisdiction over any offense… if an alleged offender is a national of the United States . . . ." This Court specifically examined the issue of whether the TVPRA may be extraterritorially and retroactively applied. This Court held that "TVPRA could be extraterritorially applied to KBR's actions even though they were committed before Section 1596 was passed." *Adhikari v. Daoud & Partners*, CIV.A. 09-CV-1237, 2010 WL 744237 (S.D. Tex. Mar. 1, 2010). This is not a case in which the statute is silent on the issue of extraterritoriality. Therefore, *Kiobel* does not alter this Court's holding regarding the expressly extraterritorial language of the TVPRA.

### 3. TVPRA Claim Against KBR

KBR argues that the TVPRA statute limits liability to the "perpetrator," 18 U.S.C. § 1595, who "knowingly provides or obtains" forced labor, 18 U.S.C. § 1589, who

"knowingly" engages in trafficking, 18 U.S.C. § 1590, or who actively "conspires" to do those things, 18 U.S.C. § 1594. KBR argues that the version in effect at the time of the conduct at issue provided for liability only against "the perpetrator." Only in 2008 did Congress amend § 1595 to "enhance[] the civil action by providing that an action is also available against any person who knowingly benefits from trafficking." H.R. Rep. 110-430, at 55 (2007). Therefore, for conduct from 2003 to 2008, only perpetrators were subject to liability, and even after 2008, knowledge of the offense was still required for liability.

Plaintiffs do not contest the knowledge requirement. Nor do they allege that KBR was merely one who benefitted from the violations. Instead, Plaintiffs contend that KBR was a perpetrator through agency and thus was in violation of the TVPRA as in effect at the time of the conduct at issue.

### a.  *Knowing Requirement*



### b. *Forced Labor or Trafficked*

KBR further argues that Plaintiffs have no evidence that any of the Nepalis were trafficked or subject to forced labor. Specifically, KBR calls into question the alleged unlawful coercion regarding seven workers: Prakash Adhikari, Ramesh Khadka, Mangal Limbu, Jeet Magar, Gyanendra Shrestha, Bishnu Thapa, and Jhok Bahadur Thapa. In response, Plaintiffs present evidence that each alleged victim suffered unlawful coercion. (Doc. No. 542, pp. 24- 54.) The proffered evidence shows that each man was deceived about his promised job; each man was promised a hotel related job in Jordan; each man's family took on significant debt in order to pay recruitment fees; when the men arrived in Jordan, they were subject to threats and harm; their passports were confiscated; and the men were locked into a compound and threatened. (Doc. No. 542 pp. 17-18.) The Fifth Circuit has found that passport confiscation is sufficient to show coercion. *United States v. Nnaji*, 447 F. App'x 558 (5th Cir. 2011) cert. denied, 132 S. Ct. 1763, 182 L. Ed. 2d 547 (U.S. 2012) and cert. denied, 132 S. Ct. 1770 (U.S. 2012). While KBR is correct that

there are legitimate reasons for holding a passport that are not in violation of the TVPRA, Plaintiffs have presented evidence that could lead a jury reasonably to find that the passport holding was coercive. Because this proffered evidence raises a genuine issue of material fact as to the existence of forced labor or trafficking, it is an issue of fact that should be submitted to the jury.

### c. *Vicarious Liability*

KBR argues that the TVPRA precludes Plaintiffs' vicarious liability theory since the statute limited liability to "the perpetrator," 18 U.S.C. § 1595, in the version of the statute in effect at the time of the conduct at issue. KBR argues that only in 2008 did Congress amend 18 U.S.C. § 1595 to "enhance[] the civil action by providing that an action is also available against any person who knowingly benefits from trafficking." H.R. Rep. 110-430, at 55 (2007). KBR's reading of the TVPRA prior to the 2008 amendment is too restrictive.

The Court is aware that resort to legislative history is always problematic. In this instance, however, the history is unambiguous. Before adopting the TVPRA, Congress discussed the widespread nature of trafficking in a report in 2000. Congress found that trafficking was the "largest manifestation of slavery today." H.R. CONF. Rep. 106-939, Sec. 102(1) (2000). Furthermore, Congress found that "[t]rafficking in persons is increasingly perpetrated by organized, sophisticated criminal enterprises." *Id.* at Sec. 102(8). Congress lamented the existing and insufficient punishment for such a grave crime, noting that "existing laws often fail to protect victims of trafficking." *Id.* at Sec. 102(17). These findings lead the Court to conclude that Congress had a broader meaning for "perpetrator" than KBR's reading. This is reflected in the 2003 version of the statute,

which was in effect at the time of the alleged conduct. The 2003 version of § 1595 authorized civil actions by "[a]ny individual who is a victim of a violation of section 1589, 1590, or 1591." Section 1590(a) imposes liability on "**whoever knowingly** recruits, harbors, transports, provides, or obtains, **by any means**, any person for labor or services" (emphasis added). The Eighth Circuit recently held this to be "expansive language" that "criminalizes a broad spectrum." *United States v. Jungers*, 702 F.3d 1066, 1070 (8th Cir. 2013). Therefore, a vicarious liability theory of the perpetrator can proceed under the 2003 version of the TVPRA.

Plaintiffs have raised a genuine issue of material fact as to whether Daoud was an agent of KBR for purposes of vicarious liability under the TVPRA. Under Texas law, "[t]he essential element of an agency relationship is the right of control." *Matter of Carolin Paxson Adver., Inc.*, 938 F.2d 595, 598 (5th Cir. 1991) (*citing Wynne v. Adcock Pipe & Supply*, 761 S.W.2d 67, 69 (Tex.App.-San Antonio 1988, writ denied); *Carr v. Hunt*, 651 S.W.2d 875, 879 (Tex.App.-Dallas 1983, writ ref'd n.r.e.)). "The alleged principal must have the right to control both the means and the details of the process by which the alleged agent is to accomplish his task." *Id.* (*citing Xarin Real Estate, Inc. v. Gamboa*, 715 S.W.2d 80, 84 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e.); *Johnson v. Owens*, 629 S.W.2d 873, 875 (Tex.App.-Fort Worth 1982, writ ref'd n.r.e.)). Absent proof of the right to control, only an independent contractor relationship is established. *See First Nat'l Bank of Fort Worth v. Bullock*, 584 S.W.2d 548, 551-52 (Tex.Civ.App.-Dallas 1979, writ ref'd n.r.e.); *In re Cooper*, 2 B.R. 188, 193 (Bankr. S.D.Tex.1980). Parties agree that control is evidenced by (1) the power to hire and fire; (2) the power of supervision over the agent's employees; (3) to participate in the daily operations of the

agent's work; and (4) to give the agent interim instructions once work has begun. *Cardinal Health Solutions, Inc. v. Valley Baptist Med. Ctr.*, 643 F. Supp. 2d 883, 889 (S.D. Tex. 2008).

Plaintiffs have provided evidence that KBR had the authority to exercise control, and did exercise said control, over Daoud's recruitment and supply of the laborers in this case. First, Plaintiffs presented evidence that KBR had the power to fire Daoud employees. In one instance, KBR directed Daoud to remove Daoud's Site Manager from the B-6 Man Camp. (Doc. No. 401, Ex. 97.) In another, Daoud's Jordanian employees at the B8 DFAC were terminated by KBR. (Doc. No. 542, Ex. 308.) Second, Plaintiffs have presented evidence that KBR had the power of supervision over Daoud's employees. (*See* Doc. No. 401, Statement of Material Fact, ¶¶ 1-13, 27-34.) Third, Plaintiffs raise a genuine issue of material fact to challenge KBR's assertion that KBR did not participate in Daoud's daily operations. KBR employed on-site representatives to control daily work, including approval for any changes in the dining facility menu. (Doc. No. 542, Exs. 282, 285.) KBR's involvement in Daoud's daily operations included inspection of forks, spoons, pans, and spatulas Daoud used in the dining facility (Doc. No. 542, 285), a three times a day report of water quality measurement (Doc. No. 542, 282), and a requirement for Daoud to report accidents to KBR's Health, Safety and Environment site representative. (Doc. No. 542, 286.) This evidence shows that KBR gave Daoud interim instructions once work had begun. Therefore, Plaintiffs have raised a genuine issue of material fact as to vicarious liability. The Court cannot grant summary judgment for KBR on the TVPRA claim.

## V.    KBR'S MOTION TO SHOW CAUSE AND MOTION FOR SANCTIONS

Also pending before the Court are KBR's Motion to Show Cause (Doc. No. 428), joined by Daoud (Doc. No. 431), KBR's Motion for Sanctions (Doc. Nos. 479, 480), and KBR's Motion to Strike Declarations and Documents Attached to Plaintiffs' Opposition to KBR's Motion for Sanctions. (Doc. No. 530.)

The Motion to Show Cause (Doc. No. 428) concerns a letter dated July 31, 2004, from Prakash Adhikari to his parents. KBR asks the Court to require Plaintiffs to explain the timing of the production, which Plaintiffs have done. No further Court intervention is necessary, so the Motion to Show Cause is moot.

KBR's Motion for Sanctions (Doc. Nos. 479, 480) must be denied. This is a complicated and fact intensive case. Emotions understandably run high when human lives have been lost. However, sanctions are not – even remotely – justified.

## VI.    CONCLUSION

For the reasons discussed above, KBR's Motion for Summary Judgment (Doc. Nos. 346; 347) is **GRANTED IN PART AND DENIED IN PART.** KBR's Supplemental Motion for Summary Judgment (Doc. Nos. 561; 562) is **GRANTED IN PART AND DENIED IN PART.**

- Summary Judgment is **GRANTED** on the ATS claim;
- Summary judgment is **DENIED** on the TVPRA claim;
- Summary judgment is **GRANTED** on the RICO claim.

Daoud's Motion for Judgment on the Pleadings (Doc. No. 570) is **GRANTED.**

Several other motions were also ruled on in this order. Daoud's Objections and Request to Strike Plaintiffs' Third-Party Declarations (Doc. No. 434) is **GRANTED IN PART AND DENIED IN PART.** KBR's Motion to Strike (Doc. Nos. 433, 436) and

KBR's Objections to and Motion to Strike Declarations and Other Documents Attached to Plaintiffs' Supplemental Response (Doc. No. 563) are **MOOT.**

KBR's Motion to Show Cause (Doc. No. 428) is terminated as **MOOT.** KBR's Motion for Sanctions (Doc. Nos. 479, 480) is **DENIED.** KBR's Motion to Strike Declarations and Documents Attached to Plaintiffs' Opposition to KBR's Motion for Sanctions (Doc. No. 530) is **MOOT.**


**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 21[th] day of August, 2013.

_____
THE HONORABLE KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE