UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| RAMCHANDRA ADHIKARI, *et al*, § | |
| § | |
| Plaintiffs, § | |
| § | |
| VS. § | CIVIL ACTION NO. 4:09-CV-1237 |
| § | |
| DAOUD & PARTNERS, *et al*, § | |
| § | |
| Defendants § | |

**MEMORANDUM AND ORDER**

This Court previously considered and, in part, rejected a Supplemental Motion for Summary Judgment filed by Defendants Kellogg Brown & Root, Inc.; Kellogg Brown & Root Services, Inc.; KBR, Inc.; KBR Holdings, LLC; Kellogg Brown & Root LLC; KBR Technical Services, Inc.; Kellogg Brown & Root International, Inc.; Service Employees International, Inc.; and Overseas Administration Services, Ltd. (collectively, "KBR"). ("2013 Order," Doc. No. 614.) KBR now seeks permission to appeal the 2013 Order under 28 U.S.C. § 1292(b). (Doc. No. 631.) After carefully reviewing the 2013 Order, the parties' well-written briefs, and the applicable law, the Court concludes that it must reconsider and re-issue its 2013 Order. KBR's prior Supplemental Motion for Summary Judgment must be GRANTED in its entirety. (Docs. Nos. 561; 562.) KBR's present Motion for Permission to Appeal Under 28 U.S.C. § 1292(b) must be DENIED as moot.

I.   BACKGROUND

   A.  Factual Background

1

This case is brought by Plaintiff Buddi Prasad Gurung ("Gurung") and the surviving family members of twelve other men: Prakash Adhikari, Ramesh Khadka, Lalan Koiri, Mangal Limbu, Jeet Magar, Gyanendra Shrestha, Budham Sudi, Manoj Thakur, Sanjay Thakur, Bishnu Thapa, and Jhok Bahadur Thapa (collectively, the "Deceased Plaintiffs"). All Plaintiffs are Nepali citizens and currently reside in Nepal. Plaintiffs allege that KBR and Daoud & Partners ("Daoud") engaged in a scheme to traffic the Plaintiffs from Nepal to Iraq. Plaintiffs allege that Defendants "established, engaged and/or contracted with a network of suppliers, agents, and/or partners in order to procure laborers from third world countries." (Doc. No. 58, *hereinafter* "First Amended Complaint," ¶ 54.)

The Complaint alleges that the Deceased Plaintiffs, whose ages ranged from 18 to 27, were recruited from their places of residence in August 2004 by Moonlight Consultant Pvt. Ltd., a recruiting company based in Nepal. (*Id.* at ¶ 62.) Most of the men were told that they would be employed by a luxury hotel in Amman, Jordan. (*Id.* at ¶ 63.) Some were told that they would be working in an American camp. (*Id.*) Although there is no indication that they were told where the camp would be, the Deceased Plaintiffs' family members assumed that they were going to the United States. (*Id.*) All of the men were led to believe that they would not be placed in a dangerous location, and that, if they found themselves in a dangerous area, they would be sent home at the employer's expense. (*Id.*) They were promised a salary of approximately $500 per month. (*Id.* at ¶ 64.) The men and their families incurred substantial debt to pay the brokerage fees in seeking out this employment. (*Id.* at ¶ 65.)

After they were recruited, the Deceased Plaintiffs were then transferred to the custody of Morning Star for Recruitment and Manpower Supply ("Morning Star"), a Jordanian job brokerage company that operates in Amman. (*Id.* at ¶ 66.) Morning Star housed the Deceased

2

Plaintiffs upon their arrival in Jordan and arranged for their transfer to Iraq. (*Id.* at ¶ 59.) Morning Star then transferred the Deceased Plaintiffs to Daoud. (*Id.*) The men were held in Jordan by agents of Daoud, and were required to turn over their passports to Daoud. (*Id.* at ¶¶ 67-68.) It was there that the Deceased Plaintiffs first discovered that they were actually being sent to work at Al Asad, north of Ramadi, Iraq. (*Id.* at ¶ 70.) Several of the men phoned relatives in Nepal, expressing concern and fear about their futures. (*Id.* at ¶¶ 70-71.) At least one of the Deceased Plaintiffs informed his family that he and the other men were being kept in a dark room and were unable to see. (*Id.* at ¶ 72.) In Jordan, the men were also informed for the first time that they would be paid only three quarters of what they were initially promised. (*Id.* at ¶ 73.) Although they wanted to return home to Nepal, rather than proceed into the Iraqi war zone, the men were compelled to proceed to Iraq because of the debts that their families had assumed to pay the brokers. (*Id.* at ¶ 74.)

Daoud transported the Deceased Plaintiffs into Iraq on or about August 19, 2004, via an unprotected automobile caravan of seventeen vehicles. (*Id.* at ¶ 75.) They traveled along the Amman-to-Baghdad highway, which was known at the time to be a highly dangerous route. (*Id.* at ¶¶ 76-81.) As they were nearing Al Asad, the two lead cars in which the Deceased Plaintiffs were being transported were stopped by a group of men who later revealed themselves to be members of the Ansar al-Sunna Army, an insurgent group in Iraq. (*Id.* at ¶¶ 81-83.) The men told the drivers to leave the Deceased Plaintiffs at the checkpoint, and that the Americans would come from the base to pick them up. (*Id.* at ¶ 81.)

Between August 20 and August 24, the Ansar al-Sunna Army posted an internet statement that it had captured the Deceased Plaintiffs, posted pictures of the Deceased Plaintiffs, and sent a video of ten of the Deceased Plaintiffs to the Foreign Ministry of Nepal. (*Id.* at ¶¶ 83-

86.) Many of the family members of the Deceased Plaintiffs saw the images broadcast on Nepali television. (*Id.* at ¶ 85.) In the video, the Deceased Plaintiffs describe their trip to Iraq, stating that they "were kept as captives in Jordan at first," were not allowed to return home, and were forced to go to Iraq. (*Id.* at ¶ 86.) One man in the video says, "I do not know when I will die, today or tomorrow." (*Id.*)

On or about August 31, 2004, international media outlets broadcasted video of the Ansar al-Sunna Army executing the Deceased Plaintiffs. (*Id.* at ¶ 87.) The group beheaded one of the men, and shot the other eleven men, one by one, in the backs of their heads. (*Id.*) The families of the Deceased Victims saw the execution video, which caused them great emotional distress. (*Id.* at ¶ 88.) The bodies of the Deceased Plaintiffs were never found. (*Id.* at ¶ 89.)

Like the Deceased Plaintiffs, Plaintiff Gurung was recruited from his residence in Nepal. (*Id.* at ¶ 91.) He was sent to Delhi, India for twenty days and then went on to Amman, Jordan for another twenty days. (*Id.*) Gurung was transported to Iraq as part of the same caravan in which the Deceased Plaintiffs were also traveling. (*Id.* at ¶ 92.) Gurung's car was not captured by the insurgents, and he arrived at Al Asad as scheduled. (*Id.* at ¶ 93.) There, he was supervised by KBR in his duties as a warehouse loader/unloader. (*Id.*) Upon learning about the death of the Deceased Plaintiffs, Gurung became frightened and expressed his desire to return to Nepal. (*Id.* at ¶ 94.) He was told by both Daoud and KBR that he could not leave until his work in Iraq was complete. (*Id.*) After fifteen months, during which he experienced frequent mortar fire without protection, Gurung was permitted to return to Nepal. (*Id.* at ¶¶ 95-96.)

### B. Procedural Background

Plaintiffs' First Amended Complaint set forth thirteen claims for relief against KBR and Daoud, including statutory claims under the Trafficking Victims Protection Reauthorization Act

("TVPRA"), the Racketeering Influenced and Corrupt Organization Act ("RICO"), and the Alien Tort Statute ("ATS"), as well as various common law claims. (Doc. No. 58.)

In 2009, the Court considered KBR's Motion to Dismiss Plaintiffs' First Amended Complaint. ("2009 Order," Doc. No. 168.) The Court granted the Motion as to Plaintiffs' negligence claims against KBR, but denied the Motion with respect to Plaintiffs' TVPRA, RICO, and ATS claims. (*Id.* at 31.) Of particular relevance to the present Order, the Court held that the TVPRA could be retroactively applied extraterritorially to KBR's actions abroad in 2004. Congress passed Section 1596 of the TVPRA in 2008, expressly granting United States courts "extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591." 18 U.S.C. § 1596(a); TVPRA, Pub. L. 110-457 (2008) § 223(a). The Court found that Section 1596 could be applied retroactively to KBR's actions in 2004 since doing so altered no vested rights. (Doc. No. 168 at 8-9.)

In 2013, the Court revisited its prior holdings in light of the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Company*, 133 S. Ct. 1659 (2013). (Doc. No. 614.) In *Kiobel*, Nigerian nationals residing in the United States sued Dutch, British, and Nigerian corporations for violations of the law of nations in Nigeria pursuant to the ATS. 133 S. Ct. at 1662. The Supreme Court found that the presumption against extraterritoriality barred the plaintiffs' claims for relief under the ATS. *Id.* at 1669. KBR argued that this "watershed" holding applied with equal force to Plaintiffs' ATS, RICO, and TVPRA claims, and moved for summary judgment. (Doc. No. 561.)

The Court held that *Kiobel* mandated the dismissal of Plaintiffs' ATS and RICO claims, but did not affect Plaintiffs' TVPRA claim. (Doc. No. 614 at 11-16.) Unlike the ATS or RICO,

5

the TVPRA includes express extraterritorial language in Section 1596. Since the Court had previously determined that Section 1596 could be applied retroactively to KBR's actions, the claim was unaffected by *Kiobel*'s holding. (Doc. No. 614 at 16.) The Court therefore denied KBR's Motion for Summary Judgment on Plaintiffs' TVPRA claim. Upon further reflection, the Court now determines that this holding was in error.

## II. ANALYSIS

### A. Extraterritoriality of the TVPRA Prior to Section 1596

As a preliminary matter, the Court concludes that the TVPRA would not have applied extraterritorially prior to the passage of Section 1596. As the Court previously explained, the passage of Section 1596 made the TVPRA expressly extraterritorial in 2008. (Doc. No. 614 at 16.) However, the TVPRA was silent with regards to extraterritoriality prior to Section 1596. The Supreme Court held that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Kiobel*, 133 S. Ct. at 1664 (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2878 (2010)).

The TVPRA prohibited forced labor and trafficking without any indication that these provisions applied abroad. *See* TVPA, Pub. L. 106-386 (2000) § 112. In Sections 1589 and 1590, Congress instituted severe punishments for "forced labor" and "trafficking with respect to peonage, slavery, involuntary servitude, or forced labor." *Id.* In Section 1595, Congress permitted any individual who was a victim of a violation of Section 1589 or 1590 to bring a civil action against the perpetrator. TVPRA, Pub. L. 108-193 (2003) § 4(a)(4). The statute's silence as to any extraterritorial application for these provisions weighs heavily in favor of finding that Congress intended to legislate only within its own territorial jurisdiction. *See Morrison*, 130 S. Ct. at 2877; *see also Liu v. Siemens A.G.*, 2013 WL 5692504 at *3 (S.D.N.Y. Oct. 21, 2013)

(finding that "silence invokes a strong presumption against extraterritoriality" despite broad language).

Plaintiffs point to the "Purposes and Findings" of the TVPRA to argue that "Congress was not legislating with inherently domestic concerns in mind." (Doc. No. 593 at 53.) For example, the TVPRA began with the following tragic finding: "At least 700,000 persons annually, primarily women and children, are trafficked within or across international borders." TVPA, Pub. L. 106-386 (2000) § 102(b)(1). The very next sentence continued with a horrifying statistic closer to home: "Approximately 50,000 women and children are trafficked into the United States each year." *Id.* Following this theme, Congress repeatedly recognized human trafficking to be an evil with national and international implications. *See, e.g.*, TVPA, Pub. L. 106-386 (2000) § 102(b)(15-16) ("In the United States, the seriousness of this crime and its components is not reflected in current sentencing guidelines, resulting in weak penalties for convicted traffickers. In some countries, enforcement against traffickers is also hindered by official indifference, by corruption, and sometimes even by official participation in trafficking."); § 102(b)(21) ("Trafficking of persons is an evil requiring concerted and vigorous action by countries of origin, transit or destination, and by international organizations."); § 102(b)(24) ("Trafficking in persons is a transnational crime with national implications."). Defendants argue that "such statements of purpose, involving both national and international concerns, [are] insufficient to overcome the presumption." (Doc. No. 601 at 24.)

The Court must agree with the Defendants. Congress clearly outlined international solutions in other portions of the TVPRA. *See* TVPA, Pub. L. 106-386 (2000) § 104 (requiring countries receiving American assistance to compile a report describing the nature and extent of human trafficking in their country, as well as their efforts to combat it); § 106 (seeking

7

international initiatives in foreign policy "to enhance economic opportunity for potential victims of trafficking as a method to deter trafficking"); §108-10 (establishing minimum standards for the elimination of trafficking, authorizing the President to provide assistance to foreign countries to meet these minimum standards, and stating a policy of not providing nonhumanitarian, nontrade-related foreign assistance to any government that does not comply, or make significant efforts to comply, with the minimum standards). Section 107(a), for example, was titled "Assistance for Victims in Other Countries," and focused solely on establishing "initiatives in foreign countries to assist in the safe integration, reintegration, or resettlement, as appropriate, of victims of trafficking." TVPA, Pub. L. 106-386 (2000) § 107(a). Congress's failure to indicate any extraterritoriality when it came to civil or criminal remedies stands in stark contrast to these overtly international endeavors. *See* TVPA, Pub. L. 106-386 (2000) § 112; TVPRA, Pub. L. 108-193 (2003) § 4(a)(4). According to the presumption against extraterritoriality, the Court must assume that Congress intended Sections 1589 and 1590 to be purely national solutions. *See Morrison*, 130 S. Ct. at 2877.

The Court is concerned that the TVPRA's purpose will be undermined if United States defendants escape liability so long as their acts of human trafficking took place outside of United States borders prior to 2008. (*See* Doc. No. 168 at 9.) Nevertheless, the Court cannot distinguish the TVPRA's protection of victims of human trafficking from the ATS's protection of aliens for violations of the law of nations. The Supreme Court found that "nothing in the [ATS] rebuts" the presumption against extraterritoriality. *Kiobel*, 133 S. Ct. at 1669. This Court must apply the same logic to claims brought by Plaintiffs under the TVPRA.

Plaintiffs try to avoid the clear implications of the Supreme Court's recent decisions on extraterritoriality by claiming that the presumption does not apply here under *United States v.*

8

*Bowman*, 260 U.S. 94 (1922). (Doc. No. 593 at 55.) In *Bowman*, the Court considered the extraterritoriality of a statute criminalizing the conspiracy to submit false claims against the United States. *Id.* at 101. The statute's extraterritoriality, the Court held, could be "inferred from the nature of the offense." *Id.* at 98. Plaintiffs argue that the same should be inferred of the TVPRA. (Doc. No. 593 at 55.) The *Bowman* rule, however, is expressly limited to the class of criminal statutes "enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated," and does not apply to the TVPRA. *See Bowman*, 260 U.S. at 98; *see also United States v. Vilar*, 729 F.3d 62, 72-73 (2d Cir. 2013).

Reaching outside of the TVPRA, Plaintiffs argue that the Military Extraterritorial Jurisdiction Act ("MEJA"), 18 U.S.C. § 3261, provides an alternative source for extraterritorial jurisdiction over KBR for its actions in 2004. (Doc. No. 593 at 50-51.)[1] MEJA provides for the punishment of "whoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States while employed by or accompanying the Armed Forces outside the United States." 18 U.S.C. § 3261(a)(1). MEJA's provision of criminal jurisdiction over felony offenses committed abroad does not provide Plaintiffs with an alternative source of jurisdiction for their civil claims under the TVPRA. *See, e.g.*, Dep't of Justice Manual, DOJML USAM § 9-20.116 ("MEJA subject certain individuals to *federal prosecution* for felony offenses committed outside the United States . . . ." (emphasis added)). In any case, the Court has already expressed its unwillingness to rest its jurisdiction on the "murky area of the law" that is MEJA. (*See* Doc. No. 614 at 14; Doc. No. 168 at 20.)

---

[1] Plaintiffs also cite 18 U.S.C. § 3271, which provides for the prosecution of any person who engaged in human trafficking "while employed by or accompanying the Federal Government outside the United States," as a source of extraterritorial jurisdiction. (Doc. No. 593 at 51.) Even if the statute operated to confer extraterritorial jurisdiction for Plaintiffs' civil claims, it was passed after the alleged conduct in this case and would be barred by the presumption against retroactivity for the same reasons as Section 1596, discussed below.

## B. Retroactivity of Section 1596

Plaintiffs therefore rely on Section 1596 to provide extraterritorial jurisdiction over KBR for violations of the TVPRA. Section 1596, which explicitly conferred extraterritorial jurisdiction to United States courts to hear claims under Sections 1589 and 1590, was enacted four years after the alleged conduct in this case. The Court now determines that the presumption against retroactive legislation bars the application of Section 1596 to KBR's conduct, mandating the dismissal of Plaintiffs' TVPRA claim.

The presumption against retroactive legislation bars the retroactive application of a statute to conduct that occurred before its passage without clear Congressional approval. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 268 (1994). To determine whether a statute would have "retroactive effect," the court must parse those statutes that have a substantive effect from those statutes that are merely procedural. *Republic of Austria v. Altmann*, 541 U.S. 677, 694 (2004). The presumption bars statutes that "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280. The presumption does not affect statutes that merely affect the propriety of prospective relief or change the procedural landscape. *Id.* at 273-75.

Jurisdictional statutes can be difficult to classify as either substantive or procedural under the *Landgraf* framework. Generally, a new jurisdictional rule is procedural since it "takes away no substantive right but simply changes the tribunal that is to hear the case." *Landgraf*, 511 U.S. at 274. "Such statutes affect only *where* a suit may be brought, not *whether* it may be brought at all." *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 951 (1997) (emphasis in original). A jurisdictional statute is better classified as substantive, however, when it creates,

rather than transfers, jurisdiction.  When a statute creates jurisdiction whole cloth, it "speaks not just to the power of the particular court but to the substantive rights of the parties as well." *Id.*

The Supreme Court reached two different conclusions regarding the retroactive effect of jurisdictional provisions in *Hughes Aircraft Company v. United States ex rel. Schumer*, 520 U.S. 939 (1997), and *Republic of Austria v. Altmann*, 541 U.S. 677 (2004).  In *Hughes Aircraft*, the Court considered an amendment to the jurisdictional provision of the False Claims Act ("FCA") permitting private parties to bring *qui tam* suits even if the suit was based on information in the Government's possession.  520 U.S. at 946.  The Court held that the jurisdictional amendment affected the substantive rights of parties since it eliminated a previous defense and expanded the class of plaintiffs that could bring suit.  *Id.* at 948-51.  As such, the jurisdictional provision could not be applied retroactively.  *Id.* at 951-52.  In *Republic of Austria*, the Court analyzed the Foreign Sovereign Immunities Act ("FSIA") that provided for federal court jurisdiction in certain circumstances where foreign states were not entitled to the general grant of immunity.  541 U.S. at 691.  The Court determined that the FSIA was not substantive since it "does not create or modify any cause of action."  *Id.* at 695 n.15.  "[T]he FSIA merely opens United States courts to plaintiffs with pre-existing claims against foreign states."  *Id.* at 695.  Although the Court recognized the difficulty in conclusively classifying the statute as procedural or substantive, *id.* at 695-96, it found "clear evidence that Congress intended the Act to apply to preenactment conduct" in any case, *id.* at 697.

In 2009, this Court faced an issue of first impression as to whether an amendment that conferred extraterritorial jurisdiction to United States courts was barred by the presumption against retroactivity.  The Court held that Section 1596 did not affect substantive rights and could therefore be applied retroactively.  (Doc. No. 168 at 8-9.)  The Court reasoned that

11

"Defendants do not now, nor did they in 2004, have the right to traffic human beings at home or abroad." (Doc. No. 168 at 8.) The Court held that Section 1596 "only enlarges jurisdiction of courts within the United States, but does not change the operative substantive laws." (Doc. No. 168 at 9.)

The Supreme Court provided guidance on this issue a year later, which this Court must now heed. Before addressing the merits in *Morrison v. National Australia Bank Ltd.*, the Supreme Court paused to remedy a threshold error. 130 S. Ct. 2869 (2010). The district court found that Section 10(b) of the Securities Exchange Act of 1934 could not be extraterritorially applied and dismissed for want of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). *Id.* at 2876. The Court noted that the case should have instead been dismissed for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). *Id.* at 2877. The Court explained that "to ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question." *Id.*

The Supreme Court's admonition in *Morrison* affects this Court's determination of the retroactive effect of the TVPRA's extraterritorial provision. The extraterritorial application of a statute, though nominally jurisdictional, necessarily affects the substantive rights of the parties. "[T]o ask what conduct [the TVPRA] reaches is to ask what conduct [the TVPRA] prohibits." *See Morrison*, 130 S. Ct. at 2877. By expanding the reach of the TVPRA to purely extraterritorial conduct, Section 1596 has increased the potential liability of defendants for past conduct.

The present case is therefore more analogous to *Hughes Aircraft* than *Republic of Austria*. In *Hughes Aircraft*, the lawfulness of the underlying conduct was not affected by the jurisdictional amendment. 520 U.S. at 947-48. The Supreme Court nevertheless held that the

amendment affected the substantive rights of parties since it eliminated a previously available defense and expanded the class of plaintiffs that could bring suit.  *Id.* at 948-51.  Likewise, Section 1596 did not change the lawfulness of human trafficking, but it removed the previously available defense of extraterritoriality and expanded the class of plaintiffs that could bring suit in American courts.

Contrary to Plaintiffs' protests, this Court does not suggest that *Landgraf* and *Republic of Austria* have been somehow overruled.  (*See* Doc. No. 593 at 46.)  A jurisdictional statute that does not affect the substantive rights of the parties has been, and will continue to be, applied to pending cases.  The presumption against retroactivity is triggered, however, when a nominally jurisdictional statute affects the substantive rights of the parties.  *Hughes Aircraft Co.*, 520 U.S. at 951; *Republic of Austria*, 541 U.S. at 695.  Guided by the Supreme Court's discussion in *Morrison*, this Court now determines that the conferral of extraterritorial jurisdiction affects more than mere procedure and is barred by the presumption against retroactivity.

### III.  CONCLUSION

Bound by *Morrison* and *Kiobel*, this Court holds that the TVPRA would not have been applied extraterritorially prior to the passage of Section 1596.  The conferral of extraterritorial jurisdiction in Section 1596 wrought a substantive change in the law, and cannot be applied retroactively.  Plaintiffs' TVPRA claim, which alleges conduct outside of the United States prior to the enactment of Section 1596, must be dismissed.  KBR's Supplemental Motion for Summary Judgment is hereby **GRANTED** as to the TVPRA claim.

**IT IS SO ORDERED.**

**SIGNED** on this the 15th day of January, 2014.

                                                                            _____
                                                                            KEITH P. ELLISON
                                                                            UNITED STATES DISTRICT JUDGE