UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RAMCHANDRA ADHIKARI, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:09-CV-1237 |
| | § | |
| DAOUD & PARTNERS, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM AND ORDER

The Court revisits, one final time, two summary judgment rulings in favor of KBR[1] in this devastating human trafficking case. Plaintiffs believe that the Court erred when it granted judgment to KBR on their Trafficking Victims Protection Reauthorization Act ("TVPRA") and Alien Tort Statute ("ATS") claims. Plaintiffs urge rehearing and, as to their ATS claim, leave to amend. (Doc. Nos. 672, 685/686.)

For the reasons stated below, and because of controlling law and the facts as elucidated by Plaintiffs, the Court cannot grant relief. Perhaps the Court has too conservatively interpreted the limitations placed on it by Congress and the United States Supreme Court; if so, however, the best recourse it can offer Plaintiffs is a direct path to the Fifth Circuit Court of Appeals. Plaintiffs' Motion for Rehearing Pursuant to Fed. R. Civ. P. 54(b) of This Court's January 2014 Order (Doc. No. 672) and Motion for Rehearing on Their ATS Claims against KBR and for

---

[1] "KBR" refers to several related corporate entities, all named as Defendants in this case. These defendants are Kellogg Brown and Root, Inc.; Kellogg Brown & Root Services, Inc.; KBR, Inc.; KBR Holdings, LLC; Kellogg Brown & Root LLC; KBR Technical Services, Inc.; Kellogg Brown & Root International, Inc.; Service Employees International, Inc.; and Overseas Administration Services.

Leave to Amend (Doc. No. 685/686) are **DENIED**. The Court reaches this conclusion notwithstanding its wholehearted sympathy with the victims and their families.

## I.     LEGAL STANDARD

Though the Federal Rules of Civil Procedure do not themselves specifically provide for a motion for reconsideration, such motions nevertheless are entertained under the Rules. Plaintiffs state that they are seeking "rehearing" under Rule 54(b), which permits the Court to reexamine its prior interlocutory rulings "for any reason it deems sufficient." *United States v. Renda*, 709 F.3d 472, 479 (5th Cir. 2013) (internal quotation marks and citation omitted). Motions for reconsideration from interlocutory orders are governed by the standards for Rule 59(e) motions. *Thakkar v. Balasuriya*, 2009 WL 2996727, at *1 (S.D. Tex. Sept. 9, 2009).

A motion under Rule 59(e) must "'clearly establish either a manifest error of law or fact or must present newly discovered evidence.'" *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005) (quoting *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)). Relief is also appropriate where there has been an intervening change in the controlling law. *See Schiller v. Physicians Resource Group Inc.*, 342 F.3d 563, 567 (5th Cir. 2003). Motions under Rule 59(e) "'cannot be used to raise arguments which could, and should, have been made before the judgment issued.'" *Id.* (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863 (5th Cir. 2003)). In considering a motion for reconsideration, a court "must strike the proper balance between two competing imperatives: (1) finality, and (2) the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*, 6 F.3d 350, 355 (5th Cir. 1993).

## II.    BACKGROUND FACTS

For purposes of context, the Court repeats the statement of facts included in its August 2013 and January 2014 summary judgment orders. As the current motions are for

reconsideration, the Court will not include allegations or facts not presented to the Court for consideration on summary judgment.

This case is brought by Plaintiff Buddi Prasad Gurung and the surviving family members of twelve other men: Prakash Adhikari, Ramesh Khadka, Lalan Koiri, Mangal Limbu, Jeet Magar, Gyanendra Shrestha, Rajendra Shrestha, Budhan Sudi, Manoj Thakur, Sanjay Thakur, Bishnu Thapa, and Jhok Bahadur Thapa (collectively, the "Deceased Plaintiffs"). All Plaintiffs are Nepali citizens and currently reside in Nepal.

Plaintiffs allege that KBR and Defendant Daoud & Partners ("Daoud") engaged in a scheme to traffic the Plaintiffs from Nepal to Iraq, where one KBR subsidiary served as a contractor with the United States government to perform specific duties at United States military facilities. According to Plaintiffs, Defendants "established, engaged and/or contracted with a network of suppliers, agents, and/or partners in order to procure laborers from third world countries." (Doc. No. 58 ("First Am. Compl."), at ¶ 54.)

The Deceased Plaintiffs, whose ages ranged from 18 to 27, were recruited from their places of residence by Moonlight Consultant Pvt, Ltd., a recruiting company based in Nepal. (*Id*. ¶ 62.) Most of the men were told that they would be employed by a luxury hotel in Amman, Jordan. (*Id*. ¶ 63.) Some were told that that they would be working in an American camp. (*Id*.) Although there is no indication that they were told where the camp would be, the Deceased Plaintiffs' family members assumed that they were going to the United States. (*Id*.) All of the men were led to believe that they would not be placed in a dangerous location, and that, if they found themselves in a dangerous area, they would be sent home at the employer's expense. (*Id*.) They were promised a salary of approximately $500 per month. (*Id*. ¶ 64.) The men and their

families incurred substantial debt to pay the brokerage fees in seeking out this employment. (*Id.* ¶ 65.)

After they were recruited, the Deceased Plaintiffs were then transferred to the custody of Morning Star for Recruitment and Manpower Supply ("Morning Star"), a Jordanian job brokerage company that operates in Amman. (*Id.* ¶ 66.) Morning Star housed the Deceased Plaintiffs upon their arrival in Jordan and arranged for their transfer to Iraq. (*Id.* ¶ 59.) Morning Star then transferred the Deceased Plaintiffs to Daoud. (*Id.*) The men were held in Jordan by agents of Daoud, and were required to turn over their passports to Daoud. (*Id.* ¶¶ 67-68.) It was there that the Deceased Plaintiffs first discovered that they were actually being sent to work at Al Asad, north of Ramadi, Iraq. (*Id.* ¶ 70.) Several of the men phoned relatives in Nepal, expressing concern and fear about their futures. (*Id.* ¶¶ 70-71.) At least one of the Deceased Plaintiffs informed his family that he and the other men were being kept in a dark room and were unable to see. (*Id.* ¶ 72.) In Jordan, the men were also informed for the first time that they would be paid only three quarters of what they were initially promised. (*Id.* ¶ 73.) Although they wanted to return home to Nepal, rather than proceed into the Iraqi war zone, the men were compelled to proceed to Iraq because of the debts that their families had assumed to pay the brokers. (*Id.* ¶ 74.)

Daoud transported the Deceased Plaintiffs into Iraq on or about August 19, 2004, via an unprotected automobile caravan of seventeen vehicles. (*Id.* ¶ 75.) They traveled along the Amman-to-Baghdad highway, which was known at the time to be a highly dangerous route. (*Id.* ¶¶ 76-81.) As they were nearing Al Asad, the two lead cars in which the Deceased Plaintiffs were being transported were stopped by a group of men who later revealed themselves to be members of the Ansar al-Sunna Army, an insurgent group in Iraq. (*Id.* ¶¶ 81-83.) The men told

4

the drivers to leave the Deceased Plaintiffs at the checkpoint, and that the Americans would come from the base to pick them up. (*Id*. ¶ 81.)

Between August 20 and August 24, the Ansar al-Sunna Army posted an internet statement that it had captured the Deceased Plaintiffs, posted pictures of the Deceased Plaintiffs, and sent a video of ten of the Deceased Plaintiffs to the Foreign Ministry of Nepal. (*Id*. ¶¶ 83-86.) Many of the family members of the Deceased Plaintiffs saw the images broadcast on Nepali television. (*Id*. ¶ 85.) In the video, the Deceased Plaintiffs describe their trip to Iraq, stating that they "were kept as captives in Jordan at first," were not allowed to return home, and were forced to go to Iraq. (*Id*. ¶ 86.) One man in the video says, "I do not know when I will die, today or tomorrow." (*Id*.)

On or about August 31, 2004, international media outlets broadcasted video of the Ansar al-Sunna Army executing the Deceased Plaintiffs. (*Id*. ¶ 87.) The group beheaded one of the men, and shot the other eleven men, one by one, in the back of their heads. (*Id*.) The families of Deceased Victims saw the execution video, which caused them great emotional distress. (*Id*. ¶ 88.) The bodies of the Deceased Plaintiffs were never found. (*Id*. ¶ 89.)

Like the Deceased Plaintiffs, Plaintiff Gurung was recruited from his residence in Nepal. (*Id*. ¶ 91.) He was sent to Delhi, India for twenty days and then went on to Amman, Jordan for another twenty days. (*Id*.) Mr. Gurung was transported to Iraq as part of the same caravan in which the Deceased Plaintiffs were also traveling. (*Id*. ¶ 92.) Mr. Gurung's car was not captured by the insurgents, and he arrived at Al Asad as scheduled. (*Id*. ¶ 93.) There, he was supervised by KBR in his duties as a warehouse loader/unloader. (*Id*.) Upon learning about the death of the Deceased Plaintiffs, Mr. Gurung became frightened and expressed his desire to return to Nepal. He was told by both Daoud and KBR that he could not leave until his work in Iraq was complete.

(*Id*. ¶ 94.) After fifteen months, during which he experienced frequent mortar fire without protection, Mr. Gurung was permitted to return to Nepal. (*Id*. ¶¶ 95-96.)

## III. ANALYSIS

### A. Plaintiffs' ATS Claim

The Court granted summary judgment on Plaintiffs' ATS claim based on the presumption against extraterritoriality, which the Supreme Court applied to the ATS in *Kiobel v. Royal Dutch Petroleum Company*, 133 S. Ct. 1659 (2013). (Doc. No. 614/617, at 11-12.) This Court found "KBR's corporate presence" in the U.S. and its "domestic conduct" insufficient to rebut the presumption, concluding that KBR was entitled to judgment because "all *relevant* conduct by Daoud and KBR occurred outside of the United States." (*Id*. at 12 (emphasis added).)

Plaintiffs suggest that the Court misconstrued *Kiobel* as embracing a bright-line rule which prohibits the extraterritorial application of the ATS in all cases, regardless of the specific facts and circumstances. They emphasize the conclusion of the Supreme Court's majority opinion, which indicated that the "presumption against extraterritorial application" could be "displace[d]" by ATS claims that "touch and concern the territory of the United States . . . with sufficient force." *Kiobel*, 133 S. Ct. at 1669. Plaintiffs also point to judicial authority postdating the Court's summary judgment ruling on the ATS claim, in which district and circuit courts outside the Fifth Circuit employ a fact-intensive analysis to determine whether claims "touch and concern" the territory of the United States with enough "force" to displace the presumption. On this authority, as well as *Kiobel*, they seek reconsideration of the Court's decision to award summary judgment to KBR on Plaintiffs' ATS claim. (Doc. No. 685/686, at 6-8.) The Court does, of course, welcome the additional case authority that has been generated since its last

decision. Indeed, part of the delay in issuing this decision has been to see if new decisional authority might bolster Plaintiffs' legal position.

The Court wishes to clarify any ambiguity in its summary judgment ruling. The Court did not, and does not wish to, embrace a bright-line rule. It considered the arguments raised by Plaintiffs regarding the points of connection between their ATS claim and the territory of the United States—arguments reiterated throughout Plaintiffs' motion for reconsideration. It reviewed the record evidence. It ruled on evidentiary objections. And it ultimately concluded that the conduct "relevant" to the ATS claim occurred outside of the United States. (Doc. No. 614/617, at 12.)

In reaching this conclusion, the Court heeded the guidance of the Supreme Court that the presumption against extraterritoriality is often "not self-evidently dispositive" and "requires further analysis" when *some* domestic conduct is involved. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010). The Supreme Court acknowledged that few cases will arrive in federal court without any domestic ties. *See id.* ("For it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States."). The Supreme Court therefore instructed lower courts to consider whether the alleged domestic conduct coincides with the "'focus' of congressional concern." *See id.*[2] In the case of the ATS, the focus of congressional concern is the "tort . . . committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

---

[2] The Ninth Circuit has expressed doubt that the majority opinion in *Kiobel* "incorporate[d] *Morrison*'s focus test," suggesting that the "touch and concern" language used by the Court indicated a different test than that employed in *Morrison*. *See Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1028 (9th Cir. 2014). This Court reads *Kiobel* differently. As highlighted by Judge Rawlinson in her partial concurrence and partial dissent, *id.* at 1035, *Kiobel* specifically cited the passage in *Morrison* applying the "focus test" in support of the pronouncement that claims must "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." 133 S. Ct. at 1669.

The tort here is human trafficking. As described above, the trafficking occurred in Nepal; Jordan; Iraq; and points in transit between and among these foreign locations. Even assuming that Daoud and other subcontractors operated as agents of KBR in enticing and then entrapping third country nationals as cheap labor for the Iraqi war zone, those activities unquestionably occurred on foreign soil. Plaintiffs can no more pursue an ATS claim against KBR based on those extraterritorial actions than they can pursue an ATS claim against Daoud. *See In re South African Apartheid Litig.*, --- F. Supp. 2d ----, 2014 WL 4290444, at *5 (S.D.N.Y. Aug. 28, 2014) ("Here, any alleged violation of international law norms was inflicted by the South African subsidiaries over whom the American defendant corporations may have exercised authority and control. While corporations are typically liable in tort for the actions of their putative agents, the underlying tort must itself be actionable. However, plaintiffs have no valid cause of action against the South African subsidiaries under [*Kiobel*] because all of the subsidiaries' conduct undisputedly occurred abroad.").

Plaintiffs seek a result on their ATS claim against KBR different from the result on their ATS claim against Daoud, based on the fact that KBR is a U.S. national while Daoud is not. But the Court cannot agree that this distinction has dispositive effect in the application of the presumption against extraterritoriality. *See Cardona v. Chiquita Brands Int'l, Inc.*, 760 F.3d 1185, 1189 (11th Cir. 2014) (rejecting attempt to "anchor ATS jurisdiction in the nature of the defendants as United States corporations"); *Balintulo v. Daimler AG*, 727 F.3d 174, 190 (2d Cir. 2013) ("Lower courts are bound by [the rule announced in *Kiobel*] and they are without authority to 'reinterpret' the Court's binding precedent in light of irrelevant factual distinctions, *such as the citizenship of the defendants*.") (emphasis added); *Doe v. Exxon Mobil Corp.*, --- F. Supp. 3d

----, 2014 WL 4746256, at *12 (D.D.C. Sept. 23, 2014) (concluding that "the presumption against extraterritoriality is not displaced by a defendant's U.S. citizenship alone").

Finally, Plaintiffs argue that this Court's ruling on the ATS claim against KBR is at odds with the reasoning of the Fourth Circuit in another case concerning atrocities committed in the course of the Iraqi war, *Al Shimari v. CACI Premier Technology, Inc.*, 758 F.3d 516 (4th Cir. 2014). Plaintiffs urge the Court to reconsider its ultimate conclusion, vacate its earlier decision, and conform its reasoning to that used in *Al Shimari*.

Plaintiffs in *Al Shimari* were foreign nationals who were detained and tortured at the notorious Abu Ghraib prison in Iraq when that prison was under the control of the U.S. military. The torture was carried out, at least in part, by U.S. civilian contractors employed by CACI Premier Technology, Inc. ("CACI"), a U.S. corporation. *See* 758 F.3d at 521-22. The plaintiffs asserted ATS claims against CACI. *Id*. at 524. The district court dismissed the ATS claims based on *Kiobel* and the presumption against extraterritoriality. *Id*. The Fourth Circuit reversed, finding the presumption adequately "displace[d]" by the following facts and circumstances:

> (1) CACI's status as a United States corporation; (2) the United States citizenship of CACI's employees, upon whose conduct the ATS claims are based; (3) the facts in the record showing that CACI's contract to perform interrogation services in Iraq was issued in the United States by the United States Department of the Interior, and that the contract required CACI's employees to obtain security clearances from the United States Department of Defense; (4) the allegations that CACI's managers in the United States gave tacit approval to the acts of torture committed by CACI employees at the Abu Ghraib prison, attempted to "cover up" the misconduct, and "implicitly, if not expressly, encouraged" it; and (5) the expressed intent of Congress, through enactment of the [Torture Victim Protection Act of 1991] and 18 U.S.C. § 2340A, to provide aliens access to United States courts and to hold citizens of the United States accountable for acts of torture committed abroad.

758 F.3d at 530-31.

*Al Shimari* is not binding on this Court. Nor are the other recent ATS decisions identified in Plaintiffs' and KBR's papers. Nonetheless, the Court has reviewed the cases commended to it, including *Al Shimari*, and finds them persuasive in the sense that they indicate how other lower courts have attempted to give substance to the blank spaces not addressed by the facts in *Kiobel*. But whereas the Fourth Circuit found the facts in *Al Shimari* to sufficiently "touch and concern the territory of the United States," this Court is not persuaded that the facts here do the same. For purposes of clarity, the Court will address Plaintiffs' arguments one-by-one.

First, as noted above, the Court does not believe that KBR's U.S. citizenship obviates the extraterritoriality analysis. Second, the Court disagrees that KBR's contract with the U.S. government shows a relevant connection to the *territory* of the United States. *Kiobel*, 133 S. Ct. at 1669. Third, Plaintiffs' assertion that the relevant conduct "occurred at a military facility operated by U.S. military personnel" exaggerates the importance of the Al Asad base in the circumstances of the case. While Deceased Plaintiffs were unquestionably headed to Al Asad, their journey was horrifically cut short before they reached the base. And while Mr. Gurung reached Al Asad, he was first brought from Nepal to Jordan and through Iraq—all foreign territories not alleged to be under U.S. control.[3] Fourth, the Court is not empowered to use the political branches' condemnation of human trafficking to ignore territorial limits on enacted legislation, even if that condemnation is "repeated[]" and "unambiguous[]" and signals a "zero tolerance" approach to the issue. *See id.* at 1664-65 (noting that the foreign policy concerns underlying the presumption against extraterritoriality "are not diminished" in the context of "alleged violations of international law norms that are 'specific, universal, and obligatory'"

---

[3] Because the Al Asad base is not at the heart of Plaintiffs' ATS claim—unlike the centrality of Abu Ghraib to the plaintiffs' ATS claims in *Al Shimari*—the Court need not decide whether it constitutes U.S. territory for the purposes of applying the presumption against extraterritoriality, as argued by Plaintiffs. (Doc. No. 685/686, at 13-14.)

because "identifying such a norm is only the beginning of defining a cause of action") (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004)).

Plaintiffs raise an additional argument that conceivably moves their case closer to *Al Shimari*. They allege that KBR's U.S.-based managers "covered up" human trafficking, and that this U.S.-based conduct is sufficient to anchor the ATS claim in the territory of the United States. As the Court noted in August 2013, Plaintiffs present a genuine issue of material fact as to whether KBR knowingly obtained trafficked labor during the relevant time period. (Doc. No. 614/617, at 17-18.) But the relevant evidence stems from KBR's overseas operations. Plaintiffs' U.S.-based evidence presents a different picture. From emails, reports, and other routine communications, it appears that KBR's U.S.-based employees monitored and directed activities at various Iraqi and Kuwaiti military bases. (*E.g.*, Exs. 13-14, 22, 24-27, 33; Doc. No. 685-3, at 125-141, 180-86, 194-242.) The subject matter of these documents ranges from the mundane (e.g., chlorine levels in the water) to the vitally important (e.g., an email conversation regarding whether KBR or its subcontractors were responsible for providing personal defense gear to subcontracted employees). None of it indicates, however, that KBR's U.S.-based employees understood the circumstances surrounding Daoud's "recruitment" and "supply" of third-country nationals like Plaintiffs, or that KBR's U.S.-based employees worked to prevent those circumstances from coming to light or Daoud's practices from being discontinued.[4]

---

[4] Plaintiffs' most damning piece of evidence—a decision by a U.S.-based employee to "pull" a consultant from Al Asad after he complained regarding the treatment of third-country nationals employed by Daoud—suffers from several disconnects to Plaintiffs' theory of U.S.-based complicity. Most importantly, at the same time that the U.S.-based manager capitulated to the instruction of KBR's on-site base supervisor that the consultant be removed from Al Asad, she requested an independent investigation into the consultant's complaints. (Doc. No. 401-8, at 66-72.) Similarly, complaints from a U.S. Marine regarding ill treatment of third-country nationals at Al Asad were forwarded through KBR's U.S.-based employees to on-site base staff with the following notation: "If true, fixe [sic] it, if not, ignore it." (Ex. 20; Doc. No. 685-3, at 164-68.)

In summary, Plaintiffs have adduced no new legal authority, and identified no error in law or fact, which disturbs the Court's conclusion that the relevant conduct by KBR and Daoud occurred outside of the territory of the United States. Plaintiffs' motion for rehearing on this claim must be denied.[5]

### B. Plaintiffs' TVPRA Claim

#### 1. Retroactivity of Section 1596

Extraterritoriality principles have also foreclosed Plaintiffs' TVPRA claim. As discussed in the Court's most recent summary judgment ruling, the TVPRA had no extraterritorial application at the time of the tragic events recounted above. (Doc. No. 670, at 6-9.) Although Congress amended the TVPRA in 2008 to provide for extraterritorial application, the Court found that the relevant provision—18 U.S.C. § 1596—could not be applied retroactively to KBR's pre-2008 conduct. (*Id.* at 10-13.) This was a reversal of the Court's prior ruling that Section 1596 was a jurisdiction-enlarging statute which did not implicate retroactivity principles and could be applied to pending cases such as this one. (Doc. No. 168, at 7-11.) The Court twice affirmed its retroactivity decision over strenuous objection by Defendants. (Doc. No. 183, at 6-9; Doc. No. 614/617, at 16.) Only on Defendants' third sally against the Court's ruling—a motion to certify the Court's initial summary judgment ruling for interlocutory appeal (Doc. No. 631)—did the Court reverse itself.

---

[5] Plaintiffs alternatively move for leave to amend their complaint in light of *Kiobel*. (Doc. No. 685/686, at 22-25.) But the Court's decision was based on the summary judgment record, not on the pleadings, and Plaintiffs have identified no evidence which was not or could not have been presented to the Court prior to its ruling. Because amendment would be futile, leave to amend is denied. *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993) ("In deciding whether to grant leave to file an amended pleading, the district court may consider . . . futility of amendment.").

12

Plaintiffs urge the Court to reverse its reversal. They offer several arguments as to how the Court's most recent summary judgment ruling gets the retroactivity analysis wrong. (Doc. No. 673/674, at 6-20.) With the utmost respect to Plaintiffs' counsel, however, these are not new arguments. The retroactivity debate—i.e., on which side of the *Hughes Aircraft*/*Republic of Austria*[6] line Section 1596 falls—has featured in no fewer than 15 thorough, well-researched legal briefs provided to the Court in this case. (Doc. Nos. 138, 143, 145, 171, 174, 561/62, 588/593, 601, 631, 638, 643, 673/674, 675, 676, 679.) In three separate orders, the Court addressed the debate at length. (Doc. Nos. 168, 183, 670.) No purpose can be served by covering this well-trod ground a fourth time.

The Court clarifies, however, the role that *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), played in its most recent decision. Plaintiffs forcefully argue that the case sheds no light on whether Section 1596 can be retroactively applied. (Doc. No. 673/674, at 6-9.) The Court cannot agree. Although its most recent decision not to apply Section 1596 to this pending case was governed by the standards articulated in *Landgraf*,[7] *Hughes Aircraft*, and *Republic of Austria*, the Court drew upon *Morrison* for guidance as to how Section 1596 should be classified under those standards. As previously explained, "a nominally jurisdictional statute" which "necessarily affects the substantive rights of the parties" cannot be categorized as "mere procedure;" rather, it represents a substantive change in operative law, thereby "trigger[ing]" the presumption against retroactivity. (Doc. No. 670, at 12-13.) This decision comports with the Supreme Court's acknowledgment in *Morrison* that whether a federal conduct-regulating statute is intended to govern extraterritorial conduct is inherently a *merits* question. *See* 561 U.S. at 254

---

[6] *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939 (1997); *Republic of Austria v. Altmann*, 541 U.S. 677 (2004).

[7] *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994).

13

("[T]o ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question."). Congress may express that intent through a statute phrased in jurisdictional terms, as it has in Section 1596. But because Section 1596 "adheres to the [TVPRA] cause of action in this fashion," it is "essentially substantive."[8] *Republic of Austria v. Altmann*, 541 U.S. 677, 695 n.15 (2004).

Plaintiffs have identified no intervening legal authority which disturbs the Court's most recent analysis on the retroactivity of Section 1596. If Plaintiffs are to receive a more favorable answer on this question, they must seek it from a higher court.

### 2. Applicability of MEJA

#### a. As to the TVPRA

Plaintiffs argue, alternatively, that the Military Extraterritorial Jurisdiction Act ("MEJA") provides a jurisdictional basis for Plaintiffs' TVPRA claim. (Doc. No. 673/674, at 20-25.) MEJA has long been at the periphery of this case, primarily as an alternative justification for finding that Plaintiffs' RICO claims could be applied extraterritorially. (Doc. No. 168, at 19-20; Doc. No. 273, at 33-34.) Plaintiffs only recently began to argue that MEJA also provides an alternative jurisdictional basis for their TVPRA claims. (Doc. No. 588/593, at 39-40; Doc. No. 638, at 1, 12-

---

[8] Plaintiffs cite *In re South African Apartheid Litigation*, 15 F. Supp. 2d 454 (S.D.N.Y. 2014), as persuasive new authority construing *Morrison* and supporting their argument for reconsideration. According to Plaintiffs, Judge Scheindlin resolved—correctly—that the Supreme Court in *Morrison* "did not intend to shift jurisdictional statutes into the merits column." (Doc. No. 676, at 3.) The relevant language from *In re South African Apartheid Litigation* is contained in a footnote addressing whether the extraterritorial reach of the ATS should be characterized as a "merits" question, or a "jurisdictional" one. *See* 15 F. Supp. 2d. at 461, n.43. The passage has no bearing on the retroactivity of Section 1596. While both the ATS and Section 1596 are nominally jurisdictional statutes, they operate very differently. The ATS is a "strictly jurisdictional" statute which "enabled federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 712-24 (2004). Section 1596 is not "strictly jurisdictional." To use Judge Scheindlin's own language, Section 1596 is part of a "complex statutory scheme"—the TVPRA. As such, it "adheres" to Plaintiffs' substantive cause of action and cannot be applied retroactively under *Landgraf*.

13.) The Court rejected the argument; not simply because MEJA is a "murky" area of law, but because the Court disagreed that MEJA has any implication for the availability and extraterritoriality of Plaintiffs' civil TVPRA claim. (Doc. No. 670, at 9 ("MEJA's provision of criminal jurisdiction over felony offenses committed abroad does not provide Plaintiffs with an alternative source of jurisdiction for their civil claims under the TVPRA.").)

Plaintiffs have provided no cause for the Court to retreat from its position. MEJA is not part of the TVPRA. It provides for criminal prosecution of certain felonies committed abroad "while employed by or accompanying the Armed Forces" or "while a member of the Armed Forces." 18 U.S.C. § 3261(a). It appears to be undisputed that Sections 1589 and 1590 of the TVPRA—the provisions KBR is alleged to have violated—would qualify for prosecution under MEJA. Plaintiffs argue that MEJA's limited extraterritorial extension of a host of federal offenses—including Sections 1589 and 1590 of the TVPRA—can be married with the TVPRA's civil remedy provision to provide an alternative "jurisdictional" basis for Plaintiffs' claim. (Doc. No. 673/674, at 20-25.)

Plaintiffs' argument loses sight of the central inquiry before the Court—whether Congress, when it enacted the civil remedy provision of the TVPRA, intended it to have extraterritorial effect. *Morrison* instructs that Congressional intent must be affirmative and clear. *See* 561 U.S. at 255 ("'[U]nless there is the affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect, 'we must presume it is primarily concerned with domestic conditions.'") (quoting *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991)). Plaintiffs would have this Court find that Congress affirmatively and clearly expressed its intent to give (limited) extraterritorial effect to the TVPRA's civil remedy provision *first* by reference to the TVPRA's conduct-regulating provisions and *then* by reference to an unrelated

criminal statute which is not part of the TVPRA and is nowhere referenced in the TVPRA. To the extent this was Congress's intent, it was neither affirmative nor clear. MEJA does not provide the answer that Plaintiffs seek.

### b. As to RICO

A recent Second Circuit decision, issued in the RICO-context, deserves special mention here, although it does not warrant reconsideration of the Court's rulings in favor of KBR. In *European Community v. RJR Nabisco, Inc.*, 764 F.3d 129, 136-39 (2d Cir. 2014), the Second Circuit determined that RICO has extraterritorial reach to the extent that it explicitly incorporates predicate acts that are themselves explicitly extraterritorial. This Court once reached the same conclusion as that expressed by the Second Circuit in *European Community*. (Doc. No. 168, at 19-20; Doc. No. 273, at 32-34.) It reversed its position in 2013, finding that "[n]o language within RICO clearly indicates that Congress intended the statute to be applied extraterritorially." (Doc. No. 614/617, at 14.) This reversal was based in large part on non-binding but persuasive case law stemming from a 2010 Second Circuit case—*Norex Petroleum Ltd. v. Access Industries, Inc.*, 631 F.3d 29 (2d Cir. 2010)—which was addressed and clarified in *European Community*. *See* 764 F.3d at 136 ("The district court here construed our rejection in *Norex* of arguments that RICO applies extraterritorially *in all of its applications* as a ruling that RICO can never have extraterritorial reach in *any* of its applications. This was a misreading of *Norex*.") (citation omitted).

*European Community* is offered by Plaintiffs here, ostensibly as support for its MEJA argument in the TVPRA context. (Doc. No. 676, at 5-7.) Plaintiffs have not asked the Court to reconsider its decision to grant summary judgment to KBR on Plaintiffs' RICO claims. To obviate any such request, the Court makes clear that reconsideration would not be granted.

16

Although *European Community* conflicts with the Court's ruling that RICO, as a whole, has no extracurricular application (Doc. No. 614/617, at 13-14), it does not support reinstatement of Plaintiffs' RICO claims. *European Community* focused on RICO's explicit incorporation of certain predicate acts which are themselves explicitly extraterritorial. *See* 764 F.3d at 136-37. Were RICO a purely domestic concern, the Second Circuit reasoned, the incorporation of these extraterritorial activities as predicate acts would be impossible to reconcile. *See id*. at 136.

The Second Circuit's reasoning in *European Community* assists Plaintiffs only to the extent that the RICO predicates of which they complain are themselves expressly extraterritorial. The predicates at issue in this case—Sections 1589 and 1590 of the TVPRA—were not expressly extraterritorial prior to 2008. (Doc. No. 670, at 6-9.) Plaintiffs have argued that MEJA gives Sections 1589 and 1590 extraterritorial reach. (Doc. No. 167, at 6-7; Doc. No. 588/593, at 45-49.) Functionally, it is the same argument they make here in the TVPRA context. And the Court accepted it before as a basis for finding RICO extraterritorially applicable to Plaintiffs' claims (Doc. No. 168, at 19-20; Doc. No. 273, at 33 & n.17), although it expressed hesitation in "resting" its "jurisdictional finding" on MEJA, "a relatively murky area of the law" (Doc. No. 168, at 20).

As should be made clear, above, the Court is now persuaded that MEJA is not a "clear expression" of "affirmative [Congressional] intent" necessary to render either the TVPRA or RICO extraterritorial. MEJA is not explicitly referenced in either of those statutory regimes. It is not a predicate act for RICO. *See* 18 U.S.C. § 1961(1). It is not an offense on which a civil TVPRA claim can be grounded. *See* 18 U.S.C. § 1595(a). MEJA is simply not relevant to the question of whether Congress intended to legislate extraterritorially when it enacted RICO and the TVPRA—the question that *Kiobel* and *Morrison* require this Court to answer.

17

## IV. CONCLUSION

For reasons stated above, the Court **DENIES** Plaintiffs' Motion for Rehearing Pursuant to Fed. R. Civ. P. 54(b) of This Court's January 2014 Order (Doc. No. 672) and **DENIES** Plaintiffs' Motion for Rehearing on Their ATS Claims against KBR and for Leave to Amend (Doc. No. 685/686). The parties are ordered to submit a proposed final judgment, agreed as to form only, by March 30, 2015.

The Court again notes its profound regret at the outcome of this action. The crimes that are at the core of this litigation are more vile than anything the Court has previously confronted. Moreover, the herculean efforts of Plaintiffs' counsel have been in the highest traditions of the bar. No lawyer or group of lawyers could have done more or done better. But, the perpetrators of the subject crimes are not before the Court, and the relief that Plaintiffs seek is not appropriate as to those who are before the Court.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the twenty-fourth day of March, 2015.

_[signature: Keith P. Ellison]_

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE